FILED BY _____ NA _____ D.C.

AUG 0 4 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

David Morris Clayman / דוד משה קליימן / אדם דוד קליימן, *Pro se*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **David Morris Clayman** ( / דוד / אדם קליימן משה דוד),<br>Plaintiffs,<br><br>        vs.<br><br>**SCOTT BESSENT**, in his official capacity as<br>Secretary of the Treasury;<br>**UNITED STATES OF AMERICA**;<br>**CONGRESS OF THE UNITED STATES**;<br>**JEROME H. POWELL**, in his official capacity as<br>Chair of the Federal Reserve; and<br>**GENE L. DODARO**, in his official capacity as<br>Comptroller General,<br>**BRENDAN CARR**, in his official capacity as Chair of the Federal Communications Commission,<br>Defendants | **CASE NO. 9:25-CV-80890-WM**<br><br>**RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

o

## PRE-HEARING CONFERENCE WITH DEFENDANTS REQUESTED

## HEARING REQUESTED ON EXPEDITED BASIS

## THREE-JUDGE PANEL REQUESTED, PER 28 U.S.C. § 2284

## |(SEE INITIAL COMPLAINT)

# RESPONSE TO DEFENDANT'S MOTION TO DISMISS

# I. INTRODUCTION AND LEGAL STANDARD

Plaintiff David Morris Clayman, a Jewish American observant of strict traditional prohibitions against and encumbrances of the written use of the unhyphenated name of the Divine especially in secular contexts, brings this action under the Religious Freedom Restoration Act ("RFRA"), the Free Exercise and Establishment Clauses of the First Amendment, and the Takings Clause of the Fifth Amendment. Plaintiff alleges that the statutory requirement that United States coins and currency bear the phrase "In G-d We Trust" (without accommodation for religious objectors) imposes a substantial burden on his sincerely held religious beliefs, denies him meaningful participation in economic and civic life, and violates constitutional and statutory protections.

Since 2014, Plaintiff has abstained entirely from the use of U.S. currency bearing the unhyphenated name of G-d. As a result, he has been excluded from cash-only services, penalized in digital transactions, denied employment opportunities, and left vulnerable to extended pretrial incarceration due to the inability to pay cash bail, which many counties and jail systems never allow to be paid by credit card or check. These harms are not abstract or symbolic—they are concrete, traceable to the government's mandatory currency inscription policy, and ongoing.

Contrary to the Government's assertion, Plaintiff's claims are not foreclosed by existing precedent. Prior decisions have primarily addressed claims by secular objectors or those asserting only dignitary harms. Plaintiff, by contrast, pleads detailed, fact-specific allegations of religious coercion and functional exclusion grounded in Jewish law, which have never been fully adjudicated by this or any federal circuit. Further, Plaintiff proposes multiple less restrictive means through which the Government could fulfill its currency-related interests without imposing the same burdens on religious objectors.

Dismissal under Rule 12(b)(6) is inappropriate at this stage. A complaint must be accepted as true and construed in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Religious Freedom Restoration Act independently requires that, once a plaintiff demonstrates a sincere belief and a substantial burden on religious exercise, the burden shifts to the Government to justify the policy under strict scrutiny. See *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726–27 (2014).

Here, Plaintiff has satisfied his burden at the pleading stage: he has alleged sincerely held beliefs, concrete and extensive burdens, and the availability of less restrictive alternatives. The Government's motion relies on sweeping generalizations, non-binding precedent, and inapposite factual scenarios. It should be denied in full.

## II. PLAINTIFF HAS STATED A PLAUSIBLE CLAIM UNDER RFRA

While Defendants contend that courts have 'universally' rejected similar RFRA challenges, that assertion overgeneralizes materially distinguishable cases. This case presents a unique combination of legally cognizable burdens and religious context not previously adjudicated, rendering such a sweeping claim factually unsupported and legally inapposite. That assertion importantly overlooks key distinctions that distinguish this case from any prior RFRA case by atheists or humanists on this topic:

1. **Plaintiff's RFRA Burden Is Not Abstract or Symbolic**

Unlike cases where plaintiffs merely objected to passive exposure to a national motto, Plaintiff here demonstrates *functional exclusion* from core economic and civic life. The Complaint outlines concrete harms, including:

- 28-day incarceration due to inability to use cash for bail;
- exclusion from employment opportunities;

- economic penalties and surcharges on digital transactions;

- inability to accept small-dollar political contributions;

- documented religious prohibition on discarding or mishandling currency with G-d's unhyphenated Name.

These are not generalized grievances but *specific, coercive burdens* that force Plaintiff to choose between religious observance and full civic and economic participation—exactly the type of burden RFRA was designed to remedy. See *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014).

