David Morris Clayman / אדם דוד קליימן / דוד משה קליימן, *Pro se*

<u>**APPENDIX A: PLAINTIFF'S PROPOSED SUR-REPLY**</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **David Morris Clayman** ( / אדם דוד (דוד משה קליימן), Plaintiff, <br><br> vs. <br><br> **UNITED STATES OF AMERICA** et. al. | **CASE NO. 9:25-CV-80890-WM** <br><br> **PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DEEM PLAINTIFF A VEXATIOUS LITIGANT AND ENJOIN FURTHER FILINGS** |

**PART A: PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO DEEM PLAINTIFF A VEXATIOUS LITIGANT AND ENJOIN FURTHER FILINGS**

**I. INTRODUCTION**

With leave of the Court, Plaintiff David Morris Clayman respectfully submits this Sur-Reply opposing Defendants' Motion to deem him a vexatious litigant and enjoin further filings. Defendants' request is premature, unsupported by an adequate evidentiary record, and based on mischaracterizations of Plaintiff's prior and current litigation. None of Plaintiff's filings have been adjudicated frivolous in a manner that justifies the extraordinary relief sought. The motion should be denied.

The next 10 pages are an ordinary short sur-reply. The remaining pages thereafter are an exhaustive, sincere, and repentant apology for the three fictitious quotes that unwittingly leaked

into my *Response to Motion to Dismiss* filing.

First, the short sur-reply:

## II. DEFENDANTS MISCHARACTERIZE PLAINTIFF'S CASES AND MOTIVES

Defendants repeatedly assert—without supporting rulings—that this case and two prior actions were vexatious or frivolous. They were not. Plaintiff's litigation has been motivated by sincerely held religious obligations and public-interest concerns, not harassment.

In the present action, Plaintiff seeks to prevent misuse of the Divine Name in U.S. currency, consistent with the Third Commandment's prohibition on taking the Name in vain. In his organ-donation incentives case, Plaintiff sought to preserve life by expanding the supply of living-donor organs, a goal aligned with both public health and religious duty to protect life. In the age-limits case under 10 U.S.C. § 1253, Plaintiff sought to avoid the risks of a gerontocracy in the Commander-in-Chief role and to encourage measured constitutional reform.

None of these objectives are trivial, harassing, or without reasonable cause. Plaintiff's failure to prevail in prior matters reflects the difficulty of standing doctrine for pro se litigants, not any intent to misuse the courts.

### B. Definitions of "vexatious" do not apply here

Defendants cite dictionary and judicial definitions suggesting Plaintiff's actions were "instituted without sufficient grounds for the purpose of causing trouble or annoyance." That characterization is inaccurate. While litigation naturally burdens opposing counsel, incidental annoyance to the U.S. Attorney's Office is not the same as an intent to annoy. Plaintiff's goals have been substantive, principled, and consistent with his rights under RFRA and the

Constitution.

## III. DEFENDANTS OVERSTATE THE BURDEN OF REVIEWING PLAINTIFF'S FILINGS

**A. Many pages are unchanged and optional for certain Defendants**

Defendants complain of excessive page length without acknowledging that most pages in the First Amended Complaint were unchanged from the original filing. From pages 53 to 108, the content consists of policy proposals for currency redesign—valuable for certain Defendants, such as the Treasury Secretary and Congress, but not necessary for the U.S. Attorney's review of core claims. The mandatory-reading portion for purposes of adjudicating the core RFRA claims does not exceed 52 pages.

Modern text-comparison tools, such as those widely used in software development, can highlight changes in minutes. Plaintiff can provide a redlined comparison on request. That the U.S. Attorney's Office chooses not to employ such tools is not a basis for labeling Plaintiff vexatious.

**B. No page-limit rule exists for complaints**

If this Court wishes to impose page limits on complaints, it may do so via local rules applied equally to all parties whether powerful or poor and everything in between. Until then, Plaintiff will err on the side of completeness to avoid dismissal for omission of potentially relevant claims or facts—particularly given the adversarial posture of opposing counsel.

## IV. FAILURE TO ESTABLISH STANDING IS NOT FRIVOLOUSNESS

A dismissal for lack of standing, without more, does not make a case frivolous.

In Plaintiff's first case (age limits for the Commander-in-Chief), the Court dismissed with prejudice. While Plaintiff disputes the characterization of that matter as frivolous, he acknowledges that the filing lacked the discipline of his later cases.

