David Morris Clayman / אדם דוד קל"ימן / דוד משה קליימן, *Pro se*

**APPENDIX: SECOND AMENDED COMPLAINT WITH APPENDICES**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **David Morris Clayman** ( / אדם דוד דוד משה קליימן),<br>Plaintiffs,<br><br>vs.<br><br>**SCOTT BESSENT**, in his official capacity as Secretary of the Treasury;<br>**UNITED STATES OF AMERICA;**<br>**CONGRESS OF THE UNITED STATES;**<br>**JEROME H. POWELL**, in his official capacity as Chair of the Federal Reserve;<br>**GENE L. DODARO**, in his official capacity as Comptroller General; and<br>**DONALD J. TRUMP**, in his official capacity as Commander-in-Chief and President of the United States | **CASE NO. 9:25-CV-80890-WM**<br><br>**SECOND AMENDED COMPLAINT**<br><br>**APPENDICES**<br><br><br>FILED BY _____ D.C.<br><br>SEP - 2 2025<br><br>ANGELA E. NOBLE<br>CLERK U.S. DIST. CT.<br>S.D. OF FLA. – W.P.B. |

## <u>EXPEDITED HEARING REQUESTED</u>

## SECOND AMENDED COMPLAINT

**COMES NOW** David Morris Clayman ( אדם דוד / דוד משה קליימן), as the Plaintiff for all Jewish sectarian religious, American civic religious, and simply civic claims herein, including:

- A plea for an updated non-sectarian motto, at minimum one that doesn't use the sacred, unhyphenated form of G-d's Name

- True access to flexible self-pay FairPay / CashAlt bail or completely "cashless" bail nationwide, requiring jails and holding facilities everywhere in the United States to, if bail is required at all, ensure (a) that the detainee has the means to pay it (FairPay) and (b) permit and facilitate reasonable and speedy detainee access to a variety of convenient and common non-cash alternative (CashAlt) financial instruments accessible from their belongings, their phone, their wearable devices, or a secure computer terminal or device made available to detainees without undue frustration for the payment of "cash" bail.

- A civic currency design overhaul (no further penny mintings, more durable and artistic plastic substrate, better themes less idolatrous of or focused on flawed dead Presidents)

- A civic currency retitling and motto tournament contest to make our daily currency name more meaningful and mission-oriented and maximally achieve compelling government interests in recurrent moral priming with every transaction we encounter (domestic or international) denominated in US currency – whether denominated in CALM, Trust, Seeds, Talents, or any other mission-oriented title better advancing compelling government interests without the Government arrogating the willy-nilly use of and unreligious destruction of my G-d's most sacred vernacular Name in physical media.

The RFRA core of this case parallels, in several important respects, the framework of New Doe Child No. 1 v. Congress of the United States, 891 F.3d 578, 591 (6th Cir. 2018), and New Doe Child No. 1 v. Congress, No. 5:16-cv-00059-BYP (N.D. Ohio). Although the Plaintiff was only very minimally included in that earlier litigation, this case provides a far more detailed presentation of the Plaintiff's particular circumstances as an American Jew. It also cures two

critical, yet easily remediable, defects noted by the Sixth Circuit in its erroneous denial of the earlier claims:

1. **False equivalence of payment forms.** The Sixth Circuit conflated legal-tender cash (Federal Reserve banknotes and coins, bearing the sacred inscription "In G-d We Trust") with alternative, non-sacred payment instruments such as credit cards, debit cards, and checks.

2. **Mistaken assumption of legal tender liquidity, sufficiency, and fungibility.** The court wrongly assumed that all plaintiffs, including this Plaintiff, could revert to legal-tender cash whenever legally or situationally necessary, and overlooked all the conditions and situations in which there is no effective or legal substitute to legal tender or cash-per-se.

Those assumptions led to the additional error of minimizing the substantial burdens faced by the Plaintiff. In reality, the Plaintiff's burdens are extensive, unavoidable, and inseparable from his religious status, as this complaint now enumerates in detail, for lack of usable fair access to 31 USC §5103 Legal Tender, which specifies that "United States coins and currency (including Federal reserve notes and circulating notes of Federal reserve banks and national banks) are legal tender for all debts, public charges, taxes, and dues." I can't force settlement of debts, public charges, taxes, and dues for lack of usable access to legal tender, and I and my corporation and associations can not economically accept from others such legal tender either, putting me and the entities I control in enormous tension with existing statutes.

Beyond RFRA, this case also implicates the Eighth Amendment's prohibitions on "excessive bail" and "cruel and unusual punishments." The Plaintiff's religious belief prevents him from using sacred legal-tender cash, rendering him unable to satisfy bail demands that require payment exclusively in that form—even though his funds exist in alternative media (credit, debit, or check) that the government declines to accept. Under Robinson v. California, 370 U.S. 660

(1962), the State may not criminalize or detain a person based on a mere "status" or immutable "condition." Yet Plaintiff's detention risk flows directly from such a status or condition, including:

(a) absolute poverty in relation to legal-tender requirements – in legal tender, the Plaintiff is among the poorest and most impoverished Americans alive (he can not circulate or accept even 1¢ of legal tender, except to shuttle the same to lifesaving charities);

(b) illiquidity of funds across payment media for lack of reliable and guaranteed facilitation of funds transfers and conversions while in custodial detention;

(c) non-fungibility of available funds into a government-mandated form;

(d) economic solitude in the absence of others to intercede; and

(e) all of the above, compounded by or originating in the Plaintiff's religious status as an American Jew strictly unable to circulate sacred "In G-d We Trust" legal tender currency that is legally or situationally required periodically by entities like Federal, State, and Local Government.

Thus, within the United States—the Plaintiff's homeland and fatherland—any requirement of legal-tender payment alone without any alternatives reduces him to an effective state in that domain of absolute and crushing poverty, similar to those who have absolutely no resources or assets, notwithstanding his substantial resources in non-sacred forms. This places his liberty at risk in ways both constitutionally impermissible and religiously unconscionable.

The pleading also enumerates a wide array of additional substantial burdens, any one of which, standing alone, should suffice to shift the burden of proof back to the Government to demonstrate that it is employing the least restrictive means—a showing it cannot make.

In addition to the RFRA claim, the Plaintiff raises numerous other claims tied to his exclusion—now spanning over 11 years—from participation in legal-tender and cash transactions within his own homeland. These include, for example, 1st Amended Free Exercise and Establishment Clause violation claims where the Government is taking the same position on the printing of G-d's Name on monetary instruments as the ancient Hasmonean Government that was expressly overruled by concerned Jewish Sages in the Talmud, and an impermissible Fifth Amendment "taking," where assets have been rendered effectively frozen or restricted solely to charitable or lifesaving uses through the combined effect of government policy and Plaintiff's compulsory religious beliefs.

The Plaintiff respectfully asks this Court to recognize that there must be a light at the end of this long and difficult tunnel, and to grant interim relief from the continuing civil and religious rights violations and substantial burdens that he, and any of those similarly situated, face not only in the Southern District of Florida but also throughout the United States in daily interactions with fellow citizens, residents, visitors, and counterparties who once, now, or will feed, clothe, shelter, educate, employ, engage, entertain, serve, indebt, discipline, transport, fund, and invest in him. This over 11 year exclusion became unavoidable in situations where cash or formal legal tender is demanded once, following a moment of religious epiphany, the Plaintiff realized that the Name of G-d wasn't hyphenated as it should be on US currency, and as such the Plaintiff could not in the shoes of a currency designer, Member of Congress, Treasury Secretary, President, or common citizen sign off on any American currency, and could thus no longer circulate sacred "In G-d We Trust" currency. At that point, all his held cash assets became instantly frozen, illiquid, and unusable in order to preserve the sanctity of the Divine Name, and as the Legislature and the Executive has refused and still refuses any form of religious accommodation, the Plaintiff needs

and asks for relief to be granted from the Judicial Branch.

