David Morris Clayman / אדם דוד קליימן / דוד משה קליימן, *Pro se*

FILED BY _ml_   D.C.

SEP - 3 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **David Morris Clayman** ( / אדם דוד קליימן /דוד משה ),<br>Plaintiffs,<br>vs.<br>**UNITED STATES OF AMERICA**, et. al. Defendants | **CASE NO. 9:25-CV-80890-WM**<br><br>**REQUEST FOR EXTENSION OF TIME AND FALLBACK RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

o

# REQUEST FOR EXTENSION OF TIME AND

# FALLBACK RESPONSE TO DEFENDANT'S MOTION TO

# DISMISS FIRST AMENDED COMPLAINT

## I. REQUESTING ONE WEEK OF TIME TO FILE SECOND AMENDED COMPLAINT

The Defendants correctly highlight certain deficiencies in the First Amended Complaint's Establishment and Free Exercise claims—points that I can remedy and clarify. In addition, I have identified multiple areas where further detail and expansion are warranted, particularly to demonstrate substantial burden, violations of the Free Exercise and Establishment Clauses, Eighth Amendment prohibitions on excessive bail and cruel and unusual punishment as applied to cash bail, and the scope of judicial relief required.

It has also become necessary to add an additional defendant in light of the August 25, 2025 Executive Order issued by President Trump mandating universal cash bail. That unexpected

Executive Action materially alters the posture of the case and requires revised pleading.

Accordingly, Plaintiff respectfully requests a short extension of one week to file both a Motion for Leave to File a Second Amended Complaint and to submit the completed Second Amended Complaint as an appendix. The Second Amended Complaint is already substantially drafted; since the issuance of the August 25th Executive Order and the U.S. Attorney's refusal to stipulate that pretrial detention based on inability to use sacred cash constitutes a substantial burden, I have devoted several days to revising and expanding the pleadings. The only task remaining is to finalize the Motion for Leave to File.

In the alternative, the following is submitted as a fallback response to the First Amended Motion to Dismiss, in the event the Court does not grant the requested extension of one week (or even a shorter extension of several days, as I anticipate being able to mail the filing by the next business day Monday, September 1st or a day later).

## II. INTRODUCTION AND LEGAL STANDARD

Plaintiff David Morris Clayman, a Jewish American who observes strict prohibitions against the written use of the unabbreviated or unhyphenated Divine Name in secular contexts, brings this action under the Religious Freedom Restoration Act ("RFRA"), the Free Exercise and Establishment Clauses and implicated Free Association rights of the First Amendment, and the Takings Clause of the Fifth Amendment. Plaintiff alleges that the statutory requirement that United States coins and currency bear the phrase "In G-d We Trust," without accommodation for religious objectors, imposes a substantial burden on his sincerely held beliefs, denies him meaningful participation in economic and civic life, and violates constitutional and statutory protections.

Since 2014, Plaintiff has abstained entirely from the use of U.S. currency bearing the

unhyphenated name of G-d. This abstention has caused repeated, concrete harms, including exclusion from cash-only services and community events, penalties in digital transactions, denial or chilling of employment opportunities, total loss of transactional privacy, and prolonged incarceration due to inability to pay cash bail in all jurisdictions that refuse credit or check (i.e. most of them). These harms are ongoing and unavoidable without religious compromise.

Contrary to Defendants' assertions, Plaintiff's claims are not foreclosed by precedent. Prior cases largely addressed secular or atheist objections framed as symbolic harms. Plaintiff instead pleads detailed religious burdens—functional exclusion from basic transactions, bail, and political participation—that have not been adjudicated on the merits. The Sixth Circuit case cited by Defendants (*New Doe Child No. 1 v. Congress of the U.S.*, 891 F.3d 578 (6th Cir. 2018)) did not address such allegations. There, Plaintiff's unique Jewish religious claims were minimally presented in the complaint drafted by counsel, Plaintiff's substantial burdens were barely mentioned, and the court assumed without basis that Plaintiff could simply equally use credit, debit or check instead. That assumption has proven false and is directly contradicted by Plaintiff's detailed allegations in this case, any single substantial burden being adequate to overturn the Government's indefensible position.

