David Morris Clayman / אדם דוד קליימן / דוד משה קליימן, *Pro se*            B"H

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **David Morris Clayman** ( / דוד אדם (דוד משה קליימן), Plaintiffs, vs. **UNITED STATES OF AMERICA**, et. al. Defendants | **CASE NO. 9:25-CV-80890-WM** **PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR PERMANENT INJUNCTION** |

o

# PLAINTIFF REPLY TO DEFENDANT'S RESPONSE IN

# OPPOSITION TO MOTION FOR PERMANENT INJUNCTION

FILED BY _____ D.C.
9cS

SEP 09 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## Introduction

Defendants argue that Plaintiff's requested safeguard—a brief opportunity for direct human conversation before demanding from this or any other Court dismissal with prejudice—is "contrary to the Rules" and "wasteful". Respectfully, this response underestimates both the constitutional stakes and the profound limits of written-only communication. Cognitive science, Supreme Court precedent, and principles of sovereign responsibility converge on a single point: as convenient as it may be for the US Attorneys in each of the 94 US District Courts, justice anywhere in the United States cannot be reduced to paper alone.

The safeguard requested is modest: a brief human exchange—whether by video, telephone, or in person—before the Government seeks to permanently extinguish a citizen's claims. Plaintiff does not propose any change to the ordinary process for motions to dismiss. He asks only that, when dismissal with prejudice or a finding of frivolousness is sought, the United States first extend a

certified offer of face-to-face (or, at minimum, telephonic) engagement. Such a safeguard would more fairly establish and strengthen the discernment and liberal construction owed to a pro se pleading and provide the pro se an opportunity to "hear out" the Government, and the Government a chance to "hear out" the pro se before permanent foreclosure of the pro ses access to justice and relief. This Court should grant it.

## I. Written Communication Is Inherently Error-Prone: The *Egocentrism Over Email Evidence*

Modern social psychology confirms what every judge intuits: words alone are poor vehicles for understanding. In their seminal article *Egocentrism Over E-Mail: Can We Communicate as Well as We Think?*, Kruger & Epley et al. conducted five controlled experiments showing that people systematically overestimate how clearly their written statements are understood.

- In Study 1, senders predicted nearly perfect understanding of sarcastic vs. serious statements, but actual comprehension was far lower (97% predicted vs. 84% actual - a 13 out of 100 gap).

- In Study 2, participants were asked to convey sarcasm either by e-mail or by voice. Accuracy via voice was nearly 75%, but via e-mail it was indistinguishable from chance (50%) – a 25 in 100 gap. Yet e-mail senders (or in the reproducible analogical case, legal writers) remained equally confident in their clarity.

- In Study 3, when face-to-face, voice-only, and e-mail were compared, overconfidence and misunderstanding were highest for e-mail (and analogically and reproducibly, strictly legal writers)—even among friends.

The authors concluded: "e-mail is an inherently more impoverished communication medium than voice or face-to-face communication". Likewise, Plaintiff argues that written legal pleadings, just

like written email communication, are an inherently impoverished communication medium and fail to serve as a channel of adequate tacit, explicit, paralinguistic, and emotional human calmunication (eg calm[1] communication) given that face-to-face and/or oral methods of calmunication are so much more effective at reducing misunderstanding than strict and exclusive blind reliance on written legal communication by the United States, promoting a significant number of cases where the United States wars with a citizen or resident over a misunderstanding that could have been avoided with human channels of calmunication instead of these very brutal rules of communication lawyers say are necessary for their professional and ethical conduct.

This empirical evidence validates what Plaintiff warned in his Motion: without the paralinguistic and tacit cues of tone, gesture, or real-time clarification, misunderstandings like those Defendants here demonstrate harden into mischaracterizations that no later amendment can fully cure. The risk is especially acute for pro se filings, which may lack legal polish but contain the seed of a meritorious claim that could be foreclosed forever with prejudicial dismissal without human conversation under existing practices the US Attorney here and in my attempted conferrals with them they (I argue very dysfunctionally) insist on. I tried several times to get the Assistant US Attorney to agree to a face-to-face or phone conversation on the basis of this research; as you can see in the attached correspondence in the Appendix, the Assistant US Attorney refused to talk with me, insisting on a medium of miscommunication instead.

## II. The United States Is a Special Kind of Litigant

Defendants argue as if the Government of the United States were just another private party. It is not.

---

[1] See the creatively explosive backronym for CALM in Plaintiff's *Second Amended Complaint*, which Plaintiff means to incorporate by reference in this *calmunication* neologism.

The United States litigates in a dual capacity: as an adversary on one side of the caption, and as the sovereign authority of the very citizen or resident on the other. When the Government opposes a resident or a citizen especially in federal court, it acts not only to defend its interests but also as trustee of the people's justice system. As the Supreme Court has observed, there exists a "fundamental constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 828 (1977).

In this light, the Government bears duties that no private party carries:

- To safeguard—not merely oppose—the citizen's constitutional access;
- To preserve the integrity of judicial process;
- To avoid adopting an adversarial posture so severe (e.g., dismissal with prejudice) without first attempting a minimal good-faith exchange.

The Government's refusal to recognize this role threatens to invert the very idea of sovereign responsibility.

### III. Application of *Mathews v. Eldridge* Balancing

Under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), courts weigh (1) the private interest, (2) the risk of erroneous deprivation, and (3) the Government's burden.

1. Private Interest. For a pro se litigant, dismissal with prejudice is catastrophic: it forecloses all opportunity to be heard on matters of constitutional and statutory right.

2. Risk of Erroneous Deprivation. The *Egocentrism Over Email* data demonstrates that written-only exchanges are fertile ground for misunderstanding, especially for untrained pro se pleadings. Requiring one short live exchange directly addresses this risk by introducing human judgment and paralinguistic cues before permanent foreclosure.

3.  Government Burden. The safeguard requested is minimal—a brief phone or video call for which there is no other adequate remedy. Compared to the weight of the constitutional interest, this burden is negligible.

Balancing these factors compels the conclusion that due process requires some opportunity for live engagement before prejudicial dismissal.

## IV. Rebutting Defendants' Arguments

### A. Local Rule 7.1's Conferral Exemption

Defendants rely on Local Rule 7.1, which exempts motions to dismiss from conferral. But Local Rules cannot abrogate constitutional due process. Federal courts retain equitable authority under the All Writs Act, 28 U.S.C. § 1651(a), to impose safeguards necessary to ensure fairness. Where the risk of error is heightened by the impoverished nature of written communication, additional safeguards are appropriate.

### B. Florida Rule of Professional Conduct 4.3

Defendants argue they cannot explain Rule 15 without giving "legal advice". This mischaracterizes Plaintiff's request. Advising a citizen of the *existence* of Rule 15's amendment right is not "counseling"; it is factual notice—akin to a Miranda warning. The Government need not draft pleadings or strategize for the litigant. It need only state: "You may amend once as of right under Rule 15(a)(1), either within 21 days after your first submission or within 21 days after we file a response like a motion to dismiss, and thereafter you can amend with leave and permission of the Court under Rule 15(a)(2)." Such minimal advisement is procedural fairness, not adversarial advice.

### C. Vexatiousness Allegation

Defendants portray Plaintiff's motions as "frivolous". Yet the *Egocentrism* research proves that written-only exchanges like the Defendant United States are insisting on breed grave misunderstanding for which there is no other adequate remedy than the preferred option firstly face-to-face or secondly telephonic voice-to-voice conversation can cure. Far from "wasteful," Plaintiff's request would conserve judicial resources by reducing misinterpretations that lead to repeated motions, appeals, and duplicative filings. One short human conversation early in the process can save months of paper conflict.

## V. Special Solicitude for Pro Se Litigants

The Supreme Court has repeatedly emphasized that pro se pleadings must be "liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Court underscored that Rule 15's mandate of free amendment "is to be heeded."

This principle presupposes human discernment. Algorithms cannot "liberally construe" pleadings, and government lawyers cannot fairly do so without at least one chance to hear from the citizen directly.

## VI. Elements of Permanent Injunction Established

As the Defendant cites, "In order to obtain a permanent injunction, the moving party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." (Alabama v, U.S. Army Corps of Engineers, 424 F.3d 1117, 1128 (11th Cir. 2005)).

As set forth above and in the original Motion, Plaintiff has:

1. Shown a basis for relief by demonstrating that citizens hold a right to have their pleadings understood and construed liberally by the United States;

2. Argued that no adequate remedy at law exists for the violation of this right; and

3. Established that irreparable harm will result if misunderstandings—predictable and avoidable—are allowed to dictate outcomes through premature and prejudicial dismissal.

The harm arises when the United States and this Court decline to make a genuine effort to *hear*—rather than merely skim, read, or, in the modern age, mechanically process—a pro se Plaintiff's claims and burdens; when they deny even minimal opportunities for face-to-face or telephonic engagement that provide the paralinguistic cues necessary to reduce misunderstanding and ensure a fair chance at humane and reciprocal treatment; and when they fail to advise a pro se litigant of the right to amend or to seek leave to amend. Safeguards of this nature—comparable in importance to Miranda warnings in the criminal context—are indispensable to a government that is truly "of, by, and for the People," rather than reflexively adversarial toward the very citizens whose consent underlies its legitimacy. Unlike other parties, the United States Government must represent all United States souls, especially all United States citizens, not all souls or all citizens minus the pleading resident or citizen party.

## VII. Relief Requested

For the foregoing reasons, this Court should:

1. Reject Defendants' contention that Plaintiff's safeguard is "implausible" or "unethical."

2. Hold that due process and equitable principles require at least one good-faith human conversation before the United States seeks dismissal with prejudice against a pro se litigant.

3.  Grant Plaintiff's Motion for Permanent Injunction to Protect Pro Se Plaintiffs.

## VIII. Plaintiff Will Respond to All *Ad Hominem* Attacks in Appendix

Defendants' Response contains several unjustified and misleading character attacks on Plaintiff, including renewed and irresponsible assertions tied to their "Donald Trump Double Standard" allegations of vexatiousness. These claims warrant a reply, but Plaintiff respectfully submits that such responses should not be charged against the page limits of this Reply, as allegations of vexatiousness properly belonged in the prior briefing and should not be repeated in every filing to create or drum up premature plausibility or illusory "truth effects" through brute "big lie" propagandistic repetition. Plaintiff's responses are therefore set forth separately in the Appendix. Plaintiff further observes that these kinds of unwarranted personal attacks could be avoided through the simple and human step of meeting face-to-face, to better gauge each other's character, intent, burdens, and suffering, rather than the United States expending effort to vilify one of its citizens before the Court without first attempting genuine personal engagement to minimize misunderstanding and minimally advising citizens of their Rule 15(a) right to amend in *Doe v Trump* (0:25-cv-60120, S.D. Florida), *Clayman v United States* (0:25-cv-60447, S.D. Florida), or *Clayman v Bessent* (9:25-cv-80890, S.D. Florida).

## Conclusion

The Constitution guarantees citizens more than the mere exchange of misinterpretation-prone papers with their government; it guarantees a meaningful opportunity to be heard. Contemporary research underscores that written submissions alone cannot always secure that fairness. Sole reliance on text risks misunderstanding—particularly when one party, unlike trained attorneys, is less adapted to the conventions of exclusive print advocacy and carries arguments or evidence that are tacit and best surfaced in direct human interaction. Having the option afforded to citizens

of at least one substantive human conversation enriched by human paralinguistic cues—whether by video, in person, or by visually-blind telephone—constitutes the minimal safeguard necessary to ensure that justice is not lost in translation before the United States demands dismissal with prejudice or deems a set of claims before this or any other United States Court as "frivolous".

s/Plaintiff David Clayman, Currently *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@ingwetrust.org
david@inhashemwetrust.org
david@clayman.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this Friday, the 5th day of September, 2025, I mailed a copy of this document to the Court via certified mail and electronically served a copy of this response to the new and old opposing counsel on the case.

*/s/ David M. Clayman*
Pro Se Plaintiff

# APPENDICES

**APPENDIX A:** "Egocentrism Over E-Mail: Can We Communicate as Well as We Think?"

Journal of Personality and Social Psychology. Kruger, Epley, Parker, Ng. 2005.

**APPENDIX B**: Response to Ad Hominem Attacks and Ongoing, Fight-Everywhere, Take No

Prisoners Vexatiousness Debate

**APPENDIX C**: Article on Illusion of Truth or Reiteration Effect Exploit

**APPENDIX D**: All Correspondence To Date Between Assistant US Attorney Kelsi Romero and

Myself

Journal of Personality and Social Psychology
2005, Vol. 89, No. 6, 925–936

Copyright 2005 by the American Psychological Association
0022-3514/05/$12.00   DOI: 10.1037/0022-3514.89.6.925

# Egocentrism Over E-Mail: Can We Communicate as Well as We Think?

Justin Kruger
New York University, Stern School of Business

Nicholas Epley
University of Chicago, Graduate School of Business

Jason Parker and Zhi-Wen Ng
University of Illinois at Urbana–Champaign

Without the benefit of paralinguistic cues such as gesture, emphasis, and intonation, it can be difficult to convey emotion and tone over electronic mail (e-mail). Five experiments suggest that this limitation is often underappreciated, such that people tend to believe that they can communicate over e-mail more effectively than they actually can. Studies 4 and 5 further suggest that this overconfidence is born of egocentrism, the inherent difficulty of detaching oneself from one's own perspective when evaluating the perspective of someone else. Because e-mail communicators "hear" a statement differently depending on whether they intend to be, say, sarcastic or funny, it can be difficult to appreciate that their electronic audience may not.

*Keywords:* e-mail, egocentrism, overconfidence, miscommunication, nonverbal behavior

Social judgment is inherently egocentric. When people try to imagine the perspective, thoughts, or feelings of someone else, a growing body of evidence suggests that they use themselves as an anchor or reference point. Although precisely why this occurs—whether the result of an overlearned and generally valid heuristic, the residual byproduct of an earlier stage of childhood egocentrism, or the inevitable consequence of an effortful cognitive process such as anchoring and adjustment—is a matter of some debate, the fact remains that the assessment of another's perspectives is influenced, at least in part, by one's own (Camerer, Loewenstein, & Weber, 1989; Epley, Keysar, Van Boven, & Gilovich, 2004; Fischhoff, 1975; Flavell, 1977; Fussell & Krauss, 1991; Gilovich, Medvec, & Savitsky, 2000; Gilovich, Savitsky, & Medvec, 1998; Hoch, 1987; Inhelder & Piaget, 1958; Kelley & Jacoby, 1996; Keysar, Barr, & Horton, 1998; Keysar & Bly, 1995; Nickerson, 1999, 2001; Ross & Ward, 1996).

Nowhere is this tendency more apparent than in the music tapping study conducted by Elizabeth Newton (1990). Participants in her study were asked to tap the rhythm of a well-known song to a listener and then assess the likelihood that the listener would correctly identify the song. The results were striking: Tappers estimated that approximately 50% of listeners would correctly identify the song, compared with an actual accuracy rate of 3%.

What accounts for this dramatic overestimation? The answer becomes immediately apparent when one contrasts the perspectives of tappers and listeners, as Ross and Ward (1996) invited their readers to do when describing Newton's results. Whereas tappers could inevitably "hear" the tune and even the words to the song (perhaps even a "full orchestration, complete with rich harmonies between string, winds, brass, and human voice"), the listeners were limited to "an aperiodic series of taps" (Ross & Ward, 1996, p. 114). Indeed, it was difficult from the listener's perspective to even tell "whether the brief, irregular moments of silence between taps should be construed as sustained notes, as musical 'rests' between notes, or as mere interruptions as the tapper contemplates the 'music' to come next" (p. 114). So rich was the phenomenology of the tappers, however, that it was difficult for them to set it aside when assessing the objective stimuli available to listeners. As a result, tappers assumed that what was obvious to them (the identity of the song) would be obvious to their audience.[1]

Of course, everyday communication is far less constrained than in the music tapping study. Seldom are we required to tap a course lecture or describe our research via Morse code (although it can

Justin Kruger, New York University, Leonard N. Stern School of Business; Nicholas Epley, University of Chicago, Graduate School of Business; Jason Parker and Zhi-Wen Ng, Department of Psychology, University of Illinois at Urbana–Champaign.

This research was supported by Research Grant 1-2-69853 from the University of Illinois Board of Trustees awarded to Justin Kruger and by National Science Foundation Grant SES-0241544 awarded to Nicholas Epley. We thank Tom Gilovich and Ken Savitsky for their helpful suggestions throughout this research.

Correspondence concerning this article should be addressed to Justin Kruger, New York University, Leonard N. Stern School of Business, 40 West 4th Street, Suite 816, New York, NY 10012. E-mail: jkruger@stern.nyu.edu

---

[1] An analogous example comes from a study by Keysar and Henly (2002) in which participants read aloud several ambiguous sentences (such as "Angela killed the man with the gun") to another study participant. Speakers read the statement after reading a scenario that resolved the ambiguity of the sentence (e.g., indicated whether the gun was the murder weapon or a possession of the victim), a scenario that was unavailable to listeners. As in the case of the tapping study, speakers assumed that what was obvious to them (i.e., the meaning of the sentence) would be obvious to the listener. Consistent with the speculation of Newton (1990) and Ross and Ward (1996), Keysar and Henly found that the overestimation was due, at least in part, to participants underestimating the ambiguity of their own utterances.

occasionally seem that way). However, we believe that the lessons learned from Newton's research are nevertheless applicable to everyday communication and one facet of everyday communication in particular: electronic mail (e-mail).

