David Morris Clayman / דוד משה קליימן / אדם דוד קליימן, *Pro se*

FILED BY CDS D.C.
Sep 22, 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **David Morris Clayman** ( / אדם דוד דוד משה קליימן),<br>Plaintiff,<br>vs.<br><br>**UNITED STATES OF AMERICA**<br>et. al. | **CASE NO. 9:25-CV-80890-WM**<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |

# PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

## INTRODUCTION

Defendant's Opposition misstates both the law and the record in a way that seems very willful. As with much of Defendant's burdening and obstructive opposition so far, this might have been worked out compassionately without rivers of ink in a paralinguistically-rich human video or telephone call.

Rule 15(a)(2) requires that leave to amend "shall be freely given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Courts deny amendment only where futility, bad faith, or undue prejudice is clear. None of those circumstances are present here, especially since under *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001), no qualifying prior request for leave to amend has until now been requested or granted. In the absence of a prior Motion for Leave to

Amend, "[i]t cannot be said that the plaintiffs already had been given an opportunity to amend or that the plaintiffs repeatedly had failed to cure deficiencies through previously allowed amendments" (*Id*). Under this Circuit's *Bryant v Dupree* precedent, this Second Amended Complaint is the first not the second opportunity to amend sought (for discretionary allowance).

The proposed Second Amended Complaint ("SAC") (1) introduces new claims arising from recent Executive Orders, (2) corrects defects identified in prior cases, (3) supplies detailed factual allegations of substantial burdens, and (4) seeks only equitable relief in areas not previously adjudicated by any court in this Circuit. Defendant's reliance on ceremonial deism precedent and presidential immunity doctrine is misplaced. The Court should permit the filing of the SAC and, as explained below, this Court should rule against the Government's Team Garbage Heap and Dungpile, the Government's "early Hasmonean" position, and rule for Team Teddy Roseavelt/Talmudic Sages/Plaintiff on the weaning of the People from their current practices to protect sacred secular documents with G-d's Name on them from garbage heaps, airborne dung, and dungpiles, not just when in Hebrew (which is canonically super-holy for Jews) but also in vernacular, here instantly in English, the language the Plaintiff is most capable of concretely relating to and worshipping and serving "First Principle" civil and Jewish religious prerogatives like the preservation of life *and* death and the Jewish protection of G-d's Names.

## I. THE PROPOSED SAC IS NOT FUTILE

### A. RFRA Claims State a Plausible Basis for Relief

Defendant argues futility by pointing to prior Establishment Clause decisions upholding the motto "In G-d We Trust." That reliance is misplaced. Those decisions involved challenges brought by non-Jewish plaintiffs on Establishment Clause grounds. None addressed the distinct

and sincerely held Jewish Talmudic objections presented here, which focus on the impermissible use of G-d's Name on secular instruments in ways that closely mirror early Hasmonean practices later rejected by the Sages themselves.

The SAC explains that this case turns on situations where the divine Name is printed (1) on impermanent media that will inevitably be destroyed irreverently—shredded, trashed, or incinerated without Shaimos burial—or (2) on currency routinely carried into bathrooms, spaces considered religiously profane, where the Name is exposed to unclean environments. Jewish law is clear: the Name of Heaven should not be degraded in these ways. Plaintiff's burden is unique; to his knowledge, no litigant has previously raised the fecal-exposure dimension of this religious violation.

Defendant attempts to fold these claims into "ceremonial deism" precedent such as *O'Hair v. Murray*, 588 F.2d 1144 (5th Cir. 1979), and *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970). But those courts held the motto non-actionable precisely because they saw "no theological or ritualistic impact." *Aronow*, 432 F.2d at 243. Here, by contrast, the SAC makes clear that the Government's continued printing of the unhyphenated Name creates precisely such theological and ritual impact, placing Jewish adherents on the horns of a dilemma between the Hasmonean practice—where G-d's Name was left to decay "on a garbage heap" or "cast on a dunghill"—and the corrective position of the Sages, who abolished and weaned the people off that practice.

