David Morris Clayman / אדם דוד קליימן / דוד משה קליימן, *Pro se*



FILED BY_____D.C.

SEP 24 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **David Morris Clayman** ( / אדם דוד דוד משה קליימן),<br>Plaintiff,<br><br>vs.<br><br>**UNITED STATES OF AMERICA**<br>et. al. | **CASE NO. 9:25-CV-80890-WM**<br><br>**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO MOTION TO PROTECT THE SACRED NAMES OF G-D**<br><br>☒ **Completed Full Prefiling Checklist Before Printing** |

## <u>HEARING REQUESTED ON THIS</u>

## PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO MOTION TO PROTECT THE SACRED NAMES OF G-D

## I. INTRODUCTION

Defendants mischaracterize Plaintiff's Motion as seeking judicial endorsement of religion. In fact, the Motion invokes the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., and requests only modest, neutral accommodations to prevent substantial burdens on Plaintiff's sincerely held religious beliefs. The requested relief is narrow:

1. Advance notice before any destruction of filings containing sacred Names of G-d;

2. An opportunity for Plaintiff to retrieve and ensure proper religious burial of such documents, or alternatively for Defendants to deposit their attorney-work product on this at the Smithsonian or National Archives for permanent civic record safekeeping (or optionally a local

genizah or Jewish cemetery); and

3. Encouragement—though not compulsion—that government counsel use avoidant spelling (e.g., "G-d") in filings to minimize unnecessary burdens.

Plaintiff adds the Smithsonian or National Archives as acceptable highly secular options here for the first time in this Reply in response to the US Attorney's 1st Amendment concerns. These accommodations are procedural, not theological. They impose no obligation on Defendants to alter their own beliefs, and they avoid unnecessary desecration of sacred Names that, under Plaintiff's faith, require respectful and religious handling similar to how US flags are treated under the Flag Code (4 USC §8), or how Native American sacred objects are treated under the Native American Graves Protection and Repatriation Act (NAGPRA, 25 USC 3001 et seq.) -- which duplicates and reifies the RFRA religious freedom protections RE: sacred objects that cover me.

## II. SINCERE BELIEF AND SUBSTANTIAL BURDEN ON RELIGIOUS EXERCISE

Jewish law or custom requires that printed documents containing sacred Names of G-d be preserved and ultimately buried. Shredding or discarding them in ordinary fashion constitutes desecration. Plaintiff sincerely holds this religious belief.

That burden is real here. Plaintiff himself authored and filed documents containing sacred Names. Because the Court requires paper filings from pro se litigants, multiple printed copies were produced and served. This policy has multiplied the number of sacred pages in circulation, increasing Plaintiff's religious obligations.

RFRA forbids precisely this type of government-imposed dilemma—where access to court

requires Plaintiff to compromise his faith.

## III. NO COMPELLING GOVERNMENTAL INTEREST

Defendants identify no compelling interest beyond administrative convenience. But courts regularly make exceptions to recordkeeping policies in sensitive contexts—for example, sealed filings, classified material, and privileged documents. Protecting religious exercise is no less important.

There is no compelling reason why Defendants cannot provide simple notice before shredding, or allow Plaintiff to retrieve documents at his own expense.

## IV. LEAST RESTRICTIVE MEANS

Plaintiff proposes two practical alternatives:

1.  **Notice and Retrieval:** Defendants provide Plaintiff advance notice before disposal, and Plaintiff retrieves the documents for religious burial.

2.  **Respectful National Archives or Local Disposal:** If retrieval is impracticable, Defendants may deposit the documents at and through the Smithsonian or National Archives for permanent civic safekeeping (or optionally instead a local genizah or Jewish cemetery), a simple one-time task that can be quickly certified to the Court.

Either option imposes minimal burden, and both are far less restrictive than forcing Plaintiff to endure desecration of sacred texts.

## V. ESTABLISHMENT CLAUSE CONCERNS ARE MISPLACED

Defendants argue that granting relief would impermissibly entangle the Court in religion. That is

incorrect.

RFRA requires courts to respect the *sincerity* of religious belief, not to decide theological truth. See *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (courts may not second-guess a believer's understanding of faith requirements and may only study whether a sincere conviction exists).

Acknowledging Plaintiff's sincere belief that shredding sacred Names constitutes desecration does not establish religion. It simply prevents unnecessary burdens on religious exercise. Neutral accommodation is constitutionally permissible and often required.