### 2. **Existing Precedents Do Not Address This Religious Context**

Plaintiff's claim arises from a distinct and well-documented Jewish tradition concerning the treatment of sacred names. The Talmudic history cited in Rosh Hashanah 18B and Megillat Taanit reveals that the very *elimination* of sacred names from currency was celebrated by Jewish communities in antiquity. No prior RFRA ruling has been informed of or addressed this specific, detailed religious belief or the intensity of functional burdens detailed here.

### 3. **Government Could Use Less Restrictive Means**

Even if the motto serves a valid purpose, RFRA requires the government to use the *least restrictive means* of achieving that interest. Alternatives such as:

- a hyphenated form ("In G-d We Trust");

- opt-out digital currency or alternate note designs;

- civic contest to modernize the national motto;

...would achieve similar expressive goals without forcing Plaintiff to desecrate sacred names or suffer religious penalties.

Defendants argue that Plaintiff's RFRA claim is barred by precedent, citing cases such as *New Doe Child #1 v. Congress of the United States*, 891 F.3d 578 (6th Cir. 2018). However, the decision in that case was greatly mischaracterized by the Defendant and this case is factually

and procedurally distinguishable, improved in its only major flaw from the Sixth Circuit with a semi-exhaustive substantiation of burdens, and does not warrant dismissal.

**A. The Sixth Circuit Case Did Not Resolve These Claims on the Merits**

Plaintiff here was a named party in *New Doe Child #1* and brought his Jewish religious objections in that action. Michael Newdow represented me on that case *Pro bono*. While I love Mike Newdow and have long considered him a friend of mine, and appreciated that he represented me then, his focus was much more on making the atheist case that he personally identifies with rather than arguing the Jewish case and my distinguishable suffering strongly or adequately. Partially as a result, and partially as a mistake, the complaint in *New Doe Child #1*—drafted and filed by counsel—failed to enumerate or develop the unique and specific burdens that Plaintiff personally faced which I argue this Court will find in some important ways go beyond what the other atheist and humanist plaintiffs Newdow was representing in that case alleged they suffered in terms of religiously emburdened suffering. To my knowledge, no atheist or humanist has yet stopped using In G-d We Trust cash full stop, as I have felt forced to do by my own religious beliefs. Since Mr. Newdow did not amend or have an opportunity to amend his complaint to include an enumeration of my unavoidable, non-substitutable suffering and burdens at the time, that prior case was dismissed for failure to allege a cognizable unavoidable commercial or governmental burden under RFRA. The Sixth Circuit noted:

"Plaintiffs do not allege that they must engage in cash-only transactions; rather, they allege merely that they use cash frequently and prefer to do so."

*New Doe Child #1*, 891 F.3d at 589 (emphasis added).

That statement does not apply here. In this action, Plaintiff explicitly alleges and enumerates that he must engage in cash-only transactions; for example, I am **required by government**

**entities to engage in cash-and-cash-only transactions and have no other options or alternatives**, including:

- payment of **criminal bail** in jurisdictions like Miami-Dade and Palm Beach County, which accept only **physical cash banknotes from detained Defendants**;

- **natural disaster scenarios** where digital payments are non-functional and cash is the only viable medium of exchange;

- "thousand papercut" economic penalties for refusing to use currency that bears the unhyphenated sacred name of G-d, a desecration prohibited under Jewish law.

Because Plaintiff faces *mandatory* cash-based transactions in key government functions—and not just a general preference for cash—his burdens are both **distinct** and **substantially more severe** than the burdens dismissed in *New Doe Child #1*. In that case, the plaintiffs remained able to function in civic and commercial life. Here, the Plaintiff faces **civil detention, economic exclusion, and religious desecration**, all tied to a government-imposed medium of exchange.

The Government's attorney, Darcie Thompson, said the following in her Motion to Dismiss:

> "Plaintiff alleges that he cannot use cash currency because it contains "God" in its unhyphenated form, contrary to his religious beliefs, including for paying bail if he is arrested, obtaining goods and services from cash-only businesses, paying cash-only tolls on roadways, and paying surcharges for low-dollar credit transactions. [DE 1] at 12. However, as noted above, courts repeatedly conclude that such burdens are not substantial under RFRA, and Plaintiff's claim must fail."