In his second case (organ-donation incentives), there has been no judicial finding of frivolousness; Plaintiff intends to refile after his medical status for standing improves. Furthermore, in that case, many of his legitimate claims on the employer and economic sponsor side of organ donor incentives were dismissed just because he was pro se rather than represented by counsel and was not allowed to represent his very-closely-held businesses and campaign organization himself. If Plaintiff were to spend $10,000 USD to hire counsel tomorrow to represent him in those respects, it seems that Plaintiff's natural standing as an employer and campaign organizer would be sufficient to restart the case on the right foot given that adequate corporate representation.

The current RFRA case has not been adjudicated at all. Labeling it frivolous before any ruling or status hearing would be improper. Indeed, its similarity to *New Doe Child #1 v. Congress of the United States*, No. 16-4345 (6th Cir. 2018), which was not deemed frivolous, underscores its legitimacy.

## V. SELECTIVE ENFORCEMENT AND THE DONALD TRUMP DOUBLE STANDARD

Defendants argue that represented parties cannot be declared vexatious litigants in this Circuit. That assertion is incorrect. In *Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277 (11th Cir. 2002), the Court upheld sanctions against a represented plaintiff and counsel for repetitious, baseless litigation. Representation does not immunize a litigant from vexatious-litigant restrictions when evidence supports such a finding. Defendant US Attorney points to In re

Farris, 330 Fed. Appx. 833, 835 (11th Cir. 2009) to try to claim that the 11th Circuit holds a Plaintiff represented by Counsel can not be labeled a vexatious litigant. I don't have direct access to the court reporter on that. But searching through the freely available Justia archives, there were two Farris cases decided by the 11th Circuit in 2009; I accessed and read them both and neither Farris case establishes any absolute protection or immunity that Defendant is claiming Donald Trump enjoys by virtue of having hired and "diffused responsibility" to counsel.

If this Court were to apply Defendants' proposed standard consistently, it would require similar action against Donald J. Trump, whose litigation history reflects repeated warnings and sanctions for extremely abusive legal practices. Trump has been the common denominator in numerous sanctions against different attorneys, including Sidney Powell, Rudy Giuliani, and Alina Habba who featured in the Middlebrooks case (despite considerable controversy and having been sanctioned for her conduct, she was insistently elevated by President Trump to the position of current Acting US Attorney for the District of New Jersey as an almost equal peer of this US Attorney Hayden O'Byrne as a reward for her conduct).

Yet Defendants seek to apply a lower threshold to Plaintiff—a pro se litigant with no history of judicial admonition for improper filings—than to a represented party with a demonstrated record of vexatious conduct.

Judge Middlebrooks described Mr. Trump in the following terms:

> "Here, we are confronted with a lawsuit that should never have been filed, which was completely frivolous, both factually and legally, and which was brought in bad faith for an improper purpose. Mr. Trump is a prolific and sophisticated litigant who is repeatedly using the courts to seek revenge on political adversaries. He is the

mastermind of strategic abuse of the judicial process, and he cannot be seen as a litigant blindly following the advice of a lawyer. He knew full well the impact of his actions. See Byrne, 261 F.3d at 1121. As such, I find that sanctions should be imposed upon Mr. Trump and his lead counsel, Ms. Habba."

I also direct the Court to review Section III ("A PATTERN OF ABUSE OF THE COURTS") of Judge Middlebrooks' second sanctions order in *Trump v. Clinton*, No. 2:22-cv-14102-DMM (S.D. Fla.), ECF No. 302 to fully appreciate the Donald Trump Double Standard the US Attorney's Office is advancing and defending. There, the court catalogued a series of plainly frivolous and vexatious cases initiated by Mr. Trump, including *Trump v. Pulitzer Board*, *Trump v. New York Attorney General*, *Trump v. Twitter*, and *Trump v. CNN*.

In each of those cases, Mr. Trump was the plaintiff and thus personally accountable for the conduct. The sanctions awarded in just one such order—$937,989.39—represent a magnitude of damage from vexatious litigation that Defendants do not allege Plaintiff has caused or approached, even at a small fraction of that scale.

It is further the view of this Plaintiff, and of many federal court observers, that Mr. Trump has not been adequately deterred from pursuing vexatious or retaliatory litigation, nor from engaging in retaliatory executive action against disfavored media outlets, universities, and law firms. That is the main reason I requested to be a John Doe in Doe v Biden, Trump, et al case that was the first case I filed here. I was not worried of President Biden vexatiously retaliating against me in his last days of Office or thereafter, but I was very worried and concerned about Trump doing so against me, a private citizen then, in his first days of Office. And we can see Trump attempting to take instant retaliatory action against me now through and by means of this attempt by the US Attorney's Office to label me vexatious and enjoin future filings prematurely, even when I'm

approaching the Court with a filing on a clearly sincere, pure, well-argued, and well-evidenced RFRA claim.