## *Table of Contents*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA                                          1
EXPEDITED HEARING REQUESTED                                                   1
SECOND AMENDED COMPLAINT                                                      1
Table of Contents                                                            7
I. INTRODUCTION                                                             10
A. The Core Religious Conflict                                              10
B. Relief Sought                                                           11
II. JURISDICTION AND VENUE                                                  13
III. PARTIES                                                               13
A. Plaintiff                                                               13
B. Defendants                                                              14
IV. FACTUAL ALLEGATIONS                                                     16
A. Sincere Religious Beliefs and Historical Foundation                     16
B. Jewish Law and Currency Practices                                       19
C. Government Currency Destruction Practices                               22
D. Coins                                                                   23
F. Substantial Burdens on Plaintiff                                        23
G. There is Often No Adequate or Legal Substitute for Legal Tender / Literal
Cash                                                                       39
I. Exhaustive Detail on Pretrial Detainment for Lack of Legal Tender In
Violation of Legal Presumed Innocence                                      40
    1. Plaintiff's Prior Detention and Denial of Access to Cash Alternatives   40
2. Arbitrary and Inconsistent Bail Payment Rules                           41
3. Practical Consequences                                                  41
4. Widespread Problem of Cash-Only Bail                                    41
5. Technological and Institutional Alternatives (CashAlt)                  41
6. Judicial and Governmental Responsibility                               41
7. Plaintiff's Means and the Cash-Strict Catch-22                          42
8. Broader Equal Protection Failures                                       42
9. System Seems Designed to Protect the Bail Bondsmen Industry, not the
Freedom of Detainees in Pretrial Detention                                 43
J. Historical Context                                                      44
K. Lessons from Israel                                                     47
L. Jewish Involvement in U.S. Currency Management                          48
V. LEGAL FRAMEWORK                                                         49
A. RFRA Standard                                                           49
B. Constitutional Standards                                               51
VI. CLAIMS FOR RELIEF                                                      51
COUNT I – Violation of RFRA (42 U.S.C. §§ 2000bb et seq.)                  51
COUNT II – Free Exercise Clause Violation                                 52
COUNT III – Establishment Clause Violation                                54
COUNT IV – Takings Clause Violation                                       56
COUNT V – Right to Petition Government for Redress and Trust That They'll

Actually Respond with Religious Protections                                      58
COUNT VI - Reasonable Pro Se Fee Request                                         58
COUNT VII - Penny Minting Ban and Currency Overhaul Under RFRA                   60
COUNT VIII - CashAlt Payment Method Commitment or Clarification for Executive
Order 14342 and Executive Order 14340 To Prevent 8th Amendment Violating
Excessive Bail or Cruel and Unusual Punishment                                   62
VII. PROPOSED REMEDIES AND CURRENCY REFORM                                       65
A. Immediate Relief Options                                                      65
B. Currency Decommissioning                                                      68
C. Alternative Payment Methods                                                   69
E. Additional Accommodations                                                     71
F. Currency Naming Contest Proposal                                             72
G. Plastic Currency Transition                                                   73
H. Presidential Candidacy Consideration                                          73
VIII. PRAYER FOR RELIEF                                                          74
CERTIFICATE OF SERVICE                                                           79
APPENDICES                                                                       80
Core Appendices                                                                  80
Additional Appendices                                                            80
APPENDIX A: CULTURAL AND RELIGIOUS PRACTICES SURROUNDING SHAIMOS                 80
    Hyphenating the Name of G-d                                                  80
    Shaimos and Document Lifecycle                                               81
    Religious Basis                                                              81
APPENDIX B: JEWISH HISTORY AND TALMUDIC BASIS                                    83
    Historical Context                                                           83
    Talmudic References                                                          83
    Key Principles Derived                                                       83
    Relevance to Plaintiff's Beliefs                                             83
APPENDIX C: Detailed Slides on Talmudic Tractate Rosh Hashanah 18B              85
APPENDIX D: "Why Write "G-d" Instead of "G-o-d"? by Yehuda Shurpin of
Chabad.org                                                                       85
APPENDIX E: Article from Times of Israel, January 25, 2023: "Shas bill: Add
'In G-d we trust' to banknotes as 'talisman for economic success'"              86
APPENDIX F: DISCUSSION OF FUTURE POTENTIAL ARREST RISK                           90
APPENDIX G: EXECUTIVE ORDER 14342 "TAKING STEPS TO END CASHLESS BAIL TO
PROTECT AMERICANS"                                                               98
APPENDIX H: EXECUTIVE ORDER 14340 "MEASURES TO END CASHLESS BAIL AND ENFORCE
THE LAW IN THE DISTRICT OF COLUMBIA"                                             98
APPENDIX I: RELIGIOUS ACCOMMODATION RE MIAMI-DADE CASHLESS BUSINESS ORDINANCE
(EMAIL)                                                                          98
APPENDIX J: BYLAWS OF DAVID CLAYMAN OF LIFESAVER LABS FOR PRECEDENT &
PRESIDENT (Specifically the In G-d We Trust Cash Use Prohibition on Page 6,
Point #6)                                                                        98
APPENDIX K: PROPOSAL FOR COMPLETE U.S. CURRENCY REDESIGN TO BETTER MEET
COMPELLING GOVERNMENT INTERESTS                                                  99
    Currency Name Change Contest to Celebrate the U.S. 250th Anniversary         99
    Switch to Durable Plastic, Variably Sized Currency                          109
APPENDIX L: HONORING PRESIDENT ROOSEVELT (ROSEAVELT) WITH A PROPOSAL FOR

APPENDIX L: HONORING PRESIDENT ROOSEVELT (ROSEAVELT) WITH A PROPOSAL FOR REVIVED AMERICAN SIMPLIFIED NUMBER AND SPELLING SYSTEM                    114

APPENDIX M: 2015 Currency Renaming Proposal: Crime-fighting, Conscientious Capital: A Quarter-Millenial Currency re:christening (Naming) Contest          120

APPENDIX N: "Bail Reform and Public Safety: Evidence from 33 Cities." Brennan Center for Justice. August 15, 2024                    121

# I. INTRODUCTION

## A. The Core Religious Conflict

1.  Plaintiff David Morris Clayman brings this pro se complaint under the Religious Freedom Restoration Act (RFRA), the First Amendment, and the Fifth Amendment to challenge a longstanding government practice: the printing (or minting) of the national motto, "In G-d We Trust," on U.S. currency and other government-issued documents like US Passports, and at the state level State Driver's Licenses and State Seals that get physically printed or stamped in full and are not safeguarded carefully and protected from unreligious destruction.

2.  For Plaintiff and others who observe strict Jewish practices regarding the sanctity of G-d's Name, this practice imposes a substantial burden. Under common American Jewish custom and personal religious belief, G-d's unredacted, unhyphenated name must not be desecrated or discarded or defiled by being carried in degrading environments like bathrooms, yet the Government routinely prints the full Name of G-d on materials that are treated like any other type of paper, walked billions of times a day into spaces Jews consider spiritually degrading like bathrooms where the print name of G-d should not be taken, and the prints of G-d's full name are destined for very routine, daily unreligious bulk destruction and disposal. This conflict renders Plaintiff unable to participate in normal economic life with the only Government-endorsed legal tender that exists in the United States without compromising his faith.

3.  The "sacred form" of G-d's vernacular English Name that I will refer to by that label from here on is the unhyphenated version with an "o" in the middle of "G-d" that is written here either not at all or as little as possible. You will only see the sacred forms (English and Hebrew) in the reproductions of the Talmudic Tractate Rosh Hashanah and Megillat Taanit in the slides inserted in the first appendix, and those pages if held or printed out in physical form (such as any kind of

paper) must be treated with extreme care and certifiably handed or mailed back to the Plaintiff at the end of this proceeding please, as a religiously and legally necessary courtesy.

## B. Relief Sought

4. Plaintiff respectfully seeks declaratory and injunctive relief to:

a. Prevent the future printing or minting of currency bearing the unhyphenated Name of G-d and redesign the currency and motto or motto-name accordingly;

b. Provide alternatives for religious objectors, including secular motto designs ideally promoted up to the very title of the currency, ideally with Apollo-mission-accelerated[1] modernized currency easily identifiable for those with disabilities like blindness or visual impairment under joint Court-ordered compliance with the outcomes of this case and *American Council for the Blind v Paulson* (525 F.3d 1256 (D.C. Cir. 2008));

c. Reform cash bail systems and public services to permit no-fee or very, very low-fee payment alternatives, to prevent 8th Amendment cruel and unusual punishment solely via refusal of the jail and detention systems to accommodate alternative very-commonly-relied-on highly portable means of currency for "cash" bail payment, like checks, credit cards, and debit cards, and all other means of payment accepted by the US

---

[1] By "Apollo-mission accelerated", I specifically mean release in under 6 years, 10 months, and 8 days – the time it took from John F Kennedy's Rice University speech on September 12, 1962 to the Apollo 11 moon landing on July 20, 1969. It should not take more time than the time required to land a human on the moon to redesign and steadily reprint / remint our currency at full printing and minting capacity. Jews and the blind and visually-impaired should not have to wait more time than that for the fulfillment of relief. It is unconscionable that the blind and visually impaired have already waited , a policy project that was first declared by the American Council for the Blind (ACB) on July 7, 1972 and still is being slow-walked by the Treasury Department. Injunctive relief was granted to the ACB on October 3, 2008 by the District Court for the District of Columbia. As of the date of revision, the blind and visually impaired have been waiting 16 years, 10 months, and 23 days for relief. As of today, 16 years and 10 months later, no banknotes, including the $1, $5, $10, $20, $50, and $100 have been redesigned. Plaintiff asks for a hard deadline for currency redesign appropriate for Jews like me, the blind, and the visually impaired, firmly within the Apollo mission timeframe of 6 years, 10 months, and 8 days dating from the date of initial docket entry of this *Second Amended Complaint*.