Dismissal under Rule 12(b)(6) is inappropriate. At this stage, the Court must accept factual allegations as true and draw reasonable inferences in Plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is plausible when the alleged facts allow the court to infer liability. Id. Under RFRA, once a plaintiff shows a sincere belief and a substantial burden on religious exercise, the burden shifts to the Government to justify the policy under strict scrutiny. See *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

Plaintiff has satisfied that burden: sincerity is undisputed, and he alleges specific, unavoidable burdens greater than those previously recognized as substantial by the Supreme Court. Less

restrictive alternatives exist, such as abbreviating or hyphenating the motto or switching to a more secular design like we had on most of our banknotes and coins up to the 1930s. Because dismissal would prematurely terminate this case before strict scrutiny of the Government's compelling interests, an evaluation of less restrictive means, and a decision on the merits of the RFRA, 1st Amendment, and 5th Amendment claims and additional relief sought, the Defendants' motion should be denied.

## II. PLAINTIFF HAS STATED A PLAUSIBLE CLAIM UNDER RFRA

Defendants argue that courts have "universally" rejected RFRA challenges to the motto on currency. That assertion mischaracterizes precedent. No prior case has addressed Plaintiff's unique Jewish religious objections or the specific, unavoidable burdens pled here. Unlike plaintiffs in Newdow-line cases who asserted only symbolic harms, Plaintiff demonstrates coercion and exclusion from civic and economic life—precisely the type of substantial burden RFRA was enacted to prevent.

### A. Plaintiff's Burden Is Concrete and Frequently Unavoidable

Plaintiff has suffered and continues to suffer direct, coercive burdens that force him to choose between religious observance and full participation in society:

- **28 days unnecessarily extended incarceration** due to inability to pay cash-only bail despite having funds electronically available via EFT/ACH and writeable via personal check, with Plaintiff being forbidden via arbitrary and capricious fiat to access his belongings in lockup (checkbook or phone) or any other computer or transfer and payment system medium for the purposes of paying his $25,000 bail with the over $80,000 of liquid funds that Plaintiff had liquidated in advance of his anticipated arrest.

- **Continuing vulnerability** to pretrial detention of up to 100 days under the best case of the Speedy Trial Act in future federal prosecutions, solely because he cannot post physical cash bail. Under Florida state law, if accused of a felony I can be held almost half a year (175 days) from the time charges are filed until my trial begins and still satisfy the "speedy trial" clock on pretrial detention. Does the Government maintain that the threat of a 175 day unnecessary pretrial detention jail term in Palm Beach or Miami-Dade because jails won't make a policy exception and accept checks or credit cards from me in lieu of physical sacred cash not a substantial burden under RFRA?

- **Exclusion from employment opportunities** in positions requiring cash-handling.

- **Economic penalties** including credit surcharges, lost discounts, and additional transaction costs.

- **Inability to accept small-dollar political contributions**, placing Plaintiff's campaign at an unequal disadvantage.

- **Inability to operate a retail business** in counties prohibiting cashless establishments.

- **Frozen wedding gifts** exceeding $2,000 in unusable cash.

- **Loss of privacy**, as exclusive reliance on digital payments subjects every purchase to government and corporate surveillance.

- **Exclusion from cash-only services** such as laundromats, tolls, street vendors, and disaster scenarios where digital payments fail.

These are not abstract or symbolic grievances but specific, life-altering burdens tied directly to the government's inscription policy.

Plaintiff has already suffered 28 days of incarceration due to his inability to use cash for bail and remains vulnerable to extended pretrial detention in any future prosecution. This vulnerability is particularly acute because Plaintiff engages in political and religious advocacy that challenges

prevailing legal and governmental norms, including controversial proposals that may be deemed offensive or provocative. Plaintiff reasonably fears that core protected political speech could be misconstrued as violating federal criminal statutes such as 18 U.S.C. §§ 871 or 878, and that his inability to post cash bail would again result in extended pretrial detention. The injury is not speculative: his advocacy is open, ongoing, and central to his campaign platform, and the threat of criminal prosecution and detention chills his exercise of protected rights.

## B. Precedent Supports Plaintiff's Position

Supreme Court precedent confirms that far lesser penalties constitute substantial burdens:

- In **Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014)**, financial penalties of $2,000 per employee were held sufficient.

- In **Wisconsin v. Yoder, 406 U.S. 205 (1972)**, which predates RFRA, potential fines as small as $5 and up to three months' jail were considered substantial interferences in religious life.