E-mail is one of the most successful computer applications yet devised (Dimmick, Kline, & Stafford, 2000; Marold & Larson, 1999; Wittaker & Sidner, 1997). According to the U.S. Department of Commerce, nearly half of the U.S. population currently uses e-mail, and the number of e-mail messages currently outnumber letters sent by the U.S. postal service (Thompson, 2001). Some have even claimed that e-mail, along with the invention of writing, printing, and telegraphy, represents the only truly revolutionary change in communication technology (de la Sola Pool, 1984). Although text-based communication is nothing new (people have been writing letters to each other for centuries), its ubiquity is: Whereas letters were at best a monthly or weekly affair, people use e-mail on a daily—even hourly—basis (Gatz & Hirt, 2000). And for good reason: E-mail is a quick and convenient method for people to conduct business, stay in touch with friends and family, and even collect data.

But there is something missing from e-mail as well. As psychologists and laypeople know, much of communication is nonverbal (Archer & Akert, 1977; Argyle, 1970; DePaulo & Friedman, 1998). Although the value of nonverbal communication is sometimes overstated (DePaulo, 1992; Krauss et al., 1981; Rime, 1982), the fact remains that nonverbal information is an important cue to the speaker's meaning, particularly when the literal content of the message is ambiguous (Allbritton, McKoon, & Ratcliff, 1996; Price, Ostendorf, Shattuck-Hufnagel, & Fong, 1991). After all, the same statement can, depending on tone, emphasis, and expression, be either sarcastic or serious, disrespectful or deferential, sanguine or somber (Abrahams, 1962; Clark, 1996; Drew, 1987; Goffman, 1959). Similarly, people use inflection and gesture to soften the blow of negative communication, to literally tone down bad news or mute unfavorable feedback. Whereas speech conveys not only what is said but also how it is said, e-mail is limited to the former. As such, e-mail is an inherently more impoverished communication medium than voice or face-to-face communication (Kiesler, Siegel, & McGuire, 1984; Sproull & Kiesler, 1986; Thompson & Nadler, 2002).

This limitation is likely to be fertile ground for miscommunication and, in particular, a lack of awareness of that miscommunication. E-mail communicators, after all, are well aware of the precise message that they intend to convey. Over e-mail, we know that we are being sarcastic when referring to the comic brilliance of, say, Adam Sandler, just as we know that we are not when making the same statement of John Cleese. Note, however, that what is obvious to us may be considerably less so to the person on the other end of the computer. Whereas we "hear" a statement differently depending on whether we are speaking sarcastically or seriously, our e-mail audience, without the paralinguistic cues that in voice communication flag sarcasm, may not. And because it can be difficult to separate one's own experience of a stimulus from the stimulus available to one's audience, one's e-mail message may be more ambiguous than one realizes.

To be sure, to help resolve such ambiguities, the tech-savvy occasionally make use of symbolic so-called emoticons, such as the smiley face ":-)," the winking smiley face ";-)," or the dreaded ":-(." This is not such a clear remedy, however, as many emoticons

are themselves ambiguous. Emoticonuniverse.com, for instance, lists no fewer than 300 emoticons, some of which are far from intuitive, including ";-?," "%-(," and ":~/."[2] Moreover, people often neglect to use emoticons altogether, particularly when the sarcasm or humor is "obvious." We are a reminded of an e-mail a well-known psychologist sent to her colleagues announcing a dinner reception in honor of a job candidate. After the usual promise of free food, good drink, and stimulating conversation, she sarcastically pointed out that "talking to the candidate is not required; just don't embarrass us." Much to her surprise, some colleagues took offense at the comment, thinking that she was genuinely concerned about the embarrassment that her boorish coworkers might cause. Apparently her colleagues did not realize that she was being sarcastic, and apparently she did not realize that her sarcasm was unclear.[3]

We suspect such misunderstandings are common. People routinely overestimate how well they can communicate over e-mail, we offer, particularly when the meaning of the message is ambiguous. We further argue that this overestimation is caused, at least in part, by egocentrism, the inherent difficulty of moving beyond one's subjective experience of a stimulus and imagining how the stimulus might be evaluated by someone who does not share one's privileged perspective.

Given the growing popularity of e-mail and the fact that successful communication depends partly on the ability to anticipate *mis*communication (Keysar & Henly, 2002), these predictions are of both practical and theoretical importance. Despite this, our hypothesis has yet to be investigated in either the social judgment literature or in the rapidly emerging literature on computer-mediated communication. Several researchers have investigated the ability of individuals to communicate over e-mail (e.g., Dennis & Kinney, 1998; Hebert & Vorauer, 2003; Thompson & Nadler, 2002; Walther, 1993, 1995; Walther, Loh, & Granka, 2005), but no researchers have investigated the perceived ability of individuals to do so, nor have they contrasted the two. The one published exception of which we are aware is a study by Sherman et al. (2001). These researchers found that home page creators predicted that others would form a more positive impression of them than was actually the case, and that this was less true when participants communicated face to face. If one assumes that the home page creators intended to portray a positive impression of themselves, then these data could be interpreted as evidence of overestimation of communication effectiveness. However, note that these researchers did not investigate e-mail, nor did they investigate the cause of this overestimation.

The present research was designed to more directly examine overconfidence over e-mail as well as the mechanism thought to

---

[2] According to the Web site, these emoticons imply that the e-mailer "speaks with a forked tongue," is "confused," and is "unsure," respectively.

[3] The common usage of the term *sarcasm* in the United States differs from most dictionary definitions. Webster's, for instance, offers the example of "My, you're early" being said to a latecomer as an example not of sarcasm, but of irony (Agnes, 1999, p. 1272), whereas most Americans would say that the opposite is true. In the present article, we follow the convention set in past research (Keysar, 1994; Keysar et al., 1998) and colloquial use by referring to instances in which one's intended meaning differs from the literal meaning as sarcasm.

underlie it. In five studies, we compared the perceived and actual ability of participants to communicate over e-mail. In each study, we hypothesized that participants' predicted ability would exceed their actual ability. Our last two studies tested the egocentrism account of this overconfidence by experimentally manipulating the phenomenological experience of e-mailers.

We also compared overconfidence over e-mail with more traditional modes of communication. Whereas our egocentrism analysis suggests that e-mail should be associated with greater overconfidence than, say, voice communication, this is by no means a forgone conclusion. Prior work has found that for all the value of nonverbal information, people have occasional difficulty interpreting nonverbal information (DePaulo, 1992; Keysar & Henly, 2002; Lanzetta & Kleck, 1970). What is more, communicators are often insensitive to these difficulties, believing their nonverbal cues are clearer to others than they really are (Keysar & Henly, 2002)— even when they do not wish them to be (Gilovich et al., 1998; Vorauer & Claude, 1998). All of this suggests that voice communication might be associated with more, rather than less, overconfidence—the opposite of what we predict. To help shed light on this issue, Studies 2 and 3 compared overconfidence in e-mail communication with that of voice communication.

### Study 1

Participants in Study 1 were given a list of 10 topics and asked to write two statements about each one. Half of the statements were to be serious and the other half sarcastic. Senders e-mailed the statements to another participant, who attempted to identify which sentences were intended to be sarcastic and which were not. The senders then predicted the receivers' accuracy. We predicted that senders would overestimate their ability to communicate sarcasm to the receiver.

#### Method

*Participants.* Twelve Cornell University students participated in exchange for extra credit in an introductory psychology or human development course. All participants had their own personal e-mail account and at least some experience using e-mail, a characteristic of all participants in this research.

*Procedure.* Participants were recruited in pairs for a study of sarcasm. Each participant was given a list of 10 topics and asked to e-mail two one-sentence statements about each one. The topics varied: Within each pair, one participant was asked to write about parties, art, dating, California, sports, TV, food, cars, literature, and life in Ithaca, New York (the town in which the study took place), and the other participant was asked to write about dorm life, movies, computers, romance, Manhattan, athletics, family, music, politics, and the Cornell Greek system. According to a predetermined random order, participants were instructed to make half of the sentences serious, such as "I do not like first dates," and the other half sarcastic, such as "I really enjoy dating because I like feeling as self-conscious and inadequate as possible." To ensure that participants understood what we meant by sarcasm, we presented several examples designed to convey the colloquial meaning of the term: a statement in which one's intended meaning is the exact opposite of the literal meaning. Apart from the examples, participants were given no specific instructions regarding how to accomplish their goal, except being told to avoid using emoticons such as ";-)."

Participants then anticipated how the receiver would interpret their statements. Specifically, participants were told (correctly) that the receiver would attempt to identify which statements were intended to be sarcastic

and which were not. Participants then indicated, for each topic, whether they thought the receiver would be able to correctly identify the nature (sarcastic or nonsarcastic) of the two statements by checking a box marked "yes" or "no." Each participant then read the 20 statements that had been e-mailed by the other participant and indicated on a questionnaire which statements they believed were sarcastic. The design was thus fully within-participants, with each participant serving as both a sender and receiver.

#### Results and Discussion

We expected participants to overestimate their ability to communicate sarcasm. To test this hypothesis, senders' predictions of the receivers' accuracy were compared with the receivers' actual accuracy. Because the data for each pair are interdependent, the data were analyzed at the level of the dyad. Specifically, we averaged each person's estimate of the number of topics (out of 10) that they expected the other person to successfully decode and compared that number with the number of topics actually decoded. As expected, participants were overconfident: On average, participants expected 97% of their topics to be correctly decoded, compared with the 84% that actually were, $t(5) = 3.23$, $p = .023$, $d = 1.32$.

We attribute these results to egocentrism. Because senders knew, for example, that the statement "*Blues Brothers, 2000*—now that's a sequel," was meant to be sarcastic, they egocentrically assumed that their audience would as well. They presumably did not realize how ambiguous the statement really is without verbal emphasis on the word "that's," a facial gesture such as an eye roll, or some background information about the communicator (such as his or her taste in films).

Note, however, that despite reliable overconfidence, accuracy rates were quite high (84%). It would therefore be misleading to suggest from these data that people are poor at communicating sarcasm over e-mail. These data do suggest, however, that however able people are, they are not as able as they believe.

### Study 2

One limitation of Study 1 was that although participants were overconfident in their ability to communicate over e-mail, it was unclear whether this overconfidence had anything to do with e-mail per se. After all, numerous studies attest to the general tendency of individuals to be overconfident in their endeavors (e.g., Dunning, Griffin, Milojkovic, & Ross, 1990; Keren, 1987; Lichtenstein, Fischoff, & Phillips, 1982; Oskamp, 1965; Vallone, Griffin, Lin, & Ross, 1990; Wright, Rowe, Boger, & Gammack, 1994). The previous study may thus have simply been yet another instantiation of that general tendency. To resolve this ambiguity, in Study 2 we contrasted the overconfidence people display when communicating via e-mail with the overconfidence they display when communicating with their voice. If our egocentrism analysis is correct, then overconfidence should be greater over e-mail than over voice—not because of differences in the perceived ability to communicate but because of differences in the actual ability to communicate.

Study 2 also went beyond Study 1 by assessing confidence among both senders and receivers. Although overconfidence in the ability to communicate a message can be problematic, it can be doubly troublesome when accompanied by overconfidence in the ability to interpret that message. We investigated both kinds of overconfidence in Study 2.

928                                   KRUGER, EPLEY, PARKER, AND NG

## Method

*Participants.* Sixty Cornell University students participated in exchange for extra credit in an introductory psychology or human development course.

*Procedure.* Participants completed the experiment in pairs. On arrival to the lab, each member of the pair was escorted to a private room and given a questionnaire. The experimenter explained that the study concerned how people detect and communicate sarcasm, and that the first part of the experiment involved selecting a series of statements that the other person in the experiment would later be asked to identify as either sarcastic or serious. Participants were next given a list of 20 statements about a number of topics, such as food, Greek life, and Ithaca weather. Half were identified (correctly) as being intended by the original author of the statement to be sarcastic and the other half nonsarcastic. Participants within each pair received a different list so that they would not be sending each other the same statements.

Participants then selected 10 of the statements to communicate to the other person in the experiment. They were told to select the statements that they believed would be easiest for the other person to identify as sarcastic or serious. The number of serious versus sarcastic statements varied randomly across participants, with a mean of five statements per category per participant. Up to this point in the experiment, no mention was made of exactly how the statements would be transmitted to the other participant (i.e., via e-mail, voice, or smoke signal) to ensure that participants in the e-mail and voice conditions did not select systematically different statements.

Meanwhile, the experimenter randomly assigned one member of the dyad to the e-mail condition and the other member to the voice condition. Participants in the e-mail condition were escorted to a computer and asked to type each statement they had selected into the computer exactly as written. Participants in the voice condition, in contrast, were escorted to a tape recorder and asked to read each statement into the tape recorder exactly as written. Both participants were told that the other participant would later attempt to identify the nature (sarcastic or serious) of each statement.

Once they had finished recording their statements, participants predicted how many statements the other participant would be able to decode correctly. Specifically, participants checked a box marked "yes" or "no" for each statement to indicate whether they thought the other person in the experiment would be able to correctly identify the true nature (sarcastic or nonsarcastic) of the statement.

Finally, participants listened to (or read) the statements selected by the other participant. Participants then indicated whether they thought each statement was intended to be sarcastic or nonsarcastic as well as whether they thought they had correctly identified the statement (yes or no).[4] All participants were then thanked, debriefed, and dismissed.

## Results and Discussion

Study 2 was a 2 (condition: e-mail vs. voice) × 2 (accuracy: anticipated vs. actual) fully within-group factorial, with the dyad as the level of analysis. Because participants communicated different numbers of sarcastic statements, perceived and actual accuracy were converted to a percentage. Responses from one group were over 3 $SDs$ away from the mean on several dependent variables and were excluded from the analysis, yielding a final sample size of 29 dyads.

Not surprisingly, participants in the voice condition communicated more effectively than those in the e-mail condition. As shown in Figure 1, participants who listened to the statements decoded nearly three-quarters of them, compared with an accuracy rate indistinguishable from chance (50%) among participants who



*Figure 1.* Anticipated and actual ability to communicate by condition (Study 2).

read them on e-mail. But more important, Figure 1 also shows that e-mailers failed to anticipate this difference. Although participants' actual ability to communicate sarcasm varied considerably depending on whether they used e-mail or their voice, $t(28) = 2.53$, $p = .017$, $d = 0.47$, their *confidence* in their ability did not ($t < 1$). This between-condition difference in overconfidence was confirmed by a 2 (e-mail vs. voice) × 2 (predicted vs. actual) fully within-group analysis of variance (ANOVA), which yielded only the predicted interaction, $F(1, 28) = 5.20$, $p = .030$, $\eta^2 = 0.16$. Participants were overconfident when they communicated over e-mail, $t(28) = 3.40$, $p = .002$, $d = .61$, but not when they communicated over voice, $t < 1$.

An interesting finding was that an analogous pattern of overconfidence emerged among participants' ability to *detect* sarcasm. Recall that after participants attempted to identify the nature (sarcastic or serious) of each statement, they also indicated whether they thought they had been successful. Although participants in the e-mail condition were less able than those in the voice condition to decode sarcasm, they were no less confident ($Ms = 89\%$ & $91\%$, respectively), $t < 1$. A 2 × 2 ANOVA comparing receivers' perceived and actual ability to detect sarcasm over e-mail and voice revealed that overall, participants were overconfident, $F(1, 28) = 33.75$, $p < .001$, $\eta^2 = 0.55$, but this was particularly true for receivers in the e-mail condition, $F(1, 28) = 3.68$, $p = .065$, $\eta^2 = 0.12$. In sum, participants in this experiment were overconfident in their ability to both convey and detect sarcasm over e-mail, but they were considerably less overconfident over voice.

## Study 3

Taken together, the results of Studies 1 and 2 suggest that people are overconfident in their ability to communicate sarcasm over e-mail. Just as people have difficulty divorcing themselves from

---

[4] Decision theorists may point out that an answer of "no" to this question is irrational because it implies that the person believes that his or her answer to the question is less than 50% likely to be correct, and if so, the participant should change it (there being only one other possible response). Given the frequency of "no" responses, we suspect that participants interpreted the question differently than decision theorists.

the melody that inevitably accompanies the act of tapping a song, so, too, do people who send a sarcastic e-mail have difficulty divorcing themselves from the sarcastic tone that inevitably accompanies the act of typing a sarcastic statement.

There are, however, several limitations of the data presented thus far. First, whereas Studies 1 and 2 focused exclusively on the communication of sarcasm (or the lack thereof), note that the egocentrism analysis we have offered ought to apply to any subtle form of communication that relies on paralinguistic cues. Thus, in Study 3, we expanded our empirical focus to include not only sarcasm and seriousness, but sadness and anger as well.

Second, whereas participants in Studies 1 and 2 were strangers, note that the majority of (nonspam) e-mails in daily life are between acquaintances. This presents a potential threat to external validity. After all, it stands to reason that people are generally better at communicating with people they know than with people they do not, which, all else equal, should be associated with decreased, perhaps even eliminated, overconfidence. To address this possibility, Study 3 compared overconfidence among strangers versus friends. In addition to addressing external validity, note that this comparison also enabled us to examine the more general impact of familiarity on overconfidence in communication.

Finally, whereas participants in the voice condition of Study 2 were unable to see one another, this is hardly characteristic of most voice interactions, which are face-to-face (Panko & Kinney, 1995). As such, a more ecologically valid test of the comparative advantages and disadvantages of e-mail versus voice requires a condition in which participants communicate face-to-face. Study 3 included just such a condition.

In addition to increasing external validity, note that including three levels of media richness allowed us to examine precisely what it is about e-mail that engenders increased overconfidence. Because we observed greater overconfidence in e-mail than in voice-only communication in Study 2, the lack of intonation alone appears sufficient to increase overconfidence, but gesture and facial expression may also play a role (Daft & Lengel, 1986; Daft & Trevino, 1987). By comparing perceived and actual ability to communicate in e-mail, voice-only, and face-to-face communication, we could find out.

### Method

*Participants.* One hundred fifty-four pairs of University of Illinois students participated on a volunteer basis.