This Court must therefore decide whether to align itself with "Team Garbage Heap and Dunghill" represented by the Executive and Legislative Branches here, perpetuating reckless overuse and contamination of the Name, or with "Team Roseavelt and Team Secular Avoidance," consistent with the Talmudic sages who prohibited superfluous inscription of the Name on secular documents that could be disrespected. Either choice necessarily implicates questions of civic

religion. But siding with the former imposes direct theological conflict and pressure upon Jewish believers such as Plaintiff, a burden cognizable under RFRA.

Plaintiff underscores that he is not an atheist. The atheist precedents do not apply here, nor do they bar a Jewish plaintiff from pressing claims grounded in sincerely held Talmudic religious obligations that, if this Court sides for the *status quo*, it will be establishing a mode of religious practice directly contrary to the Talmud.

Those cases also did not address claims under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq. RFRA imposes a distinct burden-shifting framework: once a plaintiff demonstrates a substantial burden on sincere religious exercise, the government must show a compelling interest pursued through the least restrictive means. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014).

The SAC details how Plaintiff, as a practicing Jew, cannot circulate or accept legal-tender currency bearing the unhyphenated Name of G-d without violating core commandments and Talmudic precedent. Unlike other litigants, Plaintiff faces unavoidable burdens: exclusion from bail systems, inability to settle "debts, public charges, taxes, and dues" (31 USC §5103) denominated only in cash tender, and economic marginalization in serious transactions. These allegations, taken as true, state a plausible RFRA claim.

**B. The SAC Cures Defects Identified in Prior Litigation**

In *New Doe Child No. 1 v. Congress*, 891 F.3d 578 (6th Cir. 2018), the court erred by assuming fungibility of payment forms. The SAC explicitly corrects that error by documenting the legal requirement of tender in cash under 31 U.S.C. § 5103 and the impossibility of substituting credit or digital transfers in many contexts. This careful pleading eliminates the "false equivalence" on

which prior dismissals rested.

**C. Presidential Immunity Does Not Bar Equitable Relief or Inclusion of President As Defendant**

Defendant argues futility on the ground that the SAC names the President. But Plaintiff does not seek damages from President and Commander Trump. The SAC requests only declaratory and injunctive relief directed at the August 25, 2025 Executive Orders on bail. Absolute presidential immunity, as recognized in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and *Trump v. United States*, 603 U.S. 593 (2024), applies to criminal prosecution and to personal civil liability for damages arising from official acts. It does not extend to official-capacity claims seeking prospective declaratory or injunctive relief. Courts have long entertained such suits where executive actions impose constitutional or statutory burdens.

Here, Plaintiff expressly disclaims any claim for monetary damages against the President and Chief Commander. Instead, Plaintiff seeks relief to prevent ongoing and future enforcement of federal executive actions that, in combination with Plaintiff's religious beliefs prohibiting the use of cash legal tender, risk placing him at unique jeopardy of excessive bail, detention, or other sanction in violation of RFRA, the Equal Protection Clause, and the Eighth Amendment. Plaintiff's request in the *Second Amended Complaint* to include Defendant Trump as a party to this lawsuit should be granted freely. No other party on this lawsuit can be relevantly questioned with interrogatories or challenged as to the August 25, 2025 Executive Orders and from no other lesser officer do those Executive Actions issue. Furthermore, there is no single lesser officer who can be enjoined inescapably on this topic, particularly not without the blessing and agreement of the President and Chief Commander, as funds can be withheld by any cabinet or lesser officer coercively impacting jurisdictions with fully cash-free or CashAlt bail terms. Forbidding the addition of President Trump as a party would force this Plaintiff to play "whack-a-mole" to enjoin

the Executive Branch from enforcing these coercive pressures against the Universal Guarantee of Cashless or CashAlt bail that Plaintiff is seeking from the Government through this pleading in the Courts. The US Attorney did not list lesser officers Plaintiff could add as Defendants on these matters to exhaustively handle Defendant's burning concerns RE Executive Actions in the President's stead.

## II. PLAINTIFF HAS CURED PRIOR DEFICIENCIES

Defendant contends Plaintiff "repeats the same defects." That is inaccurate. The SAC makes several material revisions:

1. **New Factual Record**: Eleven years of detailed burdens are documented, including exclusion from bail, economic transactions, and religious observance.