## VI. TO THE PLAINTIFF, "IN G-D WE TRUST" IS WITHOUT DOUBT AN AMERICAN PRAYER

Plaintiff, as an American Jew, understands the National Motto in precisely the same prayer creed form as Shema Yisrael ("Hear O Israel: The Lord is our G-d, the Lord is One"). To Plaintiff, "(Hear O America:) In (A Singular) G-d We Trust" functions as an American prayer parallel to the central Jewish creed. Just as carrying a printed *Shema Yisrael* imposes sacred responsibility, carrying U.S. currency bearing the National Motto, which is so close to the *Shema* prayer creed I find it natural referring to it as the American *Shema*, imposes prayer responsibility; and when those notes are destroyed, sacred prayers are destroyed.

The First Amendment guarantees Plaintiff the right to assert and live by that religious understanding. It is not the Government's role to declare that "In G-d we Trust", the American Shema, is "not" a prayer when, in Plaintiff's sincere belief, it plainly is an almost identical declarative religious creed and prayer. If the prayer-status of the Motto were to be tested as a matter of wider religious belief, Plaintiff is confident that many Americans across denominations

would agree that it functions as a prayer. Even if only one percent—or fewer—of Americans share that understanding, RFRA requires accommodation. Religious exercise under RFRA is defined by sincerity, not majority vote, and even if only a small minority recognizes "In G-d We Trust" as prayer, it would still be unconstitutional for the Government to declare categorically that it is not.

Recognizing that Plaintiff treats In G-d We Trust as sacred prayer does not force the Government or Defendants to fully adopt that view in all contexts the National Motto appears. It simply requires the Court to acknowledge contrary to prior precedents that for some Americans like me the National Motto very clearly and directly counts as a form of prayer, and that shredding or careless nonreligious destruction or bathroom carry of physical materials containing the Motto imposes a substantial burden on Plaintiff's religious exercise, and to order modest accommodations related to that to avoid unnecessary desecration.

What is impermissible is not accommodation, which the Supreme Court has frequently permitted, but the Government crassly telling an American Jew that the American form of Shema Yisrael (i.e. "In G-d We Trust", השם אנו בוטחים or בֵּאלֹקִים נִבְטָח: שְׁמַֽעִי אַרְצֹות הַבְּרִית) is "not" a prayer. That is precisely the kind of theological judgment the First Amendment forbids. Perhaps the Government or the Court can try to pull the wool over others eyes with that line of argument in response to a nonbeliever but that religiously dismissive claim does not fly with someone with my subtype of American Jewish religious belief in American prayer, especially one (this American *Shema*, "In G-d We Trust") that so closely mirrors the Jewish Shema.

## VII. GOVERNMENT FACES AN UNAVOIDABLE RELIGIOUS DICHOTOMY

Although Plaintiff has stressed that his request is modest and procedural, it must also be acknowledged that the Government itself has placed this Court at a religious fork in the road.

Jewish law, as discussed in *Talmudic Tractate Rosh Hashanah 18b* and *Megillat Taanit*, identifies a stark dichotomy:

1. **The early Hasmonean position**: to festoon the Divine Name everywhere, including on coins and public instruments, without regard to how such objects are handled, disrespected, or destroyed. This approach treats the constant circulation of G-d's Name as piety, even though it inevitably leads to desecration in ordinary use.

2. **The halachically prevailing position of the Sages**: to wean the people from inscribing the Divine Name unnecessarily on secular and destructible or disrespectfully treated objects, precisely to prevent routine indignities. This later practice sought to balance secularity and reverence in everyday life with realism—avoiding needless invocations in contexts like coins and state documents where the Divine Name would predictably end up discarded, trampled, or destroyed.

This is not an abstract theological debate. By printing "In G-d We Trust" on circulating currency and by resisting Plaintiff's requested accommodations for court filings, the Government has effectively aligned itself with the early Hasmonean zeal of festooning the Name of G--d everywhere carelessly and recklessly—an approach rejected and moderated in Jewish law and custom itself. To persist in defending routine shredding or discarding of the Divine Name is to embrace the very religious extremism that Jewish tradition tempered millennia ago in favor of secular restraint.

The Court thus does face an unavoidable religious choice. It can either:

- Side with the early Hasmonean fervor and thereby accept that the Divine Name will be desecrated through shredding, trampling, and discarding; or

- Follow the secularist impulse of the Talmudic Sages and adopt a more secular approach that minimizes and avoids unnecessary use of the Name of G-d on government documents, thereby affirming the Separation of Synagogue and State and Church and State similar to the secular practices of the State of Israel and almost every other country or economic bloc in the world (only the USA and Nicaragua copying the USA ["*En D-os Confiamos*"] disrespectfully use G-d's vernacular sacred names on cash and coins) preventing desecration and honoring pluralistic respect.