But that's false. That assertion materially misstates the factual posture of this case and fails to account for the substantially different circumstances and legal arguments now presented. The Government has not meaningfully disputed the enumerated factual burdens that distinguish this case from prior precedent. Respectfully, the Defendant's interpretation of *New Doe Child #1* omits critical procedural and factual nuances. As a named plaintiff in that action, I can attest that the case was resolved without the benefit of the detailed burden allegations now before this

Court. The current complaint rectifies those prior deficiencies and introduces a religious context that was neither fully developed nor adjudicated in the Sixth Circuit. No Court has ever received an enumerated claim of unavoidable substantial emburdenment like this before, none have ever received a well-substantiated and comprehensively argued Jewish complaint under Talmudic Tractate Rosh Hashanah 18B (the 6th Circuit only received a few lines of my Jewish claims and found that enough to conclude that Plaintiff Clayman had a sincere qualifying religious belief if substantial burden could be shown), and no Court has ever ruled before on whether cash-and-cash-only bail, or cash-only tolls and surcharges ("**thousand papercut injuries**") constitute substantial burdens when they are shown to be experienced and unavoidable, as they are alleged and shown to be in this present case, and as the Government does not dispute the facts of. In all those prior cases, Courts supposed that credit cards and checks could be used as perfectly equivalent substitutes for all the transactions the Plaintiffs undertook. I am arguing, asserting, and showing that I absolutely can not use credit cards and checks as a substitute or acceptable substitute in such transactions, and both imprisonment for failure to pay cash bail and the cumulative and aggregated "**thousand papercuts injuries**" I suffer in daily commerce rise far beyond "a mere inconvenience", especially in liberty- and safety-threatening cases like cash-incapable extended imprisonment for failure to pay cash bail or natural disaster and emergency preparation and planning.

The severe and substantial burden also manifests in more subtle yet deeply impactful ways. Just last week, Plaintiff received a $5.00 digital payment via Venmo from his brother-in-law, with the specific religious intention that Plaintiff donate the funds to a homeless/unhoused person upon reaching his destination, in observance of the Jewish tradition of giving to the needy. Upon arriving in Florida, Plaintiff encountered an apparently homeless individual outside a 7-Eleven and attempted to fulfill this mitzvah. However, the individual lacked access to Zelle or Venmo and

was either unable or unwilling to establish a digital payment account at that moment, claiming technical illiteracy. As a result, Plaintiff was unable to complete the donation.

This incident underscores a broader and recurring burden: non-cash alternatives only function when both parties are equipped and willing to use them. Plaintiff cannot compel others—especially vulnerable or marginalized individuals—to adopt or associate through these digital payment methods. This imposes a constraint not only on his religious practice but also on his freedom of association, as Plaintiff is functionally excluded from transacting with individuals and businesses that choose to only accept physical cash on the incorrect supposition that everyone can withdraw and use cash if they wish. Many in the United States, including those who are unbanked or digitally disconnected, are simply unable to participate in cashless exchanges.

Plaintiff has experienced increasing social and commercial isolation since he ceased using government-issued cash in 2014 for sincerely held religious reasons. Simple acts of generosity, such as donating to the homeless or offering tips, have become practically impossible. In the recent example, the unhoused man was deprived of a meal that day—not because Plaintiff lacked the funds or will to help, but because the Government's coercive cash-based motto policy arbitrarily severed the means of connection between Plaintiff and the recipient.

This harm is unnecessary. As Plaintiff has proposed, there are far less restrictive alternatives for fostering public trust—such as renaming the currency to reflect a shared secular value (e.g., "Trust," "CALM," or "Seeds") or modifying the motto to something broadly inclusive like "**In G We Trust**" (so currency users can express Trust in **G**ood, **G**overnment, and/or **G**-d, at their option) "**In Good We Trust**," "**Out of Many, One**," "**E Pluribus Unum**" (translation Out of Many One preferred – unlike at the time of our Founding, English is the *lingua franca* now, not Latin), or hosting a public contest for a better minor 6-9 point font minor motto. Most conservatively, if Plaintiff had been able to offer a physical note to this homeless man bearing "**In Good We Trust**"

or "**In G We Trust**" consistent with his faith, he would have been able to complete the religious act of charity that he was obliged to perform.

This experience is just one example among many detailed in the record—illustrating not mere inconvenience, but the cumulative burden of countless daily barriers, the "thousand paper cuts," that Plaintiff endures in ordinary commerce due to his inability, based on sincere religious belief, to switch freely between cash and cashless payment modes as others can.

It is deeply frustrating that the Government, as represented by this U.S. Attorney's Office, continues to focus narrowly on defending the current *minor motto*—"In God We Trust"—which appears in approximately 7–9 point font and is rarely given serious daily thought by most Americans. This defense avoids engaging with the much more consequential question of the *major motto*—the prominent 60–80 point text that visually defines our currency and holds the power to shape national and global perceptions of our shared values.