If the Court is inclined to entertain the United States Attorney's request to designate this pro se plaintiff as a vexatious litigant on the comparatively weak "totality of circumstances" showing made here, principles of equal treatment compel the conclusion that Donald J. Trump should be subject to the same designation and pre-filing review requirement based on the existing record. Under *Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277 (11th Cir. 2002), this Court possesses the inherent authority to impose such restrictions—whether within this Circuit or on a nationwide basis—consistent with the reasoning of *Middlebrooks*.

Although it is uncommon for a represented party to be designated as a vexatious litigant and placed under pre-filing review, Mr. Trump's extensive litigation history, both in this and other Circuits, including conduct at issue in the instant matter, reflects a sustained pattern of abusive and meritless filings. Imposing an injunction against him in his personal capacity would advance the public interest by safeguarding potential defendants (including me) from baseless vengeful litigation and conserving judicial resources in the Eleventh Circuit and beyond, thereby ensuring the evenhanded administration of justice and fidelity to the judicial oath of the United States:

> "I, _____, do solemnly swear (or affirm) that I will **administer justice without respect to persons, and do equal right to the poor and to the rich**, and that I will faithfully and **impartially discharge and perform all the duties incumbent upon me** as _____ under the Constitution and laws of the United States. So help me G-d."

Notably, just as an illustration, I take no issue with the suggested form of the Judicial

Oath of the United States above, as long as it is repeated orally and the Name of G-d is not reproduced in destructible print media, with nontheists and polytheists have an opportunity to customize it to their needs and choose another sacramental text consistent with their tradition to swear the oath upon. It's an individual oath. That kind of "oral, ecumenical, individualized ceremonial deism" is very acceptable and agreeable to my appreciation of faith and is consistent with our national embrace of religious diversity and heightening the solemnity of the occasion. There's a substantial difference between permissible "oral ceremonial deism" and Talmudically impermissible "print ceremonial deism".

## VI. PLAINTIFF'S LITIGATION IS IMPROVING, NOT DETERIORATING

Defendants themselves should note the absence of prior deficiencies, such as "shotgun pleadings," in this case. Plaintiff's arguments are increasingly well-structured, better disciplined and organized, and supported by law.

The relief sought is narrowly tailored, including:

   1. Modification of the (Printable or Mintable) National Motto to avoid misuse of the Divine Name;

   2. Recognition of and facilitation of alternative legal-tender forms accessible to religious minorities and detainees who lack other effective and actually available, accessible means of paying their bail; and

   3. Allowing as an interim measure removal of the Divine Name from cash personally owned or received by clipping the National Motto or at least G-d's Name out with a scalpel or other cutting tool without legal prosecution or penalty for currency mutilation, with the right to protect

and one day bury the Divine Name or National Motto while depositing the remainder of the cash into a bank, without being accused of or prosecuted for currency mutilation.

The appendices offer constructive, least-restrictive-means proposals for achieving governmental goals while accommodating religious exercise. Providing solutions alongside objections is a civic virtue, not a mark of vexatiousness.

The U.S. Attorney contends that my cases are similar because each invokes the Religious Freedom Restoration Act (RFRA) and because the term "organ donation" appears in two of them. This reasoning is misplaced. Many plaintiffs focus their litigation on a particular statutory framework—such as those who specialize in Americans with Disabilities Act (ADA) cases—or, historically, civil rights leaders like Dr. Martin Luther King Jr., who pursued multiple actions grounded in the Civil Rights Act of 1964 or the Voting Rights Act of 1965.

My own focus on RFRA stems from my position as a member of a religious minority for whom this statute provides essential protections for civil rights and religious beliefs. Invoking RFRA in different contexts reflects the statute's broad applicability and my ongoing efforts to challenge distinct substantial burdens imposed by the Government on my sincerely held religious beliefs—burdens embedded in facially neutral laws that have not been subjected to strict scrutiny or the least restrictive means analysis that RFRA requires.

With respect to "organ donation," the two cases in which the term appeared involved entirely different facts, claims, and legal theories, sharing only a superficial commonality of terminology and topic. The present matter—concerning currency reform—has no connection whatsoever to organ donation. At no point did I attempt to relitigate in duplicative fashion a question handled or adjudicated in a previous case.

## VII. CONCLUSION

Defendants' motion rests on mischaracterizations, selective precedent, and exaggerations of burden. Plaintiff's prior cases were brought in good faith, grounded in sincerely held religious belief and legitimate constitutional concerns. None have been adjudicated frivolous in a manner justifying a prefiling injunction.