Treasury for tax payment or by the Courts for certified copies of court records – going beyond brutish exclusive acceptance of physical legal tender by Court order;

d. Require the Government to make some flexible religious accommodation for the Plaintiff, others in similar circumstances, and current prisoners, with an alternative form or mix of legal tenders consistent with his and their religious practices in all private or public commercial settings, whether that means universal acceptance of debit cards, credit cards, FedNow, ACH, bank wire, Zelle and other common digital payment rails, including part-social payment rails like Venmo, or a modern Central Bank Digital Coin (CBDC), as studied by the Federal Reserve, and provide adequate and fair reasonable access to secure payment devices or terminals to effectuate such payments even in custodial settings, whether for bail, phone or video calls, or for commissary[2] and other secure uses;

e. Compensate for burdens suffered under the Fifth Amendment's Takings Clause and via RFRA statutory mechanisms.

5.   This complaint also proposes a longer-term solution: the establishment of a creative national contest to select a new, pluralistic motto and currency title, aiming to unify Americans through shared civic religious values, not sectarian claims that "overshoot" on religiosity, complicating or burdening any American's use of American currency and American legal tender.

---

[2] The current horrible, indefensible, paradoxical Catch-22 limitations on prisoner payments access for "cash" bail and commissary are a reflection of the fact that our otherwise voter-eligible prisoner population often is prevented from voting in local, state, and federal elections due to a mix of retrograde anti-democratic anti-suffrage laws, disconnecting felons and other prisoners from civic rights and dialogue when they need it and often need active civic reeducation, civic reflection, civic religion (of which the greatest rite is the right to vote), and civic rehabilitation the most. The Plaintiff believes universal Constitutionally-guaranteed prisoner suffrage for US citizens above voting age, with no permissible exceptions, would prevent such gross abuse and secure just change, including motivating politicians and legislators to actually visit and talk to the jailed and imprisoned and understand their unique needs, but forcing a voting rights guarantee for prisoners is a topic for which I thankfully currently lack "case or controversy" particularized-harm standing.

## II. JURISDICTION AND VENUE

6.   This Court has jurisdiction pursuant to:

○   28 U.S.C. § 1331 (federal question jurisdiction)

○   28 U.S.C. § 1346(a)(2) (claims against the United States)

○   28 U.S.C. § 1361 (mandamus)

○   42 U.S.C. § 2000bb-1(c) (RFRA)

○   US Constitution, 1st Amendment, 5th Amendment & 8th Amendment

7.   Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) and (e) because Plaintiff resides in this district at 7930 Palacio Del Mar Drive, Boca Raton, FL 33433-4148, and substantial events giving rise to this Complaint occurred here.

## III. PARTIES

### A. Plaintiff

8.   **David Morris Clayman** is a resident of Boca Raton, Florida, and a practicing roughly Conservative Jew whose religious beliefs require the utmost care and respect for the sacred unhyphenated name of G-d, in vernacular, in its dominant sacred form in any language he learns ("Mon Di-ux!" (FR), "¡Di-os mio!" (ES)), and of course also the expanded set of seven Holy Names in the tongue of Hebrew, including the holiest of all, the unpronounceable Tetragrammaton (in Hebrew letters, "Yud - Hay - Vav - Hay"). The Plaintiff is a business owner (*Lifesaver Labs Public Benefit Corporation*, a Delaware Public Benefit Corporation) and software engineer who is building mobile software to prevent sexual harm like sexual assault and weak or single-layer birth control choices causing unplanned pregnancy and highly avoidable abortions, is an investor who switches between concentrated equity bets and diversified index fund

strategies but religiously must try to avoid investments in American-cash-destroying banks or indexes that hold them, and has lately started running for Commander-in-Chief, Precedent, and President of the United States for 2028 and beyond, planning to run as part of a Presidential/Precedential Trinity team of three anchored formally by one candidate who shares power with two others. Please note the realization and struggles that precipitated and formed this case far far predate his decision to run for Precedency, but are yet one more example of his overwhelming frustration at being, like so many other Americans, relegated to the role of a Non-Player Character (NPC) in American democracy for lack of ability to have his grievances and needs on this and so many other important issues resolved through pleading with his legislators or the Executive Branch, needing instead to resort to this complete religious rights claim in the Courts for lack of relief from the political branches who have been joined in opposition to this clear and convincing pleading.

9.   Pursuant to the religious history of Talmudic Tractate Rosh Hashanah 18B, Plaintiff refrains from the use of currency or documents of any kind superfluously bearing the unhyphenated name of G-d, particularly when used as a central design element as we see on the banknotes and coins of United States currency, due to religious obligations detailed in the Talmudic Tractate Rosh Hashanah 18B4 and followed assiduously by his forebears, the Hasmonean Jews in the time of the Maccabees after the Maccabean Revolt.

## B. Defendants

10. **Scott Bessent**: Secretary of the Treasury, sued in his official capacity for overseeing the printing, minting, destruction and desecration of currency pursuant to 31 U.S.C. § 5112, 31 U.S.C. § 5120. Service: c/o Office of the General Counsel, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, NW, Washington, DC 20220.

11. **United States of America**: The federal government as a whole, responsible for implementing and enforcing the challenged policies. Service: 500 E Broward Boulevard, Ft.

Lauderdale, FL 33394, and U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

12. **Senate and House of Representatives of the United States**: The legislative bodies responsible for enacting the statutory requirements regarding currency design and content. The Senate shall be served through the Office of Senate Legal Counsel (642 Hart Senate Office Building, Washington, DC 20510) and the House shall be served through the Office of the General Counsel of the House of Representatives (219 Cannon House Office Building, Washington, DC 20515). This case would have been much easier to handle if Senate and House members had reacted sensitively to this religious design concern 10 years ago when it was first brought to their attention but ignored (multiple times on multiple trips to DC). We would have had a 10 year head start, and any attempted redesign and reissuance of currency might have been completed by now.

13. **Jerome H. Powell**: Chair of the Board of Governors of the Federal Reserve, sued in his official capacity, responsible for determining currency fitness and overseeing its destruction and desecration under 31 CFR Part 100. Service: c/o Office of the Secretary, Board of Governors of the Federal Reserve System, 20th Street and Constitution Avenue, NW, Washington, DC 20551.

14. **Gene Louis Dodaro**: Comptroller General of the United States, sued in his official capacity, tasked with auditing currency cancellation, destruction, and desecration under 31 U.S.C. § 5120. Service: c/o Office of the General Counsel, U.S. Government Accountability Office (GAO), 441 G Street, NW, Washington, DC 20548.

15. **Donald John Trump**, President of the United States, is sued here in his official capacity in light of his very recent and highly relevant exercise of executive power through the August 25, 2025 Executive Order 14342 ("Taking Steps To End Cashless Bail To Protect Americans"). That Order applies maximum federal pressure against jurisdictions such as Illinois—where my sibling

resides and where I regularly or may travel—as well as chilling all other jurisdictions contemplating the adoption of cashless bail.

# IV. FACTUAL ALLEGATIONS

## A. Sincere Religious Beliefs and Historical Foundation

16. Plaintiff adheres to the teachings of Tractate Rosh Hashanah 18B4 and Megillat Taanit. **Please attempt to read in full and fully understand this chapter of Jewish religious history** as disclosed in the inserted PDF slide presentation "Hasmonean History - Shaimos (i.e. Protected Names of G-d) on BCE Debt Notes" before going any further. **Please treat these pages that follow extremely carefully. They contain intact unhyphenated prints of G-d's Holy Name, not just in sacred form in the English languages but also in the tongues of Hebrew, which practically all religious Jews consider to be even holier and more sacred than English, or any other language or dialect. If you have a print copy of this, the print copy must be treated with the utmost respect and returned to the Plaintiff for religious storage in a genizah (a temporary religious holding site for documents destined for religious burial) and ultimately religious burial when this case closes.**

17. This chapter of history detailed in Talmudic Tractate Rosh Hashanah 18B4 and in Megillat Tanit was so important to the Jewish people in Israel that there was a holiday on the Jewish calendar on that day to celebrate the elimination of G-d's Name from debt notes, until mourning the political assassination of Gedaliah the Governor 400 years earlier with a fast day that most religious Jews still observe (the annual "Fast of Gedaliah") was ultimately deemed to re-overweigh the importance of continuing to celebrate the elimination of G-d's Name from debt contracts.

18. To simplify the history: if I had to compare this to US civic religious holidays, it would be as if Presidents' Day, Flag Day, or St. Patrick's Day were originally celebrated on September

11th, until the World Trade Center attacks replaced the celebratory day with a major mourning day that outweighs the original celebration and lasts millennia, until most Americans forget we ever had the original holiday on that date. But that does not obviate the civic religious or sectarian religious significance of these original celebratory days!

19. If this RFRA case succeeds, pending final legal success, I plan to revive the Hasmonean Maccabean tradition and celebrate with my future family a minor new American or Jewish American celebratory holiday on the day that the final judgment is rendered, which I deeply hope will be decided substantially before and effectuated with orders and responsive draft designs no later than July 4th, 2026 on the quarter-millenial celebration of American freedom.