Measured against these cases, Plaintiff's burdens—extended incarceration, severe economic loss, and exclusion from political and economic life—are greater by orders of magnitude. Defendants' argument seeks to move the goalposts far beyond what precedent requires.

## C. The Sixth Circuit Case Is Distinguishable

In *New Doe Child No. 1 v. Congress of the U.S.,* 891 F.3d 578 (6th Cir. 2018), the court found no substantial burden because plaintiffs alleged only frequent use and preference for cash. That is not the claim here. Plaintiff explicitly alleges:

- **Government-mandated cash-only transactions** (bail in Miami-Dade and Palm Beach Counties).

- **Emergencies and disasters** where cash is the only viable medium.

- **Daily economic penalties** when refusing to use currency inscribed with the unhyphenated

Divine Name.\

These allegations correct the deficiencies in the earlier case and make dismissal inappropriate.

**D. Less Restrictive Means Exist**

Even if the motto serves some valid government interest, RFRA requires the least restrictive means. Alternatives include:

- Printing an abbreviated ("**In G We Trust**") or hyphenated form ("**In G-d We Trust**"), or going back to earlier designs we had for most of our history, like "**Out of Many, One**" (E Pluribus Unum, which shouldn't be in Latin anymore – English is the worldwide *lingua franca*).

- Offering secular or neutral currency designs in a novel, beautiful direction, on more durable full-color plastic, moving away from the idolatrous or borderline-idolatrous "Dead Presidents" and overly sacred unhyphenated "In G-d We Trust" design theme.

- Also providing digital legal tender alternatives.

- Overhauling the currency design and retitling the currency to maximize the recurrent behavioral economic priming of a pro-social concept the Government wishes to promote to our awareness when transacting and relating with other "calmunity" members in commerce, like the inherently meaningful "US Trust" or "US CALM", as suggested, instead of the morally meaningless "US DOLLAR".
    - Only extremely knowledgeable currency collectors and trivia geeks know the actual meaning and origins of the word "dollar" from "valley" (thal/thaler/daler/daalder/daaler/dollar), and valley or dollar don't imply or intimate anything deeply and intrinsically good or mission-oriented like US Trust or US CALM do.

Each would preserve expressive goals without coercing Plaintiff to desecrate the Divine Name or forfeit civic participation.

## III. THE MOTTO REQUIREMENT VIOLATES THE FREE EXERCISE CLAUSE

Defendants argue that including "In God We Trust" on U.S. currency is a neutral, generally applicable law that *incidentally* burdens religion. But Plaintiff alleges *more than incidental* burden—he is effectively excluded from essential economic and civic life.

### A. Neutrality and General Applicability Do Not Foreclose Review

While neutral, generally applicable laws may pass under Employment Division v. Smith, RFRA restores strict scrutiny for federal actions. The statutes requiring the motto are not immune simply because they apply to all citizens. When they substantially burden religious practice, as here, they must be justified by a compelling interest using the least restrictive means.

### B. Plaintiff's Burden Goes Beyond Symbolic Objection

In prior cases cited by Defendants, plaintiffs objected only to passive exposure to the motto. Plaintiff here faces:

- Forced abstention from cash in many life-critical transactions.
- Extended incarceration when cash-only bail is demanded.
- Unequal ability to participate in political life, including campaign fundraising.

These burdens coerce behavior contrary to religious belief—classic Free Exercise violations.

### C. Wooley v. Maynard Does Not Control

Defendants rely on Wooley v. Maynard, 430 U.S. 705 (1977), which distinguished license plates from currency. But that dicta assumed cash was incidental and easily avoidable. Plaintiff's allegations establish the opposite: cash is unavoidable in bail, emergencies, and countless daily transactions. Unlike Wooley's dictum, the facts here show real coercion.

**D. Strict Scrutiny Applies**

Because Plaintiff pleads sincerity and substantial burden, strict scrutiny now governs. The government must now bear the burden of proof and show a compelling interest and least restrictive means. Plaintiff identifies feasible alternatives—abbrevation or hyphenation, alternative mottos that are fundamentally secular like the historical E Pluribus Unum ("Out of Many One"), and designs and retitling better promoting calmunity civic morality—demonstrating that the current scheme is not narrowly tailored, the least restrictive means, or historically consistent with the will of the Founders.