*Procedure.* Each pair of participants was recruited door-to-door by one of 77 separate experimenters following a standardized script. Depending on condition, the experimenter was instructed to recruit a pair who identified themselves either as friends or strangers. The experiment took place in one of the participants' residences, which the experimenter verified had Internet access.[5]

Once each member of the pair agreed to participate, the experimenter explained that the study would involve constructing, and then communicating, a series of five statements, each of which would be paired with one of four emotions or tones. Their job, they were told, would be to successfully communicate each specific emotion or tone to the other participant. The medium with which the statements were communicated, however, varied by condition. Approximately one third of participants were told that they were to e-mail the statements to one another, and the remaining two thirds were told that they were to speak the statements to one another. Within the latter group, half were further told that they would do so either

with or without being able to see one another. That is, instead of communicating face-to-face, they would speak with their backs to one another.

Once the pair was told the medium in which they were to communicate, each member was given a list of five topics (music, Illini football, dating, dorm food, and dorm life). Each topic was matched to one of four emotions or tones (sarcasm, seriousness, anger, or sadness). For each topic, the participant's job was to construct a statement that would successfully convey the associated emotion or tone to the other participant when either typed or spoken but without stating the emotion or tone explicitly (e.g., "I am being sarcastic"). Participants also indicated, for each topic, whether they expected the other participant to successfully guess the emotion or tone (on a dichotomous "yes" or "no" scale). Special care was taken to ensure that (a) participants were aware of the communication medium prior to making their predictions (e.g., whether they would be communicating via e-mail, with their voice only, or face-to-face), and that (b) participants understood that the other participant would be picking from a list of the four possible emotions or tones for each topic. As in Study 1, participants in the e-mail condition were restricted from using emoticons.

Next, participants communicated the five statements to one another, one at a time, as instructed (i.e., via e-mail, voice-only, or face-to-face). Specifically, one member of the pair (the sender) spoke or typed all five of his or her statements to the other participant (the receiver), and then the pair switched roles. This was done one sentence at a time, which in the e-mail condition meant that the statements were e-mailed one at a time rather than in a single e-mail. After each statement, the receiver attempted to guess the emotion or tone the sender was attempting to convey (from a list of four) and indicated his or her confidence in that guess by checking a box labeled "yes" or "no." Once this was complete, all participants were then thanked and debriefed.

### Results and Discussion

Our primary prediction was that overconfidence would be greater when participants communicated over e-mail than when participants communicated with their voice. To test this prediction, we conducted a 2 (accuracy: anticipated vs. actual) × 2 (order: Round 1 vs. Round 2) × 2 (acquaintanceship: stranger vs. friend) × 3 (medium: e-mail vs. voice-only vs. face-to-face) mixed-model ANOVA with the dyad as the level of analysis. The first two factors in this design were within-participants variables, and the second two were between-participants variables.

This analysis revealed several significant effects. First, we observed a significant main effect for communication medium, $F(1, 148) = 3.67$, $p = .028$, $\eta^2 = .05$, indicating that on average, both predicted and actual accuracy for both friends and strangers were higher in the voice conditions than in the e-mail conditions. We also observed a main effect for order, $F(1, 148) = 11.67$, $p = .001$, $\eta^2 = .07$, indicating that on average, predicted and actual accuracy for both friends and strangers were higher during the second round of communication than the first. We also observed an unexpected Accuracy × Order × Acquaintanceship interaction, $F(1, 48) = 4.17$, $p = .043$, $\eta^2 = .03$. On average, overconfidence tended to decrease from Round 1 to Round 2 for strangers but tended to increase for friends.

No other main effects or interactions were significant, except for the following two exceptions. First, we observed the predicted main effect for accuracy: Participants predicted that they would successfully communicate more emotions or tones ($M = 88.8\%$)

---

[5] We included this prerequisite regardless of condition in order to minimize sampling bias.

930                                        KRUGER, EPLEY, PARKER, AND NG

than they actually did ($M = 70.4\%$), $F(1, 148) = 118.26, p < .001$, $\eta^2 = .44$. Second, and more important, we observed a significant Accuracy × Medium interaction. As Figure 2 shows, participants were more overconfident when they communicated over e-mail than when they communicated with their voice, $F(2, 148) = 3.31$, $p = .039$, $\eta^2 = 0.04$. As in Study 2, participants' ability to communicate varied considerably depending on whether they used e-mail or their voice, $F(2, 151) = 4.68$, $p = .011$, $\eta^2 = 0.06$, but their confidence in their ability did not, $F < 1$, ns.

An interesting result was that familiarity also had no influence on the results, $Fs < 1$, ns. This null effect is important for two reasons. First, it suggests increased familiarity does not necessarily translate into increased communication accuracy, contrary to what one might expect. Second, and perhaps more important, it makes it clear that the overconfidence observed in Studies 1 and 2 did not emerge simply because participants were strangers rather than friends.

There was also no difference in either predicted or actual communication accuracy between the face-to-face and voice-only conditions, $Fs < 1$, ns. These data, together with the data presented in Study 2, suggest that the increased overconfidence in e-mail is due to the lack of intonation and vocalization rather than the lack of gesture and expression. That said, this null result is not without alternative interpretations. For instance, whereas participants in Studies 1 and 2 predicted their accuracy *after* communicating over their assigned medium, participants in Study 3 did so *before* communicating. Although all participants in Study 3 were well aware of the medium in which they were about to communicate their message, and although the results of Study 3 perfectly dovetail with the results of Studies 1 and 2, it could be argued that collecting predicted accuracy before direct experience with the communication medium diminishes the latter's impact on the former. This methodological feature was necessary in Study 3 to avoid introducing a procedural confound, as only participants in the face-to-face condition would have had access to a listener's nonverbal response to their communication when predicting their communication accuracy. Nevertheless, future research that effectively counterbalances predicted accuracy and actual communication is necessary to draw definitive conclusions about differences in overconfidence between voice and face-to-face interactions.



*Figure 2.* Anticipated and actual ability to communicate by condition (Study 3).

Our final set of analyses focused on overconfidence in participants' ability to comprehend subtleties in communication. Recall that participants in Study 2 were not only overconfident in their ability to convey sarcastic messages, but were also overconfident in their ability to detect sarcastic messages. Study 3 showed a similar pattern. Overall, participants believed that they understood more emotions and tones ($M = 89.4\%$) than they in fact did ($M = 70.4\%$), $F(1, 148) = 114.07, p < .001$, $\eta^2 = 0.44$. This effect was bigger, however, in the e-mail condition ($M_{predicted} = 89.3\%$ vs. $M_{actual} = 62.8\%$) than in either the face-to-face ($M_{predicted} = 89.4\%$ vs. $M_{actual} = 73.9\%$) or voice-only ($M_{predicted} = 89.4\%$ vs. $M_{actual} = 73.3\%$) conditions, $F(2, 148) = 3.66$, $p = .028$, $\eta^2 = 0.05$. Here, too, this effect was uninfluenced by acquaintanceship: Participants were just as overconfident when communicating with a stranger as when they were communicating with a friend, $F < 1$, ns.

### Study 4

Why do people overestimate their ability to communicate over e-mail? Our thesis is that people are biased by their own phenomenology when trying to imagine the perspective of someone else. Because people know when they are trying to be sarcastic, for instance, they egocentrically assume that their audience will know as well.

Study 4 was the first of two studies designed to test this egocentrism explanation directly. Participants communicated sarcasm to one another in a manner similar to Study 2, with one major exception: Before predicting whether the other participant would interpret the statements correctly, participants were asked to read each statement out loud into a tape recorder. Half of the participants were asked to intonate in a manner consistent with the intended meaning (i.e., to read the sarcastic messages sarcastically) and the other half in a manner inconsistent with the intended meaning (i.e., to read the sarcastic messages seriously).

Our reasoning was simple. If people are overconfident in their ability to communicate over e-mail partly because of the difficulty of moving beyond their own perspective, then forcing people to adopt a perspective different from their own ought to reduce this overconfidence. As a result, participants who vocalized the messages in a manner inconsistent with the intended meaning should be less overconfident than those who vocalized the messages in a manner consistent with the intended meaning.

### Method

*Participants.*  Fifty-four University of Illinois students participated in pairs in exchange for course credit in an introductory psychology course.

*Procedure.*  As in Study 2, participants were given one of two lists of 20 statements, half of which were sarcastic and half of which were not. Participants were told to select 10 statements that they felt would be particularly easy for the other participant to identify as either sarcastic or serious and to type each one into a computer for the other participant to read later in the experiment. Up to this point, the procedure mirrored Study 2 except that there was no voice condition (i.e., all participants communicated with one another via e-mail), and participants were asked to select five sarcastic and five serious statements (instead of a varying number as in Study 2).

When they finished typing, participants were asked to record each statement into a tape recorder, ostensibly for "later analysis." Half of the

participants were asked to vocalize each statement just as intended, that is, to speak in a sarcastic tone when reading the sarcastic statements and in a serious tone when reading the nonsarcastic sentences. The other half of participants were asked to record each statement in the opposite manner, that is, to say the sarcastic statements seriously and the serious statements sarcastically. After recording each sentence, participants in both conditions rated how sarcastic or nonsarcastic the sentence sounded to them on a scale from 1 (*very nonsarcastic*) to 11 (*very sarcastic*) and then predicted whether the other participant in the experiment would be able to correctly identify the statement.

Finally, participants read the statements that had been e-mailed by the other participant in the experiment. As in Study 2, participants indicated whether they thought the statement was intended to be sarcastic or non-sarcastic as well as whether they thought they had guessed correctly or not. All participants were then thanked, debriefed, and dismissed.

### Results and Discussion

Our primary prediction was that asking participants to read their messages aloud in a manner inconsistent with their intended meaning would change their phenomenological experience of the stimuli—that is, the sarcastic statements would no longer "sound" quite so sarcastic, nor the serious statements quite so serious—and as a consequence, would reduce overconfidence. Consistent with the first part of this prediction, participants in the opposite-phenomenology condition indicated that the sarcastic statements sounded less sarcastic ($M = 4.31$) than those in the same-phenomenology condition ($M = 7.79$), $t(26) = 7.78$, $p < .001$, $d = 1.50$. Similarly, the serious statements sounded less serious to participants in the opposite-phenomenology condition ($M = 7.04$) than they did to participants in the same-phenomenology condition ($M = 3.27$), $t(26) = 8.77$, $p < .001$, $d = 1.69$. Because participants were assigned to conditions after selecting their statements, these differences suggest that the manipulation was successful in changing senders' own subjective interpretation of the stimuli.

To investigate whether these differences influenced overconfidence, predicted and actual communication were compared in a 2 (phenomenology: same vs. opposite) × 2 (accuracy: anticipated vs. actual) fully within-group ANOVA, with accuracy operationalized as the percentage of statements correctly identified as either sarcastic or nonsarcastic.[6] This analysis revealed two interesting effects. First, there was a main effect of accuracy: As in the previous three studies, anticipated accuracy ($M = 72.3\%$) exceeded actual accuracy ($M = 62.8\%$), $F(1, 26) = 6.13$, $p = .020$, $\eta^2 = 0.19$. Second, and more important, this main effect was qualified by a significant interaction, $F(1, 26) = 8.44$, $p = .007$, $\eta^2 = 0.25$. As shown in Figure 3, the phenomenology manipulation completely erased participants' overconfidence. Whereas participants in the same-phenomenology condition overestimated the number of sentences their partner in the experiment would be able to correctly identify, $t(26) = 4.89$, $p < .001$, $d = 0.94$, there was no difference in anticipated and actual communication among participants in the opposite-phenomenology condition, $t < 1$.

As in the previous two studies, participants also were overconfident in their ability to detect sarcasm. On average, participants believed they correctly identified 88.2% of the statements, compared with the actual accuracy rate of 62.8%, $F(1, 26) = 59.09$, $p < .001$, $\eta^2 = 0.70$. This difference was uninfluenced by condition, $F < 1$, which is hardly surprising given that we manipulated the sender's phenomenology, not the receiver's.



*Figure 3.* Anticipated and actual ability to communicate by condition (Study 4).

Overall, participants were once again overconfident in their ability to communicate over e-mail. However, this overconfidence was reduced—indeed, eliminated—once participants were forced to adopt a phenomenology that differed from their own. Specifically, asking participants to vocalize their statements in a manner inconsistent with their intended meaning altered their own subjective perceptions of those statements, making the sarcastic statements sounded less sarcastic and the serious statements less serious. As a result, overconfidence disappeared. These findings further implicate egocentrism as a source of overconfidence in e-mail communication.[7]

### Study 5

Studies 1 through 3 demonstrated that people are overconfident in their ability to communicate sarcasm, seriousness, anger, and sadness over e-mail, and Study 4 implicated egocentrism as a probable source of this overconfidence. Study 5 was intended to supplement these results by exploring what may be an even more common variety of miscommunication over e-mail: humor. Informal observation suggests that attempts at humor are often less

---

[6] We included nonsarcastic as well as sarcastic statements in our measures of perceived and actual accuracy because we expected our manipulation to change not only the phenomenological experience of the sarcastic statements, but the phenomenological experience of the nonsarcastic statements as well.

[7] Notice that the videotape manipulation in this experiment is also relatively immune to an alternative interpretation of Study 4 based on experimenter demand. It is possible, after all, that deliberately asking participants to read their statements in a manner different from that originally intended may have led them to infer that the purpose of the manipulation was to reduce overconfidence and to change their responses in an effort to be consistent with this hypothesis. Although this and other demand-related interpretations are perhaps unlikely given that we found evidence for our proposed mediating variable (i.e., the phenomenological experience of the stimuli covaried by condition), Study 5 diminishes this concern even further because the videotape manipulation is a much more subtle manipulation of participants' phenomenology and presumably contains no experimental demand.

932                                              KRUGER, EPLEY, PARKER, AND NG

successful over e-mail than one would think. A "funny" joke, "amusing" anecdote, or "hilarious" tale often does not pack the intended punch over e-mail, likely for many of the same reasons attempts to convey emotions and tones over e-mail can fail us. Without the verbal channel, nuances of expression, timing, and emphasis are lost, and our electronic attempts at humor can fall flat.

The present experiment was designed to test this hypothesis as well as to provide converging evidence for the egocentrism account of e-mail overconfidence. Participants e-mailed a series of humorous "deep thoughts" by Jack Handey (a pseudonym of comedian Al Franken) to another study participant. These included observations such as the following:

> I guess of all my uncles, I liked Uncle Caveman the best. We called him Uncle Caveman because he lived in cave, and because sometimes he'd eat one of us. Later on we found out he was a bear. (Handey, 1992)

Half of the participants simply read the jokes and then e-mailed them, whereas the other half first watched a videotape of the jokes being read on the TV show *Saturday Night Live* (*SNL*). As *SNL* fans know, part of what makes these jokes funny (and all jokes, for that matter) is not merely the observations themselves, but the nuances of timing and delivery. Thus, we expected participants in the videotape condition to find the observations funnier than would participants in the control condition. But more than that, we expected this difference to translate into participants' predictions of how the jokes would be perceived by the other person in the experiment. Although the actual content of the e-mail would be constant across conditions, we expected that participants would have a hard time distinguishing their subjective experience of the joke from its objective properties available to the person at the other end of the e-mail. As a result, participants in the videotape condition should expect their e-mail recipient to find the "deep thoughts" funnier than should participants in the control condition. Thus, whereas Study 4 sought to decrease the rift between perception and reality, the present study sought to increase it.

### Method

*Participants.*   Fifty-eight University of Illinois students participated in exchange for course credit in an introductory psychology course.

*Procedure.*   Participants in the first phase of the experiment ($n = 29$) were recruited in groups of 4 to 5. On arrival to the lab, participants were told that the experiment concerned everyday communication and, in particular, how people communicate humor. They were then given a list of 10 "Deep Thoughts by Jack Handey."

Next, participants selected the five "deep thoughts" that they thought were the funniest, which they were told (correctly) would be e-mailed to another participant later in the experiment. Participants in the videotape condition ($n = 19$) next watched a video compilation of all the "deep thoughts" as being performed on *SNL*, whereas participants in the control condition ($n = 20$) did not. All participants then rated how funny they thought each "deep thought" was as well as how funny they thought the person on the other end of the e-mail would think it was. Each rating was made on a separate 11-point (*not at all funny*) to 11 (*very funny*) scale. The order in which participants provided their own humor rating and their anticipated humor rating was counterbalanced.

In the second phase of the experiment, each participant's selections were e-mailed to a yoked participant ($n = 29$) who was told to simply read and rate the humor of the five "deep thoughts" using the same scale as above.

### Results

The order in which Phase 1 participants made their ratings did not influence the results and is not discussed further.

Our primary predictions were that participants in the *SNL* condition would find the "deep thoughts" more humorous than those in the control condition, and that this difference would translate into participants' predictions about how the jokes would be evaluated by the person at the other end of the computer. As shown in Figure 4, our predictions were confirmed. Participants in the videotape condition thought that the "deep thoughts" were funnier than did participants in the control condition, $t(27) = 7.82$, $p = .009$, $d = 0.98$, and the same was true of participants' predictions of the recipients' evaluation of the jokes, $t(27) = 7.97$, $p = .009$, $d = 0.99$. Also as shown in Figure 4, this was true despite equivalent actual audience humor ratings in the two conditions, $t < 1$. As a result, participants overestimated how funny their e-mail recipient would find the jokes, $F(1, 27) = 19.55$, $p < .001$, $\eta^2 = 0.42$. However, a 2 (condition: videotape vs. control) $\times$ 2 (audience humor rating: anticipated vs. actual) ANOVA revealed a significant interaction, $F(1, 27) = 3.58$, $p = .069$, $\eta^2 = 0.12$, indicating that this was especially true among participants in the videotape condition.