2. **Expanded Legal Bases**: The SAC adds Takings Clause and Eighth Amendment claims, providing alternative constitutional grounds. The SAC should have also included an explicit Fourteenth Amendment claim for denying Plaintiff within this jurisdiction and all other United States jurisdictions the equal protection of the laws, but that case was made implicitly throughout, particularly the long list of burdens, and the Plaintiff hopes that this Court and any later review will be able to surmise and infer the Fourteenth Amendment implications even though it was not explicitly invoked.

3. **Concrete Remedies**: Proposes specific, manageable relief including a redesign deadline, acceptance of CashAlt alternatives, and accommodations consistent with and coupled consensually with the *American Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) on a strict, judicially-enforced "Apollo mission launch" timeframe.

4. **Responsive Corrections**: Explicitly addresses defects noted by prior courts (fungibility,

false equivalence, standing).

This is the opposite of repetitive pleading. It is a responsive, corrective filing, exactly what Rule 15 contemplates.

## III. ALLOWING AMENDMENT WILL NOT PREJUDICE DEFENDANTS

Defendant asserts "prejudice" because responding requires resources. But ordinary litigation expense is not legal prejudice. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

Here, the case is at an early stage: no dispositive ruling has been issued, discovery has not begun, and no scheduling order has been disrupted. In contrast, denying amendment would irreparably prejudice Plaintiff by foreclosing claims tied to newly issued Executive Orders and burdens documented for the first time.

## IV. PRO SE LITIGANTS WARRANT LIBERAL AMENDMENT

The Supreme Court has emphasized that pleadings exist to "facilitate a proper decision on the merits" and must not be treated as a "game of skill in which one misstep … may be decisive." *Conley v. Gibson*, 355 U.S. 41, 48 (1957). This principle is even more compelling where a party appears pro se. Plaintiff has not acted in bad faith or with dilatory motive. The SAC was filed promptly after new executive actions and with notice to opposing counsel. Rule 15's liberal standard should therefore be applied with full force.

Defendants are legally incorrect in asserting that Plaintiff has already had an "opportunity to amend" or has "repeatedly failed to cure deficiencies." Under *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001), an amended complaint filed once as a matter of course under Rule 15(a) does not count as a prior opportunity to amend for purposes of limiting further leave. As the

Eleventh Circuit explained:

> "The district court gave several reasons for its refusal to grant the plaintiffs leave to amend. First, the district court stated that the plaintiffs already had been "given one opportunity to amend their complaint." This assertion apparently refers to the plaintiffs' Amended Complaint, filed in response to the defendants' original motion to dismiss. Under Rule 15(a), an amendment may be made either as "a matter of course" or "by leave of court." See Fed.R.Civ.P. 15(a).[2] The Amended Complaint was filed as a matter of course, and until the renewed motion to dismiss came before the court, the plaintiffs had not asked for leave to amend. Therefore, it cannot be said that the plaintiffs already had been given an opportunity to amend or that the plaintiffs repeatedly had failed to cure deficiencies through previously allowed amendments."
> – Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001).

That binding precedent alone, which the US Attorney and Assistant US Attorney must have already been clearly aware of and chose to ignore to waste this Plaintiff's and this Court's time, should control this decision to grant the Plaintiff leave to amend and cause this Court to reject the Defendants' objections.

## V. THE BALANCE OF EQUITIES FAVORS AMENDMENT

- **Futility:** Not established. Distinct statutory and constitutional claims are pleaded.
- **Prejudice:** Minimal to Defendant; severe to Plaintiff if denied.
- **Delay:** None; amendment was timely filed.
- **Justice:** Strongly favors hearing claims on their merits rather than truncating at the pleading stage.