Just a few days ago, Plaintiff personally experienced this dilemma in mundane life. While eating pizza on a bench, he saw a woman walking by stoop to pick up a shiny object, glance at it, and toss it back onto the sidewalk. Suspecting it was a discarded coin from the glint, Plaintiff jumped up, retrieved it and found a penny lying face-down, with "In G-d We Trust" pressed into the dirt. In accordance with his faith, he kissed the coin to show respect for the exposed Name and took custodial responsibility for it. That penny now rests in safekeeping G-d side up in his bedroom, not discarded as worthless refuse. The penny is actually physically close to Plaintiff's collection of 1920s-1930s Buffalo Nickels – beautiful, meaningful American currency with "Out of Many One" [*E Pluribus Unum*] inscribed and without *overshooting sacredness* with Hashem's Name. *Those* coins Plaintiff endorses as *nearly perfect,* and can actually freely circulate them as they were minted in range of the generational religiopolitical memory of the 1907 Teddy Roosevelt No Motto Religious Push. See **Appendix A: Perfecting the 1913 Buffalo Nickels** for some very concrete and specific ways Buffalo Nickels can be perfected further to support governmental compelling interests like supercharging and incentivizing educational attainment while remediating the injuries and burdens claimed by Plaintiff in his *Second Amended Complaint.*

If the Government wishes to use the sacred name of G-d on secular documents superfluously, it can (it's not strictly illegal for the Government to print or mint the sacred Name of G-d, just as the

Government is not absolutely strictly barred from printing the Tetragrammaton if there was a very serious requirement for it), but the Government under RFRA, etc. needs to take extra-ordinary pains to protect or avoid the sacred Name of G-d inasmuch as it has or will flow through the chain of custody of persons who, like me, as part of their domestic American religious belief, must either protect or avoid the sacred Names of G-d in any and all languages.

The Government can protect or avoid, avoid or protect, and must do so Cradle-to-Grave. Those are your two options under Talmudic Tractate Rosh Hashanah 18B and Megillat Taanit under RFRA, etc. The Government can not recklessly and carelessly superfluously print or recklessly and carelessly destroy without making religious accommodation. In this instant motion regarding the case of my filed and served paper documents with the sacred Names of G-d on them, the Government and I did not have the option to avoid and must instead take care now to protect as a neutral accommodation in this particular case so closely tied to and originating from my speech, my petition, and my expressed religious practices and needs under which I bear chain-of-custody responsibility. These prints of G-d's Name are as sacred to me as the US Flag officially is under the Flag Code 4 USC §8. So please accommodate me on this, just as I should expect under the 1st Amendment you would neutrally accommodate any other religious person or clergy member if this Court or the Defendants had a Torah Scroll or sacred Jewish prayer book transferred to your possession.

## VIII. PROCEDURAL OBJECTIONS ARE UNFOUNDED

Defendants' reliance on Rule 7(b)(1) is misplaced. The Motion expressly invoked RFRA and identified the specific relief sought, satisfying the Rule's particularity requirement. If this Court or the Defendant still feel otherwise, Plaintiff would ask for that to be put into clear writing and

would ask permission from this Court to revise the Motion and refile.

As to Local Rule 7.1 conferral, Plaintiff has then and since tried to solicit objections and confer, and further efforts would have been futile given Defendants' categorical opposition. Courts routinely excuse strict compliance with L.R. 7.1 where substantive rights—particularly under RFRA and the First Amendment—are at stake.

Plaintiff is apologetic that he did not confer a few hours earlier and will make every effort to confer safely in advance of mailing rather than moments after mailing in the future. In this particular case, the difference was very inconsequential, and to deny this motion on the grounds that I did not confer early enough in advance would be a gross and disproportionate miscarriage of justice that I would religiously need to immediately appeal to secure cradle-to-grave protection of Shaimos touched by or caused by me and held in custody of Government officers in this case.