If we were to ask 1,000 Americans and 1,000 non-Americans to keep daily journals documenting how often they consciously reflect on the phrase "In God We Trust," I would confidently wager that perhaps one or none of them would encounter a real-world occasion to do so on any average day—aside from artificial observation effects. By contrast, if the primary label of our currency were changed to something intrinsically meaningful like *Trust*, *CALM*, *Talent*, or *Seeds*—each of which resonates with the core aims of commerce and education—it would be nearly impossible for all 1,000 Americans not to think about the currency's message daily.

Consider this simple thought experiment:

- "When I grow up, I want to earn a lot of Trust."
- "When I grow up, I want to earn a lot of CALM."
- "When I grow up, I want to earn a lot of Dollars."

The first two naturally evoke values worthy of aspiration and naturally align with the moral aims of society. The third, while common, lacks the inherent ethical or educational resonance of the others. This illustrates how a rebranded currency title could reflect and promote Adam Smith's insight that economic exchange is also an exchange of moral sentiment—trust, calm, talent, and growth—not merely the pursuit of anonymously named dollars.

I am proposing that the Government respond to this RFRA and larger challenge not defensively, but constructively—by seizing the opportunity to retitle and reframe our currency in alignment with shared civic values. Doing so would not only serve as a less restrictive alternative for achieving the Government's stated objectives but would in fact more effectively inspire daily reflection and commitment to a national mission (and, I'd argue, a national secular civic religion) rooted in virtue. In that light, I question whether this U.S. Attorney's Office is adequately representing the Defendants, the Department of the Treasury's mission, or the higher aims of our civic and commercial identity. Plaintiff urges the Court to consider whether a more constructive and creative response—one aligned with the Department of the Treasury's stated mission to promote public confidence and inclusive economic participation—might better serve the compelling interests at stake.

**B. RFRA Requires a Fact-Based Inquiry into Substantial Burden**

Whether a burden is "substantial" under RFRA is a mixed question of law and fact and rarely appropriate for resolution at the pleading stage. The government's motion disregards the factual allegations of the Complaint, which include:

- a 28-day incarceration in 2018 resulting from Plaintiff's inability to pay cash bail with desecrated currency;

- forced reliance on costly or unavailable third-party intermediaries (e.g., bail bond agents), and even then if I call a bail bond agent they might fail to operate as faithful agents and use cash against my wishes, risking desecration of our overly sacred IGWT currency;

- the impossibility of using gifted currency freely, depriving Plaintiff of economic value due to religious prohibitions;

- chronic financial penalties, surcharges, and missed transactions due to religiously-forced refusal to handle IGWT-marked bills.

Unlike atheist or symbolic claimants, Plaintiff here adheres to a religious tradition in which mishandling or discarding of the unhyphenated divine name constitutes a violation of Talmudic religious tradition with both spiritual and communal consequences. This is a matter of doctrinal sincerity, not abstraction.

RFRA requires courts to ask whether the government has imposed a coercive penalty for refusing to violate one's religion. It does not allow the government to substitute its own assessment of religious significance or acceptability. See *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014); *Gonzales v. O Centro Espírita*, 546 U.S. 418 (2006).

## III. PLAINTIFF HAS STATED VIABLE FIRST AMENDMENT CLAIMS

### A. Free Exercise Clause

Defendants assert the motto is part of a neutral, generally applicable law. However, Plaintiff's Complaint alleges that the policy of "cash and cash-only bail" imposes not an incidental burden, but a direct and coercive religious conflict. The cash-only policies in jails and public tolls create a *strict liability penalty* for observing Plaintiff's faith—delaying release from jail, impeding mobility, and enforcing religious compromise under threat of deprivation. Such facts state a valid Free Exercise claim. See *Holt v. Hobbs*, 574 U.S. 352 (2015).

B. **Establishment Clause**

Plaintiff's Establishment Clause claim does not rest solely on offense or symbolism, but on state-mandated *display, carry, and destruction/erasure* of sacred religious language in print in ways inconsistent with major Jewish practice. The Complaint further alleges that no Jewish state (including Israel) uses similar wording on its own currency, suggesting that there are feasible available less-restrictive alternatives to articulating anything that the Government has a compelling interest to communicate on the ceremonial deist front in a more ephemeral unprinted medium that doesn't get erased, destroyed, and desecrated regularly and that United States has crossed a line into religious compulsion not required by tradition or necessity. At a minimum, these facts entitle Plaintiff to discovery and judgment on merits and do not warrant dismissal at the pleading stage.