The extraordinary remedy sought is unwarranted, premature, and—if granted—would create an unjust double standard favoring powerful, represented litigants over religious minority pro se plaintiffs.

Plaintiff respectfully requests that the Court deny Defendants' motion in full. At a minimum, Plaintiff requests that this Court not take any adverse action until after the Status Hearing scheduled for August 21, when the Plaintiff, the Chief Magistrate Judge, and the Defendant will have a chance to conference and discuss, hopefully collaboratively and compassionately.

Plaintiff respectfully requests that the Court enjoin Defendants from labeling Plaintiff as a "vexatious litigant" or seeking to restrict future filings anywhere nationally without first obtaining pre-filing review and clearance from a Judge or the Chief Magistrate Judge of this Circuit. Responding to the U.S. Attorney's attempt to impose such a label has required substantial and irreplaceable time and effort—diverting two and a half full days from Plaintiff's work on developing and improving product-market fit for patented sexual assault prevention technology (*U.S. Patent No. 12,347,301 B1, "Consent Management System Over a Communications Network"*).

This diversion of resources compounds the substantial time already required to litigate the present matter concerning legal tender and religious freedom, imposing an undue burden on Plaintiff's

ability to advance his public-benefit mission. Through Lifesaver Labs Public Benefit Corporation (formerly Healthy Consent PBC), Plaintiff works to prevent sexual assault and related harms, including unnecessarily high rates of abortion arising from the absence of robust, multilayered birth-control commitments. These efforts aim to protect vulnerable individuals from sexual violence, prevent avoidable loss of unborn life, and improve the investigation and adjudication of sexual assault cases through the development of better conflict evidence—objectives that should align with the Department of Justice's and United States Attorney's core mission, particularly as advanced by the DOJ's Office on Violence Against Women.

Rather than responding to Plaintiff's outreach seeking cooperation toward these shared objectives, Defendants have instead directed the United States Attorney to pursue an unwarranted vexatious-litigant designation. This course of action further burdens Plaintiff's exercise of protected rights and impedes progress on Lifesaver Labs' sexual-assault prevention initiatives. Plaintiff respectfully requests that the Court ensure such unnecessary expenditure of governmental and judicial resources and development time—especially against a pro se litigant—does not recur absent an overwhelmingly compelling showing of good cause.

## PART B: PLAINTIFF'S APOLOGY AND CLARIFICATION REGARDING INACCURATE CASE QUOTATIONS

Plaintiff acknowledges and accepts responsibility for unwittingly including inaccurate quotations in his prior filing. After reviewing the specific citations identified by the U.S. Attorney, Plaintiff confirmed that while the cited case names and numbers were accurate, the quoted language was not present in exactly the same form in the source opinions. These quotations were generated by ChatGPT in a manner that superficially resembled the actual case language but was, in fact, fabricated.

This was not a willful or intentional misrepresentation. Before filing, Plaintiff confirmed that each case cited was real and read the opinions for general substance, but he failed to verify the quoted language as a word-for-word exact match. Plaintiff now recognizes that this was a serious oversight. Going forward, he will cross-check every quotation against the underlying case text before submission and self-certify that any AI-assisted citations or quotations are accurate.

To correct the record, Plaintiff is prepared to file an appendix amending his Response to the Motion to Dismiss at the request of the US Attorney or this Court. He will hereafter treat generative AI sources—such as ChatGPT and Claude—as potentially unreliable for direct quotations, similar to how one might approach a journalist or author previously found to fabricate quotes. ChatGPT was responsible for producing the false quotations here, Claude did not contribute inaccurate quotes in this matter.

Plaintiff has already manually searched the First Amended Complaint for all quotations and citations and confirmed there are no fabricated case quotations at all in that filing. This is unsurprising, as Plaintiff, unlike the Defendant, rarely relies heavily on case citations; much of

his work involves novel legal arguments with limited existing case law.