20. In the case *New Doe Child No. 1 v. Congress of the U.S.*, 891 F.3d 578, 591 (6th Cir. 2018), the sincere religious belief of the Plaintiff was accepted and went unchallenged. In the instant case, there has been no effort by the US Attorney to question the sincerity of my faith and any such effort would be very swiftly knocked down.

21. For the sake of legal completeness, the Plaintiff wishes to point out that beyond being a somewhat atypically logically consistent American Jew on the question of protecting the vernacular Name of G-d in all physical non-digital media forms, he is also properly ordained as a Universal Life Church (ULC)[3] Minister. He attained ULC ordination on September 1, 2014 after realizing in August 2014 that he could not use United States cash any longer and might need to challenge the machinery of the Government on its cash printing and coin minting practices. Plaintiff sought ordination on the belief that formal legal clergy status as recognized under federal law would help him exercise his independent religious conscience without having to dedicate himself and divert his life for four long years of rabbinic study to attain rabbinic semichah

---

[3] The Plaintiff wishes the Universal Life Church had a legal division called the Universal Life Synagogue (ULS) that better matched the Plaintiff's religious identity, but while ULC aims to be maximally non-denominational, representing all faiths under preferred assembly language (church, synagogue, mosque, temple, etc.) is understandably a non-trivial lift.

(rabbinic ordination) and the complete ordination appropriate to extremely well-rounded all-purpose Jewish religious leadership. Plaintiff has a great deal of respect for those who finish rabbinic semichah and does not pretend to be anywhere near as well-trained as rabbis on general matters of Jewish law. However, the Plaintiff is sufficiently expert on this question of the protection of G-d's vernacular Name to press forward with this case as an individual citizen, as an American, as a Jew, as an American Jew, and as a ULC Minister almost solely focused on civic and civil religious questions under RFRA with a secular (worldly) foundation, such as previously civic religious major organ donor incentives to preserve life, and here civic religious currency reform. Previous case law all around the country consistently supports the full legal recognition of ULC ordination. ULC Ministry comes with only two core tenets, which the Plaintiff abides assiduously by:

a. Do only that which is right.

b. Every individual is free to practice their religion however they like as long as their actions do not impinge upon the rights or freedoms of others and are in accordance with the law.

22. Judaism, by comparison, has a much more exhaustive set of ritual and belief requirements. But to settle the question of whether I'm Jewish or not by any standard, the Plaintiff's mother is Jewish by Orthodox standards and the Plaintiff has followed the necessary Jewish rites. No one can reasonably question whether the Plaintiff is Jewish. While the Plaintiff like the majority of American Jews sometimes frankly has some doubts about the scientific existence of G-d in biblical form in our modern world, he has faith in G-d nonetheless and follows religious practices consistent with Conservative or Traditional Judaism. Plaintiff's religious belief operates on a Pascalian wager, and his belief grounds him and provides him with a tremendous sense of purpose and focus on preserving life and death.

## B. Jewish Law and Currency Practices

23. Plaintiff adheres to Jewish laws and customs, including the principle of avoiding the unnecessary destruction or desecration of sacred texts and names, of which there are seven holy names in Hebrew and, for the Plaintiff, one (G-d unhyphenated) in English and one sacred form in almost every other commonly spoken language the Plaintiff learns or translates to.

24. Under Jewish law, custom, and tradition, many Jews like the Plaintiff believe not just the Hebrew names but also the dominant name of G-d in languages like English must generally be hyphenated (e.g., "G-d") on secular documents to prevent the intact sacred name from being desecrated if mistreated or from getting diluted or treated superfluously. That belief is based on the following passage from Rosh Hashanah 18B4, which is explained again more patiently in the attached slide presentation:

מוֹתֵיב רַב אַחָא בַּר הוּנָא: בְּתְלָתָא בְּתִשְׁרֵי בְּטֵילַת אַדְכַּרְתָּא מִן שְׁטָרַיָּיא. שֶׁגָּזְרָה מַלְכוּת יָוָן גְּזֵרָה שֶׁלֹּא לְהַזְכִּיר שֵׁם שָׁמַיִם עַל פִּיהֶם, וּכְשֶׁגָּבְרָה מַלְכוּת חַשְׁמוֹנַאי וְנִצְּחוּם הִתְקִינוּ שֶׁיְּהוּ מַזְכִּירִין שֵׁם שָׁמַיִם אֲפִילּוּ בִּשְׁטָרוֹת. וְכָךְ הָיוּ כּוֹתְבִים: בִּשְׁנַת כָּךְ וְכָךְ לְיוֹחָנָן כֹּהֵן גָּדוֹל לְ-ל עֶ-יוֹן.

It is stated in *Megillat Ta'anit*: **On the third of Tishrei the** ordinance requiring the **mention of** G-d's name **in** legal **documents was abolished,** and on that day fasting is forbidden. **For the kingdom of Greece had issued a decree** against the Jews **forbidding them to mention the name of Heaven on their lips. When the Hasmonean kingdom became strong and defeated** the Greeks, **they instituted that people should mention the name of Heaven even in their** legal **documents. And therefore they would write: In year such and such of** Yoḥanan the High Priest of the G-d [לְ-ל עֶ-יוֹן] Most High.

וּכְשֶׁשָּׁמְעוּ חֲכָמִים בַּדָּבָר, אָמְרוּ: לְמָחָר זֶה פּוֹרֵעַ אֶת חוֹבוֹ וְנִמְצָא שְׁטָר מוּטָּל בָּאַשְׁפָּה, וּבִיטְּלוּם, וְאוֹתוֹ הַיּוֹם

עֲשָׂאוּהוּ יוֹם טוֹב. וְאִי סָלְקָא דַעְתָּךְ בָּטְלָה מְגִילַּת תַּעֲנִית — קַמַּיְיתָא בְּטוֹל, אַחֲרָנְיָיתָא מוֹסִיפִין?!

**And when the Sages heard about this they said: Tomorrow this one,** the borrower, **will repay his debt,** the lender will no longer need to save the loan document, **the document will be cast on a dunghill,** and the name of Heaven written there will come to disgrace. **And** so **they annulled** the ordinance to mention G-d's name in documents, **and they made that day into a Festival.**

Source:

https://www.sefaria.org/Rosh_Hashanah.18b.15?lang=bi&with=all&lang2=en

25. While it is very common for American Jews to hyphenate the Name of G-d in their own writing practices, it is not common yet for American Jews to realize the logical extension is a need to protect United States currency from bathrooms and end-of-life careless destruction. The Plaintiff acknowledges his practices with currency are very rare currently among American Jews, possibly wholly singular, but whether typified and classified under Jewish law as a religious legal requirement, custom, or strict idiosyncratic chumra[4] ("a fence around the law"), these practices reflect the most logical extension of the underlying religious beliefs of hundreds of thousands or even millions of American Jewish "hyphenators" (of the Name of G-d) like me. Analogous civic religious protections can be seen in American law as applied to the proper recommended display

---

[4] A chumra is a "fence about the law", meaning any rigorous Jewish practice that goes beyond the established narrow most understanding of what's necessary under Jewish law. Some chumras have become halakhic Jewish laws. For instance, anyone who takes the prohibition to not "boil a calf in its mother's milk" to mean that chicken meat (hens do not even produce milk and don't have calves) can not be consumed within X number of hours of drinking cow milk have taken on a chumra as law. Choosing to wait six hours instead of three between meat and milk consumption is a commonly passed-on minhag (family tradition) as well as a chumra for those who take such on beyond what they were taught by their nuclear family to be strictly necessary. It's worth mentioning that chicken meat can curiously be eaten under Jewish law with chicken eggs but not with cow milk, all under rabbinic extensions to this prohibition of not "boiling a calf in its mother's milk". In Jewish law not all rules need to make sense to us mortals to be considered valid and binding Orthodox law. These are some illustrations of chumras, minhags, and Halachic laws.

and disposal of the American flag under 18 U.S. Code §700, "Desecration of the flag of the United States; penalties". and 4 U.S. Code §8 "Respect for flag".  These codes require ceremonial destruction of the flag when worn. Similarly, under Judaism, there are conventions and religious requirements for respect and disposal for the Name of G-d (unlike the American flag burning is strictly disallowed; ceremonial Jewish religious burial is permitted), and the Government is not and most People in the United States are not cautiously abiding by those strictures, making it difficult or typically impossible for Plaintiff Clayman to transact in cash with them.