**IV. THE MOTTO REQUIREMENT VIOLATES THE ESTABLISHMENT CLAUSE**

The Establishment Clause forbids government endorsement or advancement of religion. The mandatory inscription of "In God We Trust" on all legal tender does just that: it elevates one religious viewpoint, compels continual contact with sacred language that is routinely erased and destroyed, and operates in the name of all citizens—including Plaintiff—in direct conflict with his beliefs. Plaintiff acknowledges that religiously appropriate "intact burial" of banknotes and coins is impracticable. Creating facilities for such burials would be costly, unsafe, and unmanageable, while requiring specialized machinery to cut out the motto for separate burial I recognize would itself impose extraordinary expense and engineering burdens that I'm hesitant to request unless the Government drags its feet like it has done in its extremely-slow-walked accommodation in *American Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008). Such unstinting "intact burial" approaches are religiously necessary for me as an American Jew but would be burdensome, would be uncompromising, and are not the least restrictive means of addressing the conflict that I'd be willing to calmpromise on for the sake of government efficiency as long as the Government moves speedily and efficiently to fix this.

## A. Endorsement of Religion

The statute mandating the motto is not neutral. It privileges monotheistic traditions that permit willy-nilly unrestricted use and reproductive printing of the Divine Name without custodial care and end-of-life restrictions while disadvantaging Jewish and any other religious minorities who forbid its casual inscription or destruction and require custodial care and end-of-life religious burial. In this way, the government places itself in the role of theological arbiter, endorsing certain religious understandings over others.

## B. Coercion Through Daily Transactions

Unlike ceremonial references (legislative prayers, motto displays), currency is indispensable to daily life. Plaintiff is forced to choose between violating his beliefs or being excluded from transactions, employment, and even liberty through cash bail. This level of coercion exceeds passive exposure and falls squarely within the category of impermissible government compulsion.

## C. Precedent Does Not Bar the Claim

Defendants cite cases rejecting Establishment Clause challenges to the motto. But those cases treated it as "ceremonial deism" or symbolic acknowledgment. Plaintiff's claim is distinguishable: his religious tradition regards even "superfluous" use of the Divine Name as direct desecration, and he is concretely excluded from economic and political life as a result. The Establishment Clause does not allow the government to adopt sectarian language in a form that directly burdens religious minorities.

## D. Less Restrictive, Neutral Alternatives

The government can pursue its expressive goals through secular or pluralistic means without

invoking the unhyphenated Divine Name. Options include abbreviating the motto to "In G We Trust," adopting neutral terms such as "In Good We Trust," or redesigning currency to rely on nonsectarian symbolism with equal or greater recurring moral force.

Plaintiff also notes that the title "U.S. Dollar" itself is underleveraged as a civic symbol. Alternatives such as "U.S. Trust," "U.S. CALM," or "U.S. Seeds" could serve as a more powerful cultural lever, magnifying the government's intended priming effect while avoiding religious entanglement. As demonstrated by past national rebranding efforts—including even renaming geographic features like the Gulf of Mexico to the Gulf of America—there is no constitutional impediment to renaming the currency in a manner that better reflects inclusive civic and national values.

The government's continued insistence on the current formulation, despite available and considerably more effective and more promising alternatives, is neither necessary nor neutral. It reflects unconstitutional favoritism for a religiously fraught status quo that imposes avoidable burdens on Plaintiff's faith.

## V. THE MOTTO REQUIREMENT VIOLATES OR INTERFERES WITH THE 1ST AMENDMENT GUARANTEE OF FREE ASSOCIATION

In my First Amended Complaint, I briefly referenced violations of the First Amendment arising under the guarantee of free association. I noted that the Government's practices "impose a constraint not only on [my] religious practice but also on [my] freedom of association, as [I am] functionally excluded from transacting with individuals and businesses that choose to only accept physical cash on the incorrect supposition that everyone can withdraw and use cash if they wish."

By way of example, I would like to attend salsa and Latin dance events around South Florida; yet it is not uncommon for clubs and bars to require a cover charge payable exclusively in cash,

which prevents me from associating with and enjoying the company of others in my community. Similarly, when invited to an event or establishment, I must first inquire whether it is cash-only, and at times decline participation altogether. The same barriers extend to personal services, as I cannot hire workers—such as cleaning personnel—who accept only cash, a common practice in South Florida service industries.