### Discussion

These findings further implicate the role of egocentrism in e-mail (mis)communication. As in Study 4, participants' assessments of the stimuli available to their e-mail recipient were influenced by their own phenomenological experience of the stimuli. As a result, participants overestimated the extent to which humor would be conveyed, but this was particularly true when participants' own phenomenological experience of the stimuli was especially rich. These results are analogous with those of Vorauer and



*Figure 4.*   Own, predicted audience, and actual audience humor ratings by condition (Study 5). Humor ratings were on a scale ranging from 1 (*not at all funny*) to 11 (*very funny*).

Ross (1999), who found that people overestimated the extent to which their personality traits were transparent to an interaction partner, especially when self-knowledge was salient to them.

Note, however, that participants were hardly unaware that their audience's perspective would differ from their own. As Figure 4 shows, participants recognized that others might not find the jokes quite as funny as they did (the difference between the dashed and solid-black lines). However, as Figure 4 also shows, this difference was not only underestimated, but was completely insensitive to the actual difference in humor. As can be seen, the difference between e-mailers' own impression of the stimuli and their predictions of the e-mail recipients' impression of stimuli was the same regardless of the extremity of the participants' own perspective. As a result, the greater the difference between e-mailers' own perspective of the stimuli and that of their audience, the greater the miscalibration in e-mailers' predictions.

## General Discussion

If comprehending human communication consisted merely of translating sentences and syntax into thoughts and ideas, there would be no room for misunderstanding. But it does not, and so there is. People convey meaning not only with what they say, but also with how they say it. Gesture, voice, expression, context—all are important paralinguistic cues that can disambiguate ambiguous messages (Archer & Akert, 1977; Argyle, 1970; DePaulo & Friedman, 1998). Indeed, it is not uncommon for paralinguistic information to more than merely *supplement* linguistic information, but to alter it completely. The sarcastic observation that "Blues Brother, 2000—now that's a sequel" may imply one thing in the presence of paralinguistic cues but quite the opposite in the absence of them.

The research presented here tested the implications of these observations for the rapidly escalating technology of e-mail, a communication medium largely lacking in paralinguistic information. We predicted that because of this limitation subtle forms of communication such as sarcasm and humor, would be difficult to convey. But more than that, we predicted that e-mail communicators would be largely unaware of this limitation. Because participants knew what they intended to communicate, we expected them to assume that their audience would as well.

Five studies confirmed these predictions. In each one, participants overestimated their ability to communicate over e-mail. This was true regardless of whether participants were trying to communicate sarcasm (Studies 1 through 3), humor (Study 5), or some other emotion or tone (Study 4), and regardless of whether participants were free to craft their own communication (Studies 1 and 3) or were constrained by the experimenter (Studies 2, 4, and 5).

Studies 2 through 5 also shed light on one cause of this miscalibration. We reasoned that when people try to anticipate the perspective of their e-mail audience, they focus excessively on their own phenomenology or experience and insufficiently consider the audience's perspective. This implies that the greater the difference between the communicator's own interpretation of the stimuli and the stimuli available to the audience, the greater the miscalibration. Consistent with this account, we found in Studies 2 and 3 that overconfidence was greater when participants communicated over e-mail than by voice, presumably because they failed to consider the extent to which their audience's perspective was

different from their own. As shown in Figures 1 and 2, whereas the ability to communicate varied considerably depending on whether participants communicated by e-mail or voice, confidence in that ability did not. To their credit, participants did not assume that their audience would identify *all* of their sarcastic statements and thus seemed to realize that their audience did not share their own "privileged" perspective. But nor did they take adequate account of the gulf between their own perspective and their audience's.

More direct evidence came from Studies 4 and 5, in which manipulations of e-mailers' own phenomenologies produced corresponding changes in their estimates of what they had communicated to their audience, with overconfidence reduced when the e-mailers' phenomenology was brought into line with their audience's (Study 4) and increased when it was made even more discrepant (Study 5). In other words, whereas Studies 2 and 3 held constant the phenomenology of the communicator and manipulated the richness of the stimuli available to the audience, Studies 4 and 5 held constant the stimuli available to the audience and manipulated the phenomenology of the communicator. In each case, however, overconfidence varied as a function of the difference between the e-mailer's impression of the stimuli and the stimuli available to the e-mail recipient: The bigger the rift between the two, the greater the overconfidence.

Along the way, we also found that participants overestimated their ability to interpret e-mail. In Studies 2 through 4, participants overestimated their ability to discern emotions and tones, and Studies 2 and 3 revealed that this was particularly true over e-mail. Although not central to our hypotheses, we cannot help but note that egocentrism likely plays a role here as well. Once a statement is interpreted as, say, sarcastic, it may be difficult to "hear" the statement any other way, leading people to believe they understood their partner's communication better than they actually did (cf. Ross & Ward, 1996).

## Caveats

There are, however, some alternative interpretations of these results that deserve mention. For example, it is possible (albeit unlikely) that participants were simply unfamiliar with e-mail and thus were unaware of its limitations. If so, then the observed overconfidence may have been a function not of egocentrism, but of the novelty of e-mail. Although the background of our participants limits this possibility (most used e-mail regularly, if not obsessively, and all had a personal e-mail account), we suspect that experience with e-mail is an important moderator worth investigating in future research. A reasonable hypothesis is that the more experience people have communicating over e-mail, the less overconfident they are likely to be. Whether overconfidence disappears, however, remains to be seen.

Another possibility is that these results were produced by a misunderstanding of statistical regression. Whenever two variables are imperfectly correlated, extreme values on one variable are associated with less-extreme values on the other. Because communicators' own impressions of the stimuli were likely imperfectly correlated with their audience's, and because participants selected statements that were (to them) particularly funny or sarcastic, they may have failed to recognize that their audience's impressions were likely to be less extreme than their own by chance alone (cf. Kahneman & Tversky, 1973). Note, however,

that this possibility cannot account for the interactions observed in Studies 2 through 5 and thus cannot account for our overall pattern of results.

It is also possible that there were important differences between the way participants communicated with one another in our studies and the way people communicate with one another in everyday life that may have influenced the results. For instance, the voice conditions in our studies may have differed from everyday voice communication on factors such as time to plan remarks and level of distraction, which may have influenced calibration. As well, note that we explicitly prohibited participants in the e-mail conditions from using emoticons, which is hardly a feature of most e-mail programs. Although this design feature was necessary to maximize internal validity, it does raise questions about external validity. After all, emoticons are specifically designed to reduce the ambiguity of e-mail communication; thus, prohibiting participants from using them may have artificially reduced accuracy and increased overconfidence.

Despite the surface plausibility of this caveat, there are several reasons to doubt it. First, note that although emoticons can help disambiguate messages, many emoticons are themselves ambiguous (does that ":-)" after "I'm really looking forward to seeing you" mean that she is flirting—or kidding?). Second, note that people typically use disambiguating emoticons only when they feel that there is an ambiguity that needs disambiguating, an event that the present research suggests people are likely to underestimate.

Further reason to doubt this alternative comes from a follow-up study. Participants e-mailed a series of statements to one another in a manner similar to that of Study 3. In particular, participants were given a list of 10 topics (e.g., music, politics, dorm life) and for each one were asked to construct a sentence that would effectively communicate a specified emotion or tone (such as sarcasm or anger). They were told (correctly) that each statement would be e-mailed to another participant in the experiment, the latter of whom would then try to guess the intended emotion or tone (from a provided list of 20). We predicted, as in the previous studies, that senders would overestimate the success rate of receivers. Unlike the previous studies, however, we experimentally manipulated whether participants were able to use emoticons. We found that overconfidence did not differ between those who were using emoticons and those who were not. Thus, it does not appear that our results can be attributed to the restriction against the use of emoticons.

Nor can the results be attributed to the lack of acquaintanceship of our participants. We explicitly examined this issue in Study 3 and found that overconfidence was independent of whether participants were acquainted with their communication partner. At first blush, this would seem counterintuitive. After all, it stands to reason that people are generally better at communicating with people they know than with people they do not, which, all else equal, should be associated with decreased, perhaps even eliminated, overestimation of that accuracy. But all, we suspect, is not equal. First, note that even if familiarity was associated with improved communication, it would also be likely to be associated with improved confidence, which might result in increased, rather than decreased, overconfidence (cf. Gill, Swann, & Silvera, 1998; Swann & Gill, 1997; Van Boven et al., 2000). Second, it is not clear that acquaintanceship ought to enhance accuracy to begin

with: Prosody is shared, and it is unclear whether familiarity with one's speaker or addressee would convey much additional benefit. Indeed, in Study 3, we found no evidence of increased communication effectiveness among acquaintances.

## Implications

Although our focus has been on e-mail miscalibration, we believe that the overconfidence we have documented here likely characterizes a wide range of rapidly emerging media types. Chat rooms, instant messaging, text-based gaming environments—all have been touted for their superiority to asynchronous text media such as e-mail because of the dynamic nature of the discourse and ability to provide rapid feedback. But because these synchronous media are largely text-based, there likely remains a rift between the subjective stimuli available to the communicator and the objective stimuli available to the audience that communicators may fail to fully appreciate. In fact, we suspect the synchronous and rapid nature of these mediums may actually *increase* the rift between senders and receivers. Compared with synchronous media, asynchronous text media such as e-mail more readily allow for reflection and reconsideration of one's communication before transmission. As we saw in Study 4, such a moment of reconsideration may allow communicators to recognize the ambiguity inherent in their messages and thereby increase communication calibration. Of course, future research is necessary in order to test these hypotheses.

To be sure, we do not mean to suggest that egocentrism in communication is always undesirable. As others have pointed out, using one's own perspective as an indicator of another's is a generally valid, useful heuristic—one whose absence would render effective communication overwhelmingly difficult (Davidson, 1982; Hoch, 1987; Nickerson, 2001). But in a world with as many diverging perspectives as our own, the downside to egocentrism seems quite clear as well. To the extent that successful communication depends on an accurate assessment of one's clarity (Keysar & Henley, 2002), overconfidence of that clarity reduces the quality of communication. Specifically, overestimating the obviousness of one's intentions can lead to insufficient allowances for ambiguities in communication—with occasionally destructive results (Kruger, Gordon, & Kuban, in press).

Consider, for example, the phenomenon known in electronic bulletin boards and e-mail groups as "flaming"; the cascade of openly hostile e-mail that follows a violation of electronic etiquette, or "netiquette" (Sproull, Kiesler, & Zubrow, 1984). Although this phenomenon was originally attributed to the disinhibition and deindividuation afforded by the anonymity of the Internet (Kiesler et al., 1984; Siegel, Dubrovsky, Kiesler, & McGuire, 1986; Sproull & Kiesler, 1991), evidence for this interpretation is at best mixed (Lea, O'Shea, Fung, & Spears, 1992; Lea & Spears, 1991). Instead, we suspect that the phenomenon can be traced, at least in part, to egocentrism. To the extent that people overestimate the obviousness of the fact that they are "just kidding" when they poke fun or criticize, they may unwittingly offend.

## References

Abrahams, R. D. (1962). Playing the dozens. *Journal of American Folklore, 75,* 209–220.

Agnes, M. (Ed.). (1999). *Webster's new world dictionary* (4th ed.). New York: Macmillan.

Allbritton, D. W., McKoon, G., & Ratcliff, R. (1996). Reliability of prosodic cues for resolving syntactic ambiguity. *Journal of Experimental Psychology, 22,* 714–735.

Archer, D., & Akert, R. M. (1977). Words and everything else: Verbal and nonverbal cues in social interpretation. *Journal of Personality and Social Psychology, 35,* 443–449.

Argyle, M. (1970). *Social interaction.* New York: Atherton Press.

Camerer, C., Loewenstein, G., & Weber, M. (1989). The curse of knowledge in economic settings: An experimental analysis. *Journal of Political Economy, 97,* 1232–1254.

Clark, H. H. (1996). *Using language.* Cambridge, England: Cambridge University Press.

Daft, R. L., & Lengel, R. H. (1986). Organizational information requirements, media richness, and structural design. *Management Science, 32,* 554–571.

Daft, R. L., & Trevino, L. (1987). Message equivocality, media selection, and manager performance. *MIS Quarterly, 11,* 355–366.

Davidson, D. (1982). Paradoxes of irrationality. In R. Wollheim & J. Hopkins (Eds.), *Philosophical essays on Freud* (pp. 289–305). Cambridge, England: Cambridge University Press.

de la Sola Pool, I. (1984). *Communication flows: A census in the United States and Japan.* Amsterdam: University of Tokyo Press.

Dennis, A. R., & Kinney, S. T. (1998). Testing media richness theory in the new media: The effects of cues, feedback, and task equivocality. *Information Systems Research, 9,* 256–274.

DePaulo, B. M. (1992). Nonverbal behavior and self-presentation. *Psychological Bulletin, 111,* 203–243.

DePaulo, B. M., & Friedman, H. S. (1998). Nonverbal communication. In D. T. Gilbert, S. T. Fiske, & G. Lindsey (Eds.), *The handbook of social psychology: Vol. 2* (4th ed., pp. 3–40). New York: McGraw-Hill.

Dimmick, J., Kline, S., & Stafford, L. (2000). The gratification niches of personal e-mail and the telephone: Competition, displacement, and complementarity. *Communication Research, 27,* 227–248.

Drew, P. (1987). Po-faced receipts of teases. *Linguistics, 25,* 219–253.

Dunning, D., Griffin, D. W., Milojkovic, J. D., & Ross, L. (1990). The overconfidence effect in social prediction. *Journal of Personality and Social Psychology, 58,* 568–581.

Epley, N., Keysar, B., Van Boven, L., & Gilovich, T. (2004). Perspective taking as egocentric anchoring and adjustment. *Journal of Personality and Social Psychology, 87,* 327–339.

Fischhoff, B. (1975). Hindsight = $\neq$ = foresight: The effects of outcome knowledge on judgment under uncertainty. *Journal of Experimental Psychology: Human Perception and Performance, 1,* 288–299.

Flavell, J. (1977). *Cognitive development.* Englewood Cliffs, NJ: Prentice Hall.

Fussell, S. R., & Krauss, R. M. (1991). Accuracy and bias in estimates of others' knowledge. *European Journal of Social Psychology, 21,* 445–454.

Gatz, L. B., & Hirt, J. B. (2000). Academic and social integration in cyberspace: Students and e-mail. *Review of Higher Education, 23,* 299–318.

Gill, M. J., Swann, W. B., & Silvera, D. H. (1998). On the genesis of confidence. *Journal of Personality and Social Psychology, 75,* 1101–1114.

Gilovich, T., Medvec, V. H., & Savitsky, K. (2000). The spotlight effect in social judgment: An egocentric bias in estimates of the salience of one's own actions and appearance. *Journal of Personality and Social Psychology, 78,* 211–222.

Gilovich, T., Savitsky, K., & Medvec, V. H. (1998). The illusion of transparency: Biased assessments of others' ability to read one's emotional states. *Journal of Personality and Social Psychology, 75,* 332–346.

Goffman, E. (1959). *The presentation of self in everyday life.* Garden City, NY: Doubleday.

Handey, J. (1992). *Deep thoughts.* New York: Penguin.

Hebert, B. G., & Vorauer, J. D. (2003). Seeing through the screen: Is evaluative feedback communicated more effectively in face-to-face or computer-mediated exchanges? *Computers in Human Behavior, 19,* 25–38.

Hoch, S. (1987). Perceived consensus and predictive accuracy: The pros and cons of projection. *Journal of Personality and Social Psychology, 53,* 221–234.

Inhelder, B., & Piaget, J. (1958). *The growth of logical thinking from childhood to adolescence: An essay on the construction of formal operational structures.* New York: Basic Books.

Kahneman, D., & Tversky, A. (1973). On the psychology of prediction. *Psychological Review, 80,* 237–251.

Kelley, C. M., & Jacoby, L. L. (1996). Adult egocentrism: Subjective experience versus analytic bases for judgment. *Journal of Memory and Language, 35,* 157–175.

Keren, G. (1987). Facing uncertainty in the game of bridge: A calibration study. *Organizational Behavior and Human Decision Processes, 39,* 98–114.

Keysar, B. (1994). The illusory transparency of intention: Linguistic perspective taking in text. *Cognitive Psychology, 26,* 165–208.

Keysar, B., Barr, D. J., & Horton, W. S. (1998). The egocentric basis of language use: Insights from a processing approach. *Current Directions in Psychological Science, 7,* 46–50.

Keysar, B., & Bly, B. (1995). Intuitions of the transparency of idioms: Can one keep a secret by spilling the beans? *Journal of Memory and Language, 34,* 89–109.

Keysar, B., & Henly, A. S. (2002). Speakers' overestimation of their effectiveness. *Psychological Science, 13,* 207–212.

Kiesler, S., Siegel, J., & McGuire, T. W. (1984). Social psychological aspects of computer-mediated communication. *American Psychologist, 39,* 1123–1134.

Krauss, R. M., et al. (1981). Verbal, vocal, and visible factors in judgments of another's affect. *Journal of Personality and Social Psychology, 40,* 312–320.

Kruger, J., Gordon, C., & Kuban, J. (in press). Intentions in teasing: When "just kidding" just isn't good enough. *Journal of Personality and Social Psychology.*

Lanzetta, J. T., & Kleck, R. E. (1970). Encoding and decoding of nonverbal affect in humans. *Journal of Personality and Social Psychology, 16,* 12–19.

Lea, M., O'Shea, T., Fung, P., & Spears, R. (1992). "Flaming" in computer-mediated communication: Observations, explanations, implications. In M. Lea (Ed.), *Contexts of computer-mediated communication* (pp. 89–112). New York: Harvester Wheatsheaf.

Lea, M., & Spears, R. (1991). Computer-mediated communication, deindividuation and group decision-making. *International Journal of Man-Machine Studies, 34,* 283–301.