## VI. PLAINTIFF'S POSITION ALIGNS CLOSELY WITH PRESIDENT THEODORE ROSEAVELT (ROOSEVELT), A SUBSTANTIAL MINORITY OF CIVIL WAR ERA AND 1907-1908 CHRISTIANS AND JEWS, AND PERHAPS PLAINTIFF HOPES EVEN PRESIDENT AND COMMANDER TRUMP

Plaintiff's position is neither novel nor idiosyncratic. In fact, it aligns with the views of President Theodore Roseavelt, who, in 1907, forcefully opposed the superfluous inscription of "In G-d We Trust" on coins. Roseavelt explained that "at present… there is no warrant in law for the inscription," and went further, articulating a principle nearly identical to Plaintiff's: placing the divine Name on currency "does no good but does positive harm, and is in effect irreverence which comes dangerously close to sacrilege". Plaintiff goes a bit further than Roseavelt and argues under Talmudic precedent that the use of the Name of G-d on our currency and passports doesn't just come dangerously close but actually definitively *crosses* the line into sacrilege. Roseavelt believed that a sacred motto, if invoked at all, should be "uttered only with that fine reverence which necessarily implies a certain exaltation of spirit," not stamped on objects that inevitably wind up in sordid or profane places—including, as Plaintiff pleads, bathrooms, trash heaps, and shredders. Roseavelt's reasoning resonated with a substantial minority of Christians and Jews in the Civil War and Progressive Era, who expressed concern that casual use of G-d's Name degraded rather than honored religion (see Appendices). Plaintiff stands squarely within this tradition: he argues that Jewish law requires G-d's Name to be preserved and treated with reverence, and that the government's continued practice of inscribing it on perishable, profaned, and frequently desecrated currency imposes an unavoidable religious burden. Just like Theodore Roseavelt, Plaintiff takes no religious RFRA issue with *In G-d We Trust* being inscribed and exalted in the House of Representatives above the rostrum. The RFRA issue comes when the Name of G-d is exposed to garbage heaps, dung, and dung heaps, or is treated irreverently.

The theological origins and references of Theodore Roseavelt's Christian resistance to the motto on currency are different from the Plaintiffs Jewish reliances. Roseavelt relied on citations like Matthew 6:24, "No man can serve two masters: for either he will hate the one, and love the other;

or else he will hold to the one, and despise the other. Ye cannot serve G-d and mammon." (KJV, Matthew 6:24 – see also Luke 16:13). Plaintiff relies instead on Talmudic Tractate Rosh Hashanah 18B (in Complaint, FAC, and SAC), which is more hyper-specific and detailed about how we must treat the Names of G-d on secularized documents. But President Roseavelt and the Talmudic Sages / Plaintiff end up in approximately the same resting place argumentatively. President Theodore Roseavelt and I are aligned and on the same team here.

Far from being eccentric, Plaintiff thus walks in the footsteps of a President revered for his civic leadership, and echoes concerns long voiced by religious Americans across denominations. And even today, there is reason to believe that President and Commander Trump—who has invoked themes of religious liberty in his policymaking—might reconsider the wisdom of unreflective reliance on mid-20th-century "ceremonial deism" precedent if confronted with the full scope of Jewish, Christian, and historical objections documented here, objections that were strong enough for 81 out of 212 (38%) Episcopal Convention representatives to vote *against* the reimposition of In G-d We Trust on our coins in the Synod House of the Cathedral of St. John the Divine on November 13, 1907 (see Appendix A Part 2). If RFRA were in force in 1907, a minority of 38% of Episcopalian Representatives would have been far beyond sufficient for supporting and enforcing Theodore Roseavelt's move to remove the Name of G-d from our coins and currency.

This practice of printing/minting the Name of G-d on circulating currency was even more controversial it seems in and around the time of the Civil War when first imposed on one coin design. But the highly evangelistic and establishmentarian Treasury Secretary Salman P. Chase and his ideological heirs slowly normalized and accustomed much of the public over almost a century to acceptance of the motto In G-d We Trust over time through "salami-slicing" tactics:

performing "a series of many small actions [on minor coinage, bit by bit over time] to produce a much larger action or result that would be difficult or [deemed] unlawful to perform all at once"[1] like stamping all the coinage and banknotes in one fell stroke with a sectarian sacred motto immediately fully implicating the 1st Amendment and provoking overwhelming response.