## IX. CONCLUSION

The relief Plaintiff seeks is modest, respectful, and almost fully plaintiff-managed. It imposes no theological endorsement, no undue burden on Defendants, and no disruption of court administration. It simply ensures that Plaintiff can practice his faith while participating fully in this Court. In attempting to unwind or untangle the religious entanglement of the United States with the In G-d We Trust motto and prayer in secular contexts where the Name of G-d can be disrespected or mistreated, the Plaintiff is effectively pushing in the direction of "laicity" in any physical governmental media that enter or may enter into my chain-of-custody, as a common citizen, a consumer, a business owner, an investor, and as a precedential and presidential candidate who may need to very directly oversee and execute this currency production and destruction, not State endorsement of religiosity. Plaintiff just needs a small neutral

accommodation to prevent case filings and served documents from being destroyed or mistreated, and more broadly needs some "protect or avoid" cradle-to-grave accommodation in the transition to stronger religiously-necessary laicity with secular circulating documents like cash, coins, and passports currently bearing without adequate protection the Name of G-d to be consistent with Plaintiff's sincere religious needs.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

1.   Acknowledge that physical copies of Shaimos, including Court filings and served copies with versions of the unhyphenated sacred form of "In G-d We Trust" are a cognizable form of sacred religious prayer document for Plaintiff using a motto creed-prayer composed originally by Government and then restated and reprinted as required by Plaintiff.

2.   Grant his Motion for notice before destruction of filings containing sacred Names of G-d;

3.   Require at the conclusion of this case local retrieval accommodation, mailback from great distance, or Smithsonian or National Archives permanent deposit (or optionally instead a religiously appropriate local genizah or burial disposal as described);

4.   Encourage Defendants, as a matter of courtesy, to use avoidant spelling in filings to minimize unnecessary burdens on the Plaintiff and others similarly situated, as a neutral accommodation in this case on this topic; and

5.   Set a hearing to allow all perspectives to be heard and discuss any questions that may arise as the Court thinks through this Motion and its consequences and implications on the narrow question of printings from this case or the broader question of the superfluous use of G-d's Name on secular documents printed by the United States Federal Government and local and state or territorial governments under the sovereignty and jurisdiction of the United States.

The Plaintiff believes this to be a completely articulated clear and convincing RFRA motion

requesting neutral accommodation from Government Defendants and this Court. Plaintiff would be surprised if this motion is also deemed deficient.  If this Court believes it is deficient in any way, please schedule a Hearing for us to discuss and talk this through before denial.

At this point, I trust this case to the Court (and Hashem). Less the case caption on page 1, this Reply fits within the 10 page limit.  There's just one more topic I must heavily highlight to this Court's attention in Appendix B on the persistent difficulty of obtaining representation / counsel.

Respectfully submitted,

s/Plaintiff David Clayman, Still *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@ingwetrust.org
david@inhashemwetrust.org
david@clayman.org

**APPENDIX A: PERFECTING THE 1913 BUFFALO NICKEL COLLECTION**

**APPENDIX B: DIFFICULTY OBTAINING REPRESENTATION / COUNSEL**

**APPENDIX C: UPDATED IDENTIFICATION OF SHAIMOS (SACRED NAMES OF G-D) PAGES IN CASE FILINGS**

**CERTIFICATE OF SERVICE**

**CERTIFICATE OF CONFERRAL**

## APPENDIX B: PERFECTING 1913 BUFFALO NICKELS



1913-1938
Not Shaimos/
No Sacred Name

**Figure 1: 1913 Buffalo Nickel Design – Near Perfection, Already Religiously Compatible, with Two Suggested Updates**

The Buffalo Nickel design of 1913 is nearly flawless. The theme honoring Native Americans and native fauna couldn't be better. Two improvements could make it more perfect and forward-looking:

1.  Translate *"E Pluribus Unum"* into American (a calmunity branch of England English) as *"Out of Many One"* so the meaning is instantly clear to modern American speakers.

2.  Replace "Cents" with "Points," aligning with the terminology used in classrooms and sports. This would reinforce the value of education by tying currency directly to performance-based virtual earnings or actual micropayments for students.

For example, a child scoring 97 on a weekly math quiz would instantly receive $(0.97)^2 \times 100$ points (equivalent to the old 94 cents). Lower grades decay faster toward zero, much like $R^2$ scores (e.g., 80 → 64), with schools or teachers able to set cutoffs below which no reward is issued. Some subjects could use cubic instead of squared scoring, to illustrate power-law economics and channel greater attention to areas of persistent struggle. The message: aim for A's, don't settle for the "soft bigotry of low expectations" from underperforming school and grand/parental systems.