C. **The Moral Bankruptcy of Ceremonial Deism Defenses in this Context**

Moreover, the Defendant's invocation of the **"ceremonial deism"** doctrine fails to engage with the Plaintiff's specific religious claims regarding the sanctity of G-d's Name. In particular, the Plaintiff holds sincere religious beliefs—grounded in Jewish law and Talmudic tradition—that prohibit any government from printing the Name of G-d superfluously or casually, especially in ways that dilute its sanctity and diminish its spiritual significance over time. This dilution is, ironically, the very rationale the Government invokes in defense of ceremonial deism.

To illustrate the nature of the burden, one may analogize—albeit loosely—to **trademark dilution law**: the Government is effectively using what the Plaintiff regards as the holiest "trademark" in the English language—G-d's unhyphenated Name—without authorization, reverence, or adherence to religious norms regarding its appropriate written use. In doing so, the Government not only secularizes and mass-reproduces this sacred term but also claims de facto editorial control over its orthography and placement on federal instruments of commerce.

From the Plaintiff's religious perspective, the Government has no rightful claim to control or disseminate the printed Name of G-d on printed secular objects subject to routine destruction and difficult-to-avoid general and airport bathroom carry such as currency, driver's licenses, or passports. Jewish tradition sets strict boundaries on when, where, and how G-d's Name may be written, especially in permanent forms. To illustrate the gravity of this issue, imagine if the Government proposed tomorrow to print the **Tetragrammaton**—the most sacred and unutterable Name of G-d in Hebrew, composed of the letters Yud–Hay–Vav–Hay—on U.S. currency. Such an act would provoke overwhelming objection and religious outrage from virtually every observant Jewish community worldwide, and would force religious Jews to abstain from using U.S. banknotes entirely, lest they disrespect or profane the divine Name.

The Plaintiff asks: does the Government seriously claim the right to print the Tetragrammaton on federal currency under the "ceremonial deism" doctrine? And if it concedes that it may not do so—because of the uncontested sanctity of the Tetragrammaton—then by what logic or authority does it presume to continue printing the English equivalent, which the Plaintiff considers analogously holy and requiring of protection, in the language through which he relates most intimately to G-d? In English—the Plaintiff's sole fluent language—the unhyphenated word "God" carries religious significance almost as great, particularly in the function of vernacular prayers and religious thought Plaintiff can perform and fully comprehend in context, as what Hebrew represents for all practitioners of Judaism. The Government's disregard for this burden is not merely a matter of doctrinal disagreement; it constitutes a religious imposition on Plaintiff's practice, conscience, and ability to engage with commerce on equal terms.

## IV. TAKINGS CLAUSE CLAIM IS SUFFICIENTLY PLED

Defendants argue that Plaintiff voluntarily gave away currency he could not use. But that misstates the legal theory: Plaintiff was deprived of the *usable value* of gifted property due to a

government-imposed religious burden. This is a textbook regulatory taking—transforming lawful ownership into unusable property due to faith-based objections caused *solely* by federal design mandates. See *Horne v. Department of Agriculture*, 576 U.S. 351 (2015).

If the Government were to enact or uphold a law that prohibited Assistant U.S. Attorney Darcie A. Thompson—the attorney who filed the instant motion—from using the say $256.25 in physical cash currently in her possession for any purpose other than life-preserving charitable donations, and simultaneously froze approximately $2,000 in cash gifts she received at her wedding, rendering those funds usable solely for charitable purposes with no option to convert them into other lawful uses, it is almost certain she would view such action as an unconstitutional **Governmental Taking** and pursue legal remedies accordingly.

If the Government or its counsel disagrees, Plaintiff proposes a thought experiment: imagine this Court issuing an order that forcibly freezes and permanently confiscates all physical cash held by employees of the U.S. Attorney's Office for the Southern District of Florida and all cash, petty or otherwise, held or used by Republican candidates for Office or owners, employees, and agents of the *Trump Organization* that President Trump is an owner of; prohibits them from making cash deposits or withdrawals from any financial institution; and requires that all their frozen cash received to date or in the future be only donated exclusively to malaria prevention charities—without any avenue for relief under the **Takings Clause**.

There is little doubt that such an order would be immediately challenged by those affected as an unconstitutional deprivation of property. Plaintiff is confident—beyond any reasonable doubt—that if the roles were reversed, and the Government attorneys and Donald Trump were subjected to the same conditions Plaintiff now faces under his sincerely held religious beliefs, they would seek swift injunctive relief and invoke constitutional protections litigiously under the Takings Clause without an instant of hesitation.

The Government didn't just confiscate about $2,000 in cash wedding gifts from me. The net present value of that cash is far greater. If you compound that over 25 years at 8% historical S&P 500 yields, less capital gains tax, the value that they actually confiscated from me is closer to $11,942.