Notably, of the three case quotations that the Defendant cited as incorrect that I've verified were wrong, only one may have been meaningful and material. From the *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1295 (11th Cir. 2002) case citation, I cited an AI hallucination that prefiling injunctions against pro ses were an "extreme remedy" that were only to be used "sparingly". Like the Defendant US Attorney, I can't find 11th Circuit precedent matching that language. But for the sake of justice and proportionality, I should point out that such language does certainly exist in other Circuits, and to my mind it is widespread enough to speculate that the Supreme Court would say that prefiling injunctions against pro ses actually are an "extreme remedy" to be used "sparingly" in any circuit. For instance, in Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812 (4th Cir. 2004), the 4th Circuit says "[s]uch a drastic remedy must be used sparingly". And in Mallon v. Padova, 806 F. Supp. 1189 (E.D. Pa. 1992), the Eastern District of Pennsylvania cites the Third Circuit as stating that prefiling injunction "is an extreme remedy which must be narrowly tailored and sparingly used." Those cases from other districts on the same subject are probably the legal foundation on which those hallucinated, fraudulent case quotations were generated. That being said, this Plaintiff would apologetically welcome a judgment from this Court that formally affirms and introduces into this Circuit the cautionary criteria above recognizing prefiling injunctions against a pro se as an "extreme remedy" to be used "sparingly" in this Circuit so that Southern District of Florida precedent on this can be in harmony with other Circuits that have weighed in on the extremity of this measure the US Attorney seeks.

**Sanctions Request.** If the Court determines that an apology is insufficient and sanctions are necessary for these nonexact quotations submitted in Court, Plaintiff respectfully requests that they be proportionate to the nature and circumstances of this unintentional error. A symbolic fine

not exceeding $180.00—comparable to a significant parking penalty—would be sufficient to deter future carelessness. If the Court deems a higher amount appropriate as a general deterrent, Plaintiff asks that it not exceed the federal filing fee of $405.00, as anything more like a $1,000 fine (more appropriate to and proportional for a licensed attorney) or using this regrettable mistake to label Plaintiff a vexatious litigant or enjoin any of his future filings would be excessive, unnecessary, and would unduly burden his religious exercise and personal finances.

**Shared Responsibility.** Plaintiff urges the Court to recognize that a portion of the responsibility stack is stacked with the AI providers—OpenAI, Inc., OpenAI Global, LLC, OpenAI LLC (Delaware), and Anthropic PBC (Delaware). These entities knowingly produce very helpful, almost indispensable research and writing support tools that output fabricated but convincing legal quotations while users are preparing documents that the AI providers know from session context are likely meant to be used imminently in Court legal filings, and they should also bear some contributory accountability when such output foreseeably misleads the service user and hits Court dockets downstream. Plaintiff is willing to provide the Court and any appointed Special Master with complete chat transcripts from this matter from ChatGPT to aid in determining the extent of AI-provider responsibility.

**Remedial Measures.** In keeping with a prior opinion by Chief Magistrate Judge Matthewman, Plaintiff has sought out and completed a one-hour CLE course on "Ethics & Artificial Intelligence (AI) in Florida" from the Florida Bar's 2024 Annual Convention. In future originating case filings, he will include a certification stating either (a) that no portion of the filing was drafted by generative AI, or more commonly (b) that all AI-drafted content has been personally verified for accuracy, including all quotations and citations.

**Good Faith and Future Prevention.** Plaintiff did not intend to mislead or deceive this Court and

is taking this matter seriously. Before the upcoming status conference on August 21, he will review all prior pleadings filed in the Southern District of Florida to identify and correct any other inaccurate quotations or citations. He is committed to ensuring that such errors do not recur and to assisting the Court in addressing the broader systemic risks posed by generative AI in legal practice in the interest of judicial efficiency and conserving judicial resources nationwide.

*/s/*Plaintiff David Clayman, Currently *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@clayman.org
david@harmlesshands.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this Monday, the 4th day of August, 2025, I mailed a copy of this document to the Court via certified mail and electronically served a copy of this response to the new and old opposing counsel on the case.

_/s/ David M. Clayman_
Pro Se Plaintiff

The Undersigned Pro se Plaintiff hereby certifies that I have read and will comply with all judge-specific requirements for Chief Magistrate Judge Matthewman, United States Chief Magistrate Judge for the Southern District of Florida. I further certify that (a) no portion of any filing in this case will be drafted by generative artificial intelligence or (b) that any language drafted by generative artificial intelligence–including quotations, citations, paraphrased assertions, and legal analysis–will be checked exhaustively from here on for accuracy using the freely available resources available to this Pro se Plaintiff by me, as a responsible human being, before being submitted to this Court. I understand that I as the signer on this case will be held responsible for the contents thereof according to applicable rules of Pro se discipline, regardless of whether generative artificial intelligence drafted any portion of this or future filing in this case and regardless of any negligent misrepresentation or contributory fraud in the Undersigned Plaintiff's generative artificial intelligence sources for which the entity providing generative artificial intelligence may be separately found responsible, pending determination by this Court or any Standing Special Master or Standing Judicial Committee so authorized on the subject of AI court compliance in legal writing and research assistance under this Court's jurisdiction.

_/s/ David M. Clayman_
Pro Se Plaintiff