26. There is a religious question in Judaism whether the vernacular names of G-d must be religiously protected as *Shaimos* and be hyphenated or otherwise abbreviated on secular documents and documents that won't be cared for with religious burial and avoidance of unclean surfaces or rooms (notably, being placed or falling on the floor or being walked into bathrooms). The Plaintiff has attached a new appendix from Chabad.org by Rabbi Yehuda Shurpin titled "Why write 'G-d' Instead Of 'G-O-D'?"  In that appendix, you'll see that the consensus opinion as summarized by him converges on protecting the Name of G-d in English vernacular out of precaution, with many like me believing it's not just a precaution but necessary. The Plaintiff follows the opinion that the vernacular names of G-d in their dominant, most sacred form – the dominant form that native and second-language speakers anchor their understanding of G-d to in that language –  must be religiously protected. There are many who believe only the Hebrew Names of G-d need to be protected. That's also a principled philosophical stance, but not the most religiously tolerant or understanding, considering that Jews like me who can't speak, listen, read, or write Hebrew fluently relate to G-d mostly and arguably often most meaningfully in our vernaculars.

27. This belief is not "self-imposed". Plaintiff does not "choose" to abstain from currency out of preference; his faith and understanding of Jewish law and legal custom prohibits use of the unhyphenated Name, under the rulings of the Sages above in Hasmonean times. This is a

central belief of the Plaintiff that Plaintiff is forced to follow connected to the Third Commandment to not take the Name of G-d in vain and the prohibition on the erasure of G-d's Name, provisions that outrank almost all other religious requirements as fundamental to the sacred relationship we have, build, and acculturate to with G-d. Courts may not question the centrality of a belief under RFRA (*Burwell v. Hobby Lobby*).

## C. Government Currency Destruction Practices

28. The lifespan of banknotes is quite short, particularly from G-d's geological timescales. About 15% of all currency Americans deposit into banks gets destroyed as "unfit for circulation." The Federal Reserve destroyed about 136 million banknotes in 2022 alone—372,000 banknotes with G-d's Name shredded unceremoniously each day.

29. Currency lifespans:

a.  $1 bills: 6.6 years

b.  $5 bills: 4.7 years

c.  $10 bills: 5.3 years

d.  $20 bills: 7.8 years

e.  $50 bills: 12.2 years

f.  $100 bills: 22.9 years

30. About 70% of all "new" banknotes printed are just replacements for currency the Federal Reserve shreds daily. In a typical American lifespan of 77.5 years, the sacred name on a $1 banknote would go through 11.7 "half-lives."

31. **It's even more painful from a Jewish religious continuity perspective that the Government relies on cash destruction machinery made by Giesecke & Devrient.** Giesecke & Devrient is a German firm with a shameful Nazi history and historical affiliation. They served the Axis Powers in World War II, helped industrialize currency printing in Hitler's Third Reich, trafficked in blood money as suppliers of Reichsmarks, and knowingly counterfeited

British banknotes in Operation Bernhard. This is the same company, I understand, that facilitates the destruction of G-d's Name on US currency today in gross and obscene violation of my understanding of the needs of Jewish custom.

## D. Coins

32. While coins last longer than banknotes, they are treated often even more disrespectfully and carelessly—often ending up on floors, in dirt, or lost in couches. Almost no one adequately respects the Name of G-d on pennies, nickels, or dimes.

## E. Federal Reserve Inflation Programmatically Devalues The Sacred Name of G-d

33. **The Name of G-d should not lose over half its inflation-adjusted value over 50 years, with a stated Federal Reserve target of *diminishing the value of G-d's Name by 2% per annum.*** A quarter (25¢) whose value is guaranteed by the Name of G-d from 1986 has fallen to an equivalent of 8.5¢ today. If currency bears G-d's Name, it should appreciate through deflation or perfect monetary steadfast stability, not diminish through programmed inflation.

## F. Substantial Burdens on Plaintiff

34. Plaintiff has been unable to use or circulate cash currency since 2014 because of this. Because non-Jews and most Jews don't yet protect G-d's Name on currency as strictly, the only persons with whom Plaintiff can transact are astute currency collectors dealing with highly collectible specimens or lifesaving organizations that convert cash into stochastically strongly probabilistic or definite lives saved (under the overriding religious duty to preserve life).

35. In the Sixth Circuit case *New Doe Child No. 1 v. Congress of the U.S.*, 891 F.3d 578, 591 (6th Cir. 2018), the attorney representing the Plaintiff then did not attempt to exhaustively list the

many substantial burdens that the Plaintiff suffered as a result of this government policy of printing the vernacular sacred Name of G-d on banknotes and minting it on coins. The Plaintiff, as a religious Jew, was unique among those Plaintiffs both on the basis of his belief and also in that the Plaintiff, unlike the other Plaintiffs, completely abstained from any use of cash or coin for 11 plus years now, with no capability to switch to coin or cash when compelled by circumstances. As a result of not being presented with a full list of Plaintiff's substantial burdens, the Sixth Circuit and the Ohio Northern District Court erred in their belief that Plaintiff did not suffer substantial burdens under the meaning of RFRA law, given existing case precedents.

36. Plaintiff has experienced numerous hardships:

**a. Cash-Strict Legal Tender Bail Payment Policies Imperil Plaintiff's Legally Innocent / Presumed Innocent Pretrial Freedom**

The Plaintiff has experienced numerous hardships arising from cash-strict bail policies. Chief among them is the unconscionably prolonged detention imposed solely because the Plaintiff's sincere religious beliefs prohibit use of legal-tender banknotes, combined with jails' refusal to accept alternative forms of payment. Even a single day of such detention constitutes cruel and unusual punishment under Robinson v. California, 370 U.S. 660 (1962), and a substantial burden under RFRA.

This burden is examined in much greater detail with enormous specificity in Section I, "Exhaustive Detail on Pretrial Detainment for Lack of Legal Tender" below, supplemented by an Appendix, "Discussion of Potential Future Arrest Risk".

**b. Inability to Pay for Everyday Transactions**: Plaintiff is excluded from cash-only services like coin-operated laundromats, cash cover entry fee bars, cash cover entry social events like the Latin Dance events he would have loved to go to more often, and

cash-only street food, limiting his ability to participate in communal activities, infringing on his 1st Amendment Freedom of Association and interfering with his ability to travel freely to areas of the United States that are more cash-reliant, like Puerto Rico or other states and territories or more impoverished, unbanked, or more demographically elderly or very young areas of the country where cash use is still very heavy. As a former teacher in school systems that cater to a young demographic base of customers that are heavily cash-reliant, the Plaintiff was often unable to pay for subsidized faculty school lunch at the cash register because only cash was being accepted for payment.

**c. Significant Added Surcharges**: Over 11 years, Plaintiff has paid over $1,000 in religious belief surcharges—coffee shops charging 50¢ surcharges on credit transactions under $10, gas stations offering 10¢/gallon cash discounts he can't use, skydiving companies charging $200 cash but $220 credit.

No Court has ever ruled before on whether cash-only surcharges ("**thousand papercut injuries**") constitute substantial burdens when they are shown to aggregate, be experienced, and be unavoidable, as they are alleged to be in this present case, and as the Government does not dispute the facts of.

**d. Travel Cash Toll Risk and Remaining Public Transit Legal Tender / Cash Reliance**: Plaintiff must plan road trips carefully to avoid cash-only tolls. On one trip from Ohio to Canada, his father had to pay a cash toll over Plaintiff's strenuous objections. Because of his inability to pay cash into the till, for a very long time riding on PalmTran was hell; Plaintiff hasn't attempted to ride PalmTran for over 6 years since before the introduction of the Paradise Pass in 2021, even though he's historically been extraordinarily committed to the civic virtues of public transit reliance, because of his quite terrible experiences getting

stranded or inconvenienced in extremely awkward places for lack of cash methods of payment, and the awfully inconvenient methods PalmTran used to have for purchasing farecards without cash (back before Paradise Pass, it used to basically require a special 1 hour+ trip to PalmTran headquarters). Both of these problems are getting substantially less difficult in the top 250 American cities by population to manage over time versus 2014 when I first refrained from cash, with further and more widespread adoption and penetration of cashless payment methods, but it still requires more preplanning for me to get around than for anyone else who could flexibly switch to cash if, for instance, they enter a tollroad anywhere in the country that doesn't accept or partner with SunPass or if they hop onto a bus for which they don't yet have a local card-purchased prepaid transit card.

**e. Emergency Preparedness Challenges**: Plaintiff cannot hold cash for natural disasters when electronic systems fail. Plaintiff lives in Florida currently, where hurricanes are an annual life-threatening phenomenon. How does this Court expect the Plaintiff to fend for himself when a hurricane hits Palm Beach County hard and electronic payment systems go down when steady access to funds is needed the most and lack of access to legal tender is most grave?

**f. Privacy Invasion With No Escape**: Exclusive reliance on digital payments subjects all transactions to invasive diligent government and corporate surveillance and review stretching all the way back to 2014. Unlike others, because Plaintiff can not use cash Plaintiff can not and does not have the freedom to "live off the grid" without reverting to the most primitive barter, which is obviously a non-starter. Plaintiff cannot even buy condoms, lubricant, marijuana, or pregnancy tests without the federal, state, and local Government knowing or being able to pry into my life via any complaisant Court order or subpoena.