This phenomenon flows directly from the Government's promotion and guarantee of physical legal tender, which places me in unavoidable religious conflict regarding its use and circulation. If granted leave to file a Second Amended Complaint (ideally without resetting the clock on the pending Motion to Dismiss), I will set forth these burdens on my freedom of association expressly and in greater detail.

## VI. THE MOTTO REQUIREMENT VIOLATES THE TAKINGS CLAUSE

The Fifth Amendment prohibits the government from taking private property for public use without just compensation. Plaintiff's inability, for religious reasons, to use or circulate U.S. currency inscribed with the unhyphenated Divine Name deprives him of meaningful use of property and imposes unique financial losses.

### A. Loss of Practical Use of Property

- Plaintiff received over $2,000 in cash wedding gifts that he could not use for any personal purpose without violating his faith. The funds were effectively coercively frozen assets, leaving him no option but compelled donation.
- Plaintiff faces ongoing deprivation whenever he receives or is offered legal tender, as all my legal tender by conflicting Government and religious order cannot be lawfully used, exchanged, or deposited for full and free use without religious compromise.

### B. Compelled Sacrifice

The inability to use legal tender forces Plaintiff into sacrifices not imposed on other citizens, equivalent to having his liquid cash assets involuntarily frozen by conflicting order of the Treasury Department and my G-d. Unlike ordinary market fluctuations, this deprivation stems directly from the government's decision to mandate a religious inscription on the sole form of legal tender, destroying or impairing five of its key essential traits: its fungibility, its portability, its acceptability (both in general and as legal tender), its inclusivity, and its uniformity, making it a useless store of personal value and a terrible almost perfectly inefficient medium of exchange for transactions with me – *except* as a channel for lifesaving charity. The result is functional confiscation of value without compensation.

## C. Distinguishable From General Market Burdens

Defendants may argue that diminished property value from regulation is not a taking. But this is not a generalized regulatory effect; it is a unique religiously compelled forfeiture, secondary to Government's ongoing unrelenting insistence on printing and minting the sacred Name of G-d superfluously in a sacred context on a physical, bathroom-portable, oft-unceremoniously-destroyed medium without anywhere near adequate religious precautions. No secular workaround restores the lost use: Plaintiff cannot transfer, deposit, or spend inscribed cash without violating his beliefs. If US Attorney Quiñones and Assistant US Attorney Romero do not believe this constitutes a Taking, for the promotion of empathy, the Plaintiff urges this Court to issue a hypothetical order freezing all the physical cash of Quiñones, Romero, and all other employees of this US Attorney's Office at this instant and into perpetuity, enjoining them from using physical cash for any purpose other than charity. I trust it won't take very long before they change their tune and accuse this Court of a Takings Clause violation, particularly as significant life events and the exchange of goods and and services force them toward cash or legal tender.

**D. Relief Is Appropriate**

Because Plaintiff's religious exercise renders government-issued cash unusable freezing his assets, the statutory inscription scheme operates as a de facto taking of and impairment of value. At minimum, Plaintiff is entitled to proceed beyond the pleading stage to establish the scope of uncompensated deprivation.

**VII. CONCLUSION**

At the pleading stage, Plaintiff need only allege facts that, if accepted as true, plausibly establish entitlement to relief. He has done so. Plaintiff alleges:

- **Sincerely held religious beliefs**, already acknowledged as genuine in prior litigation.
- **Concrete, unavoidable burdens**, far more severe than those deemed substantial in *Hobby Lobby* and *Yoder*.
- **Specific factual allegations correcting prior deficiencies**, including:
  - inability to pay **cash-only bail**, resulting in prolonged incarceration;
  - loss of property such as frozen wedding gifts and the inability to invest in sectors tied to currency destruction;
  - **loss of privacy** from exclusive reliance on digital payments;
  - vulnerability in **emergencies and disasters** when cash is indispensable;
  - **barriers to employment** in cash-handling roles;
  - prohibitions on **cashless retail** in jurisdictions like Miami-Dade, with punishing and unlimited $1,000-per-incident administrative law fines (which Plaintiff will assert in a Second Amended Complaint, if given leave to re-amend), affecting Plaintiff's economic freedom to invest in or grow and build up organizations with any kind of retail over his lifetime;