Lichtenstein, S., Fischhoff, B., & Phillips, L. D. (1982). Calibration of probabilities: The state of the art to 1980. In D. Kahneman, P. Slovic, & A. Tversky (Eds.), *Judgment under uncertainty: Heuristics and biases* (pp. 306–334). Cambridge, England: Cambridge University Press.

Marold, K. A., & Larson, G. (1999). Is the range war over? An investigation into preferences for e-mail and v-mail. *Social Science Computer Review, 17,* 466–471.

Newton, L. (1990). *Overconfidence in the communication of intent: Heard and unheard melodies.* Unpublished doctoral dissertation, Stanford University, Stanford, CA.

Nickerson, R. (1999). How we know—and sometimes misjudge—what others know: Imputing one's own knowledge to others. *Psychological Bulletin, 125,* 737–759.

Nickerson, R. S. (2001). The projective way of knowing: A useful heuristic

936                                   KRUGER, EPLEY, PARKER, AND NG

that sometimes misleads. *Current Directions in Psychological Science, 10,* 168–172.

Oskamp, S. (1965). Overconfidence in case-study judgments. *Journal of Consulting Psychology, 29,* 261–265.

Panko, R., & Kinney, S. T. (1995). Meeting profiles: Size, duration, and location. *Proceedings of the Twenty-Eighth Annual Hawaii International Conference on System Sciences,* Vol. 4, 1002–1011.

Price, P. J., Ostendorf, M., Shattuck-Hufnagel, S., & Fung, C. (1991). The use of prosody in syntactic disambiguation. *Journal of the Acoustical Society of America, 90,* 2956–2970.

Rime, B. (1982). The elimination of visible behaviour from social interactions: Effects on verbal, nonverbal and interpersonal variables. *European Journal of Social Psychology, 12,* 113–129.

Ross, L., & Ward, A. (1996). Naive realism in everyday life: Implications for social conflict and misunderstanding. In E. Reed, E. Turiel, & T. Brown (Eds.), *Social cognition: The Ontario Symposium* (pp. 305–321). Hillsdale, NJ: Erlbaum.

Sherman, R. C., End, C., Kraan, E., Cole, A., Campbell, J., Klausner, J., & Birchmeier, Z. (2001). Metaperception in cyberspace. *Cyberpsychology and Behavior, 4,* 123–129.

Siegel, J., Dubrovsky, V., Kiesler, S., & McGuire, T. W. (1986). Group processes in computer-mediated communication. *Organizational Behavior and Human Decision Processes, 37,* 157–187.

Sproull, L., & Kiesler, S. (1986). Reducing social context cues: Electronic mail in organizational communication. *Management Science, 32,* 1492–1512.

Sproull, L., & Kiesler, S. (1991). *Connections: New ways of working in the networked organization.* Cambridge, MA: MIT Press.

Sproull, L., Kiesler, S., & Zuorow, D. (1984). Encountering an alien culture. *Journal of Social Issues, 40,* 31–48.

Swann, W. B., Jr., & Gill, M. J. (1997). Confidence and accuracy in person perception: Do we know what we think we know about our relationship partners? *Journal of Personality and Social Psychology, 73,* 747–757.

Thompson, L., & Nadler, J. (2002). Negotiating via information technology: Theory and application. *Journal of Social Issues, 58,* 109–124.

Thompson, L. L. (2001). *The mind and heart of the negotiator* (2nd ed.). Upper Saddle River, NJ: Prentice Hall.

Vallone, R. P., Griffin, D. W., Lin, S., & Ross, L. (1990). Overconfident predictions of future actions and outcomes by self and others. *Journal of Personality and Social Psychology, 58,* 582–592.

Van Boven, L., Kruger, J., Savitsky, K., & Gilovich, T. (2000). When social worlds collide: Overconfidence in the multiple audience problem. *Personality and Social Psychology Bulletin, 26,* 619–628.

Vorauer, J. D., & Claude, S. D. (1998). Perceived versus actual transparency of goals in negotiation. *Personality and Social Psychology Bulletin, 24,* 371–385.

Vorauer, J. D., & Ross, M. (1999). Self-awareness and feeling transparent: Failing to suppress one's self. *Journal of Experimental Social Psychology, 35,* 415–440.

Walther, J. B. (1993). Impression development in computer-mediated interaction. *Western Journal of Communication, 57,* 381–398.

Walther, J. B. (1995). Relational aspects of computer-mediated communication: Experimental observations over time. *Organization Science, 6,* 186–203.

Walther, J. B., Loh, T., & Granka, L. (2005). Let me count the ways: The interchange of verbal and nonverbal cues in computer-mediated and face-to-face affinity. *Journal of Language and Social Psychology, 24,* 36–65.

Wittaker, S., & Sidner, C. (1997). E-mail overload: Exploring personal information management of e-mail. In S. Kiesler (Ed.), *Culture of the Internet* (pp. 277–295). Mahwah, NJ: Erlbaum.

Wright, G., Rowe, G., Boger, F., & Gammack, J. (1994). Coherence, calibration, and expertise in judgmental probability forecasting. *Organizational Behavior and Human Decision Processes, 57,* 1–25.

Received March 24, 2004
Revision received August 18, 2004
Accepted August 29, 2004 ■

### E-Mail Notification of Your Latest Issue Online!

Would you like to know when the next issue of your favorite APA journal will be available online? This service is now available to you. Sign up at http://watson.apa.org/notify/ and you will be notified by e-mail when issues of interest to you become available!

**APPENDIX B:** Response to Ad Hominem Attacks and Ongoing, Fight-Everywhere Vexatiousness Debate

## Plaintiff's Response to Defendants' Section III Argument on "Vexatious Litigant" Designation

Plaintiff respectfully responds here to Section III of Defendants' Response, entitled "This Motion Further Bolsters Defendants' Motion to Label Plaintiff a Vexatious Litigant." Plaintiff argues again here that this appendix should not count toward the 10 page limit on Replies as it is on an unrelated matter the Assistant US Attorney should have left completely within the finished briefing of her earlier *Motion to Deem Plaintiff Vexatious and Enjoin Further Filings*.

### I. Prematurity and Disproportion

Defendants' request is premature. The case has not yet been resolved on the merits, and no dispositive ruling has issued from this Court. Courts in this Circuit and others have cautioned against designating a litigant as "vexatious" at an early stage of proceedings, particularly where amended pleadings are pending. Such a designation is extraordinary, stigmatizing, and difficult to reverse once imposed. To invoke it now—before Plaintiff's Second Amended Complaint has even been adjudicated—would unfairly prejudice Plaintiff and risk short-circuiting the merits review to which he is entitled.

### II. Plaintiff's Filings Demonstrate Progress, Not Abuse

Defendants characterize Plaintiff's filings as "baseless." Respectfully, Plaintiff's First Amended Complaint cured multiple deficiencies of the original complaint, and Plaintiff has sought leave to file a Second Amended Complaint that addresses additional points raised by the Government. Far from evidencing abuse, this demonstrates a pro se litigant's effort to refine and improve his pleadings in good faith, consistent with Rule 15's liberal amendment standard, and likely

consistent with or overperforming relative to other pro se plaintiffs this Court has encountered. Similarly, Plaintiff's motions—including those seeking electronic filing privileges and the appointment of a special master to more systematically and deeply solve AI case quotation hallucination for the Federal Court system —were brought with genuine purpose with the intent to be useful and helpful and not to harass.

### III. Communications with Counsel

Defendants also cite Plaintiff's conferral emails as evidence of "harassment." Plaintiff has here produced his correspondence with AUSA Romero for the Court's review. None were intended to harass; all were efforts—sometimes lengthy—to meet the conferral obligations imposed on parties. One quoted remark has been mischaracterized. Plaintiff did not simply state, as Defendants allege, "You should not have passed the bar." Rather, in the course of legal argument, Plaintiff expressed concern that the AUSA's reading of RFRA precedent was not genuine. Such strong language, while perhaps pointed, was directed at legal reasoning, not personal attack. Plaintiff welcomes the Court's assessment of whether any communication crossed a line but asks that any such assessment be even-handed.

### IV. Constitutional and Religious Dimensions

Attempting to brand Plaintiff a vexatious litigant in this context would also function as religious discrimination. Plaintiff's claims arise directly from sincerely held religious beliefs concerning the handling of U.S. currency bearing the Divine Name, and from RFRA-protected objections to mandatory cash bail systems. To penalize Plaintiff for vigorously asserting such claims—as opposed to dismissing them on the merits—would burden religious exercise and chill protected petitioning activity. Plaintiff's circumstances are materially more severe than those of claimants

whose religious burdens have been upheld by the Supreme Court, including *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

## V. Trendline of Responsible Litigation

Plaintiff has filed only three cases in this District, each progressively better researched and prepared. The first was dismissed with prejudice, the second without prejudice for standing, and this third case presents substantial RFRA claims that have not yet been adjudicated. This record does not support the extraordinary sanction of a vexatious litigant order. By contrast, the right to file good-faith claims—even repeatedly on matters of national and religious importance—is a core aspect of citizenship and the First Amendment right to petition.

## VI. Conclusion

Defendants' attempt to preemptively stigmatize Plaintiff as "vexatious" is procedurally premature, substantively unsupported, and constitutionally fraught. Plaintiff respectfully submits that the Court should decline to adopt such a designation and instead adjudicate the pending complaints and motions on their merits.

## VII. For The Record – Given Context, That's Not What I Said

Notably, AUSA Romero deliberately misquotes me as having said, "You should not have passed the bar." That's not what I contextually said, and for comparison, the one time I inadvertently minorly misquoted case law via unknowing AI hallucination Mrs. Romero sought to have me disciplined, admonished, and censured by this Court for using hallucinatory AI quotes, calling such hallucination "problematic". This misquote is worse than merely problematic and arguably egregious. What I actually said in some context was that AUSA Romero seemed to be <u>disingenuous</u> in denying my substantial burdens, particularly the burden of unmerited pretrial

detention when legally presumed innocent and held in jail solely on my religious belief that I can't use legal tender / sacred cash as bail.

Here's exactly how I said that she wasn't being genuine, in fully quoted context:

"Understood, thank you. I must note that in my last email I overlooked the fact that I had already provided two brief bullet points identifying some of the revisions I intend for my Second Amended Complaint. In truth, the list of changes i considerably longer, and several are far more fundamental—including arguments about the fundamental nature of legal tender, its implications, and my lived experience of being barred from using the only form of legal tender judicially and Congressionally recognized in the United States, and the vulnerabilities and burdens that periodically unavoidably engenders.

**"I cannot accept your interpretation of binding precedent. Can you? I don't think you're being genuine or you really shouldn't have passed the Bar. In Burwell v. Hobby Lobby, a $2,000 financial penalty was held to constitute a substantial burden. In Wisconsin v. Yoder, even a $5–$50 fine and the threat of three months' imprisonment for religious practice was deemed sufficient, under a First Amendment claim, to improperly coerce religious belief. By comparison, if I were again charged with a felony requiring $25,000 bail, I would face two unconstitutional outcomes: (a) remaining incarcerated until judgment solely because non-cash payment options are unavailable (as in Miami-Dade and Palm Beach), or (b) being compelled—if communication with bail agents is even feasible without outside support—to pay a nonrefundable $2,500+ surety bond fee solely to avoid violating my religious objection**

to cash. Under Hobby Lobby **and Yoder, such consequences plainly constitute a**
**substantial burden on religious exercise. Do you still disagree?"**

Given that the AUSA is repeatedly threatening me with the continued risk of indefinite pretrial
detention—detention I cannot remedy by posting bail because of my sincerely held religious
beliefs—and given that all of our communication has been confined to writing, which strips away
tone and nuance, I respectfully request that AUSA Romero extend the benefit of the doubt and
agree to meet with me by video or phone. Such a conversation would allow for tonally rich,
calmly communicative dialogue and reduce the risk of misinterpretation. Research such as the
"Egocentrism Over E-mail" study demonstrates that written words alone, especially sarcasm or
irony, are disproportionately misread, often harshly.

Further, as a pro se litigant, I must be free to question the genuineness of the Government's
posture toward me. The U.S. Attorney's Office has, in filing after filing, pressed for me to be
branded a "vexatious litigant" while dismissing my religious burdens as frivolous and refusing all
reasonable stipulation requests. My interpretation is that this posture is not grounded in the merits
of my case but is instead driven by political pressure within the Office—pressure that ultimately
traces upward to former President Trump, whose administration has been publicly vexatious and
retaliatory toward critics. Given my prior *Doe v. Trump* filing, I believe I may be on a "disfavored
litigants" list, which would explain the intensity of the Government's campaign here.
Nevertheless, I remain confident that the merits of this case, when read fairly, will be recognized
by this Court.

9/5/25, 6:29 AM

# Psychology Today

US  🔍



# Illusory Truth Effect

Reviewed by Psychology Today Staff

## What Is the Illusory Truth Effect?

The illusory truth effect is the tendency for any statement that is repeated frequently—whether it is factually true or not, whether it is even plausible or not—to acquire the ring of truth. Studies show that repetition increases the perception of validity—even when people start out knowing that the information is false, or when the source of the information is known to be suspect.

The illusory truth effect was first established in a series of psychological studies reported in 1977. Under controlled conditions on a series of tests several weeks apart, researchers found that each time an untrue statement was repeated, participants' confidence in the validity of the statement rose, while assessments of the validity of statements presented uniquely on each test never changed. Many studies since have validated the initial findings under an array of conditions.

The illusory truth effect can create cultural memes and misconceptions, such as the widely held belief that we only use 10 percent of our brains.

Because it can make false information appear true, it can also be used to deliberately manipulate the thinking of others. It is a useful tool for political propaganda. It can serve as an incentive for bad actors—commonly political or ideological

9/5/25, 6:29 AM

# Psychology Today

The deliberate spread of misinformation by individuals or groups, especially by way of the Internet, is known as **dark participation**. There is much evidence that it is being used by bad actors to foment discord and doubt about policies, leadership, and other important matters in populations approaching important decisions.

Contents
- **How the Illusory Truth Effect Works**
- **Uses of the Illusory Truth Effect**
- **Countering the Illusory Truth Effect**

## How the Illusory Truth Effect Works

When it comes to human judgment, we are influenced by more than just the informational value of content. Among other factors, we are swayed by our experience of information processing. Repeated statements, whether they are factually true or false, are easier to process—they create processing fluency, which lends them validity.

The illusory truth effect does not hinge on whether the repetitions occur moments apart or weeks apart. Above and beyond the declarative information in a statement, processing ease is itself a piece of information we use to evaluate the truth of claims.

We infer truth from fluency of processing because, in the natural world, truth and fluency are correlated. Processing fluency is so equated with the truth that the illusory truth effect can occur with other facilitators of fluency in the

# Psychology Today

US  🔍

contrast fonts.

### Are smart people immune to the illusory truth effect?

The illusory truth effect is such a robust phenomenon that it operates independently of cognitive ability. Neither differences in cognitive ability, in need for closure, nor in cognitive thinking style influence the power of repeated statements to appear true. An analytical thinking style is no protection, and a need for cognitive closure is not a facilitator.

### Are subject experts exempt from the illusory truth effect?

Knowledge offers little protection against the illusory truth effect because people often underutilize their stored knowledge—a phenomenon called knowledge neglect. Even experts in an area of knowledge are vulnerable to the illusory effect. As one team of researchers reports, "people sometimes fail to bring their knowledge to bear and instead rely on fluency as a proximal cue."

Nor, when evaluating recently presented information, do they monitor the source of information in their knowledge base, which could be a clue to its validity. In fact, information may be stored without any memory of the source of information. Such lapses in evaluating

# Psychology Today

## Uses of the Illusory Truth Effect

Because **the illusory truth effect** operates both on information that is true and information that is false, it is frequently deployed to fuel the deliberate spread of misinformation in service of swaying public opinion. After all, people are most likely to share with others information they believe is true. However, recent history has shown that the power of mere repetition to put the imprimatur of truth on misinformation can rapidly undermine individual and population health, trust in institutions and government itself, and the civility of society.

The deliberate spread of misinformation is known as disinformation, and it has long been a tool of propagandists to bias people's judgment. In the age of the internet, however, it has extended reach, power, and speed. Social media platforms, in particular, have built-in mechanisms for rapid repetition.

**Psychology Today**

US 🔍

One of the most noted uses of the illusory truth effect is what has come to be known as the birther conspiracy. Ahead of the U.S. presidential election in 2008, fringe theorists and political extremists on the right widely circulated on the internet rumors that Democratic candidate Barack Obama was not qualified to be president because he did not meet the requirements of the U.S. Constitution that holders of the office must have been born in the U.S.

Even today, years after then-candidate Obama publicly released his birth certificate proving he was born in the state of Hawaii and not, as birthers alleged, in Kenya, many still believe his presidency was illegitimate.

## Countering the Illusory Truth Effect

It is easy to feel despair about the illusory truth effect: There is no way to catch up with the accelerating speed of repetition of falsehoods once they are unleashed on social media. Plus, there is a built-in paradox: **Correcting a lie** involves repeating the falsehood—which only solidifies it further. How, then, is it possible to counter false claims—or even discuss them at all—without reinforcing them?

### What is a truth sandwich?

Cognitive linguist George Lakoff has proposed a way to correct any lie by framing it with the truth. You begin by mentioning the truth, briefly mention the falsehood

# Psychology Today

beginnings and endings more than middles. "1. Start with the truth. The first frame gets the advantage," Lakoff has advised on the social media platform X. "2. Indicate the lie. Avoid amplifying the specific language if possible. 3. Return to the truth. Always repeat truths more than lies."

## What is prebunking?

Researchers specifically exploring the spread of climate misinformation came up with a technique for neutralizing repeated lies that is applicable to far more types of misinformation, so-called "inoculation." They suggested creating messages that first explain the flawed argumentation technique used in the misinformation—highlighting the way scientific information is distorted—and then feature the scientific consensus on the subject. Inoculation messages can be deployed preemptively to keep disinformation from gaining traction—a practice they call "prebunking."