Under RFRA, had RFRA in its present form been in place in 1907, even just President Roseavelt singularly taking muscular civil legal action alone as a citizen would have been enough for the Courts to overrule any Congressional majority on the matter on any sincere assertion from Roseavelt that the motto was sacrilegious and substantially burdened him and that he meant to defend his view and the principled position of 38% of Episcopalian Convention attendees in the Courts. But the question before this Court is not whether such concerns are majoritarian, now or then, but whether they are sincere, substantial, and entitled to protection under RFRA and the Constitution. The record, together with Roseavelt's example, answers that question decisively in Plaintiff's favor. The Plaintiff hopes that President Trump will have an opportunity to review these full arguments and split from the other Defendants representing Team Dungheap and Mammon and join the side of the Plaintiff on Team Roseavelt, Talmudic Sages, and Secularist Name Avoidance in Irreverent/Disrespectful Contexts, Fecally-Exposed Carry and Garbage Heap, Shredder, and Dungpile Destruction Pathways.

## CONCLUSION

For the reasons above, Plaintiff respectfully requests that the Court grant leave to file the Second Amended Complaint, especially per the controlling 11th Circuit precedent of Bryant v Dupree,

[1] Salami Slicing Tactics. Accessed on September 13, 2025. https://en.wikipedia.org/wiki/Salami_slicing_tactics

252 F.3d 1161, 1163 (11th Cir. 2001).

The Plaintiff also respectfully asks the Defendants again to not waste so much of the Plaintiff's time. The *Bryant v Dupree* precedent cited was surely something the US Attorney knew of in advance before filing that kind of opposition.

s/Plaintiff David Clayman, Still *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@ingwetrust.org
david@inhashemwetrust.org
david@lifesaverlabs.us
david@clayman.org

APPENDIX A: "Roosevelt Dropped 'In G-d We Trust'" and "Denounce Coin Motto Order: Episcopal Convention Votes, 131 to **81**, to Retain 'In G-d We Trust'". New York Times. November 14, 1907.

APPENDIX B: President and Commander Theodore Roseavelt's Letter to Reverend Roland Dwyer on the In G-d We Trust Inscription. November 11, 1907.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of September, 2025, I mailed a copy of this document to the Court via certified mail and electronically served a copy of this response to the opposing counsel on the case.

*/s/ David M. Clayman*
Pro Se Plaintiff

**Postscript:** Still hoping to eventually institute a National RFRA holiday on the day this decision is finally rendered in favor of President Roseavelt and Talmudic precedent, consistent with the 1907 *Roseavelt-Gaudens* and Talmudic treatment of this controversy,

# ROOSEVELT DROPPED 'IN G█D WE TRUST'

### President Says Such a Motto on Coin Is Irreverence, Close to Sacrilege.

### NO LAW COMMANDS ITS USE

### He Trusts Congress Will Not Direct Him to Replace the Exalted Phrase That Invited Constant Levity.

WASHINGTON, Nov. 13.—In answer to one of the numerous protests which have been received at the White House against the new gold coin which have been coined without the words "In G█ We Trust," President Roosevelt has written a letter, which he to-day made public. The letter follows:

"When the question of the new coinage came up we looked into the law and found there was no warrant therein for putting 'In G█ We Trust' on the coins. As the custom, although without legal warrant, had grown up, however, I might have felt at liberty to keep the inscription had I approved of its being on the coinage. But as I did not approve of it I did not direct that it should again be put on. Of course the matter of the law is absolutely in the hands of Congress, and any direction of Congress in the matter will be immediately obeyed. At present, as I have said, there is no warrant in law for the inscription.

"My own feeling in the matter is due to my very firm conviction that to put such a motto on coins, or to use it in any kindred manner, not only does no good, but does positive harm, and is in effect irreverence, which comes dangerously close to sacrilege. A beautiful and solemn sentence such as the one in question should be treated and uttered only with that fine reverence which necessarily implies a certain exaltation of spirit.

"Any use which tends to cheapen it, and, above all, any use which tends to secure its being treated in a spirit of levity, is from every standpoint profoundly to be regretted. It is a motto which it is, indeed, well to have inscribed on our great National monuments, in our temples of justice, in our legislative halls, and in buildings such as those at West Point and Annapolis—in short, wherever it will tend to arouse and inspire a lofty emotion in those who look thereon.