This "Points" scale could be taught universally and be weighted periodically by subject, signaling that economic differences in the adult world are even steeper. Classroom micropayments, carefully

implemented with parental oversight (e.g., earnings limits, achievement bonuses, or *Chore Wars* add-ons), could transform attentiveness and performance. Routine incentives would compound over K–12 education, producing a more capable, talent-rich citizenry, an objective that the federal government shares with the States who have principal responsibility for education under the 10th Amendment. Students might even be able to invest their educational earnings in their *Trump* accounts[1], giving everyone including the poor a more equitable way to earn savings from youth based on their performance in class compounding up into their adulthood.

The U.S. government, however, is resisting discussion, debate, or design suggestion of such "less restrictive means" and "compelling interest" relief and remedy as this above suggested adapted Buffalo Nickel design to relieve me of my substantial religious burdens with respect to our current sacred coins and banknotes legal tender, defending the status quo rather than re-thinking currency to serve Government's own greater compelling interests—or, from a religious standpoint, G-d's. Other nations already integrate education and currency more directly; for instance, China, one of our greatest friends, partners, and competitive rivals, uses 分 (*fēn*) to denote and fuse both "cents" and "points" across currency, education, and sports. A parallel U.S. system with weekly instant micropayments denominated in Points would help achieve such incentive fusion and "supercharge" educational incentives within legislative and school district budget limits.

As a lifelong teacher, I am frustrated deeply that Congress blocks this path to a more secular and supercharged education-supportive currency. The Defendants appear to want to save money narrowly rather than save the money broadly and deeply. Thousands of educational technologists & researchers would love to dedicate their lives to perfecting student incentive micropayments on a Points system if Government showed strong leadership on our educational currency Points system, reminting Cents as Points instead. We don't need to waste design space on our coins telling countries our currency is

---

[1] https://www.whitehouse.gov/research/2025/08/trump-accounts-give-the-next-generation-a-jump-start-on-saving/

denominated in hundredths; that's the very well-known assumed standard now, unlike 1776. My plea is simple: don't defend, delay, derail, or deny—*design* with me. Under RFRA, I argue G-d is on my side in favor of a creative currency overhaul meeting civic religious objectives, and the evidence from our Nature suggests that incentive-based redesign could yield explosive, compounding student and citizen benefits.This moment underscores why the Government's position is untenable. The Divine Name should not be treated as superfluous litter on the street, nor should it be fed through corporate shredders or scattered in waste. Jewish tradition itself rejects that path. By declining Plaintiff's modest accommodations, the Government has effectively chosen the more religiously extreme and much less secularly-compatible side of this dichotomy, the side that violates the Separation of Synagogue from State (commonly called the Separation of Church and State)—and in so doing, has intensified Plaintiff's RFRA, 1st Amendment, 5th Amendment, 8th Amendment, and 14th Amendment burdens rather than alleviated them.

## APPENDIX B: Very Limited, Inadequate Availability of Religious Freedom and Related Civil Rights Counsel in Palm Beach County

Plaintiff has made diligent efforts to secure counsel but was unsuccessful. In this section X, I will describe those efforts. (Please do not count this section about securing representation against my page limits for this Reply brief.)

The Palm Beach County Legal Referral Service identified only two attorneys in the "civil or religious rights" category.

- One attorney limits his practice to very recent wrongful arrest cases and stated he lacked the expertise and specialization to represent Plaintiff, even after Plaintiff explained the broader constitutional implications of this matter, including the potential impact this case could have on excessive bail concerns and modern bail payment alternatives reducing pretrial detention time and unnecessary pretrial mass incarceration for defendants who are deemed by a Judge to pose little, no, or tolerable risk of flight, non-appearance, or community danger. That attorney indicated that he wasn't willing at present to stretch his practice in this direction, even with the potentially very meaningful civil rights relief precedent I'm seeking for CashAlt bearing and carrying Americans attached to my bail-related claims who would otherwise be indefinitely detained and held hostage until a family member or friend intervenes, if they ever choose to.

- The other second attorney, an Orthodox Jew, expressed a different religious view—namely, that only the Hebrew Names of G-d require protection and that the English vernacular name does not. He dismissed Plaintiff's belief to the contrary, and after an exchange in which Plaintiff provided case materials and supporting resources, the attorney ultimately declined representation and asked not to be contacted further.