Compounded value of $2,000 by time of retirement:

$$A = 2000 \times (1 + 0.08)^{25} = 2000 \times (1.08)^{25}$$

$$A \approx 2000 \times 6.8485 \approx \boxed{\$13,697.03}$$

Confiscation Total, Accounting for Capital Gains Tax = (13697.0 - 2000) * .85 + 2000 = **$11,942**

Adjusting for inflation and purchasing power, it would be a bit less, but the point is the same: at my current age, it's in the projected neighborhood of at least a 4x retirement fund loss in future true value.

Would Darcie Thompson or Donald Trump not complain of a Taking if this Court forced her or him to contribute $11,942 of their retirement savings to charity, without her having a choice in the matter? I'm sure she and he, like me, would find a way to "accept" it or "tolerate" it under compulsion for as long as necessary, given that it is moved to and devoted to a worthy lifesaving cause. But it's still a compulsory Governmental Taking that the Government ought to be liable to compensate us for. A Secret Service agent operating under the direction of the President can not stop random people on the street and force someone like Gerald Groff or Joseph Kennedy if they're Roman Catholics to freeze up and impound all their petty cash or cash wedding gifts and force them to donate almost $12,000 in their future retirement funds to worthy charities on the spot for that cash to be useful to anyone at all - that's unquestionably an illegal and

unconstitutional property right violation and religiously discriminatory Taking, however good and necessary the charitable cause is.

This thought experiment illustrates the **lack of empathy and possible hypocrisy** underlying the Government's current position. It is easy to dismiss a burden when one does not bear it and when the US Attorney's Office and the Trump Organization isn't directly affected—but if the Government were required to live under the same restrictions it now defends per the Golden Rule, its constitutional objections would likely be loud, swift, emphatic, and reinforce Plaintiff's position. The Plaintiff simply asks that his religiously motivated inability to use cash be given the same constitutional respect as a Governmental impoundment and confiscation of his past, present, and non-declinable future cash property, as the Government surely would if this affected Donald Trump, Republican Presidential Campaigns, or the Trump Organization.

## V. THIS CASE PRESENTS A FACTUAL AND LEGAL QUESTION THAT WARRANTS PROCEEDING TO DISCOVERY OR SUMMARY JUDGMENT

Even if this Court were inclined to find precedent persuasive, dismissal at the Rule 12(b)(6) stage is premature. The Complaint offers more than conclusory allegations—it presents evidence of deeply sincere religious practices, tangible injuries, and numerous, plausible alternatives the government has not yet seriously explored.

## VI. THE US ATTORNEY'S OFFICE AND DEFENDANTS ARE IMPROPERLY SEEKING TO CLASSIFY THIS AND ME AS VEXATIOUS WITHOUT EVALUATING THIS OR MY LAST CASE JUSTLY ON THEIR MERITS

In the interest of complying with page limits set by the Local Rules, I will address the Defendant's attempt to label me a "vexatious litigant" in a separate response to their motion on that specific issue. However, to state my position briefly: the Defendant's allegations are laced with what

appear to be willfully misleading factual errors and distortions. Their attempt to brand either me or this action or my last action on organ donor incentives as vexatious is not only objectively incorrect but objectively abusive, in a way that even almost veers into or borders anti-Americanism or antisemitism. Government should not wield "vexatious" labeling as a weapon against minority religious perspectives. I doubt the Government would attempt to classify a Christian like a Member of the Church of Latter Day Saints or an Evangelical Protestant with such labels for a well-researched, well-evidenced, well-argued, and well-grounded case brought forward like this. Cases from such denominations have been consistently welcomed and supported by the Government and the Supreme Court Majority in cases like Groff v. DeJoy, 600 U.S. 447 (2023) or Kennedy v. Bremerton School District, 597 U.S. 507 (2022). The Government didn't try labeling Joseph Kennedy nor Gerald Groff as vexatious for their effort at vindication under RFRA.

While I accept that my first action this year on strict Commander-in-Chief and Presidential age limits and mandatory retirement under 10 US Code §1253 and other topics like a State of the Constitution Address may seem inconvenient, frivolous, and strangely or weirdly argued to legally-indoctrinated law school graduates and officers of the Court who are trained to avoid digression, I have learned from the dismissal in that case and changed my expressive strategy to be more conventional and focused in my last action and this one, and far from vexatious, this litigation is much more unobjectionable and is **valorous**, **virtuous**, **values-driven**, **verifiable**, **veridical**, and **vital**—a sincere effort to guide, and if necessary compel, the political branches through the judiciary to properly **venerate** the First Amendment, RFRA, and our shared civic values. Ideally, that veneration would be done in the most visible way possible—through the 60–80 point currency name that reaches every hand and eye in reach of our country's commerce—without the Government continuing to **venerate** or **vilify**, **vandalize** or **vitiate** the Name of G-d through its current unconstitutional practices. I am disappointed in Darcie

Thompson for filing that misleading vexatiousness complaint. I would no longer hire Ms. Thompson as an Assistant US Attorney if I were one of her hiring authorities in the future. I will respond to that vexatiousness charge at more length in a separate response.