**g. Accumulation of Inert, Frozen Currency Barred from Recirculation**: Plaintiff received $1,485 in United States federal reserve banknote wedding gifts he could not use. His only justification for depositing was making an equivalent donation to life-saving charity under pikuach nefesh, the overriding Jewish religious obligation to preserve life, mirrored in the Plaintiff's understanding of American religion as the "lifesavers override".

**h. Disrupted Employment Opportunities**: Plaintiff cannot competitively work as a bank teller, Starbucks barista, Panera employee, waiter, street vendor, delivery driver, parking attendant, anything involving cashier duties, male stripper[5], Federal Reserve employee, or serve on banking committees without imposing an undue burden on business operations unless I achieve currency reform change. Plaintiff has talked to managers at his local Starbucks about working as a barista; they say religious accommodation is likely impossible, given that any employee must and is expected to be free to shift into working any and all other roles behind the bar, including the cash register, for which it would be an undue burden on the business if I were to frictionally and insistently object to accepting cash from every customer who offers or can only pay in cash.

**i. Disrupted Childhood Experiences for Future Children and Painfully Uncomfortable Substitute Teaching Classroom Experiences**:
Plaintiff cannot responsibly teach his future children about money by involving them in the circulation of current U.S. currency, which he views as part of an "early Hasmonean" cash system. His children could not operate something as simple as a lemonade stand or accept cash unless the proceeds were immediately donated to lifesaving charity, or unless life itself were at stake.

As a former teacher, Plaintiff also observed firsthand how prominently "In G-d We Trust" appears in elementary school currency handouts, creating discomfort when teaching

---

[5] Please forgive me for joking. Aside from this stripper reference, this complaint is deadly serious.

diverse groups of students. While working as a substitute teacher in Illinois, Plaintiff—though a monotheist himself—was deeply uncomfortable instructing six- and seven-year-olds, some of whom might be polytheists, atheists, or agnostics, to use worksheets marked with the National Motto. He could not reasonably ask these children or their parents whether the motto aligned with their beliefs, nor could he protect the handouts from reuse once they had come into his custody, conflicting with his religious impulse to safeguard the Name.

Plaintiff contends that sectarian, sacred-tinged teachings have no proper place in the public school curriculum outside of a World Religions or U.S. Religions curricular context. Indeed, the Government itself seems to tacitly acknowledge this: many of the Bureau of Engraving and Printing's own children's storybooks on currency, distributed through the U.S. Currency Education Program, conspicuously omit depictions of the motto[6]—likely to avoid Establishment Clause challenges. Yet other government educational materials, such as U.S. Mint Coin Classroom coloring pages, do feature it[7], creating direct conflict for teachers or substitute teachers like Plaintiff.

Plaintiff accepts that civic and civic religious education is a proper and important role for public schools. But requiring teachers to direct young children to read, recite, and internalize "In G-d We Trust" in the context of learning to count and appreciate money crosses the line into sectarian instruction, in a manner that imposes "early Hasmonean" practices on everyone in the United States population. For Plaintiff, this constitutes an Establishment Clause and Free Exercise violation and a substantial burden on religious exercise under RFRA. On at least three separate occasions in Illinois, Plaintiff was required to deliver this exact "In G-d We Trust" currency counting lesson to kindergartners.

---

[6] https://www.uscurrency.gov/sites/default/files/downloadable-materials/files/en/play-money-coloring-sheets-en.pdf
[7] https://kids.usmint.gov/resources/coloring-pages

Looking forward, he wishes to remain engaged in education—both when his own children attend elementary school and later in retirement—but he cannot in good conscience continue teaching lessons or assuming responsibility for lessons that force him to evangelize or promote the state-endorsed motto to impressionable children from pluralistic and undifferentiated backgrounds. Absent a secular revision of the motto or curriculum reform, Plaintiff is left with no way to comply with both his religious obligations and his once-and-future professional role as an educator.

### j. Difficulty Tipping/Donating to Service Workers and the Needy:

Plaintiff needs 2-3 minutes to tip via Zelle instead of 10 seconds with cash. That makes the kinetics and reaction speed donating to panhandlers or roadside sellers nearly kinetically impossible.

Many times driving to Aventura, FL I wanted to buy roses or other flowers for my now ex-wife from roadside vendors coming off the highway at the Ives Dairy or Hallandale Beach Boulevard exits. I couldn't ever buy her flowers that way because the transaction time required to buy flowers without cash was too high to fit within a red light cycle; it would have been irresponsible and a probable violation of law for me to hold up traffic trying to negotiate a Zelle or other digital cash transfer roadside.

This fairly severe and substantial burden interfering also with equal 1st Amendment freedom of association also manifests in more subtle yet deeply impactful ways. Just about a month or two ago, Plaintiff received a $5.00 digital payment via Venmo from his brother-in-law, with the specific religious intention that Plaintiff donate the funds to a homeless/unhoused person upon reaching his destination, in observance of the Jewish tradition of giving to the needy. Upon arriving in Florida, Plaintiff encountered an apparently homeless individual outside a 7-Eleven and attempted to fulfill this mitzvah. However, the individual lacked access to Zelle or Venmo and was either unable or

unwilling to establish a digital payment account at that moment, claiming technical illiteracy. As a result, Plaintiff was unable to complete the donation.

This incident underscores a broader and recurring burden: non-cash alternatives only function when both and all parties are equipped, able, willing, and have the time and commitment to use them. Plaintiff cannot compel others—especially vulnerable or marginalized individuals like the 2-3% of American households that are strictly legal-tender-cash only—to adopt or associate through these digital payment methods. This imposes a constraint not only on his religious practice but also on his freedom of association, as Plaintiff is functionally excluded from transacting with individuals and businesses that choose to only accept physical cash on the incorrect supposition that everyone can withdraw and use cash if they wish. Many in the United States, including those who are unbanked or digitally disconnected, are simply unable to participate in cashless exchanges.

Plaintiff has experienced increasing social and commercial isolation since he ceased using government-issued cash in 2014 for sincerely held religious reasons. Simple acts of generosity, such as donating to the homeless or offering tips, have become practically impossible within a reasonably short and spontaneous span of time. In the recent example, the unhoused man was deprived of a meal that day—not because Plaintiff lacked the funds or will to help, but because the Government's coercive cash-based motto policy arbitrarily severed the means of connection between Plaintiff and the recipient.

**k. Inability to Walk Sinlessly into Bathrooms with Currency**: Like any Shaimos, Plaintiff must guard G-d's Name from bathrooms and any other places considered too filthy for the Name of G-d to be uttered or carried. He must leave wallets outside or

"double wrap" cash in plastic bags, which is an impractical, unlivable requirement when we're dealing with currency.

I challenge you to try walking around town for a week with cash in your wallet or purse never allowing yourself to walk into any bathrooms, public or private, with that wallet or purse bearing sacred cash within. It quickly becomes deeply burdensome and unmanageable -- every time nature calls you have to try to find a safe place to store or stow your wallet or purse unattended or entrusted to a stranger until you're relieved. It's not a minor inconvenience; it becomes an unliveable duty to guard cash you're carrying from the dual threat of theft on one hand or spiritual defilement on the other.

### I. Inability to Park in Cash-only Lots

Periodically I go to downtown Fort Lauderdale or Miami, and I semi-frequently encounter parking lots at major events or dense downtowns where I can't park. For instance, I'm not able to pay for parking in the cash-only lot at Le Tub in Hollywood, FL, which lacks good substitute parking alternatives nearby, and even after spending a long time explaining my religious beliefs the parking lot attendants refuse to accept anything other than cash for parking. Parking is hard enough to begin with; adding this in just makes it harder.

The worst experience I had with this was on a trip to Puerto Rico, where it wasn't even clear that I'd be able to get my car out of the lot after my ex-wife and I came back from a day of exploring and sightseeing. The parking lot's cash-only payment policies had not been made clear to us upfront.

While generally this is an "inconvenience" rather than a substantial burden, when I'm caught by surprise RE: payment method restrictions on parking debt settlement to legal tender like I was in Puerto Rico paying for my parking becomes a serious threat that could

even, in a state of failure or failed compromise, deprive me of freedom or lead to towing and impoundment of my car.

m. **Inability to Take Small Cash Donations in Small-dollar-committed Political Campaign**:

The Plaintiff is a candidate for the office of United States Precedent (commonly referred to as President) in the 2028 election. His campaign is built on an idealistic small-dollar strategy, intentionally structured so that even teenagers—whom he seeks to enfranchise—can participate as "max donors." The only contemplated exception is a potential separate fundraising initiative to support a national incentive pool for living kidney and liver donations, justified under a "Lifesavers Override" imperative to protect and preserve life.