○ exclusion from ordinary **civic and political participation**, including campaign fundraising and service in offices that oversee currency destruction systems;

○ artificial and unconscionable total economic separation from the ~2.6% of US households who exclusively use cash (are unbanked and use neither prepaid cards nor nonbank payment apps) or the 14% of American consumers who report that in a typical week they perform "all" or "almost all" of their purchases in cash;

○ insidious long-term statistically and anecdotally evidenced psychological decompensation effects from desired strict frugality that being forced to pay for everything always via credit or debit card for 11 years causes (which Plaintiff will assert in a Second Amended Complaint, if given leave to re-amend)

These allegations—set out with semi-exhaustive specificity in the First Amended Complaint, and capable of further amplification and articulation if leave to amend is granted—overcome all the grounds on which the Sixth Circuit dismissed Plaintiff's barely mentioned and poorly specified burdens in *New Doe Child No. 1 v. Congress of the U.S.*, 891 F.3d 578 (6th Cir. 2018).

•   **Feasible less restrictive alternatives** exist, such as hyphenating the motto, adopting secular variants, or providing alternative note designs, which would serve the government's interests without coercing religious minorities.

•   The Government lacks a compelling interest in continuing to use the **unhyphenated sacred form** of "In G-d We Trust." Other mottos, including *E Pluribus Unum* ("Out of Many, One"), historically served the same unifying and legitimacy-promoting functions. For more than a century, U.S. and predecessor currency circulated successfully without the contested inscription—on Buffalo Nickels (1913–1938) and on banknotes until 1955—demonstrating that currency acceptance and reliability do not depend on this relatively recent religious formulation. Indeed, the requirement should have been reconsidered after RFRA's enactment in 1994, or at the

latest in 2018 in *New Doe Child No. 1 v. Congress of the U.S.*, 891 F.3d 578 (6th Cir. 2018), had the Jewish religious claims been more fully developed and presented.

Defendants seek dismissal by portraying Plaintiff's claims as merely symbolic without true substantial burdens. They are not and my burdens are very real and often unavoidable. The burdens pleaded are tangible, ongoing, substantial, sometimes extremely severe, threatening, limiting, and legally cognizable. Under Rule 12(b)(6), dismissal is inappropriate. This case must proceed to discovery, where the government will bear its burden under RFRA's strict scrutiny and the Constitution.

**For these reasons, the Motion to Dismiss should be denied in its entirety.**

## VIII. PLAINTIFF IS AN ORDAINED MINISTER

The Plaintiff did not state in his Original or First Amended Complaint that he has been an ordained minister of the non-denominational Universal Life Church (ULC) since September 1, 2014, shortly after he ceased using or circulating "In God We Trust" currency. While the Plaintiff does not believe that his ULC ministerial status should be necessary to establish the sincerity or validity of his claims, he notes it here in the event that federal law affords additional protections to ministers of recognized religious organizations. The Plaintiff emphasizes that his entitlement to deference and respect for his religious conscience as an American Jew stands independently of this ordination. Nevertheless, should the Court grant leave to file a Second Amended Complaint, the Plaintiff intends to incorporate his ULC ministerial status and related journey into the body of that pleading, as well as a deeper description of who the Plaintiff is in relation to this case.

## IX. AMENDING COMPLAINT WAS THEN AND IS NOW JUSTIFIED AGAIN

As has become characteristic of the U.S. Attorney's filings, they object reflexively—even where

Plaintiff has amended by right to cure deficiencies that previously prevented important arguments and evidence from being considered. In earlier cases, for example, my earnest medical testing for kidney-donor qualification—evidence exceeding that in *Bellochio v. Garland*—could not be weighed because it was presented after the complaint rather than incorporated into it. That procedural flaw is exactly what my amendments were designed to avoid.

Plaintiff has repeatedly expressed willingness to provide a redlined "track changes" version highlighting the differences between the Original and First Amended Complaint, and likewise between the First and Second Amended Complaint. The U.S. Attorney, however, has never requested such a comparison, nor made any attempt to use the readily available tools that permit straightforward isolation of changes between PDF versions. Having neglected these options, the Government has no basis to disparage my amendments as opaque or improper.