## How can I protect myself against the illusory truth effect?

A good way to survive in a "post-truth world," say researchers, is to become your own fact checker. It's necessary because most people are biased toward believing the headlines they read. Focusing on the accuracy of headlines—in contrast to how interesting

# Psychology Today

US 🔍

Ask yourself, "How truthful is this statement?" At that point, you begin a memory search for relevant information, or you can search reliable outside sources of information. Actively rating the truth of claims at the point of exposure keeps people from resorting to feelings of fluency as the marker of truth.

You can test your own **susceptibility to misinformation. It's a two-minute quiz** developed by researchers at the  University of Cambridge

## Essential Reads



### A Simple Guide to Spotting Pseudoscience

Learn what pseudoscience is, why it's persuasive, and how to recognize it so that you can stay open-minded without being misled.



David Clayman <david@clayman.org>

---

# Dear Kelsi and Darcie – Filings today
2 messages

---

**David Clayman** <david@clayman.org>                                    Mon, Aug 4, 2025 at 1:15 PM
To: Darcie Thompson <darcie.thompson@usdoj.gov>, AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Dear Kelsi and Darcie,

Here are the latest filings that I submitted in Court today in response to Darcie's Motion to Dismiss and Darcie's Motion to Deem Plaintiff Vexatious and Enjoin Further Filings. I tried responding as quickly as I possibly could, in the interest of speeding up judgment in this case to give the Department of Treasury as much time as possible to accommodate before the Quarter-Millennial on July 4, 2026 (334 days)

I also filed a First Amended Complaint, as promised, and a Motion for Electronic Filing Privileges.

**Kelsi, is this adequate service of process to you?** Darcie was satisfied with electronic service of process via email so I'm guessing it's the same with you.

**Or do you need me to physically mail copies to your office? If so, please let me know and send me your mailing address.**

Future process service will just go to Kelsi. I'm including Darcie here because some of these motions directly call into question her honesty, candor, ethics, and integrity in her latest filings. I'm very unhappy about and disturbed by this extremely premature and inappropriate motion to deem me vexatious, while seemingly deliberately mischaracterizing my prior pleading history with a notable lack of compassion for Pro Se learning curves and mailing challenges, and a complete lack of self-accountability for Darcie's failure to file a timely Motion to Dismiss response in *Clayman v Trump*.

You can read my full *Response in Opposition* to see all my arguments and evidence against Darcie's seemingly knowingly wrongful representations of my and her filing record and the relevant legal standard in the Southern District of Florida. I'm getting better and better as a pro se plaintiff with more experience in each filing facing your office's often-pretty-obstructive objections. For instanec, in this case, I didn't get a counterclaim from Darcie in her Motion to Dismiss claiming that I had filed a "shotgun pleading", as i had seen her clraim in my prior two cases. I'm adapting and improving as a civil plaintiff, assisted as well by better guidance of AI prompting synergy.

Kelsi – Please please take as much care with this claim from a strand of Judaism as you would a claim from a strand of politically popular and SCOTUS protected Evangelical Christianity. Being of a religious minority, I should nonetheless be treated no differently and with no less accommodation and care than plaintiffs like Gerald Groff (Groff v DeJoy), Joseph Kennedy (Kennedy v Bremerton School District), and from an accommodation sufficiency standpoint, the American Council for the Blind (American Council for the Blind v Paulson). If your office continues opposing the narrow version of my religious accommodation requests on the miniscule motto, I believe you'll end up on the losing side of the final Court decision. I concede that you can easily legally oppose that the dollar be renamed, that it be graphically redesigned, and the unorthodox suggestion that our American number system be simplified. All of that is readily and easily opposable or ignored, though I think doing so comes at cost to our civic and commercial future. You just can't ignore the need to switch the motto to, at a minimum, to "In G We Trust" (where "G" can be substituted depending on your belief by the traditional G-d, or Grace, or Government, or Grandparents, or any other sectarian or secular entity Americans place their trust in), or "In G-d We Trust", if Government and Congress insists on what I consider to be an awkward orthographical interreligious compromise and a continued awkward deistic approach to Government.

**Special Note: I didn't mention in my Amended Complaint that I'm a ULC Minister and a Clergy Member as well since September 1, 2014.** I was ordained very shortly after I realized that carrying and circulating IGWT was in violation of my religious beliefs and halted personal use of cash in July or August 2014. ULC ordination has full legal status in the United States under federal law and court precedent as a means of ecumenical ordination. I'm officially clergy even without going through the rigors and sacrifice of traditional Jewish religious rabbinic semicha. I've had letters of good standing issued in the past in Illinois and Ohio to solemnize marriage and defend religious freedom. When I went to file my case at the Courthouse in an effort to perform a favor to the Government and save Secretary Bessent and Congress two days of design and deliberation time before the Quarter-Millenial by short-circuiting USPS mailing delay on this response in the absence of electronic filing privileges, there was a ULC minister present also filing paperwork whose presence reminded me well that I may have made a mistake not declaring my ULC clergy status in my Amended Complaint. I don't think it was legally necessary, but my clergy status further hardens my ability under law to determine my

sincerely held religious beliefs, so given the opportunity I will make mention of it in the future, whether in Hearings or in any future filings I may need to make. In a few days, my ministry credentials will be updated to my current restored legal name and I'll reorder cards and a letter of good standing localized to Florida. Please account for acceptance of my clergy status in any replies, responses, or filings you may have in the future. If you need a more recent Letter of Good Standing with rights to solemnize in Florida to grant my clergy status credence in this District, just let me know and I'll send you it as soon as it arrives with my updated restored legal name.

The motto and specifically any matching or linked "conjunctioned currency name" are an Archimedean Point and Archimedean Lever repeated subvocally/cognitively in our Broca's and Wiernecke's areas and vocally **many many many billions of times a week** that the Government is not using to maximal effect to guide and support our values-based reasoning in commerce. Please don't waste this historic opportunity to tilt commerce in the direction of *C.A.L.M.*, *Trust*, *Seeds*, *Talents*, or any other better name that Congress selects in its wisdom as most aspirational and appropriate for the explosive, diverse, super-critical "aims of education" and the fundamental "aims of commerce" and community (what I've been suggesting we alternatively call and spell "**calm**unity", especially in conjunction with what I'm suggest as the most useful and brilliantly flexible currency title suggestion).

Feel free to call me at (321) 252 - 9626 at any time to discuss and conference. I'd love to get on the same page and settle and support the Department of Treasury and Government on this in any way I can. I just can't and won't sacrifice my principles or religious beliefs on this of course, so if you're going to be oppositional and adversarial to even minimal motto change we're going to have to exhaustively litigate our way through judicial remedies and, if needed, appeals.

Sincerely yours,
David Clayman
+1 (321) 252 - 9626

Attached: Last ULC Ministry Letter of Good Standing from 2017 localized to Illinois

**Ministry Letter of Good Standing.pdf**
1486K

---

**David Clayman** <david@clayman.org> Mon, Aug 4, 2025 at 1:19 PM
To: Darcie Thompson <darcie.thompson@usdoj.gov>, AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Dear Kelsi and Darcie,

Apologies, I forgot to attach today's filings. Here they are. I'm told these will appear in the docket tomorrow.

Kelsi, please let me know if you need me to mail physical copies.

Sincerely,
David Clayman

Attachments:

- First Amended Complaint
- Response to Motion to Dismiss
- Response in Opposition to Motion to Deem Plaintiff Vexatious and Enjoin Further Filings
- Appendix Letter to Defendants (included with and stapled to Response in Opposition to Motion to Deem Plaintiff Vexatious)
- Motion for Leave to File Electronically

[Quoted text hidden]

---

**5 attachments**

**Motion for Leave to File Electronically and File Emergency Motions.pdf**
153K

**Letter to Defendants - RFRA IGWT Case.pdf**
154K

RFRA IGWT Vexatious Response.pdf
300K

RFRA IGWT Response to Motion to Dismiss.pdf
531K

RFRA IGWT First Amended Complaint.pdf
17510K



David Clayman <david@clayman.org>

---

## Sur-reply to Motion to Deem Vexatious & Motion for Special Master

**David Clayman** <david@clayman.org>                                        Mon, Aug 11, 2025 at 5:38 PM
To: AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Dear Kelsi,

Please find below electronic service of process of a copy of:
1. Leave to File and Sur-reply to your and Darcie's Motion to Deem Plaintiff Vexatious and Enjoin Further Filings
2. Motion for Special Master (to Systematically Investigate and Recommend Action on AI Abuses in the Federal Court System)

Please feel free to reach out if you want to conference or collaborate in any way before the Status Hearing on August 21st.

I sincerely meant to send these earlier this morning to you right after the time that I dropped these off at the Courthouse first thing in the morning but I forgot to send after my long drive back home, until just a moment ago when I got the email notification from the Court filing system that these documents were approved for or accepted into the docket. I'll try to make sure to send process of service electronically before drop-off in the future to avoid any electronic process of service time gaps or mistakes.

Please again, just as a reminder, I would greatly appreciate it if you'd please abbreviate or hyphenate the Name of G-d like I do in any of your future writings and filings in this case as they relate to my religious beliefs or your counterclaims. Doing so would help accommodate my religious beliefs about protecting the Name of G-d in streams of paper that might carelessly end up in a wastebasket, landfill, or recycling yard instead of a religious burial in a designated *Shaimos* grave, especially if you're communicating the Name of G-d for my sake or you need to or intend to send or serve me with any paper copies of filings with the Sacred Name of G-d printed on them. It's just much more difficult and inconvenient to handle, protect, process, and "end-of-life" retire documents made sacred as such. I don't think it's too much to ask for you to write "In G We Trust" or "In G-d We Trust" instead of the unhyphenated current National Motto in your filings as a religious accommodation and courtesy as we continue debating the merits of this case. If you insist on writing the Full Name of G-d out on paper, that paper then for me requires special handling. Let's please try to accommodate each other's beliefs to try to avoid entangling one another in special paper handling requirements.

All the best,
David Clayman

---

**2 attachments**

📎 **S.D.Fla._9_25-cv-80890-WM_25.zip**
458K

📎 **S.D.Fla._9_25-cv-80890-WM_26.zip**
441K



David Clayman <david@clayman.org>

---

## Can we meet before the Hearing and before you file anything else?
5 messages

---

**David Clayman** <david@clayman.org>  
To: AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Sun, Aug 17, 2025 at 8:00 AM

Dear Kelsi,

I received your latest Motion to Dismiss Amended Complaint in the *In G-d We Trust* case Friday afternoon.

I write to express serious concerns with the course the U.S. Attorney's Office has taken in my matters. Specifically: (1) your motion to dismiss my *In G-d We Trust* case—and all prior cases—with prejudice, without first making any attempt to confer with me; (2) your effort to reclassify my organ-donation incentives case as dismissed with prejudice when it was not; and (3) your continued attempts to brand me a vexatious litigant.

What troubles me most is that each of these steps has been advanced without even a minimal effort to engage with me directly—whether by videoconference, phone, or otherwise—to assess my character, motives, or the factual basis for my filings. To seek the permanent denial of a citizen's access to justice without a brief, good-faith conversation is inconsistent with the fairness and neighborliness that should guide the Department of Justice's relationship with the public.

Had I refused dialogue or evaded contact, I would understand the decision to press forward with prejudicial dismissal. But the opposite is true: I have been willing to engage, yet you ask the Court to dispose permanently of 108 pages of carefully prepared filings—filings that demonstrate substantial burdens under the law—and all the arguments therein without any attempt at direct human exchange. This burdens not only me but also the Court, and it eliminates the opportunity to clarify or narrow issues informally.

For that reason, I believe a procedural safeguard is warranted: before the government may seek dismissal with prejudice, it should be required to make a genuine, good-faith effort to meet with the litigant—virtually or in person—for at least a brief oral exchange. Such a safeguard would not displace written motions practice, but it would ensure that before a citizen is permanently barred from the courts, their grievances are heard orally and aurally in the longstanding tradition of argument.

I remain willing to meet with you at any time before the August 21 hearing—or thereafter if necessary. I would prefer, and respectfully request, that such a meeting be recorded with the recording made equally available to both parties without FOIA requests or procedural hurdles. That said, if you prefer to speak informally, I am open to a meeting without a recording. As the private party, I believe the choice properly rests with me, given your role as a public official and my First Amendment right to record absent a compelling government interest to the contrary. To my knowledge, no such interests are implicated here.

Accordingly, I respectfully request your response by 5:00 p.m. Eastern on Tuesday, August 19, indicating whether you are willing to meet prior to the August 21 hearing to pursue mutual understanding. My schedule is flexible—I can adjust my commitments to accommodate a time that works for you. Such a meeting would also give you the opportunity to reconsider, and if appropriate, withdraw both the vexatious litigant effort and the request for dismissal with prejudice, before I am compelled to ask Judge Matthewman to admonish you, your colleague Darcy who initiated this course, and your office for employing such prejudicial tactics.

If you decline and continue to press for dismissal with prejudice—especially while also pursuing the extraordinary step of labeling me a vexatious litigant—I intend to seek binding precedent that the government may never, anywhere, pursue dismissals with prejudice, vexatious litigant designations, or pre-filing injunctions unless it first certifies in writing that it made a genuine, good-faith effort to meet with the opposing party in a conversational setting. I will further urge that such precedent be applied as broadly as possible, especially to ensure that pro se plaintiffs like me are not steamrolled carelessly and impersonally, with impunity.

I look forward to your response by close of business on Tuesday. If no reply is received, I will have to treat that silence as an intentional decision not to confer and as a continued reliance on the "nuclear option" of dismissal with prejudice—without affording me, or others similarly situated, the basic opportunity to be heard and engaged by our government as equal citizens deserving of fair consideration.

Respectfully,
David Clayman

---

**Romero, Kelsi (USAFLS)** <Kelsi.Romero@usdoj.gov>                    Mon, Aug 18, 2025 at 9:07 AM
To: David Clayman <david@clayman.org>
Cc: "Petri, Steve (USAFLS)" <Steve.Petri@usdoj.gov>

Good morning Mr. Clayman,

I have received your email below; however, I politely decline to participate in a recorded personal conferral. Rather, I prefer any conferral be conducted in writing.

Our office has a practice of treating every litigant, pro se or otherwise, with fairness and respect, but that does not entitle you to any special deference. None of the motions that have been filed by our office require us to confer with the opposing party prior to filing, and I would encourage you to review the local rules for this district to familiarize yourself with the same.

Further, we will not be withdrawing our motions, as such motions are supported by established precedents and the Federal Rules. Our motions have nothing to do with any negative perception of your character, rather, they are based upon the fact that every case you have filed in this district has been without legal foundation based upon already decided caselaw, as noted in our motions, and are an inefficient use of government and judicial resources.

**Kelsi R. Romero**

*Assistant United States Attorney*

United States Attorney's Office

Civil Division

**500 East Broward Boulevard**

8th Floor

Fort Lauderdale, Florida 33394

Office Direct: 954-660-5694

Office Cell: 786-390-4645

Email: Kelsi.Romero@usdoj.gov



[Quoted text hidden]

**David Clayman** <david@clayman.org>                    Mon, Aug 18, 2025 at 12:19 PM
To: "Romero, Kelsi (USAFLS)" <Kelsi.Romero@usdoj.gov>

Dear Mrs. Romero,

**Reading** between the lines, you have not expressly **declined to meet with me for a genuine, human, heart-to-heart discussion** if the meeting is unrecorded. I therefore wish to confirm:

1. **Will you meet with me before the August 21 Hearing if I agree not to record electronically?**

2. **If so, will you permit me to hire a court reporter or transcriptionist so we have an accurate, neutral record of our discussion?**

My concern is straightforward: without a transcript, I have no protection against potential mischaracterizations of what is said. I have personally experienced how an official's distorted account of my words created volatility, led to unjustified force, and gave rise to false allegations. That experience showed me how damaging it can be when the record does not reflect what was truly said.

I am not seeking to record secretly or without notice. I have been transparent about my desire for mutual accountability and fair access to the record. It seems reasonable to expect that public officials, in the performance of their duties, should be able to engage accurately whether a conversation is recorded or transcribed.

If you decline to permit recording, I will yield out of caution regarding Florida's two-party consent laws—pending judicial review. I do not wish to risk prosecution for asserting what I believe to be a First Amendment right to record conversations with public officials who hold power over my rights and wellbeing. But I will preserve my right to raise this issue before Judge Matthewman on August 21.

This is especially relevant given that, under the 2025 Return to In-Person Work Executive Action and OPM guidance, you are required to perform your duties from a federal office. If you are on federal property, it stands to reason that federal rules—rather than Florida's two-party consent laws—should govern the legality of recording. It would be incongruous if residents of Georgia (also in the Eleventh Circuit) could record their AUSAs under one-party consent, while Floridians in the same circuit could not, despite both AUSAs operating from federal land under the same federal policies. If I misunderstand this, please clarify. Otherwise, I would expect to exercise my right to record with full prior notice.

In the meantime, my immediate request is simple: if our meeting must be unrecorded, please confirm that I may hire a court reporter or transcriptionist to ensure accuracy.

To be clear, I ask you to let me know:
A) Whether you continue to refuse a recorded videoconference or telephone meeting before the Hearing;
B) Whether you are open to an unrecorded videoconference or telephone meeting;
C) If only (B), whether I may hire a court reporter or transcriptionist to preserve a faithful record of our discussion.