"But it seems to me eminently unwise to cheapen such a motto by use on coins, just as it would be to cheapen it by use on postage stamps or in advertisements. As regards its use on the coinage, we have actual experience by which to go. In all my life I have never heard any human being speak reverently of this motto on the coins or show any signs of its having appealed to any high emotion in him, but I have literally, hundreds of times, heard it used as an occasion of and incitement to the sneering ridicule which it is, above all things, undesirable that so beautiful and exalted a phrase should excite.

"For example, throughout the long contest extending over several decades on the free coinage question, the existence of this motto on the coins was a constant source of jest and ridicule, and this was unavoidable. Every one must remember the innumerable cartoons and articles based on phrases like 'In G█ we trust for the 8 cents,' 'In G█ we trust for the short weight,' 'In G█ we trust for the 37 cents we do not pay,' and so forth and so forth.

"Surely, I am well within bounds when I say that a use of the phrase which invites constant levity of this type is most undesirable. If Congress alters the law and directs me to replace on the coins the sentence in question, the direction will be immediately put into effect, but I very earnestly trust that the religious sentiment of the country, the spirit of reverence in the country, will prevent any such action being taken.

"THEODORE ROOSEVELT."

## DENOUNCE COIN MOTTO ORDER.

### Episcopal Convention Votes, 131 to 81, to Retain "In G█ We Trust."

After a red-hot debate the Episcopal Diocesan Convention, meeting in the Synod House of the Cathedral of St. John the Divine, on Morningside Heights, yesterday, by a vote of 131 to 81, passed resolutions protesting against the elimination of the motto, "In G█ We Trust," from the new ten-dollar gold pieces. The debate on the question lasted an hour and a half, and for a part of that time the convention was in some disorder.

The motto question came up directly after a motion by John Brooks Leavitt, calling for the printing of certain Biblical selections to be used in church pews, had been tabled. The Rev. W. M. Grosvenor of the Church of the Incarnation offered the following:

Whereas, It has been announced that in the coining of certain pieces of the money of the United States there has been omitted the words used from the foundation of the Republic, "In G█ We Trust"; therefore, be it

Resolved, That this convention protests against such change, and declares that the highest interest of our country demands the preservation of all those customs that have stood for the recognition of G█ in the life of the people.

### John Brooks Leavitt Shouted Down.

There was an instant's silence and then half a dozen men jumped up to second the motion. Mr. Leavitt also arose and when he could make himself heard said:

"I wish to move that this resolution be laid on the table, inasmuch as this convention has seen fit to lay on the table a resolution restoring the Bible to the pews. Which is the more important?"

This motion was simply shouted down, and then the Rev. J. W. Buckmaster of Mount Vernon declared that the motto had been on the coins only since the civil war and not since the founding of the Republic. Dr. Grosvenor accepted the amendment, but Dr. Loring W. Batten and others tried to sidetrack the issue by calling for the "order of the day," which was Bishop Greer's speech.

"I don't want this thing cut off in the middle," cried Dr. Grosvenor. "I want it to come up now and not go over until I don't know when."

Dr. Grosvenor said the proposal to take the motto from the coins aroused his deep indignation, and Dr. Gustav Carstensen of Riverdale, opposing the motion, said: "I think this effort is a mistake and misleading in the inference that we go as a nation back into apostasy. Our godliness is not shown in this, but in the way we keep our treaties. Let us avoid stultification."

Dr. Batten admitted that the spirit of the resolution was good.

"But there are other things that are more timely for discussion and argu-

The New York Times
Published: November 14, 1907
Copyright © The New York Times

ment," he went on, "in our National, State, and municipal life. They are moral wrongs, and they should come first. It looks to me, too, as if this motto were upon the coins against the express command: "You cannot worship G[illegible] and Mammon."

The Rev. Leighton Parks declared that the passing of the resolutions would look like a rebuke to the Government.

**Rebuke to the Government Meant.**

"It is!" shouted half a dozen of the delegates. "That's how we mean it."

Dr. Parks urged postponement, and Everett P. Wheeler offered an amendment to the effect that the Secretary of the Treasury be asked to have the words put back if they had been taken off.