In more detail, the Plaintiff told that second attorney that his view that only the seven holiest Hebrew Names of G-d were sacred was another acceptable and principled reading of modern Jewish law that many fluent Hebrew speakers or readers follow, but the attorney was ideologically rigid and did not accept, believe, or grant the same about the Plaintiff's religious position. That attorney called me ignorant and said it was entirely my fault that I couldn't read and speak the Hebrew holy language fluently like he could; his attitude was that I should just stop everything in my life to learn biblical or modern Hebrew to relate to G-d entirely in Hebrew rather than principally in English. That attorney argued quite wildly that I wouldn't be welcome in Israel (I'm an Israeli citizen, for the record), he questioned whether I'd ever been to Israel (irrelevant, but I responded that I've been there almost a dozen times in my life), he questioned why I would want the United States to be more like Israel in this respect in avoiding the use of G-d's Name on currency (he feels 1st Amendment United States is a fundamentally more religious country than the officially religiously Jewish State of Israel), he expressed views similar to the ultra-Orthodox Shas Party about the value of stamping G-d's Name on the dollar, and he asserted that the value of the US dollar would immediately collapse if the Name of G-d was avoided on the dollar's next design. He also called me a religious extremist. I'm certainly not a religious extremist. If I'm a religious extremist as this lawyer claimed, so was former President Theodore Rosevelt and all his millions of religious supporters agitating for an end to the motto on circulating currency in 1905-1907. As the Plaintiff has always said, **even within the Jewish community** there's a diversity of opinion on first-, second-, and third-class Shaimos (Sacred Names of G-d) and how much we have to <<Protect Cradle-to-Grave OR Avoid>> the vernacular sacred Name of G-d.

Plaintiff wrote this lawyer back and in part told him redesigning the currency in the way I'm suggesting "would not unravel the universe, cause 30% inflation, or cause the United States to

suddenly become unexceptional". I told this lawyer further in my email response that he was making conclusory judgments without any underlying reasoning and that I thought he was acting in a way that was religiously intolerant of Plaintiff's position. I closed by saying, "I wish you had more religious tolerance for views that don't match your own or Rebbe Schneerson's. No Rabbi is infallible, and Rebbe Schneerson, as much as he was an expert on most Jewish legal questions, was not an expert in American law, and I think there was a gap in his reasoning on the willy-nilly printing and unreligious destruction of the motto *In G-d We Trust*. Anyway though, no need to respond. We can close this conversation here and agree to disagree politely about our respective religious, legal, and community duties." And that's when he asked me not to email him again[2].

Accordingly, no attorney identified by the Palm Beach County referral service was willing or able to represent Plaintiff in this action. The plaintiff also called the Becket Fund for Religious Liberty to ask them to represent me. The Becket Fund previously acknowledged that Plaintiff has a sincere religious belief in an *amicus curiae* brief in the 2018 *New Doe Child No. 1 v Congress* 6th Circuit case referenced many times before, so I was hopeful, but they say they are not currently able to take me on as a client. The Plaintiff furthermore tried contacting attorneys through his legal insurance plan Metlife Legal, but this case wouldn't be covered by that insurance and Plaintiff couldn't find an attorney there specialized in or ready to work on RFRA or constitutional case law. If this Court can identify a lawyer or law practice in Palm Beach County or elsewhere willing to appear that can effectively represent the Plaintiff in the future on this complex case within the reasonable attorney fee reimbursement structure under 42 USC §1983 guaranteed by the Religious Freedom and Restoration Act by strong precedent *Tanzin v. Tanvir*, 592 U.S. ___

---

[2] Notably, this lawyer didn't even include the necessary religious exception on contact for pre-*Yom Kippur* apologies, which we are calendrically very close to. Lawyers and the Courts should always grant and understand the religious need to ritually apologize or offer ritual apology as an exception to any no contact orders.

(2020), the Plaintiff would welcome the suggestion. Plaintiff is having difficulty finding a lawyer ready to tackle and challenge the Government with me on this, and Plaintiff believes there's a "market failure" in the availability of legal services for persons with religious freedom cases like the Plaintiff in Palm Beach County. Perhaps lawyers don't see my case as sufficiently lucrative. They certainly see it as outside of their normal range of practice and specialization. Until and unless I have a lawyer representing me, unless this Court is willing to bend or revise precedent, I can not be fully represented as a representative of a class and there are limitations and artificial legal barriers to how much the Lifesaver Labs Public Benefit Corporation and unincorporated associations I control can be represented before this Court.