**VI. MY SINCERE DEEP APOLOGIES TO TREASURY SECRETARY BESSENT (FOR MISSPELLING SECRETARY BESSENT'S LAST NAME AS "BESSANT" IN MY INITIAL COMPLAINT)**

I noticed after filing my initial complaint and summons that I had misspelled Treasury Secretary Bessent's name in the caption as "Bessant" instead of Bessent. I understand Secretary Bessent's full given name is **Scott Kenneth Homer Bessent**. I know how frustrating I myself find it when someone misspells my name; I'm very sorry for failing to take adequate care and misspelling his name in this filing.

Secretary Bessent, I hope to meet you in person or through teleconference someday soon for a design discussion, collaboration, or some interrogatories if necessary, and apologize for this mistake in person.

I've corrected the caption in this filing and, if granted a Hearing, I will request that the Court update the name this case is filed under to accurately reflect your true family name. For all those reading this, let's all try to get this corrected from here on and as soon as possible rather than compounding the error by copying the original complaint's caption.

## CONCLUSION

This is not a symbolic or speculative claim. Plaintiff has lived the consequences of the government's coercive currency policy in real, concrete terms—experiencing unjustified extensions of incarceration, systemic commercial exclusion, and a cascade of burdens that

derive directly from his inability, on sincerely held religious grounds, to handle U.S. currency bearing the unhyphenated name of G-d.

While the Sixth Circuit in *New Doe Child #1 v. Congress* declined to find a substantial burden in cases where plaintiffs merely preferred to avoid the motto or don't take the time to enumerate their burdens, that case is materially distinguishable. Here, Plaintiff is not alleging preference—he is asserting and substantiating coercion and a complete and total boycott of cash use that has lasted for over 10 years, with all the cumulative burdens, suffering, and experiences that have come from that. In jurisdictions like Miami-Dade and Palm Beach County, he faces the prospect of months of unnecessary incarceration for any minor crime he might be wrongfully accused of, due to denial of religiously-compatible bail payment options by the jail systems in Palm Beach County, Miami-Dade County, and elsewhere across the United States in his travels while adhering to his religious tradition. In disaster contexts, he is functionally prevented from preparing for or surviving emergencies comfortably on equal footing with other Americans, as he can not use cash in emergencies unless it rises to be so severe that life is at stake. And in daily commerce, he suffers thousand-papercut injuries that compound into civic exclusion and financial disadvantage, all traceable to the government's choice to make desecrated cash the singular key to full participation.

RFRA does not ask whether the government finds a burden acceptable—it asks whether the Plaintiff is being coerced to violate his religion and whether less restrictive means could serve the government's aims. Here, Plaintiff has plausibly alleged both that the burden is substantial and that obvious, feasible alternatives exist—including hyphenated spellings, optional designs, or alternate currency names that promote shared civic values while respecting religious conscience.

The government's attempt to classify this claim as meritless—based on precedents it misreads and burdens it refuses to acknowledge—only underscores the need for discovery and fact-based

adjudication. A motion to dismiss is no substitute for the inquiry RFRA demands. Nor should this Court permit a mischaracterized precedent or bureaucratic inertia to foreclose a sincere Jewish American's right to practice his faith with dignity, and to participate in his country's economy, polity, and charitable obligations without desecrating what he holds most sacred.

For all these reasons, for my RFRA claims, non-incidental 1st Amendment claim, and Takings Clause claims, and in light of the substantial, unavoidable burdens pleaded—with burdens enumerated unlike those in any case dismissed before—this Court should deny the Motion to Dismiss and allow the case to proceed to discovery and, ultimately, judgment on the merits.

## REQUEST FOR HEARING AND PREHEARING CONFERENCE

In light of the arguments above, the staggering amount of ongoing Ouroboros-shredding of G-d's Sacred Name, and the limited time available before the Quarter-Millenial to discuss, debate, and launch new designs as suggested to remediate, the Plaintiff would like to ask this Court to require the Government to arrange a meeting expeditiously between the Plaintiff and the Defendants, and especially Treasury Secretary Bessent and any stakeholders he wishes to identify (like the Directors of the Bureau of Engraving and Printing and the US Mint who report to Secretary Bessent), to discuss how to settle and remediate this case collaboratively, compassionately, creatively, and maximally constructively before a full Hearing. The Plaintiff is really optimistic and anticipates that Secretary Bessent and the Trump administration will or can be a wonderful partner on this.