This small-dollar (or "small CALM") strategy, paired with federal matching funds, would function far more effectively if the Plaintiff were able to accept spontaneous campaign contributions of any kind, including cash, particularly in high-traffic urban areas. Such funds could be directly deposited into his campaign committee's account to support outreach, including distributing Lifesavers candies and miracle berries with suddenly-sweet-tasting sour fruits, pushing the envelope of the Overton windows and financing voter-by-voter the development of a lifesaving policy platform and campaign team. However, due to his strict religious objection to handling U.S. currency bearing the unhyphenated Name of G-d, the Plaintiff cannot accept or handle cash donations and can not allow or accept anyone organizing on his behalf or on behalf of any campaign team he's a major player in (for instance, if an equal-third member on the proposed *Lifesavers Trinity* triumvirate Precedential committee) to do so either. He is limited to slower, more cumbersome digital payment methods, which reduce spontaneity and accessibility for a large swath of prospective donors and voters.

This religiously motivated restriction places Plaintiff Clayman's campaign at a uniquely severe disadvantage compared to other candidates. While every other campaign may accept and instantly use the full value of cash contributions—without alienating donors, without delay, and without incurring transaction fees—the Plaintiff's campaign cannot. Instead, every contribution must pass through credit-card processors or other intermediaries, effectively imposing a transaction-fee "tax" on his political activity that no cash-accepting campaign bears. Other candidates freely leverage small-dollar and spontaneous cash exchanges, whether through donations or low-cost campaign merchandise—buttons, t-shirts, or symbolic items such as Reagan's "Make America Great Again" (later adopted by Trump) or Andrew Yang's "Make America Think Harder" hats—to build grassroots momentum. Plaintiff, by contrast, is barred from this vital channel of political participation.

If the Court doubts that this constitutes a substantial burden, or finds the US Attorney's claims that I face no substantial burdens credible, Plaintiff respectfully invites the Court to consider a simple test: impose, even temporarily, a prohibition on all political candidates in this District—or nationwide—from accepting or using physical cash for a single quarter in the midst of campaign season, and freeze their cash assets until a future currency reform reaches near-total penetration. Such an experiment would expose the inadequacy of cashless alternatives within days. It would also provoke immediate litigation from major Democratic and Republican candidates, almost certainly including Fifth Amendment "Takings Clause" challenges to their seized petty cash funds—the very argument Plaintiff presses here, arising from his own prior wedding gifts in U.S. currency that he cannot use because of the religious compulsion embedded in the national motto.

If this Court would hesitate or refuse to impose such a restriction on other presidential candidates in 2026 or 2028 to "level the field," then it must recognize that Plaintiff's

inability to use cash is not theoretical but a real, ongoing, and constitutionally significant burden on his rights to political participation and religious freedom. While one appellate court in *New Doe Child No. 1 v. United States* declined to credit this precise rationale, Plaintiff submits that his present circumstances are distinguishable: this is a different circuit, a different election cycle, with an actual and active candidacy at stake rather than a theoretical one. Estoppel cannot foreclose this claim, which is ripe for full consideration on the merits.

### n. Disrupted Investment Freedom

The Plaintiff does not feel religiously free to invest in banks that help destroy sacred cash per current law and Federal Reserve policy. As such, the Plaintiff can not invest in concentrated bank stocks or other cash-destroying businesses, and is forced to invest in narrow sector index funds rather than safer, more diversified broad index funds like the S&P 500, which currently holds at least 9 traditional or diversified banks (Bank of America, Citigroup, etc.) which I should not hold stock in, directly or indirectly, until they succeed in protecting G-d's Name on currency. To be transparent, I once recently traded into the S&P 500 in an effort to match my investments to the general US economy, around the time that I realized I might have to run as a placeholder for the Precedency or Precedential Trinity Team. But I traded out of that position and am back in a more risky tech industry fund that doesn't contain any depository institutions. The only real financial institutions it contains are Mastercard and Visa, which advance cashless society standards.

### o. Psychological Derailment of Cash-primed Frugality

Major credit card companies, economists, and behavioral researchers have documented for decades that reliance on credit cards gradually erodes vigilance over spending. By contrast, the physical act of handing over a dwindling number of banknotes or coins

naturally prompts individuals to second-guess their choices and moderate their pace of spending. Entire budgeting systems, such as the "cash-envelope" method, are built on this dynamic to help households remain within strict financial limits. Yet I am categorically unable to draw on these tools—even partially—to re-anchor myself in disciplined, cash-based frugality.

Over the years, I have observed in myself an unwanted drift toward less frugal habits, a drift that I cannot easily restrain without the tangible cues of cash—touching it, parting with it, and feeling its absence in everyday transactions. This is not speculative or anecdotal: the frugality-enhancing effect of cash is among the most well-established, robust, and reproducible findings in economic psychology, grounded in measurable neural mechanisms[8]. Denied access to cash, I am forced into a higher-effort, higher-willpower struggle simply to impose on myself the same restraint that cash naturally and predictably instills.

I should not be placed at this systemic disadvantage—subject to the "step-on-the-gas" psychology of credit card spending—yet the Government, by refusing to accommodate my religious belief, has done precisely that. For more than eleven years, it has substantially burdened me with a steady stream of "death by a thousand papercuts" economic injuries in heightened debit or credit card-reliant spending, undermining my ability to live in accordance with my faith and maintain the frugality that holding and experiencing the more tangible loss-aversive pain of paying and losing cash uniquely supports.

---

[8] "MIT Sloan Study Shows Credit Cards Act to Step On Gas To Increase Spending". https://mitsloan.mit.edu/press/mit-sloan-study-shows-credit-cards-act-to-step-gas-to-increase-spending?utm_source=chatgpt.com

**p. Punishing, Prohibitive Barriers to Retail Entrepreneurship and Investment of any kind due to Miami-Dade, Philadelphia, New York City, and other jurisdictions nationwide with cashless retail prohibitions**

The Plaintiff resides in Florida near Miami-Dade County and previously lived there in Aventura for nearly two years. Miami-Dade provides a striking local example of the burdens imposed by cash mandates: the County's **Cashless Retail Prohibition Ordinance (Sec. 21-60)** requires every retail business to accept "United States coins and currency, including Federal Reserve notes," and imposes escalating penalties for noncompliance. Under **Miami-Dade Ordinance Sec. 8CC-4**, violations may incur fines of $1,000 per day, doubling to $2,000 per day for continued refusal to accept cash. For the Plaintiff, whose faith forbids the use of sacred cash except to donate it entirely to lifesaving charities, compliance would be religiously impossible. Yet no business can function if every cash payment received must immediately be given away, as though it were itself a charity.

The question thus arises: *Can the Plaintiff, like nearly any other American, open a retail business in the coming decade while adhering to his religious convictions?* The answer is no. He would be coerced into accepting cash under threat of $2,000 daily fines, forcing closure. When the Plaintiff contacted the Miami-Dade Office of Consumer Mediation to request an accommodation under Florida RFRA, his request was denied, and a follow-up email has gone unanswered.

Without judicial recognition of religious exceptions to cash-acceptance mandates, the Plaintiff faces not only personal exclusion but also the chilling effect such ordinances impose on other observant Jews. Rabbis and Jewish business owners in Miami-Dade, New York City, Philadelphia, and other jurisdictions may be forced into a difficult reckoning: either suspend or restrict their cash operations until an exemption is granted,

or risk ruinous fines of $2,000 per day. If Jewish law were to formally extend the longstanding practice of hyphenating or abbreviating G-d's Name to prohibit handling cash as sacred text (Shaimos), the impact on Jewish retail businesses could be devastating, very, very far beyond a "mere inconvenience".

The Plaintiff recognizes the complexity of this mutual accommodation problem. Approximately 2–3% of U.S. households are unbanked and rely on cash exclusively. He is compassionate toward the burdens they would face if cash were refused. This tension helps explain why few rabbis have yet publicly endorsed his position: until U.S. currency is redesigned to remain civic but not sanctified, adopting his practice wholesale could create serious hardship for the unbanked while also dividing Jewish communities. Yet, this Plaintiff stands here as the starting point of that change—asking the Court to recognize that Jews with his beliefs cannot lawfully be forced into cash-based business operations, and that RFRA requires exemptions to protect both their faith and their livelihoods from the substantial burdens imposed by ordinances like Miami-Dade's.

**p. Vulnerability to strict debt collection and payment practices and policies without access to legal tender**

While many businesses tend to be accommodating, especially when I explain my religious beliefs, there's nothing stopping any business like a towing and vehicle impoundment company from insisting on debt settlement in cash-strict legal tender. While I try my best not to ever improperly park, almost every driver has made a mistake and gotten ticketed or towed at some point in their lives, even multiple times over stretches of 11 years, and I find that it is especially hard negotiating means of payment with organizations that carry coercive and controlling legal power over me or my possessions, particularly when legally I carry a debt that needs to be discharged that defaults into legal tender settlement. It's not comfortable being constantly under threat of being unable to discharge sudden debts just

because I carry no legal power to force debt settlement through any payment method I can actually use, while the debt collector has clear legal sanction to insist on legal tender. Flipped around as a CEO and entrepreneur, it isn't comfortable knowing that if my business ever indebts another business or goes into debt to another business without a protective CashAlt "method of payment" contract term in place, they might pay me legal tender and I would be forced under civil or criminal penalty legally to accept, or they might demand that I pay them in legal tender and I and my business would be forced into a deeply uncomfortable stand-off again under civil or criminal penalty.