Contrary to their mischaracterizations, my amendments have consistently expanded claims and evidence, rather than retreating from or collapsing arguments. They were previewed in advance to all Defendants in the cover letter accompanying service of process, and they are substantive enough to warrant revision under the Rules. No law, custom, or practice restricts revisions to only those the U.S. Attorney deems "substantial" or agreeable.

Nor were these amendments filed for vexatious purposes. On the contrary, a comparison of the Original and First Amended Complaint demonstrates substantive refinement, and the same will be true of the First versus the Second. The Government's complaint reduces to a grievance that Plaintiff didn't surrender or dilute claims for their convenience—something Rules do not require.

## X. DISMISSAL WITH PREJUDICE IS NOT WARRANTED OR EVEN TIMELY

As set forth in Plaintiff's *Motion to Protect Pro Se Plaintiffs*, dismissal with prejudice is an extraordinary sanction and is particularly inappropriate against a pro se litigant who has not been

afforded the safeguard of a good-faith meet-and-confer. Before permanently foreclosing amendment, the Government should be required to engage directly—by videoconference or telephone—with the pro se party to clarify grievances, identify potentially cognizable claims, and ensure the litigant is informed of the right to amend under Federal Rule of Civil Procedure 15.

This safeguard is especially vital in the modern era of automated drafting and review. Without at least one live human exchange, there is a heightened risk that a pro se pleading will be prematurely mischaracterized or dismissed through mechanistic processes rather than genuine human discernment. The Supreme Court has long instructed that pro se filings must be liberally construed, *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), a standard that presupposes thoughtful human interpretation.

Yet, Plaintiff's experience in this case has been the opposite: the Government seeks to cut off amendment, mischaracterizes pleadings, and advances dismissal with prejudice without once attempting to hear Plaintiff out. At that point, there is little to distinguish the process from one that could be carried out by a fully automated "robolawyer." Indeed, Plaintiff would frankly prefer such a system under the inhuman faceless empathy-less procedure the US Attorney insists on, because even any fairly trained AI model would stipulate within seconds that being imprisoned or threatened with imprisonment for 28 days (or even one day) based solely on religious beliefs about cash use constitutes a substantial burden under RFRA.

Accordingly, until the Government undertakes a genuine human engagement with Plaintiff, asking for dismissal with prejudice is premature, especially more so on a case such as this, which I think I stand a very strong chance of prevailing on. The Court should deny such relief, preserve Plaintiff's right to amend, and allow this case to proceed to discovery and early summary judgment on the actual merits.

## XI. VEXATIOUS LITIGANT DESIGNATION THAT US ATTORNEY IS IRRESPONSIBLY DRUMBEATING AND REPEATING FOR ILLUSORY TRUTH EFFECT IS CERTAINLY NOT RIPE

Any suggestion by the U.S. Attorney that Plaintiff should be designated a "vexatious litigant" is, at this stage, both premature and very unsupported. If the Government wishes to pursue such an extraordinary designation, equity requires that this Court and the U.S. Attorney first consider imposing similar consequences upon former President Donald Trump and his counsel, Alina Habba, who have demonstrably engaged in repeated, wasteful, and vindictive litigation that has drained both governmental and judicial resources.

Plaintiff, by contrast, stands in a uniquely precarious position. As both an ally and, at times, a sharp opponent of Mr. Trump depending on the context, I face a heightened risk of becoming the target of vexatious or vindictive litigation initiated either by Trump himself or by officials aligned with him. Such risk is not hypothetical. A future prosecution could be weaponized against me for advancing positions rooted in my civic, civic-religious, and religious beliefs—such as my good-faith advocacy to modify 18 U.S.C. §§ 871 and 878 in line with recognized principles of Israeli state policy and Jewish religious law regarding legitimate state-sanctioned retaliation against genocide perpetrators like Vladimir Putin. As such, I argue I have standing to prophylactically reciprocally request that Donald Trump in his personal and/or official capacity be labeled as a vexatious litigant in the public interest.