I believe a genuine heart-to-heart is essential before any motion for dismissal with prejudice, vexatious-litigant designation, or pre-filing injunction is pursued. To proceed without such engagement risks a hollow and mechanical brutish form of justice, where filings are generated and processed in the absence of human dialogue or understanding. I cannot accept that there should be a motion for my claims to be dismissed with prejudice or branded as frivolous or vexatious without even one authentic exchange between me, the U.S. Attorney's Office, and the Court—yet that is what appears to have happened in my first case, and what you are now attempting to vexatiously impose by blunt repetition in my second case and this one.

My schedule is flexible all the way up to the very hour of the upcoming Aug 21 12 PM Eastern Hearing. I can make time to meet you anytime. Just propose a time to meet and lay out your conditions for it explicitly and I'll confirm and be there.

Respectfully,

David Clayman

[Quoted text hidden]

---

**Romero, Kelsi (USAFLS)** <Kelsi.Romero@usdoj.gov>                    Mon, Aug 18, 2025 at 1:05 PM
To: David Clayman <david@clayman.org>

Mr. Clayman,

As indicated in my previous email, my preference is that any and all conferrals be in writing. Therefore, I am unable to agree to an in-person conference. Further, as already discussed, the motions filed by the United States in this case do not require conferral under the Rules. Any motions filed are based upon your written filings before the Court, and thus, a conference would be unproductive.


Regards,

[Quoted text hidden]

---

**David Clayman** <david@clayman.org>                               Thu, Aug 21, 2025 at 10:12 AM
To: "Romero, Kelsi (USAFLS)" <Kelsi.Romero@usdoj.gov>

Dear Mrs. Romero,

Perhaps these motions may not require conferral under the Rules **yet**. I argue that they do require conferral under our anatomic needs and anatomic limitations for coming to mutual understanding, especially in this age of generative AI.

Here I'm attaching a Motion that I'm serving hereby electronically to prevent prejudicial dismissal of Pro Se Plaintiff complaints until the United States makes a good faith effort to meet with the affected Pro se. I'm arguing in filing this that all prior prejudicial dismissal attempts your Office has made, including this one, are procedurally defective.

Looking forward to meeting you at noon. I'll send this Motion to the Judge's chambers immediately and also certified mail this before the noon meeting.

All the best,
David Clayman


[Quoted text hidden]



📄 **Motion** to Protect Pro Se Plaintiffs.pdf
    564K



David Clayman <david@clayman.org>

## Motion to Protect Pro Se Plaintiffs from Premature Prejudicial Dismissal

**David Clayman** <david@clayman.org>                                 Thu, Aug 21, 2025 at 10:21 AM
To: Judge William Matthewman <matthewman@flsd.uscourts.gov>
Cc: AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Dear Honorable Chief Magistrate Judge Matthewman,

I look forward to appearing before you at today's noon hearing.

Attached please find a motion I am mailing to the Court today, seeking to enjoin the United States from pursuing prejudicial dismissal of any pro se plaintiff's claims without first certifying that a good faith effort at meaningful, human communication has been made.

In my motion, I respectfully request that such communication take place through a live, conversational medium—face-to-face or telephonic—rather than solely through the written word. I believe this safeguard is essential to ensure mutual understanding, particularly in light of the growing reliance on automated, generative text systems in litigation.

I will not attempt to summarize the motion further here, as it is set forth in full in the attached filing.

Respectfully,
David Clayman

📄 **Motion to Protect Pro Se Plaintiffs.pdf**
564K



David Clayman <david@clayman.org>

---

## Magistrate Judge Consent Form
3 messages

---

**Shanda Walker** <Shanda_Walker@flsd.uscourts.gov>                    Thu, Aug 21, 2025 at 12:17 PM
To: "david@clayman.org" <david@clayman.org>, "kelsi.romero@usdoj.gov" <kelsi.romero@usdoj.gov>

Good Afternoon,

Please see the attached Magistrate Judge Consent form for your signatures.   After all parties have signed,
if the parties could please file on the docket it would be greatly appreciated.

Thank you,

Shanda Walker
**Courtroom** Deputy to
**Chief U.S. Magistrate Judge William Matthewman**
**(561) 803-3418**
Email: Shanda_Walker@flsd.uscourts.gov

📄 **Magistrate Judge Consent Form.docx**
22K

---

**Romero, Kelsi (USAFLS)** <Kelsi.Romero@usdoj.gov>                    Thu, Aug 21, 2025 at 12:24 PM
To: "david@clayman.org" <david@clayman.org>

Mr. Clayman,

Once you have had a chance to sign the form, please email it to me and I will sign and get it filed. Thank you.

**Kelsi R. Romero**

*Assistant United States Attorney*

United States Attorney's Office

Civil Division

500 East Broward Boulevard

8th Floor

Fort Lauderdale, Florida 33394

Office Direct: 954-660-5694

Office Cell: 786-390-4645

Email: Kelsi.Romero@usdoj.gov



[Quoted text hidden]

---

**David Clayman** <david@clayman.org>                         Thu, Aug 21, 2025 at 12:26 PM
To: "Romero, Kelsi (USAFLS)" <Kelsi.Romero@usdoj.gov>

Hi Mrs. Romero,

Here it is! I had to convert it to PDF to sign it... if that's a problem for you let me know and I'll find some way to sign as a .DOCX.

It was nice seeing you today. I hope we all have a chance to actually talk more in a future Hearing.

David

[Quoted text hidden]

📄 **Magistrate Judge Consent Form.pdf**
50K



David Clayman <david@clayman.org>

---

# Suggestions for Second Amended Complaint Procedure?
5 messages

---

**David Clayman** <david@clayman.org>
To: AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Sun, Aug 24, 2025 at 11:52 AM

Dear Mrs. Romero,

I intend to amend my complaint once more, this time through a Second Amended Complaint. My purpose is to address more directly the arguments you have raised and to include additional burdens and legal claims that were not fully specified in prior pleadings. For example, I plan to expand on what it means to be barred from using legal tender—currently limited to cash—and the substantial burdens that flow from that restriction.

That said, I want to avoid mooting or duplicating your pending Motion to Dismiss, which would only delay these proceedings. Do you have any recommendations on how I may properly seek leave to file a Second Amended Complaint without undermining your Motion to Dismiss?

To reduce unnecessary work, I am prepared to provide you with a redlined "track changes" version comparing the Second Amended Complaint to the First. Had I realized earlier that this would lessen your review burden, I would have taken that approach previously.

Please note: I will not be abandoning my RFRA, First Amendment, or Fifth Amendment claims. The revisions should not be read as concessions, but as clarifications, further persuasive arguments, and a fuller discussion of what constitutes a "substantial burden" under controlling precedent. It remains astonishing to me that the Attorney General contends that 28 days of incarceration does not qualify as a substantial burden under RFRA. One can hardly imagine that argument being advanced if, for instance, Coach Joseph Kennedy of *Kennedy v. Bremerton* had been jailed for 28 days solely for his religious practice of prayer at midfield.

If you were willing to stipulate that I do, in fact, face substantial burdens, the need for a Second Amended Complaint might be reduced. But since you are contesting nearly every point—including whether prolonged imprisonment itself meets the RFRA threshold—my Response to the Motion to Dismiss is already pressing against the 20-page limit, and essential factual assertions risk being improperly confined to briefing rather than pleaded in the complaint.

Among the arguments that must be included in the Second Amended Complaint are:

- That I cannot start or invest in a retail business in Miami-Dade County, New York City, or Philadelphia—jurisdictions that enforce prohibitions against cashless retail. In Miami-Dade, for example, refusing to accept cash incurs fines of $1,000 per violation. For me, compliance means being compelled to accept sacred cash and direct it toward lifesaving charitable work, rather than sustaining the business itself. This reality makes it exceedingly difficult, if not impossible, to operate successfully. Any business owner in those jurisdictions would agree that being forced to dedicate all cash receipts under government compulsion, while simultaneously barred from requiring credit, debit, or check payments, would gravely disadvantage and potentially destroy their enterprise.

- That being barred or burdened from investing in banks or retail nationwide imposes a major restraint on my religious belief and investment strategy. This is a direct result of the government's unnecessary printing of God's Sacred Name on legal tender—without compelling justification and despite many less restrictive alternatives.

While you may view these additions as "minor" and object to another revision, they are not minor to me. They strike at the core of my religious exercise and my ability to live in accordance with my beliefs. For that reason, they must be properly set forth in the operative complaint, not relegated to an overlong response brief that the Court cannot rely upon in determining questions of substantial burden and jurisdiction.

Please advise how you prefer I proceed so that I can handle this as efficiently as possible. I am willing to adapt to your preferred process if you are prepared to work cooperatively.

At minimum, however, I ask you to stipulate in good faith that—at least in the view of the Defendants, including Congress and the Attorney General—extended pretrial detention imposed because of a religious inability to pay strict cash bail qualifies as a "substantial burden" under RFRA. Absent such a good faith stipulation, I will escalate and pursue broader relief, including a judicial declaration that cash bail itself is unconstitutional for all defendants in the Southern District of

Florida versus the less restrictive alternatives demonstrated in Illinois's no-cash-bail system. Such a remedy would reflect the experience of Illinois and move toward a strictly risk-based pretrial release system under more exhaustive community safety risk and fleeing risk factor study rather than the current more cursory, arbitrary, and capricious wealth- and means-of-payment-based approach, of which I am an exemplary victim.

Please get back to me as soon as possible and no later than noon on Tuesday, August 26th. I have to certifiably mail my Response to the Motion to Dismiss by Friday, August 29th, and I'd like to find a mutually agreeable way to file without slowing down final adjudication.

Sincerely,
David Clayman

---

**Romero, Kelsi (USAFLS)** <Kelsi.Romero@usdoj.gov>                    Mon, Aug 25, 2025 at 9:43 AM
To: David Clayman <david@clayman.org>

Mr. Clayman,


If you choose to file a Second Amended Complaint, you may not do so without first seeking leave from the Court. Further, if you seek leave from the Court to file a Second Amended Complaint, I will be objecting to the filing of a Second Amended Complaint. Finally, we will not be stipulating that anything you have mentioned in the Complaints thus far meet the threshold for a "substantial burden" based on current binding precedent.


If you do seek leave to file a Second Amended Complaint, please do so as soon as possible so that the Defendants are not again forced to spend significant time replying to a filing that will be mooted out if the Court grants you leave.


Thank you.


**Kelsi R. Romero**

*Assistant United States Attorney*

United States Attorney's Office

Civil Division

**500 East Broward Boulevard**

8th Floor

Fort Lauderdale, Florida 33394

Office Direct: 954-660-5694

Office Cell: 786-390-4645

Email: <u>Kelsi.Romero@usdoj.gov</u>



[Quoted text hidden]

---

**David Clayman** <david@clayman.org>                                      Mon, Aug 25, 2025 at 10:18 AM
To: "Romero, Kelsi (USAFLS)" <Kelsi.Romero@usdoj.gov>

Sadly none of that surprises me, I've slowly come to expect your office to obstruct and promise objection reflexively without even first hearing or asking for detail on any of the full merits of the *Second Amended Complaint* revision, though it really shocks me and the conscience that the United States doesn't concede and stipulate that unnecessary imprisonment for one's religious beliefs doesn't count as a substantial burden. The United States doesn't seem to want to follow the Golden and Silver Rule in good faith.
- "Do unto others as you would want done to you."
- "Do not do unto others what you would not want done to you." "What is hateful to you, do not do to your fellow."
If there's ever any day where I have some fractional influence over the US Attorney's Office and the conduct of the United States in its legal affairs, I'm going to do everything in my power to tear up your super-adversarial obstructivist playbook and try to promote honest, sincere, and compassionate engagement with the arguments and evidence of those who have sincere grievances against the United States, in part through a phase of sincere case inquiry. This isn't any reasonable way to handle citizen grievances; pledging to object to my *Second Amended Complaint* revision without seeing any part of it shows a very blind lack of care, concern, or respect for liberty and wellbeing.

**Urgent Question:** Would it be possible for me to ask the Judge to adjudicate this Preliminary Motion to Dismiss on the basis of the First Amended Complaint and my response to your existing Motion to Dismiss and then after its defeated (as I expect it will be defeated) request leave to file the Second Amended Complaint before discovery? Or would you want to file a wholly new duplicative briefing round of another *Motion to Dismiss For Failure to State a Claim* if I did that, suggesting that immediate filing of a *Second Amended Complaint* is more time-effective and efficient for us?

I'm just trying to weigh the options for getting this adjudicated as quickly as possible to give the Treasury Department maximal lead-time to adapt and rectify this problem while amending substantially and substantively <u>additively</u> (*not subtractively*) once more. Basically, would it be ok with you for me to hold off on the Second Amended Complaint until we get into Discovery, in the hopes of saving each other and the Court time?

[Quoted text hidden]

---

**Romero, Kelsi (USAFLS)** <Kelsi.Romero@usdoj.gov>                         Mon, Aug 25, 2025 at 10:24 AM
To: David Clayman <david@clayman.org>

Mr. Clayman,


My objection to you amending your Complaint yet again is not a "reaction" as you so suggest. Rather, based on what you have detailed in your email, amendment of your Complaint would be futile as it would still fail under binding legal precedents. The choice is ultimately yours as to whether to seek leave to file a Second Amended Complaint, and I cannot give you legal advice as to when or if you should do so. As stated previously, if you choose to attempt to amend your complaint again, I will be objecting as I believe it would be a waste of the government and the Court's time and resources.

[Quoted text hidden]

---

**David Clayman** <david@clayman.org>                                      Mon, Aug 25, 2025 at 11:36 AM
To: "Romero, Kelsi (USAFLS)" <Kelsi.Romero@usdoj.gov>

Hi Mrs. Romero,

Understood, thank you. I must note that in my last email I overlooked the fact that I had already provided two brief bullet

points identifying some of the revisions I intend for my Second Amended Complaint. In truth, the list of changes is considerably longer, and several are far more fundamental—including arguments about the fundamental nature of legal tender, its implications, and my lived experience of being barred from using the only form of legal tender judicially and Congressionally recognized in the United States, and the vulnerabilities and burdens that periodically unavoidably engenders.

I cannot accept your interpretation of binding precedent. Can you? I don't think you're being genuine or you really shouldn't have passed the Bar. In *Burwell v. Hobby Lobby*, a $2,000 financial penalty was held to constitute a substantial burden. In *Wisconsin v. Yoder*, even a $5–$50 fine and the threat of three months' imprisonment for religious practice was deemed sufficient, under a First Amendment claim, to improperly coerce religious belief. By comparison, if I were again charged with a felony requiring $25,000 bail, I would face two unconstitutional outcomes: (a) remaining incarcerated until judgment solely because non-cash payment options are unavailable (as in Miami-Dade and Palm Beach), or (b) being compelled—if communication with bail agents is even feasible without outside support—to pay a nonrefundable $2,500+ surety bond fee solely to avoid violating my religious objection to cash. Under *Hobby Lobby* and *Yoder*, such consequences plainly constitute a substantial burden on religious exercise. Do you still disagree?

The correct conclusion—at the District Court, Court of Appeals, and Supreme Court levels—must be that even a single unnecessary day of incarceration beyond one's conditional pretrial release hearing, if imposed because of religious belief or lawful means of payment, is a substantial burden within the meaning of RFRA. It should not take prolonged litigation to establish what is self-evident: unnecessary imprisonment for religious reasons is incompatible with both RFRA and the Constitution.

To be clear, I do not object to a brief hold while a personal check clears and posts to verify receipt of funds. Such a safeguard is acceptable and reasonable when a detainee is assessed a cash pretrial release condition and voluntarily selects a slower method instead of immediate systems such as FedNow, Zelle, wire transfer, or credit card. What I object to is (1) arbitrary confiscation of my checkbook with no reaccess right to write a check to any County, State, or Federal Jail to pay my bail, (2) categorical denial of checks, credit cards, debit cards, and other legitimate non-cash methods, and (3) conditioning release on payment mechanisms wholly inaccessible from custody without government-facilitated services such as cashier's checks. The Government also bears a duty to provide supervised access to modern digital platforms (Venmo, Zelle, FedNow, etc.) until a secure "jail mode" is implemented. The pressing question remains: how many unnecessary nights in jail today are directly attributable to government insistence on cash-only bail in a society where most people rely on alternatives? Especially given that the Federal Reserve reports the typical American carries only $67 in cash, meaning that in jurisdictions requiring cash-only bail, virtually any bail above $67 entraps the average citizen —regardless of whether they have thousands or tens of thousands of dollars immediately available through debit cards, credit cards, checking accounts, or brokerage accounts.

Accordingly, my Second Amended Complaint will seek a declaration that cash bail and release conditions tethered to cash-only payment methods are arbitrary, capricious, and unlawful under RFRA and the Fourteenth Amendment. As presently implemented, these systems deny equal access to pretrial release for (a) the roughly 40% of Americans who rarely or never use cash (Pew Research), and (b) the overwhelming majority who do not carry sufficient cash to cover felony bail. Liberty is therefore conditioned not on risk or merit but on whether friends or family intervene—a discriminatory and corrosive outcome for a nation that ought to safeguard principled dissent and limited civil disobedience.

Regrettably, this dispute will consume time I would prefer to devote to advancing my work with Lifesaver Labs. But given your continued refusal to recognize the substantial burden imposed under RFRA per my risk of imprisonment and any or all my other listed burdens, I see now more than ever the necessity of challenging your interpretation preventatively and proactively—while I remain outside of jail, before any next experience of being unjustly charged and arrested, with full freedom and access to drafting tools—rather than from a jail cell.

Please advise whether my citations to *Wisconsin v. Yoder* and *Burwell v. Hobby Lobby* are sufficient for you to stipulate, in good faith, that pretrial detention conditioned on religious belief constitutes a substantial burden under RFRA. If not, I will have no choice but to pursue a broader challenge seeking to invalidate cash bail practices in the Southern District of Florida and beyond—at minimum to protect American Jews who hold similar beliefs, but ideally to safeguard all defendants subjected to this indefensible "Custodial Catch-22" created by arbitrary legal tender restrictions on bail payment, while simultaneously denying the natural and effective non-cash methods Americans use for small, midsized, large, and very large transactions.