The Rev. J. L. Parks of Calvary declared that the Church was losing force by not exercising enough caution before plunging into matters not within its province. It was frittering away its time and not minding its own business.

Following this the motion was made to postpone indefinitely, and there was a chorus of "noes" that was deafening. Dr. Grosvenor, red in the face, wanted to know whether there was anything more sacred than the name of God. Finally, pointing to the reporters' table, he said:

"If we don't vote on this thing to-day we have the newspapers to reckon with."

The motion to postpone was then put and lost, and the resolutions were carried by a vote of 131 to 81.

**J. P. Morgan Re-elected a Trustee.**

Bishop Potter delivered his customary charge to the convention, and Secretary Harris reported that the diocesan fund amounted to $800,481, with a gross income of $30,406. J. P. Morgan was re-elected a Trustee, and George A. Crocker was elected to take the place of George R. Schieffelin, and for the most part the old officers of the various funds were re-elected.

J. P. Morgan was not present at the convention, though he had been at every one for many years. Last night Bishop and Mrs. Potter and Bishop and Mrs. Greer received the delegates at Sherry's. The convention will meet at 10 o'clock this morning.

The New York Times
Published: November 14, 1907
Copyright © The New York Times

200

November 11, 1907.

Dear Sir:

When the question of the new coinage came up we lookt into the law and found there was no warrant therein for putting "IN G[redacted] WE TRUST" on the coins. As the custom, altho without legal warrant, had grown up, however, I might have felt at liberty to keep the inscription had I approved of its being on the coinage. But as I did not approve of it, I did not direct that it should again be put on. Of course the matter of the law is absolutely in the hands of Congress, and any direction of Congress in the matter will be immediately obeyed. At present, as I have said, there is no warrant in law for the inscription.

My own feeling in the matter is due to my very firm conviction that to put such a motto on coins, or to use it in any kindred manner, not only does no good but does positive harm, and is in effect irreverence which comes dangerously close to sacrilege. A beautiful and solemn sentence such as the one in question should be treated and uttered only with that fine reverence which necessarily implies a certain exaltation of spirit. Any use which tends to cheapen it, and, above all, any use which tends to secure its being treated in a spirit of levity, is from every standpoint profoundly to be regretted. It is a motto which it is indeed well to

have inscribed on our great national monuments, in our temples of justice, in our legislative halls, and in buildings such as those at West Point and Annapolis - in short, wherever it will tend to arouse and inspire a lofty emotion in those who look thereon. But it seems to me eminently unwise to cheapen such a motto by use on coins, just as it would be to cheapen it by use on postage stamps, or in advertisements. As regards its use on the coinage we have actual experience by which to go. In all my life I have never heard any human being speak reverently of this motto on the coins or show any sign of its having appealed to any high emotion in him. But I have literally hundreds of times heard it used as an occasion of, and incitement to, the sneering ridicule which it is above all things undesirable that so beautiful and exalted a phrase should excite. For example, thruout the long contest, extending over several decades, on the free coinage question, the existence of this motto on the coins was a constant source of jest and ridicule; and this was unavoidable. Everyone must remember the innumerable cartoons and articles based on phrases like "In G█ we trust for the other eight cents"; "In G█ we trust for the short weight"; "In G█ we trust for the thirty-seven cents we do not pay"; and so forth and so forth. Surely I am well within bounds when I say that a use of the phrase which invites constant levity of this type is most undesirable. If Congress alters the law and directs

me to replace on the coins the sentence in question the direction will be immediately put into effect; but I very earnestly trust that the religious sentiment of the country, the spirit of reverence in the country, will prevent any such action being taken.

Sincerely yours.

Rev. Roland C. Dryer.
Mendo, N.Y.

In G We Trust
7930 Palacio Del Mar Dr
Boca Raton, FL 33433-4148

Retai

UNITED STATES POSTAL SERVICE

RDC 99

CERTIFIED MAIL

9589 0710 5270 3399 7212 49

INSPECTED

Clerk of Courts, US District Court Southern District Fl
701 Clematis Street, Suite 202
West Palm Beach, FL 33401