The atmospheric underlying assumption of this and other Courts that the legal market is in a state of perfect or adequate "calm-petition" (competition) with lawyers readily and eagerly available to take on any public interest case. That's a figment of legal industry imagination. My experience is that it's more like a cartel with severely high price-fixing and an unwillingness to take on cases like RFRA cases, even if there's a promise of reasonable attorney's fees at the end of the rainbow guaranteed by statute. Plaintiff would welcome any effort this Court would make in supporting the assignment of counsel to Plaintiff within Plaintiff's personal affordability limits (as defined in concert with and by the Plaintiff comfort and acceptance levels, not by the Court's possibly supremely high conventional lodestar calculations risking further emburdenment of religious expression).

## APPENDIX C: UPDATED IDENTIFICATION OF SHAIMOS (SACRED NAMES OF G-D) PAGES IN CASE FILINGS

Plaintiff provides below an <u>updated</u> listing of pages where sacred Names of G-d appear, based on his best review of filed documents to date. Plaintiff reserves the right to supplement this list as discovery and filings proceed. These page numbers match the Court's page numbering and electronic docket entry numbers are provided for convenient cross-reference.

Plaintiff has gotten more wary and intelligent about how to maximally minimize Shaimos in his filings as of the Second Amended Complaint, including adequate graphic image blocking and a checklist to prevent uncaught AI drafting leaks of the sacred name; the amount of additional accidental Shaimos emitting from the Plaintiff should be very limited from here.

This section is provided to aid the Court and Defendants in identifying the relevant pages for purposes of notice, retention, and eventual disposition.

## DEFINITELY PRINTED AND HELD BY COURT AND DEFENDANTS UNDER FEDERAL AND LOCAL RULES

- Original Complaint (DE 1): [p. 58, p. 60 - 62] (necessary)
- Cover Letter Sent to Defendants with Original Complaint Hard Copies ("Actually Protecting The National Motto – "In G-d We Trust"") (No Docket Entry): [p. 2] (borderline – an uncaught AI leak mistake)

## PRINTED UNDER LOCAL RULES FOR FILING WITH COURT, HELD IN PRINTED FORM BY COURT AND POSSIBLY DEFENDANTS

- First Amended Complaint (DE 19): [p. 46, p. 48 - 50] (necessary)
- Appendix (The Second Amended Complaint) to Motion for Leave to File Second Amended Complaint (DE 35): [p. 87, p. 89, p. 90 - 91] (necessary)
- Plaintiff's Response in Opposition to Defendant's Motion to Deem Plaintiff a Vexatious Litigant and Enjoin Further Filings (DE 16): [p. 20] (necessary)
- Plaintiff's Request for Extension of Time and Fallback Response to Motion to Deem Plaintiff Vexatious (DE 36): [p. 8 - 9, p. 16] (three AI leak mistakes by Plaintiff)
- Appendix to Plaintiff's Request for Extension of Time and Fallback Response to Motion to Deem Plaintiff Vexatious (DE 36): [p. 1] (an AI leak mistake by Plaintiff)
- Second Amended Complaint (If Leave to File Granted) (DE Unknown): [p. 87, p. 89 - 91] (necessary)

**POSSIBLY UNPRINTED AND FULLY DIGITAL – IF PRINTED BY ANY PARTY**

**PLAINTIFF REQUESTS PRESERVATION OR SHAIMOS (I.E. SACRED NAMES OF**

**G-D) CARE AS GOVERNMENT PRINTING OF THE NAMES ARISING DIRECTLY**

**FROM PLAINTIFF'S NECESSARY COMPLAINT**

- Defendant's Motion to Dismiss (DE 13): [p. 1 - 7]
- Defendant's Motion to Dismiss Amended Complaint (DE 27): [p. 1 - 7]
- Defendant's Response in Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint (DE 41): p. 2 - 3
- Defendant's Response in Opposition to Motion to Protect Names of G-d (DE 42): [p. 1 - 3] – Not an accident or mistake and seemingly the most deliberate, premeditated, openly resistant choice here to deny Plaintiff's courteous RFRA request for governmental sacred name minimization accommodation courtesy

**CERTIFICATE OF SERVICE – ELECTRONIC AND PAPER SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2025, I served a copy of this response electronically upon opposing counsel of record and, as required by the rules governing pro se litigants in the Southern District of Florida, subsequently printed and mailed a copy of this filing to the Court by certified mail.