Plaintiff also separately requests a Hearing whether or not that Prehearing Conference is adjudged, and, as before, the Plaintiff requests a Three Judge Panel to decide these questions if there is no settlement agreement to come out of the Prehearing Conference. Plaintiff's request for a Three Judge Panel has not been decided affirmatively or negatively yet.

## FINAL REQUEST

The Plaintiff would like to please kindly ask the Court, opposing counsel, and Defendants as a ecumenical courtesy, to hyphenate the Name of G-d in its judgments, orders, and other filings on this case whenever and wherever possible if you would. While I appreciate that you may have a different preferred way of spelling the Name of G-d, joining me in hyphenating the Name of G-d would help protect the Name of G-d for the Plaintiff on paperstreams that derive from this case I initialized through my filings in a way that accommodates Plaintiff's beliefs and make the Court's filings and orders more printable and easily disposable, destructible, and recyclable by the Plaintiff and any Jews with beliefs similar to those of the Plaintiff. Nontroubling conscientious document destructibility is a critical–I argue essential–usability feature of any Government paperwork, security document, or identification document, however sacred.

Still working to preserve life and death, and the G-d-given right to religious liberty,

s/Plaintiff David Clayman, Currently *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@clayman.org
david@harmlesshands.org

See **APPENDIX A: *The Government Is Squandering Precious Time...***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this Monday, the 4th day of August, 2025, I mailed a copy of this document to the Court via certified mail and electronically served a copy of this response to the new and old opposing counsel on the case.

_/s/ David M. Clayman_
Pro Se Plaintiff

## Appendix A

**The Government Is Squandering Precious Time Before the Nation's Quarter-Millennial Anniversary by Defending Its Inconspicuous 9-Point Religious Motto Printing—Which In Present Form Violates RFRA, etc. and Garners Little Weekly Attention—Rather Than Pursuing a Less Restrictive and Far More Effective Approach: Communicating Our Shared Civic Values Through the Much Larger, 60–80 Point Currency Name, Repeated and Cognitively Engaged With Many Trillions of Times per Week Domestically and Globally**

ChatGPT Prompt: *"What font size is "In G-d We Trust" on US currency? What font size is the word "Dollar" on US currency? Please approximate"*

*Response, just edited to hyphenate the Name of G-d to make this appendix printable:*

The exact font size of text like **"In G-d We Trust"** and **"Dollar"** on U.S. currency is not officially published, but we can estimate approximate point sizes based on physical measurements of printed bills:

---

## "In G-d We Trust"

- **Typical appearance**: Centered above the main image on the reverse (back) side of bills, like above the Lincoln Memorial on the $5 bill or above the White House on the $20.

- **Estimated font size**:

  ○ Approximately **9–11 points** on most denominations, depending on the note.
  ○ On a **$1 bill**, the size is slightly smaller—likely **7–9 points**.

---

## "Dollar"

- **Typical appearance**: Prominently displayed on the front or back, often integrated into ornate elements (like the word "ONE" on the $1 bill or "TWENTY DOLLARS" on the $20 bill).

- **Estimated font size**:

  ○ Varies **widely** by denomination.
  ○ On a **$1 bill**, the word **"ONE DOLLAR"** on the back spans several inches and is effectively the largest type on the bill—roughly **60–80 points or larger**, depending on how you calculate based on height.
  ○ On other denominations like the $10 or $20, **"TEN DOLLARS"** or **"TWENTY DOLLARS"** appears in multiple places at varying sizes—from **~12 points** in smaller type to **72+**

**points** in stylized banners or borders.

---

## Measurement Assumptions:

- **1 point = 1/72 inch**.
- The back of a $1 bill is about **6.14 inches** wide.
- A phrase taking up roughly **1/3 inch in height** would be about **24 points** in font size.

---

Would you like me to generate a visual approximation or table comparing multiple denominations and fonts?

Prompt: **Yes**

ChatGPT Follow-up Response:

Here's a table and visual chart comparing the estimated font sizes of "In G-d We Trust" and the word "Dollar" across different U.S. currency denominations. These are approximations based on visual inspection of physical bills. Let me know if you'd like to include visual samples of the text rendered at those font sizes.

Approximate Font Sizes of US Currency

| Denomination | In G-d We Trust (pt) | Dollar Text (pt) |
|---|---|---|
| $1 | 8 | 72 |
| $5 | 10 | 65 |
| $10 | 10 | 68 |
| $20 | 11 | 70 |
| $50 | 11 | 72 |
| $100 | 11 | 75 |