Not being able to use or rely on the use of legal tender is hazardous as an individual and as a business owner.

37. **Challenge to the Court, Court Staff, and Officers of the Court**: I am arguing and asserting in all these subpoints that the aggregated "**thousand papercuts injuries**" and more major injuries and limitations I suffer in daily commerce and life rise far beyond "a mere inconvenience".  If this Court or its Officers don't believe Plaintiff is substantially burdened, he challenges Members to recruit ten (or more) friends and family to live completely cashlessly for three months—30 months of collective experience--keeping assiduous journals on the frustrations they experience daily, weekly, and monthly being totally unable to use cash. Record your frustrations honestly and conscientiously with privacy losses, disaster fears during South Florida hurricane season, cash-only establishments, having to leave your wallets and purses outside bathrooms whenever nature calls, and in your professional lives violating the law to refuse any legal tender payments, as I must do if I were in your position, from citizens for any services like certified copies or bail payment. You'll surely become convinced of my burden within a day, or a month or two, if you are not already convinced now that the boundaries I'm constrained by transactionally in not being able to use cash or legal tender significantly limit my freedom and possibilities that I'm entitled to by American birthright.

## G. There is Often No Adequate or Legal Substitute for Legal Tender / Literal Cash

38. In the case *New Doe Child No. 1 v. Congress of the U.S.*, 891 F.3d 578, 591 (6th Cir. 2018), the Sixth Circuit Court of Appeals introduced the supposition in its rejection of Plaintiff's inadequately listed and unenumerated substantial burdens that the Plaintiff could just as easily switch to paying for goods, services, and debts with credit card, debit card, or check. Specifically, they said, "Plaintiffs could avoid cash by using credit cards and checks" (*Id 4*). However, the Court erred in not recognizing that credit cards and checks are certainly not legal tender, and have significantly different properties than cash that lead many persons and institutions to strongly prefer or even insist on cash or legal tender instead.

39. In many of the substantial burdens listed above, it should be clear that the Plaintiff can not switch or can not switch effectively to credit card, debit card, check, or other means. The properties of cash versus credit card versus check are many, but the critical point is that physical cash especially in the absence of a universal Central Bank Digital Currency (CBDC) or other alternative legal tender still has a special and unique place as the <u>sole legal tender</u> and plays a distinct role for debt settlement, privacy, efficiency, universality, simplicity, immediate settlement, speed of hand-to-hand exchange, low transactional costs, trustworthiness, psychology, ease-of-use, standard acceptance as a best-alternative-to-negotiated-alternative (BANTA), emergency and disaster preparedness, coordination and cooperation with those households that *are* entirely cash-reliant and unbanked, effectiveness in a power outage or battery failure, "tuckable" convenience when running outdoors, and more. If you think that cash is completely replaceable without substantial burdens, you haven't thought hard enough about how Americans live their whole lives, through all the ups, downs, lefts, rights, and sideways experiences we have over the course of a month, year, or lifetime.  The Plaintiff would very much like to get back to

using cash as soon as possible; Governmental policy currently forbids that with no light yet at the end of the tunnel.

## H. Ceremonial Deism Rejected

40. There has been a "legal" or "extra-legal" idea of ceremonial deism suggesting governmental religious expressions like "In G-d We Trust" are harmless due to long-standing dilute and diluting usage. **Plaintiff rejects this excuse** on grounds that ceremonial deism is inconsistent with Talmudic Tractate Rosh Hashanah 18B4, where even "superfluous" printings of G-d's Name were deemed inappropriate as they would end up on a "dunghill," and general Jewish doctrine in which diluting the Name of G-d through superfluous overuse to meaningless or irrelevance is not considered acceptable or permissible.

41. In Lynch v. Donnelly (1984), Justice Brennan wrote that these phrases were protected from scrutiny because they "have lost through rote repetition any significant religious content." Plaintiff fiercely disagrees—the Government cannot or at least should not dilute any of G-d's Sacred Names in any language to meaninglessness through overused secular repetition.

42. Plaintiff cannot reasonably expect the Government to bury currency fully intact at end-of-life, and machine-stamping out the Name or the National Motto mechanistically from all currency subject to destruction is an impractical mechanical engineering step. The only feasible, reasonable strategy is immediate Court-ordered currency redesign.

## I. Exhaustive Detail on Pretrial Detainment for Lack of Legal Tender In Violation of Legal Presumed Innocence

### 1. Plaintiff's Prior Detention and Denial of Access to Cash Alternatives

The Plaintiff was detained for 28 days in Illinois before cashless bail reforms, despite having more than $80,000 in liquid funds available through check, debit card, or electronic transfer. Jail

officials categorically denied access to those methods, requiring instead the use of physical cash the Plaintiff could not religiously handle.

## 2. Arbitrary and Inconsistent Bail Payment Rules

Broward County allows credit card payments, while Palm Beach and Miami-Dade require physical cash only. This patchwork leads to arbitrary detention based not on risk or means, but on geography and a jail's narrow policy.

## 3. Practical Consequences

Reliance on bail bondsmen is illusory for many detainees, as access to phones or negotiations is blocked. Even when possible, the 10% nonrefundable fee can exceed the coercive fines recognized as substantial burdens in Yoder ($5) and Hobby Lobby ($2,000).

## 4. Widespread Problem of Cash-Only Bail

Federal Reserve data shows that two in ten Americans carry no cash on a typical day, and the average carries only $67. Thus, any bail above that threshold disproportionately detains the cashless. For the Plaintiff, this is further compounded by religious restriction, placing him in "artificial absolute poverty" in cash-strict systems.

## 5. Technological and Institutional Alternatives (CashAlt)

The Plaintiff argues that check, ACH, FedNow, or monitored digital transactions could resolve these problems. The Government's refusal to adopt such accommodations violates due process and equal protection, and traps the presumptively innocent in pretrial servitude.

## 6. Judicial and Governmental Responsibility

Judges and jailers reflexively deny electronic payment access, often by rote citation of policy rather than constitutional analysis. This reflex converts a person's lawful condition—cashless but otherwise solvent—into unlawful imprisonment, in violation of Robinson.

## 7. Plaintiff's Means and the Cash-Strict Catch-22

The Plaintiff routinely carries around $83,000 in accessible electronic funds via his credit cards, debit cards, and checkbook, which are linked on and payable from his smartphone and smartwatch as well, but Plaintiff is treated by jail staff in thousands of counties across the United States as "unable to pay" bail and functionally impoverished by cash-only cash-strict systems. This makes religiously prohibited tender the only path to liberty—an unacceptable RFRA burden and a "condition or status" violation per *Robinson v California*.

## 8. Broader Equal Protection Failures

The Plaintiff urges nationwide CashAlt standards, guaranteeing timely release (within two hours for most cases) based on any lawful payment method, at least all those accepted by Courts and the Internal Revenue Service for the payment of court fees from members of the public and taxes at credit card and debit card processing surcharges no higher than what the Government charges taxpayers outside detention paying their taxes. Without this, liberty is conditioned on arbitrary payment forms and familial support, fracturing equal protection of law, and if CashAlt is accepted but at supremely high fees like 7% processing fee premiums, detained payers are subjected to unconscionably high discriminatory fees presumptively tipping the scales marginally from "limit of acceptable adjudicated bail" to "excessive bail by an added 5%", in violation of the Constitution's 8th Amendment when readily available alternatives exist like the IRS payment

acceptance standard set currently via Pay1040[9] to:

>   Debit Card: Flat $2.15 fee

>   Personal Credit Card: 1.75% processing fee with a minimum $2.50 charge

>   Commercial Credit Card: 2.89% processing fee with a minimum $2.50 charge

>   Cash: $1.50 fee

>   Cards Accepted: Visa, Mastercard, Discover, American Express, STAR, Pulse, NYCE, Accel, AFFN, Cirrus, Interlink, Jeanie, Shazam, Maestro

>   Digital Wallets Accepted: Click to Pay; PayPal

The Plaintiff does not argue with a 2% or 3% processing fee for credit cards. Above a 3% processing fee, Plaintiff would object strenuously and even appeal on grounds of unnecessarily excessive bail applied discriminately to credit card users.

**9. System Seems Designed to Protect the Bail Bondsmen Industry, not the Freedom of Detainees in Pretrial Detention**

The persistence of cash-only bail requirements appears not to serve any genuine public-safety interest, but instead to channel business toward the bail bondsman industry. When a detainee has the personal means to pay bail directly through check, debit, or electronic transfer as I do but is prohibited from doing so, the only remaining path to freedom is to contract with a private bondsman. These intermediaries extract a standard 10% nonrefundable premium fee, which can amount to thousands of dollars even in routine cases. In effect, the State delegates to private actors a gatekeeping role over liberty, compelling defendants to enrich a commercial industry before exercising a

---

[9] https://www.irs.gov/payments/pay-your-taxes-by-debit-or-credit-card