To allow the Government to brand my very rapidly improving filings as "vexatious" while ignoring the vastly greater, seemingly incorrigible and unrepentant record of vexatiousness by Trump and his agents would not only be inequitable but also chill my ability to engage in protected religious, legal, and political advocacy. I cannot meaningfully campaign for the

Precedency—or propose reforms to national security law—if I must operate under constant threat of retaliatory and resource-draining legal actions from the Attorney General or U.S. Attorney acting at Trump's direction. At a minimum, parity requires that any such vexatious litigant labels or prefiling injunctions or restrictions be first tested against Trump and his counsel Alina Habba, whose machinations to elevate her to service as US Attorney for the District of New Jersey was recently on August 21, 2025 declared unlawful (1:24-cr-00768-MWB, District of New Jersey) jeopardizing hundreds of civil and criminal cases, before being considered against me.

This Court should not hold its punches. If this Court truly believes that I have been "vexatious" or improperly motivated, on the basis of one dismissal with prejudice followed by a dismissal that was explicitly issued without prejudice and with leave to amend, and a potentially prevailing case now, then label me as such. But label the US Attorney's boss Donald Trump, who is an implied Defendant in this case, and Alina Habba the unlawful and New Jersey District chaos-inducing Acting US Attorney for the District of New Jersey, as well in the same stroke as vexatious litigants with appropriate prefiling injunctions, to prevent further abuse that's orders of magnitude more damaging and, in Trump's case, stretches back for many decades of vindictive vexatiousness expensively damaging innocent defendants for no other purpose than his seeking dominance or concessions through the unlawful or inappropriate use of the Courts.

And allow me the chance to appeal any such vexatious litigant designation; while I can't say for sure that I'll appeal if so labelled until I see any such hazardous labeling reasoning in writing from you, such a designation is something that I likely can't permit to go unchallenged, on the basis of the weak and mischaracterized evidence the US Attorney cites and on the basis of my own awareness of my own strong civic and religious motivations and pace of improvement this year in focused and more conventional legal writing and civil procedure awareness.

Please instruct the US Attorney and the United States to not file any other attempt to label me or

entities I control as vexatious again until they meet the requirements of a prefiling injunction and consistently make good faith efforts to meet with me and hear me out. This vexatious designation attempt by the US Attorney is itself highly vexatious, is so premature and grossly anticipatory that it's probably politically and improperly motivated, wastes significant Court resources, and has caused significant needless emotional distress and distraction from my work of building sexual assault and sexual harm prevention technology, and could have been avoided if they had had a quick conversation with me before attempting this to actually authentically try to understand the merits of this and my previous cases.

## XII. WILL MAIL SECOND AMENDED COMPLAINT AND RELATED MOTION FOR LEAVE TO FILE AS SOON AS HUMANLY POSSIBLE

Plaintiff will mail the *Second Amended Complaint* with a request for *Leave to File Second Amended Complaint* separately on the next business day Monday, September 1st or as soon as humanly possible, certainly beyond any doubt within one week. It answers many of the Defendants' complaints in this dismissal attempt more fully, at the cost of being even more exhaustively argued (read: longer). I will send the Defendants a copy of the redlined version of my pleading compared to the *First Amended Complaint* to proactively make the changes easier and faster for them to process

Defendants I should note are already objecting to the filing of a *Second Amended Complaint*. I'll address that to the best of my ability in the *Motion for Leave to File*.

That's all. Still working to preserve life and death equitably, and here the G-d-given right to pluralistic religious liberty, the sacredness of G-d's Name that underpins my religious belief and religious expression in my native (and only fluent) language, and the Separation of Church and Synagogue from State entrusted to us by the Founders who used no such divisive religious mottos

on coinage or banknotes of the time,

s/Plaintiff David Clayman, Currently *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@ingwetrust.org
david@inhashemwetrust.org
david@clayman.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this Monday, the 29th day of August, 2025, I mailed a
copy of this document to the Court via certified mail and electronically served a copy of this response to
the new and old opposing counsel on the case.

/s/ *David M. Clayman*
Pro Se Plaintiff

See **APPENDIX A:** ***The Government Is Squandering Precious Time...***
See APPENDIX B:

David Clayman
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148



CERTIFIED MAIL

9589 0710 5270 2652 1294 26



Retail



33401

RDC 99

U.S. POSTAGE PAID
FCM LG ENV
BOCA RATON, FL 33
AUG 29, 2025

$13.26

S2324A502605-50

Clerk of Court, US District Court for Southern FL
701 Clematis Street
West Palm Beach, FL 33401

INSPECTED