As an alternative, perhaps the courts might consider a judicially mandated system of investment-grade accounts that allow individuals to segregate and dedicate a portion of their net worth to serve as bail security. Such funds could be freely invested but instantly transferable to cover bond if needed. Call them "Romero Bail Bond Accounts" if you like; I would gladly set aside a significant portion of my savings in such an account to protect myself from unjust pretrial detention—if the United States made any meaningful effort to provide such an option. Instead, the government seems intent on defending a cash-only bail funds accessibility paradox that arbitrarily extends the detention of those presumed innocent, not because of danger or flight risk or any other cognizable legitimate reason for holding a presumably innocent detainee in jail, but merely because the United States obstinately insists on an outdated and inaccessible means of payment.

I'll also now push for relief in the form of a declaration or development of an alternative form of digital legal tender until the In G-d We Trust cash is fully or overwhelmingly cleared out of the circulating financial system. There's been a lot of talk of a central bank digital currency at the Federal Reserve and Treasury; perhaps this religious freedom complaint is a case that forces that or something similar from contemplation to action, executing it into place.

I hate how much time this case is taking.
Sincerely,
– David
[Quoted text hidden]



David Clayman <david@clayman.org>

## Adding President Trump as Defendant; Opinions Maturing
2 messages

**David Clayman** <david@clayman.org>                                    Tue, Aug 26, 2025 at 7:35 PM
To: AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Dear Mrs. Romero,

After sending my last message, I learned that President Trump issued an Executive Order yesterday titled "Taking Steps to End Cashless Bail to Protect Americans". This Order appears to place significant Executive Branch pressure on jurisdictions such as Illinois or New Jersey that operate under a cashless bail framework, and might even apply pressure to jurisdictions like Broward County that accept credit cards in lieu of physical cash. It's hard to say, because the word "cash" and "cash bail" in the Executive Action is imprecise and ambiguous on included accepted payment methods from jurisdiction to jurisdiction.

Because I frequently travel to Illinois and travel even more frequently to and through Broward County, and because I could easily be arrested in Illinois or Broward County again (I've been arrested previously in both), this development affects me and threatens me directly. Before Illinois reformed its system, I was held there for an additional 28 days on cash bail, solely because my religious faith prevents me from using currency that bears G-d's Name. The President's action against cashless bail, particularly in Illinois, therefore has immediate and personal relevance to me. I believe it establishes at least imminent standing for me to seek permanent injunctive relief—specifically, to ensure that "cash" is interpreted more broadly to encompass a range of liquid and illiquid payment methods, rather than restricting release exclusively to physical banknotes and coins. According to the Federal Reserve, the typical American carries only about $67 in cash, while I personally carry none at all for religious reasons, but maintain over $83,000 in credit and debit availability, several thousand by check, and well over $200,000 in liquefiable assets and brokerage credit lines accessible electronically.

**Could you clarify whether this Executive Order is intended to limit me (and, effectively, the typical American) to the narrow definition of "cash" as physical notes and coins, or whether it extends to cash equivalents recognized by accounting standards and wider payment methods Americans employ with more frequency than cash or to substitute for cash on large payments, such as checking accounts, debit and credit cards, ACH transfers, wire payments, or digital platforms increasingly used for taxes and other large transactions?**

**Because of the President's action yesterday, I believe I may now need to add him, in his official capacity, as a Defendant in this case. If I do so, must he be served with a paper summons, or may service be effected electronically through you, given that you would likely represent him officially?** Avoiding an additional paper copy would help limit the production and circulation of sacred Names (Shaimos), which under Jewish law must be tracked, retrieved, and buried. I ask whether RFRA accommodations might allow electronic service here. I note that public reporting has alleged that President Trump has destroyed documents—including classified ones—by shredding, marking, or even flushing them, which could desecrate sacred Names. Regardless of whether those reports are accurate, I would prefer not to risk entrusting such documents to that process.

Separately, on reviewing my last email, I recognize that some of my statements were too strongly worded. For example, I wrote that "the Government bears a duty to provide supervised access to modern digital platforms," when I should have said that I *believe* such a duty exists. The courts may or may not agree, and they could reasonably decide that providing access to debit cards, credit cards, and checks is sufficient, even if broader access to modern platforms like Venmo, Zelle, or FedNow is not recognized as mandatory.

The central argument remains: extended pretrial detention for inability to use cash constitutes an impermissible substantial burden. As the Supreme Court held in *Robinson v. California*, 370 U.S. 660, 667 (1962), "even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." By the same reasoning, even a single day of extended detention caused by my sincere religious inability to use cash should qualify as a substantial burden under RFRA.

**Given this additional *Robinson v California* precedent above, would you please finally be willing to stipulate that one or more days of detention under these circumstances or refusal of all my commonly-carried religiously compatible means of payment as a detainee constitutes a substantial burden and government coercion of religious belief?** If so, once even one substantial burden is stipulated or established, the burden of proof would properly shift to the Government to demonstrate that strict scrutiny is satisfied—namely, that the printing of G-d's Name policy sacralizing currency beyond the level where I can use it serves a compelling interest and is, in any legitimate governmentally compelling interest, implemented by the least restrictive means considering all reasonable alternatives.

If you would prefer, I am willing to revise my prior email to reflect these more moderated positions, or we can carry these refinements into the pleadings I plan to file by Friday. I apologize for the earlier haste in sending without sufficient qualification and tempering.

All the best,
David Clayman

**P.S.** I have mailed the attached letter to the Supreme Court for consideration; it is expected to arrive tomorrow. I share it with you because it relates to one of the three key issues raised in my earlier case in *Doe v Trump*, which you described all of as frivolous. I believe my proposal for a periodic "State of the Constitution Address" could serve valuable civic and civic-religious purposes, offering Congress and the Executive constructive nonpartisan or less partisan semi-regular ratifiable guidance from the Court on what the individual Justices may feel are achievable and meritorious constitutional emendation suggestions, to be considered and revised freely by Congress and the States in the ordinary proposal and ratification process. I had not realized the lower courts are procedurally barred from reviewing and forwarding such suggestions upward as advisory opinions to the Supreme Court; though counterintuitive, I now understand that only the Supreme Court itself may consider them and that the Supreme Court body takes and processes mail proposals directly rather than allowing suggestions and proposals to be staged, reviewed, and refined in the lower Courts first.

---

**State of the Constitution Address Proposal.pdf**
218K

---

**Romero, Kelsi (USAFLS)** <Kelsi.Romero@usdoj.gov>          Thu, Aug 28, 2025 at 10:28 AM
To: David Clayman <david@clayman.org>

Mr. Clayman,

To the extent you are attempting to confer with the U.S. Attorney's Office about any Motion or Amendment referenced in your below email, please note our objection to the same in your filing. To the extent that you are attempting to solicit a stipulation or concession regarding an area of the law referenced in your below email, please note that we decline to stipulate or concede any area of the law referenced in your email and specifically object to the adding of any additional parties to this action.

**Kelsi R. Romero**

*Assistant United States Attorney*

United States Attorney's Office

Civil Division

500 East Broward Boulevard

8th Floor

Fort Lauderdale, Florida 33394

Office Direct: 954-660-5694

Office Cell: 786-390-4645

Email: Kelsi.Romero@usdoj.gov



[Quoted text hidden.]



David Clayman <david@clayman.org>

## Another substantial burden example you might relate to and test yourself
1 message

**David Clayman** <david@clayman.org>                                        Fri, Sep 5, 2025 at 1:24 PM
To: AUSA Kelsi Romero <kelsi.romero@usdoj.gov>

Dear AUSA Romero,

I just want to share one other example of a commercial exclusion because I can't circulate cash legal tender. I'm going to be exhaustive, just because if I don't cover all the bases on this I fear that you'll find some loophole to reject this additional story of burden that didn't even make it into my *Second Amended Complaint*, in part because it just happened / is happening now, I don't think of the lottery unless the jackpot is high, and my memory of all my burdened and commercial exclusion experiences isn't perfect.

The Powerball lottery is at an estimated 1.80 billion or $826.4 million (millibillion) cash value, the second largest Powerball lottery jackpot ever. I could save a tremendous amount of life if I had immediate access to a $826.4 million fortune; I'd probably distribute the bulk of it like McKenzie Scott aggressively to super-effective lifesaving charities; the rest I'd use to fuel experimental *Lifesaver Labs* projects and popularize and secure the pattern of Team Precedencies / Team Presidencies and a slate of lifesaving policies attached to that. I would also have enough wealth where dropping $30,000 - $50,000 on lawyers to represent me on these legal cases I have wished to bring to this Court's attention would become economically more feasible... though religiously still difficult to justify as funds wastage at the extortionate fees lawyers charge.

Back to the main point: I want to buy 20 additional tickets ($40) in this Powerball lottery before the drawing tomorrow night. I'm doing this purchase partly to support education and general revenue in the State of Florida (if I lose), and partly to gain enough wealth where I can more easily change the world positively (if I win). Either way, win-win, if I can buy.

However, I've gone to every Powerball lottery ticket seller in my 33433 ZIP code and all five locations in my ZIP code have refused to sell me Powerball tickets unless I pay in sacred cash. They're all implicitly and explicitly discriminating religiously against my religious inability to use the payment method they're asking for, as the government presently allows them to do by making only sacred cash legal tender and thereby making legal tender inaccessible to me. I told them that I can't use cash because of my religious beliefs, and I ask if they'll accept debit card instead, and they say "sorry", they can't religiously accommodate.

I personally stopped and asked at all the following:

1. Publix (7060 W Palmetto Park, Boca Raton, FL 33433)
2. Publix Liquors (7050 W Palmetto Park Suite 26, Boca Raton, FL 33433)
3. Mobil (7176 Beracasa Way, Boca Raton, FL 33433)
4. Chevron (7035 W Camino Real, Boca Raton, FL 33433)
5. Shell (7006 Palmetto Circle North, Boca Raton, FL 33433)
6. Mobil (20385 FL-7, Boca Raton, FL 33498) – Outside my ZIP Code, but I was nearby

I've spent at least 40 minutes so far trying to find a neighborhood store to sell me lottery tickets.

At any time, either before this 1.80 billion Powerball drawing or after, I challenge you to find a store nearby you in Florida that sells lottery tickets and takes payment from debit cards. I'm only personally familiar with one chain that does: RaceTrac, whose nearest location to me is a 40 minute drive away (at 3299 N Federal Hwy, Pompano Beach, FL 33064). I can't afford to spend *another* 40 minutes driving today after I failed finding a local store, and after spending the time to write this to document my frustration with finding a lottery store that will sell to me. In general, if everyone in the United States who buys lottery tickets had to drive 40 minutes to buy their lotto tickets every time they wished to participate *many* fewer lottery sales would occur. I'm happy to assert that as a legally cognizable fact of spatial economics.

The only reason I know RaceTrac accepts debit for lottery tickets is because I happened to be at one the other day when I stopped to recharge my electric vehicle at a nearby Walmart-EA pit stop and bought two Powerball tickets at the RaceTrac nearby incidental to a drink purchase when I saw how high the jackpot had gotten. One of those two tickets I bought there hit the Powerball, so I "won" (broke even) at a redemption of $4. But I can't *actually* redeem my Powerball ticket from a store since they'll only redeem my ticket in sacred cash... which I can't use and must refrain from carrying. So my only option to redeem it was to either mail it in burning up a first-class forever stamp and envelope for a little more than 76¢,

reducing my unlikely lottery breakeven to a loss of >76¢, to get a $4 check back from the Florida lottery (costing them some mailing cost, a second envelope, and hassle to process and mail my check request back) or I learned from my brother I could exchange the ticket cashlessly for another Powerball entry. My brother did that for me; he traded my two entries for one entry with multiplier (his pref; I wanted a 1:1 cashless trade for another two jackpot entries).

So I currently have a
1 in 292,201,338 chance of winning or splitting the Powerball jackpot, instead of
1 in ~13,914,349 as it would be if I could buy an additional 20 entries as I would like.

I just got a crazy idea to try later today seeing if I can negotiate payment with and through money order. Maybe maybe my neighborhood Publix will let me buy a money order for a premium from them and then "cash" that money order in exact exchange for 20 Powerball entries in a two-phase transaction. Unless you hear back from me with a correction, assume that that payment method is not accepted by Publix. But even if that were to work, the fact that I have to go through these transactional pretzel twists to participate in the Interstate and Florida Lottery is an example of interstate commercial exclusion

There are no legal ways that I know of to buy digital lottery tickets in Florida, and digital lottery apps like Jackpocket, which I've explored, don't seem to be legal in Florida or accepted under Google Play Store policy like they are in other states, and they also seem to check and verify my location before allowing me to buy tickets in other states, which I think they disallow unless I'm physically present there. And all other states that currently *have* digital lotteries would have a significantly higher nonzero state income tax than Florida's zero state income tax load on lottery winnings.

**It would be great if you could agree to stipulate that this lack of equitable and equal access to the interstate lottery counts as more than a "mere inconvenience" but an actual substantial burden that any common, everyday citizen or member of a jury would recognize as such, if they couldn't buy lottery tickets in their ZIP code due to their sincere religious beliefs.**

Please let me know if you'd agree to stipulate as such, or if you'd change your mind on reading the Second Amended Complaint and stipulate acceptance to any of my newly listed or previously listed substantial burdens.

And please understand that my odds of winning the lottery and catapulting into the same wealth and privilege category as the scions of Donald Trump, namely Donald Trump Jr. and Eric Trump, are approximately zero rather than nonzero right now over the next month because of this inability to use sacred cash to buy into the Interstate Powerball Florida-flavored lottery. I wouldn't want to rest my entire case on this one commercial exclusion, but it's another supplementary example of the "thousand papercuts" I face, and that you'd face or be sure to encounter in a large enough population if you or the officers of the Court were to experiment with refraining from using any and all legal tender for several months.

I'll leave it there. It probably took me more than 40 minutes to write this message, but on the whole, I think this message as well-documented as it is stands a reasonable chance of securing me future equitable and equal neighborhood ZIP code access to the interstate lottery as another demonstration of commercial exclusion. About half of Americans feel like the right and privilege to dream of winning the neighborhood lottery in a given year is an important experience, and I don't spend even close to the per capita annual average spend on lottery competition, but I still wish to enjoy the option of burning cash on the lottery socially dreaming of a transformative jackpot when jackpots grow to the point where they're not a heavy statistical negative-expectation.

https://www.fool.com/money/research/lottery-statistics/?utm_source=chatgpt.com

This is all happening briefly put because the US Government basically has the Israeli Shas Party and early Hasmonean position of printing In G-d We Trust on currency, and I hold the more dominant Israeli position and the modern vernacular version of the Talmudic Rosh Hashanah Tractate later Hasmonean "Third of Tishrei holiday" position that "In G-d We Trust" unhyphenated is inappropriately holy to print on currency that isn't carefully guarded and religiously buried. That's why I'm having so much trouble buying lottery tickets, etc. etc. and all my other burdens and exclusions I'm suffering or have suffered from.

This message is in my original voice; it wasn't reprocessed/rephrased by AI. And while I recognize it comes to close to 4 pages single-spaced in a word processor, which is equivalent ChatGPT estimates to about 15 minutes of continuous conversation, if we were cooperating and communicating by voice a disclosure like this over 10 minutes may have been cut down to 2 minutes, if I could get quick interrupting verbal feedback from you in a face-to-face or voice-to-voice conferral that you understand and would stipulate to this situation, or any of the other situations I've been in, without me having to exhaust and head off every possible misinterpretation.

I argue that it is indisputable to any United States jury that any American being denied neighborhood access to the interstate lottery simply because of their religious beliefs is worth a 15 minute communication to the US Attorney or another federal office capable of and motivated to investigate religious accommodation needs in the United States.

This email, and others like it, are undeniably I posit the side effect of noncooperation and adversarial construction and treatment up to this point from your office when I've made efforts to handle this as partners instead. I wouldn't even bother to add or mention this lottery burden if it weren't for your rejection of what I perceive to be my most severe, obvious, and undeniable undue-extended-imprisonment-threat-as-religious-prisoner claims around legal tender-requiring bail conditions nationwide for which President Trump seems to be pushing jurisdictions across the country coercively hard.

Unless I hear a *clear and convincing* reason by 4 PM Eastern today why I shouldn't reproduce our full email history to the Court, I'll finish printing out all our correspondence between you and me including this email any any responses I get for submission to full Court review, given that I anticipate even more further (I'd argue vexatious) complaint from your team that I'm wasting your time in bringing these relevant matters and experiences to your attention as they happen and emerge, as you seek to permanently bar me for the rest of my life from using American cash and American legal tender, with all the consequences in my life little and large that that would cause me, my family, any descendants, and those who think like me from 11 years ago to forever forward if this case isn't adjudicated in my favor with some less restrictive alternative means of more powerfully achieving governmental compelling interests like those I spent so much time charting out in so many feasible and valuable directions for your and specifically the Secretary of Treasury's conscientious review.

Let me know naturally if you change your mind and wish to speak in a more natural and human way by video or voice anytime. That offer is always open and stands throughout the pendency of this case and any other situations we might ever be aligned or opposite on that would benefit from briefer full-bandwidth sincere human conversation.

All the best,
David Clayman

David Clayman
7930 Palacio Del Mar Dr
Boca Raton, FL 33433-4148



CERTIFIED MAIL

9589 0710 5270 2652 1262 89



Retail

U.S. POSTAGE PAID
FCM LG ENV
BOCA RATON, FL 33433
SEP 05, 2025

33401

RDC 99

$9.44

S2324E500496-15

Clerk of Courts, US District Court for Southern District FL
701 Clematis Street, Room 202
West Palm Beach, FL 33401

INSPECTED