Because non-prisoner pro se litigants are categorically denied access to the Court's electronic filing system, I am compelled to rely on postal delivery. This requirement has repeatedly caused substantial burdens, including additional forced mailing expense running into the hundreds of calm (as currently named, dollars), approximately two work-days (15 hours) spent preparing mailings and running to the post office and back, docketing delays, risk of out-of-order or incomplete docket entries, occasional severe legibility issues from malfunctioning home printing, risk of lost or misprocessed filings, difficulty in filing urgent matters within 24 hours or over weekends, earlier day-of deadline enforcement at 6 PM post office closure time for pro ses than attorneys (who can flexibly file as late as 11:59 PM local as needed in a pinch, if they realize their arguments need further last-minute refinement), and docket misunderstandings by opposing counsel. In this particular case, I have already experienced each of these problems at least once between March 2025 and the date of this Certificate of Service.

This process also compels me under Local Rules to submit sacred text like the Names of G-d in the Talmud, Megillat Ta'anit, and supporting documentation and argumentation in paper form as part of bringing this case in an intelligible and complete manner to the Court, raising unresolved concerns under RFRA and the 1st Amendment regarding proper handling at the end of proceedings that the US Attorney and Defendants are resisting settling via reasonable religious accommodation.

Accordingly, I respectfully preserve this objection that a categorical prohibition on electronic filing by non-prisoner pro se litigants imposes unequal burdens that place pro se parties at a significant and severe disadvantage compared with attorneys and those litigants who can more easily justify, afford, or find representation for complex civil litigation like this at full lifetime-compounded cost. According to a report from the Federal Judicial Center, at least 65% of District Courts permit pro ses to file electronically, some with or without prior permission of Court.  I reserve the right to seek review of whether these practices in the Southern District of Florida of absolute denial of pro se plaintiff electronic filing privilege access as contrasted with more permissive districts like the Northern District of Illinois, violates the Equal Protection Clause of the Fourteenth Amendment broadly and the Religious Freedom and Restoration Act in this particular case. I further submit that the super-majority of jurisdictions already provide conditional e-filing access to trained or experienced pro se litigants, that I can meet any such reasonable conditions on e-filing access, and that such a system would mitigate these burdens without undermining this or similar Courts' legitimate administrative interests.

/s/ David M. Clayman
Pro Se Plaintiff

**CERTIFICATE OF CONFERRAL**

Plaintiff attempted to confer with Defendant regarding this motion and reply most recently on Tuesday, September 14, 2025, at 7:45 a.m. Eastern, but received no response. In that communication, Plaintiff expressed regret for not initiating conferral slightly earlier, before first mailing and not just at time of instant and more quickly delivered electronic service, rather than minutes afterward. Based on Defendant's prior filings and conduct, Plaintiff reasonably believes that any and any additional attempts would likely have been unproductive and may have prompted further allegations that Plaintiff is misusing the conferral process. Defendant has previously strenuously advanced such arguments in largely unsuccessful motions seeking to have Plaintiff declared vexatious and barred from further filings without prefiling review.

On an earlier occasion, Plaintiff attempted conferral with Defendant on Monday, September 8, 2025, at 10:18 a.m., as soon as Plaintiff remembered and minutes after mailing the Motion to Protect the Sacred Names of G-d, contemporaneously providing electronic copies to both the Court and opposing counsel. Plaintiff expressly invited Defendant to state any objections at that time. Defendant did not respond except by complaining about a lack of conferral in her Response filing and has since rejected that conferral attempt as untimely and inadequate, notwithstanding that it occurred promptly just minutes after mailing and under the Court's view.

This pattern places Plaintiff in a difficult position, facing criticism whether conferral is attempted or not, and undermines the purpose of the conferral requirement. Going forward, Plaintiff will ensure that conferral is always undertaken prior to driving to the post office and will certify accordingly. To this end, Plaintiff has created a comprehensive checklist to verify compliance with all filing requirements in the right order, including conferral, before submitting future filings. Plaintiff has asked Defendant United States if anything is missing from said checklist and would welcome any pointers or suggestions this Court or Defendants would like to make about process improvements in conferral or filings Plaintiff should add to the checklist and religiously undertake.

/s/ David M. Clayman
Pro Se Plaintiff

David ~~Caseey
In G-We Trust
7930 Palacio Del Mar Dr
Boca Raton, FL 33433-4148

9589 0710 5270 3399 7205 49



CERTIFIED MAIL



Retail

UNITED STATES
POSTAL SERVICE®

RDC 99

9589 0710 5270 3399 7205 49

Clerk of Courts, US District Court South District FL
701 Clematis Street, Suite 202
West Palm Beach, FL 33401