

**LIFE IN ISRAEL**

**Free The Hostages! Bring Them Home!**

(this is a featured post and will stay at the top for the foreseeable future.. scroll down for new posts) ------------------------------...

Jan 31, 2013

Pages

Home

Advertise on Life in Israel!

# Why Stanley Fisher opposed In Gd We Trust

"In G⬛d We Trust" is the motto of the United States of America and it graces the currency on both paper and coins.

In Israel there is no such statement on the currency. in Stanley Fisher's previous term as Governor of the Bank of Israel, there was a movement to start including the same phrase, in Hebrew of course - "בה' אנו מאמינים" - In G⬛d We Trust.  Fisher opposed the idea, and it was rejected due to that opposition.

The Director of the lobby for Jewish Values, Ofer Cohen, who had led the movement back then has now explained Fisher's opposition. Fisher had said he opposes it because he did not want to see ⬛d's name [on currency] that might be thrown out in the garbage, or mistreated.
(source: Bechadrei)

Though, it must be noted, that the document displayed on Bechadrei's website (see link above), signed by the Minting department, gives other, more official reasons, for having rejected the idea. Despite that, Fisher's reason for opposing the idea, so as not to see G⬛d's name on a surface that might be defaced or mistreated, is a more Jewish reason...

---------------------------------------------------
**Reach thousands of readers with your ad by advertising on Life in Israel**
---------------------------------------------------

Posted by Rafi G. at 4:48 PM    

Labels: money, Stanley Fisher

## 6 comments:

**Yochanan** January 31, 2013 5:17 PM

If it has the letter "He" and the Geresh, is it really his name?

Reply

▾ Replies

**Rafi G.** 🖉 January 31, 2013 5:25 PM

it doesnt sound to me like Fisher was making a halachic decision. it seems to me he felt it was simply disrespectful.

Reply

**Baruch Gitlin** January 31, 2013 5:18 PM

I remember reading the Theodore Roosevelt opposed placing "In G⬛d We Trust" on American currency when it was first proposed, for more or less the same reason, so Fisher is in good company.

Reply


Blue Nile
**Popular Styles**
SHOP TRENDING ENGAGEMENT RINGS


"My feet have finally found the perfect shoe"
REGISTER ON THE NFS
SHOP NOW


JAMES ALLEN
UP TO
**40% OFF**
DIAMOND CLASSICS

Disclaimer: Some of the links and banners o...
Israel are ads, and some are affiliate links. A...
links are links that will earn me a commissio...
any purchases you might make after clicking...
more be...

anon January 31, 2013 5:24 PM

Download
Extension for Mac (Free)

Only 2 Step
Click "D...
Add Ima...

# Why did Fisher object to inscribing Gd's name on the money bills?

Ofer Cohen, Jewish values group chairman, proposed inscribing on the money bills, "In Gd we believe" - as it appears on the dollar, but Stanley Fischer objected • Why?

**Sari Roth, B'Chadrei Charedim**
20th of Shevat 5773  31.01.13 | 13:22

Shortly after the announcement of the Governor of the Bank of Israel, Stanley Fischer that he will not continue in office the first story which indicates Fisher's Jewish values is published here.

It was during last term when an interesting initiative was jointly promoted by Ofer Cohen, chairman of Jewish values group, and MK Nissim Zeev of Shas. According to the initiative, it will be written on the money bills "In Gd we believe", as appears on the dollar of the United States of America.

At some point the two realized that the initiative is encountering opposition from the Bank of Israel.

In a conversation with Cohen he says, that one day he met the Governor in the Knesset and tried to test him - why is he "stopping" the initiative.

Fisher's reply startled him: "I did not want the name of Gd to be thrown right down the drain..."

Source: https://www.bhol.co.il/news/744836

NOTE (10/23/2025): Stanley Fisher soon thereafter about a year and a half later on June 16, 2014 became the Vice-Chairman of the United States Federal Reserve during the period of time Plaintiff Clayman realized to his shock that "*In G-d We Trust*" was a serious Jewish religious problem on United States currency.
Stanley Fisher did not, to my knowledge, take any significant action on this, even though he was responsible for preventing this from happening in Israel.



David Clayman <david@clayman.org>

## RE: In G-d We Trust
6 messages

---

**Adam Clayman** <adam@clayman.org>                                    Mon, Aug 18, 2014 at 11:57 PM
To: Rabbi Blau <rabbiblau@greenroadsynagogue.org>

Hi Rabbi,

I hope you enjoyed your trip to New York!

I took a trip to the Cleveland Fed, and reconstructed over a dozen torn 'In G-d We Trust' prints from banknote shreds they
handed out at the end of the tour. I also ordered a 5lb bag of banknote shreds from the BEP to see if I can identify a fully
intact sample of In G-d We Trust within, and I'm tracing the shred residue to the composting farm in Cleveland where it
ends up. Hopefully by Weds or Thurs I'll be able to secure a tour and take a video of its final resting place.

I'm not sure what to do with the shreds that I have, or what to do with what I've reassembled. I figure to be on the safe
side I should bury it as Shaimos at Mt. Olive, but that brings up the old question of whether banknotes are shaimos.

I took a very close read of the history of the inscription's adoption, and it seems to be anything but secular, both to
Christians and Jews. The Congressional Record showed that its adoption in the throes of the Civil War was decidedly
religious.

I'd be very interested in learning more detail about the status of 'In G-d We Trust' in Judaism. I've talked to a few rabbis
now, and there doesn't seem to be a coherent concensus on this, other than that it would be desirable of the name of
Hashem was appropriately abbreviated or hyphenated. I mean, there's even some anecdotal evidence that Governor
Stanley Fischer opposed the addition of 'In The Name [Of Hashem] We Trust' on the grounds that it could end up in the
trash. Is not the same a burning concern for out own low-value 'In G-d We Trust: coins?

Do you have time to talk anytime over the next couple days about what you know of applicable shaimos halacha? I've
gotten opinions that rely on whether the responsible author and/or printer is Jewish or non-Jewish, whether the expression
is now dilute enough by tradition to be more secular than religious, and whether 'G-d' in a non-Hebraic language qualifies
for Shaimos protection, etc.

I need to hear your reasoning before I can make a decision about what to do with these English-language shaimos shreds
I was given by the Cleveland Fed. Do I not bury them?

I'm free all day today (Tuesday, 8/19) and tomorrow (Wednesday, 8/20). If you have any time available for me, please let
me know! My cell is below, and I'm available the next couple days at the drop of a hat.

Adam Clayman
(330) 259 - 5861

---

**Rabbi Blau** <rabbiblau@greenroadsynagogue.org>                          Tue, Aug 19, 2014 at 7:59 AM
To: Adam Clayman <adam@clayman.org>

I appreciate hearing from you and find the topic very interesting. I have a lot of school meetings today but will call you
if I have a window of opportunity for us to meet. Have a wonderful dy.

[Quoted text hidden]

---

**Adam Clayman** <adam@clayman.org>                                    Tue, Oct 11, 2016 at 9:27 AM
To: "Michael A. Newdow Esq." <NewdowLaw@gmail.com>

This is the earliest record I have of when exactly American cash lost all its use value for me.

This dates back to 18 August 2014. I remember experiencing anagnorisis on the Friday afternoon before, just before Shabbat starting on **15 August 2014**. That weekend was a flurry of frenetic research activity.

Since that day exactly, my cash assets have been frozen and I haven't been able to transact in cash. So, counting today, that's **2 years, 1 month and 14 days**.

[Quoted text hidden]


--

Æ/æ

---

**Mike Newdow** <newdowlaw@gmail.com>                                        Wed, Oct 12, 2016 at 12:09 AM
To: Adam Clayman <adam@clayman.org>

Thanks for the citation.

So what did the rabbi say?

- Mike


[Quoted text hidden]
--
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464


916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com

---

**Adam Clayman** <adam@clayman.org>                                        Wed, Oct 12, 2016 at 2:56 AM
To: Mike Newdow <newdowlaw@gmail.com>

All Rabbis lump into one of two categories: Camp A and Camp B.

Camp A) Many Orthodox see no problem, because Hebrew is the only holy language and hyphenation of the Name in English is a double dose 'fence about the law' that's technically unnecessary, but advisable nonetheless (or, some say, unnecessary). Rabbi Blau below fit into this category. The Hebrew 'Yud Hei Vav Hei' primary and six Hebrew secondaries (seven in total) are the only forms of expression that qualify for Shaimos protection like that described in 18B. This view is philosophically/logically consistent and religiously sound. Nonetheless, some of these Rabbis veer into dangerous territory by making life hard on Camp B. Let's call them linguistic snobs. One terrible and inconvenient example of linguistic snobbery is the late, great Chabad Rebbe, who is held up by his followers as a modern day Messiah, and is on record as actively supporting IGWT with evangelical fervor. Since it was English rather than Hebrew, he figured he should support it as a State-sponsored subsidy of JudeoChristian education. This was all premised on Orthodox linguistic snobbery that applies protection only to the seven HEBREW holy names. Rabbi Blau is, for example, not a linguistic snob.... he simply holds the respectable stance that while IGWT may be in poor taste, it's not, according to him, a religious breach, because it's written in a non-Hebrew, non-Aramaic langauge.

Camp B) Many, especially those with Congregations that aren't conversationally fluent in Hebrew, or where thrice-daily Hebrew prayer attendance is not observed and English is the coin of the realm for relating to G-d... many of these sorts of Rabbis immediately or soon recognize significant tension on being presented with 18B and that photograph I sent you of the shreds of G-d's Name on our currency. They'll agree that the English name of G-d ought to be protected and buried under the Shaimos ceremonies at end-of-life in any other context, but as soon as the conversation moves into the context of US currency rather than, say, half-sheets or strips of paper with 'G-d Bless You' handwritten or printed on them (under Jewish law, printing and handwriting are the same), then they'll make up whatever excuse or two that comes to the top of their head for why it's become normalized, and they'll lose interest in pursuing it while they reflect on the politics. It's common for them to diffuse personal responsibility for accomplishing a policy change by saying absurd things that are

horribly inept for a US Citizen to say, like, 'Well, it's OK because the BEP and Treasury are non-Jewish'. Ummm... no. First, the religious identity of the printer is irrelevant, so long as they're acting on our behalf. Second, the Government is the representative of the People.... We are the sovereign. That should be the end of it. But third, to pour salt in the wound, Jacob Lew, Janet Yellen. Lael Brainard and Stanley Fisher are all fasting for Yom Kippur, and they're not doing that because they are Christian. So, the Secretary of the Treasury and the Controlling Majority of the Federal Reserve Board which destroys this IGWT currency are all Jewish, and according to Camp B, Jews are neither responsible for the printing nor the destruction of the Name you admit, in all other contexts, must be protected?  Rabbis aren't exactly known for actively sponsoring policies that the federal government will find terribly inconvenient, that on the face of it will seem unpopular, and that will surprise Christian evangelical voters, with whom we're allied and upon whom we rely to protect the identity, security, and future of Israel. They're also not excited about telling their congregations and (to be real) donor families, many of whom run family businesses, etc. that have traditionally accepted cash, that they have to refrain from exchanging any paper or coin currency. That's not the hill most Rabbis want to die on. Even after acknowledging that it's a problem, they don't want to rock the boat on In G-d We Trust.

There are members in both Camps A and Camps B that hold principled, pragmatic, understandable positions, considering the circumstances. Rabbi Blau's position is very respectable, as he's supportive of other beliefs and seems to agree that IGWT printing is not ideal, even if it seems the evolutionarily stable strategy in our current political ecology.

The more liberal position (that English Shaimos exists) is the position that I hold.

[Quoted text hidden]

---

**Mike Newdow** <newdowlaw@gmail.com>                                    Wed, Oct 12, 2016 at 7:10 AM
To: Adam Clayᵉman <adam@clayman.org>

Thanks, Adam. Well said.

By the way, please let me know what aspects of what you have told me are okay for me to discuss with others, and what you wish to remain confidential. I'm fine with whatever you wish (which, whether I'm fine with it or not, I am obliged to do).

- Mike

[Quoted text hidden]



David Clayman <david@clayman.org>

## RSVP for Constituent Coffee
4 messages

---

**Adam Clayman** <adam@clayman.org>                                    Thu, Sep 4, 2014 at 6:52 PM
To: Allen Ernst <allen_ernst@portman.senate.gov>

    Hi Allen,

    May I RSVP for the next constituent coffee on Weds. September 10, when Congress reconvenes?

    Always,
    Adam Clayman

---

**Ernst, Allen (Portman)** <Allen_Ernst@portman.senate.gov>            Fri, Sep 5, 2014 at 1:24 PM
To: Adam Clayman <adam@clayman.org>

    Adam,


    Thank you for both your emails.  The coffee on Wednesday will take place from 8:30-9:30 AM in our conference room,
    Russell 447 (4th floor of Russell Senate Office Building).  I have added you to the list.


    Best,


    allen

    [Quoted text hidden]

---

**Adam Clayman** <adam@clayman.org>                                    Tue, Sep 9, 2014 at 10:09 AM
To: "Ernst, Allen (Portman)" <Allen_Ernst@portman.senate.gov>

Hi Allen,

I'm afraid I can't make it to this week's Constituent Coffee as planned. I've taken over a long-term substitute
teaching position, and the school's Parent Teacher Conferences are scheduled for tomorrow.

May I RSVP for next week's Constituent Coffee on Wednesday, September 17th?

I'd very much like a chance to speak with the Senator for a few minutes next week about religious freedom in the United
States: the implications of RFRA and Hobby Lobby on the status of "In G-d We Trust", as printed on currency and minted
on coins.

To summarize: I've been studying the topic almost full-time since August 15th, and I've come to the conclusion that "In G-d
We Trust" is incorrigibly problematic even among the major three Abrahamic faiths, from the point-of-view of Judaic (if not
Christian or Muslim) culture, as it significantly burdens Jewish religious expression in a manner that the Senate isn't
familiar with yet. In 1907, Theodore Roosevelt argued that the printing of "In G-d We Trust" on currency was "irreverence,
bordering on sacrilege", and took the motto off the eagle ($10) and double-eagle ($20) gold coins. Had Theodore
Roosevelt known in 1907-1908 about the Talmudic Tractate Rosh Hashana (18b), "In G-d We Trust" would have been
removed then, and our currency wouldn't have special burial requirements. But since it does still carry G-d's name, it's my

sincere belief--consonant with existing Jewish religious tradition--that the National Motto needs to be respectfully clipped out from our paper banknotes and ritually buried by the Federal Reserve Cash Processing Offices, rather than shredded indiscriminately by G&D machines and mulched with manure, etc. at Rosby's Farms and other third-party processing facilities. It's simpler, however, to explain in person with a copy of Tractate Rosh Hashana in hand, so if at all possible, I'd like to RSVP for the September 17th Constituent Coffee.

All best,
Adam Clayman


[Quoted text hidden]

---

**Adam Clayman** <adam@clayman.org>                                        Tue, Oct 11, 2016 at 9:54 AM
To: "Michael A. Newdow Esq." <NewdowLaw@gmail.com>

I contacted Senator Portman's Office to present this problem to them in the most graphic terms. By the time I sent this message, I had discovered that the G-d shreds were sent to Rosby's Raspberry Farms. I directly referenced a violation of religious freedom under Ross Hashana 18B.

I spoke with enormous depth, detail, and feeling to Senator Portman's top legislative director in DC, with Ross Hashana 18B in hand. I walked her through it patiently, and explained the history, just as I did with you. Yet after the Constituent Coffee, Senator Portman and Senator Portman's Staff promptly ignored me. He's always been a principled champion of religious liberty... except, perhaps, when religious liberty is unpopular or takes time to communicate to those who put him in power.

I also met with Senator Brown's Office. Senator Brown is on the Banking Committee with jurisdiction over Treasury. Again, nada.

You can confidently say to the Judicial Branch that the Legislative has knowingly failed to uphold their burden to equally protect and defend religious freedom under RFRA. They failed to make earlier preparations for this transition after they had warning in September 2014 that a violation of the 3rd Commandment to not take G-d's Name in vain was occurring under a plain reading and interpretation of Jewish law as old as the Maccabees. If this reaches Appeals in 2 years, we could have had 4 years of a gentler transition under our belts had Senator Portman and Senator Brown of Ohio listened and acted under their RFRA burden.

Even if this isn't strictly necessary in Court, I recommend holding on to this in the event of a political tempest. Perhaps this an squash a maelstrom as we gain momentum and attract evangelical ire. I notified my legislators years ago of this violation of Judaism and they ignored me, even after being presented with a crystal clear claim and crystal clear evidence.

I think this is the last essential record I have of how quickly I raced to put an end to this. As soon as I had anagnorisis, I contacted several rabbis, found Ross Hashana 18B, figured out the horrible truth of Rosby's Raspberry Farm cash composting, and rushed to tell/persuade/warn my US Senators. I did everything I was taught in Civics Class I should do for a claim like this, and the Legislative willfully refused to work on a religious minority's behalf.

[Quoted text hidden]

--
Æ/æ



David Clayman <david@clayman.org>

---

## Only accepts $9 cash for disposition
1 message

---

**Adam Clayman** <adam@clayman.org>                          Fri, Aug 4, 2017 at 12:16 PM
To: "Michael A. Newdow, Esq." <NewdowLaw@gmail.com>



No checks
No debit or credit cards

Have to go downtown now to get a certified copy of my case disposition, because of IGWT.

A simple example.



David Clayman <david@clayman.org>

## Put differently: You're going to win our case before these coins are scrapped
1 message

**Adam Clayman** <adam@clayman.org>                                                    Mon, Aug 21, 2017 at 5:19 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi MIke,

A more succinct way of putting that last letter is this:

**18 months:** expected lifetime of a US dollar bill
**36 - 48 months:** expected timespan for *Newdow Law* to win the IGWT case
**150 months:** remaining lifespan of typical average 25¢ coin used for laundry

I have no hope that I can use dollar bills or any paper currency. The lifespan of paper currency is just too short for us to win the case first. But coins last so long, I think I can just barely afford to play a game of risk with the Federal Reserve, betting that you'll win the case in a Day of Judgment within the next 4 years, before these coins that I'm possessing and using reach their own "Day of Judgment" in 12 and a half years.

But here's an amazing thing you can say: **Paper currency vanishes faster than lawsuits.**

**A dollar bill used today would be destroyed within 18 months, before an Appeals filing reaches the Supreme Court.**

A typical coin used today, on the other hand, will outlive the lawsuit by several turns of the wheel. And, for what it's worth, that's how I'm distinguishing the limited use of coins for laundry from the use of paper currency, the latter of which endangers the Name of G-d at a much faster, more frequent terminal rate.

I'm counting on you winning the Case for us within the next four, max five years. I'm hopeful to the point of certainty that you'll be able to rescue the coinage system of G-dshreds before these coins that will flow into laundry from my hands get scrapped.

I'll call later to try to boil this down for you, and make sure we're on the same page. Laundry's just killing me, man. I've put up with a lot to not use IGWT coins or bills over the last three years, but limited laundry coinage is the ultimate nuisance deal-breaker. Coins are just so entrenched in the world of dense urban renters' housing.

I hope G-d will forgive me for this limited breach of the sanctity of the Name. I just can't figure out how to *behaviorally* keep myself in clean clothes at reliable levels otherwise.

Adam David Clayman
+1 (312) 414 - 7628



David Clayman <david@clayman.org>

## No truly card-based laundry within miles

**Adam Clayman** <adam@clayman.org>                                    Wed, Aug 23, 2017 at 10:23 AM
To: Mike Newdow <newdowlaw@gmail.com>

Dear Mike,

The laundromat six blocks from me which I thought was card-based actually turned out to be cash-based, also.

Drop-off laundry is almost entirely coin-based, ultimately, and pick-up laundry is $32 for the first twenty pounds: an absurdly high cost that's just not sustainable over the course of five years of weekly laundry.

I finally collapsed into sin, and took out coins from Chase Bank to do my laundry in my building. I'll try again, when I next move, to find an apartment with in-unit laundry / dryer.

<u>August 22, 2017 was the first time in three years that I used coins.</u> If I remember correctly, I stopped using coins in July 2014. It was a fundamentally flawed and forced choice; coins are just too entrenched in the building laundry and laundromat system, and I just have to have clean clothes or I'll lose my job.

Adam David Clayman
+1 (312) 414 - 7628



David Clayman <david@clayman.org>

---

## Denied a Library Card
6 messages

---

**Adam Clayman** <adam@clayman.org>                                      Mon, Sep 4, 2017 at 6:49 PM
To: Mike Newdow <newdowlaw@gmail.com>

Dear Mike,

I was denied a *Chicago Public Library* Library Card over a $1 reissue fee. The manager, pictured, literally ripped up my application after I asked for religious accommodation to pay by check, debit, or credit card. He said he's only taking cash, and without cash, I can't get a library card from the Chicago Public Library. I explained to him that RFRA is Illinois Law, and explained that I couldn't destroy Hashem's Name, but he just didn't care: cash or no library card.

But, he was kind enough to return my ripped up library application, and as evidence, I took a few photographs.

See the attached photos for denial of a basic right: the right to borrow books from a library.

---

Adam Clayman
(312) 414 - 7628









**Mike Newdow** <newdowlaw@gmail.com>                                    Tue, Sep 5, 2017 at 5:02 AM
To: Adam Clayman <adam@clayman.org>

Keep a listing of these events, Adam. I will put them all together soon (I hope).

[Quoted text hidden]

—
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464

916-201-6078 (cell)

626-532-7694 (Google voice)

NewdowLaw@gmail.com

---

**Adam Clayman** <adam@clayman.org>                                      Thu, Sep 14, 2017 at 10:24 AM
To: Mike Newdow <newdowlaw@gmail.com>

Here's the listing you requested. I started this index in early August, when the number of different accidents and burdens suffered got too large for me to keep in my head all at once.

**✝ IGWT Chronological Evidence of Burdens**

Adam Clayman
(312) 414 - 7628

[Quoted text hidden]

---

**Mike Newdow** <newdowlaw@gmail.com>                                      Fri, Sep 15, 2017 at 2:52 AM
To: Adam Clayman <adam@clayman.org>

Can you attach the file, Adam?

I can't get Google Drive to work.

Thanks.

[Quoted text hidden]

---

**Adam Clayman** <adam@clayman.org>                                      Sun, Sep 17, 2017 at 10:07 AM
To: Mike Newdow <newdowlaw@gmail.com>

Sorry this took so long. Attached you'll find an .XLSX (if you have Excel, etc.) and a .CSV (if you don't).

Adam

Adam Clayman
(312) 414 - 7628

[Quoted text hidden]

**2 attachments**

📄 **IGWT Chronological Evidence of Burdens.xlsx**
6K

📄 **IGWT Chronological Evidence of Burdens - Sheet1.csv**
3K

---

**Mike Newdow** <newdowlaw@gmail.com>                                      Sun, Sep 17, 2017 at 12:18 PM
To: Adam Clayman <adam@clayman.org>

Got it, Adam.

10/23/25, 7:39 PM
Case 9:25-cv-80890-WM   Document 60-5   Entered on FLSD Docket 10/27/2025   Page 14 of 94
Clayman Family Mail - Desired authority card

Thanks.

[Quoted text hidden]



David Clayman <david@clayman.org>

## Statesville NC

3 messages

---

**'Joel Clayman' via Clayman Clan** <clan@clayman.org>          Wed, Sep 6, 2017 at 2:39 PM
Reply-To: Joel Clayman <joel_clayman@yahoo.com>
To: "clan@clayman.org" <clan@clayman.org>

Just passed Charlotte, North Carolina in heavy rains. Will try to get to Virginia or West By G-d Virginia tonight.

Sent from my iPhone

---

**Adam Clayman** <adam@clayman.org>                         Wed, Sep 6, 2017 at 4:38 PM
To: Mike Newdow <newdowlaw@gmail.com>

Haha, Mike, check this out.

My secular father, who pokes fun at me, and even derides me for my stance against and abstention from IGWT currency, also hyphenates the Name of G-d in this email message below about escaping Hurricane Irma.

This is a very natural example of this hyphenation pattern among American Jews, and evidences what I was taught to do as a child in protecting the Name from destructions once written down.
[Quoted text hidden]

---

**Mike Newdow** <newdowlaw@gmail.com>                       Sun, Sep 10, 2017 at 5:56 AM
To: Adam Clayman <adam@clayman.org>

I used to live near Statesville (in Winston-Salem).

Bummer that your father doesn't understand your position.

By the way (although it is not really related to the claim that you are bringing), you might want to ask your dad what he would think if the money all said "In Jesus We Trust." And - even if it wouldn't bother him - would he deride his Jewish friends who felt it was outrageous.


[Quoted text hidden]
--
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464


916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com



David Clayman <david@clayman.org>

## Did you just hear that?

**Adam Clayman** <adam@clayman.org>                                    Tue, Jan 30, 2018 at 9:33 PM
To: Mike Newdow <newdowlaw@gmail.com>

I have a couple updates, incidents that could be included in the lawsuit pleadings, all taking place in Illinois.

So far, I've paid for two loads of laundry in about 6 months. Mostly I wear dirty clothes.

Adam Clayman
(312) 414 - 7628

[Quoted text hidden]



David Clayman <david@clayman.org>

---

## Denied Chicago Public Library Card over $1 IGWT cash replacement fee
2 messages

---

**Adam Clayman** <adam@clayman.org>                                     Tue, Feb 20, 2018 at 10:05 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike!

I hope this reaches you well.

I just want to briefly let you know I was denied a public library card over a $1 card replacement fee that Chicago Public Libraries refuses to accept via check or credit card.

This happened many months ago, actually; I was negligent in not writing it up for you before. I have several photos from that date.

I can't use iGWT cash, so I can't take books out of Chicago Public Library System.

Unless, I suppose, I commit fraud and claim that I have never had a Library Card. But "identity fraud" is very, very, VERY against my principles. I made several different kinds of accommodation requests to the Supervisor at the Main Branch (check, debit, credit, digital payment, fee waiver) but all those requests were denied. I still have the Library Card Replacement Form that the Supervisor shredded up, and I might have some brief video of what happened too; I'll have to look.

I don't know. Maybe this example is more "hard hitting" than most. Libraries are quite sacred and library access is publicly sacrosanct, and seeing my borrowing privileges infringed upon by IGWT over a $1 Bill Card Replacement Fee (average $1 bill print-to-shred lifespan: <1.5 years) might immediately and viscerally connect with the Judges and Justices.

Adam

=======================

**An Attempt at Speechwriting**

<Atheist Arguments First or Second in Opening>

**"Your Honor, one of the clients I represent in this case is a conservative, religious Jew who can't bear to see the name of G-d disgraced by the Federal Reserve through the practice of inevitably shredding or otherwise defacing the name of G-d at the end of a currency note's life cycle. Since he holds the Name of G-d to be too sacred to release from his hands into general circulation, where the Name of G-d will eventually be shredded into pieces, he hasn't been able to use any cash with G-d's Name at all for about four years. He's been forced to conduct all his transactions by check or on debit and credit cards, and is occasionally locked out of critical government services because of his inability to participate in the conventional United States cash and coin system.**

**"Just to give you one example, he lost his Chicago Public Library card. When he went to apply for a replacement at the Harold Washington Library Main Branch in downtown Chicago, he was informed of a $1 Card Replacement Fee that Library Staff insisted must be paid in cash. He offered alternative means of payment, but his request was refused. He asked for Religious Accommodation, under Federal and State Religious Freedom Restoration Act Laws, but his accommodation requests were refused. He was forced to watch as the Shift Supervisor tore up his Replacement Library Card application into shreds and threw his application into the trash. As a result, my client's**

access to the Public Library System has been infringed upon for over 6 months running, because my client can not bear to be complicit in the destruction of the Name of G-d.

"His religious beliefs stem and derive from Talmudic Tractate Rosh Hashanah 18B, which is available before this Court as <u>Exhibit G</u>. In brief, the Jewish people have a religious custom and a series of religious laws prohibiting them from knowingly writing out then destroying the Name of G-d on a destructible, impermanent medium like a debt contract, a debt note, or a currency note. Anything with the Name of G-d written or printed on it as a central feature must be treated with the utmost dignity and respect. If a document with the Name of G-d on it must be retired, it must be buried as "Shaimos", i.e. a holy document bearing the Name of G-d. Anyone who disrespectfully treats, mutilates, or permits the unceremonious destruction of a document with the Name of G-d on it is guilty of taking the Name of G-d in vain: a breach of the 3rd of the 10 Commandments ("Thou shalt not take the Name of the Lord they G-d in vain.")

"A very large fraction of American Jews, my client included, will never write the Name of G-d out on paper without hyphenating it, so as to protect themselves from mistakenly destroying a sacred document. My client, who spent time scrutinizing the design of American currency and studying its life cycle, was forced into an awareness that the cash and coins we use in the United States, that the Federal Reserve routinely destroys, qualify as sacred documents under the lessons of Rosh Hashanah 18B, particularly for an American Jew, like himself, who holds the primary English Name of G-d to be sacred.

"The presence of the Name of G-d on the currency also bars my client from paying cash in other contexts that are critical to his liberty and freedom. As perhaps the most egregious example, my client was accused of and charged with a criminal offense. Bond was set at a $2,500 payment level. He had more than enough in his checking account to cover the cost of his bond, and his checking book was in his personal items where he was being held (Cook County Jail), but the Jail Staff refused to allow him to write a check as a means of payment, even after he explained and asked for religious accommodation, and offered to provide proof of available funds and remain in jail for as long as necessary for his check to clear. My client was deprived of his liberty for 28 days, forced to remain in jail for roughly a month, before his parents bailed him out. After his release from jail, until the day of his plea agreement, he was forced to make arrangements with his attorney to hold funds on his behalf in escrow, just in case he was taken back into custody, because he knew he could be trapped again by his inability to pay Cook County in In G-d We Trust cash.

"No American should be held in jail for 28 days because a political, principally Christian majority insists on evangelizing via state-printed currency that ultimately end up, in a blink of G-d's eye, in landfills, in violation of Jewish Law and the Protective Jewish Religious Custom of hyphenation.

"My Jewish client joins the Atheist Plaintiffs in alleging 1st Amendment Establishment Violations in addition to his unique experience of being fully obstructed from participation in IGWT cash and coin commerce, and all that has resulted in, including 28 days of unnecessary imprisonment and his inability to restore his borrowing privileges at the Chicago Public Library over a $1 cash replacement fee he can't possibly pay in cash, without knowing the dollar bill that leaves his hands will, one day, at the end of its life, be buried in a religious ceremony rather than unceremoniously and disrespectfully shredded into paper pulp."

"Our joint arguments, Atheist and Jewish American, run the gamut from highly secular to highly religious. There's a range of opinion among the Plaintiffs as to whether the Name of G-d should be held in esteem or held in contempt. But what we all agree upon, strenuously, is that the name of G-d has no place on paper currency or even metal coins, and that it is an improper and unconstitutional Motto for the United States of America, not just from the atheist, agnostic and secular gnostic perspective, but from other deistic religious beliefs like Judaism (which requires hyphenation), Islam (which would imprint Allah), and Hinduism (which disavows belief in a monotheistic G-d) as well.

<Atheist Arguments First or Second in Closing>

Adam Clayman
(312) 414 - 7628

Mike Newdow <newdowlaw@gmail.com>                                         Fri, Feb 23, 2018 at 8:31 AM
To: Adam Clayman <adam@clayman.org>

That was a beautiful "attempt at speechwriting" (i.e., your paragraphs for our 7th Circuit complaint).

You have definitely put that complaint next in line - I plan to be filing it by the end of May.

Great job, Adam. Thanks!

- Mike

[Quoted text hidden]

—

Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464

916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com



David Clayman <david@clayman.org>

---

## Calling Stanley Fischer, Ofer Cohen as Witnesses

3 messages

---

**Adam Clayman** <adam@clayman.org>                                    Sat, Mar 10, 2018 at 7:22 PM
To: Mike Newdow <newdowlaw@gmail.com>

*Mike, did I send you this already? Check out the attachments. When Former Governor Fischer was stopped on the street by Ofer Cohen, he confessed his real rationale for blocking IGWT from Israeli Currency. The reasons he gave in the Official Bank of Israel Letter were only half the story, or maybe just half-truths and bullshit. The real reason is the same reason that I have for refraining from using the currency: because all coins and cash end up destroyed unceremoniously and thrown into trash and waste streams without any commemoration / sanctification / ceremony.*

Why Stanley Fischer opposed In G-d We Trust (in Israel)
Why did Stanley Fischer object to inscribing G-d's Name on the money bills?

Adam Clayman
(312) 414 - 7628

**2 attachments**



**Bank_of_Israel_Statement.png**
144K

**Bank_of_Israel_Statement_Translation.docx**
15K

---

**Mike Newdow** <newdowlaw@gmail.com>                                    Sat, Mar 17, 2018 at 3:01 AM
To: Adam Clayman <adam@clayman.org>

Although RFRA supposedly elevates any sincere to the highest level of protection, the fact that you have a high-ranking Israeli concurring with your view surely cannot hurt.

By the way, if I didn't already provide you with this, you can listen to the oral argument before the 8th Circuit panel here.
[Quoted text hidden]

—
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464

916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com

---

**Mike Newdow** <newdowlaw@gmail.com>                          Sat, Mar 17, 2018 at 3:11 AM
To: Adam Clayman <adam@clayman.org>

And here are the key papers.

[Quoted text hidden]

---

**4 attachments**

📄 **Final Appendix.pdf**
5624K

📄 **2017-02-15 AOB.pdf**
343K

📄 **2017-04-17 #3 - A-ees' Br (f'd).pdf**
448K

📄 **2017-05-16 Pltf Reply Brief.pdf**
170K



David Clayman <david@clayman.org>

## Illustrative Wikipedia Article on Names of G-d (Note: I didn't write this)
2 messages

**Adam Clayman** <adam@clayman.org>                                      Sun, Mar 18, 2018 at 1:14 AM
To: Mike Newdow <newdowlaw@gmail.com>

Thanks for talking tonight.

I just found an article that spontaneously appeared on Wikipedia that helps explain some of the Jewish belief structures that are endemic on the use of G-d's name. I haven't made any edits to these pages... yet. So this is a pretty decent indication of where Judaism stands on the protection of (Hashem = The Name) in the English language. At the very end of the article, under the section "English Names", it says "there is a dispute whether the word "G-d" unhyphenated in English or other languages may be erased." That's true; there is something of a dispute. Under RFRA, all disputants are right, as long as the Government lacks a compelling interest to burden us with taking the name in vain.

Anyway, the history of this page on the Names of G-d in Judaism shows it was first created on 16 June 2001, almost 13 years before I came to the crushing realization that I couldn't use currency anymore. It's incredible: even on the very, very first version of the page in 2001, back when I was only 15 years old (I'm now nearly 32), the first author made sure to speak of the hyphenation of G-d's name as part of Jewish culture:

Selection from First Version of Article:  "Orthodox Jews believe that even Adonai is too holy to say except in prayer; so in conversation they will call G-d haShem, which is Hebrew for "the Name". Many Orthodox Jews also write "G-d" instead of "G-d": while this is by no means required by their religion (only the Hebrew name, not the English, is holy), they do it to remind themselves of the holiness attached to G-d's name."

This viewpoint and the responsibility or advisability (we dispute) to hyphenate G-d's name is by no means obscure: it's a really important topic to cover, as you can see from the Wikipedia history on the topic, which is a decent representation of a cross-section of Jewish views, with maybe a bit of a heavier slant toward Orthodox and academic beliefs.


Wikipedia: Names of G-d in Judaism
https://en.wikipedia.org/wiki/Names_of_God_in_Judaism
https://en.wikipedia.org/wiki/Names_of_God_in_Judaism#English_names
https://en.wikipedia.org/wiki/Names_of_God_in_Judaism#cite_note-84


Adam Clayman
(312) 414 - 7628

**Mike Newdow** <newdowlaw@gmail.com>                                    Sun, Mar 18, 2018 at 12:34 PM
To: Adam Clayman <adam@clayman.org>

Thanks, Adam.

As I've previously noted, I think yours is a great case to accomplish the goal we both share.

- Mike
[Quoted text hidden]
--
Michael Newdow

CA SBN: 220444

10/23/25, 8:44 PM

Case 9:25-cv-80890-WM    Document 60-5    Entered on FLSD Docket 10/27/2025    Page 23 of 94
Clayman Family Mail - Illustrative Wikipedia Article on Names of G-d (Note: I didn't write this)

PO Box 248
Nice, CA  95464


916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com



David Clayman <david@clayman.org>

---

## Statutes & Constitution :View Statutes : Online Sunshine

**Adam Clayman** <adam@clayman.org>                                    Thu, May 10, 2018 at 1:50 PM
To: Mike Newdow <newdowlaw@gmail.com>

Sorry, I should have written you back ages ago.

Yes, I do, have a passport, and it's an absolute and utter pain having THE NAME (HaShem) printed inside.

I actually used to have memorized the exact pages where THE NAME (HaShem) was written on my passport. It's on page 9, 13, 20, 31, 34, and 50.

There's mention of the Creator on page 11. No objection. There's also Native American idol worship depicted on page 23 and 49, in the form of a sacred totem pole, ancestral and spiritual. Technically, I'm supposed to object to that, but it's not something that I'm going to object to myself, nor would I support a communal objection. These are Native Americans we're speaking of... it's not a holy cross being depicted originating in the Middle East.

So far i've been lucky, or blessed, and no one has stamped or stickered any of the divine Names. But that can change at any time, and i find it exceedingly difficult to halt a Viet Passport Control Agent, and delivering preliminary instructions to the Government of _____ (Zhong, a/k/a China) about where they can and can't stamp my Foreign Experts Visa while they have my passport in their possession. So far, like i've said, i've been lucky, or very blessed. But that can change any time, and HaShem (THE NAME) can be stickered over or stamped over in an irreversible way, in a manner and in a context that i'll have tremendous difficulty overseeing and halting.

Having a Passport with THE NAME (HaShem) inside it poses other problems. In order to sanctify THE NAME, i'm obligated to avoid brining any expressions of THE NAME into bathrooms or anywhere near toilets, unless it's double wrapped, double sealed from air-borne physical contamination. Can you imagine what that's like at an airport?? On one hand, i can double wrap my passport, and make it hard to impossible to retrieve anytime i'm asked for my identification. On the other hand, i can keep it single wrapped or out, and risk errantly and forgetfully walking into a bathroom and setting off a wave of recrimination (against myself) for having exposed my Passport, and THE NAME, as included inside THE NATIONAL MOTTO, to physical contamination.

This might sound to an evangelist or nationalist like a fun sideshow demonstration of how important THE NATIONAL MOTTO and THE NAME are to a US Citizen, but it's not a friggin' sideshow: it's a religious crime for me to make a mistake, however slight, in protecting THE NAME and THE NATIONAL MOTTO from contamination. The guilt is borne by me; not by them. I'd much, much, much rather have the Name off these documents, and frankly, it must be done, because in a blink of G-d's eye (10 Years), these documents are discarded.

Adam Clayman
(312) 414 - 7628
[Quoted text hidden]



David Clayman <david@clayman.org>

## Four Different Responses (Happiness, Association, "FREADOM", and Cash's Privacy Features)

**Adam Clayman** <adam@clayman.org>                                Fri, Jun 1, 2018 at 9:20 PM
To: Mike Newdow <newdowlaw@gmail.com>

### Right to Life, Liberty, and the Pursuit of Happiness

My client, Adam Clayman, moved to a month-to-month lease on the Northside of Chicago for what he thought would only be a couple months while conducting a job search. The only affordable month-to-month rental options he could find were all had coin-operated laundry machines in the building. He eventually found a laundromat that said by phone that they would take credit card, and so he agreed to a lease nearby, only to find out after moving in that the laundromat was card-operated, but that the cards had to be purchased with coins. So Plaintiff Clayman was stuck at 4128 N Clarendon without laundry service, soldiering on, thinking that he could get through two months without laundry, but his job applications, job search, and location transfer stretched on month-by-month unexpectedly to eight months. During that time, he only was able to wash his clothes twice in eight months. He wore the same five pairs of pants for weeks, to avoid the superfluous use of G-D's NAME for secular purposes, as outlawed in Rosh Hashanah 18B[4], attached as a Authoritative Religious Source. It was like Plaintiff Clayman was forced to live a camping lifestyle in the middle of the City of Chicago because he couldn't use coins and enter and utilize coin-operated laundromats any longer. He lapsed once and laundered his clothes once, just once, in advance of a job interview for a permanent teaching position, but he was coerced into an unusually slovenly, unkempt lifestyle by the Government. This was not a mere inconvenience; not being able to do laundry when running out of clothes, or alternatively, being forced into higher-income "laundry in-unit" annual lease housing, is a substantial burden.

### Right to Freedom of Association

My client, Clayman, was also living during this time less than a mile from a bar (the Cubby Bear) that held a salsa dance every Saturday night. He couldn't enter and freely associate with other salsa dancers, because the Cubby Bear insisted on a cash-only cover fee for entrance, and despite offering every alternative under the sun, the Cubby Bear wouldn't make any accommodation for any other form of tender from Plaintiff Clayman. So for eight months, Clayman was coerced out of his rights to free association.

### Rights to Borrow Reading Material Freely at Local Library, Coerced Book Purchasing Pattern: Freedom

Then Clayman lost his Chicago Public Library (CPL) Card. When he went to replace it, the CPL Main Branch Supervisor insisted that the $1 Replacement Card Fee be paid in cash, no exceptions. Plaintiff Clayman could not pay the $1 Replacement Fee to local government, and could not and would not fraudulently start a fresh account from scratch, so he had to make do without local library borrowing privileges in Chicago for over 5 months. During that time, he had to make do with digital library access, using his sister's Cuyahoga County Public Library Access Codes to borrow digital titles with Overdrive for a Kindle he felt forced and coerced to purchase after his borrowing privileges were taken from him in Chicago. Notably, not all books Plaintiff Clayman wished to read were available digitally, but often these same books were available at CPL Library Branches for free, had he been able to replace his card with a $1 cash-only replacement fee.

### Rights to Privacy

10/23/25, 2:40 PM Clayman Family Mail - Four Different Responses (Happiness, Association, FREALD24, and Cash's Privacy Features)

Case 9:25-cv-80890-WM Document 60-5 Entered on FLSD Docket 10/27/2025 Page 26 of 94

Because Plaintiff Clayman has been unable to benefit from the privacy rights afforded by cash, every purchase that he has made since July 2014 is subject to Governmental review at anytime, for the full lifespan of each commercial transaction he's ever made since then. Plaintiff Clayman is, among other things, a believer in the right to privacy, and finds it outrageous that the Courts do not honor and defend the critical Constitutional importance of his being able to equally buy anything from contraceptives to sex toys from the family planning aisle of his local drug store with cash rather than credit, just as other families would or might. If my client, Plaintiff Clayman, wants to buy KY Jelly at Walmart, is it not Plaintiff Clayman's essential and compelling interest that the Government not have visibility into the transaction, barring a legitimate warrant? Plaintiff Clayman's essential privacy rights are at stake here. If the Court argues that Plaintiff Clayman does not need to use cash, and can find digital substitutes, it's also arguing that Plaintiff does not need the right to privacy, as no widespread private method of buying contraceptives at the corner store is otherwise–or likely will ever be–available, this Court's speculation about Bitcoin notwithstanding. Cash's combination of privacy and fungibility is unequalled betwixt all its competitors, and will remain so as far as the "All-Seeing Eye" has yet to perceive, or allow.

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Just FYI: You can call me about this on Shabbat, even
5 messages

**Adam Clayman** <adam@clayman.org>                                    Fri, Jun 1, 2018 at 9:35 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

I just left you a voicemail. Near the end of it, I started making a really important claim: that I have a right to privacy from Corporations, not just the Government. When I'm forced to use my credit card or debit card for every transaction that I make, Charles Schwab, Chase Bank, and the local businesses where I transact have a chance to build a buying profile from all my transactional data. I would prefer to deny them that access into how my mind works.

Another compelling argument is that using credit and debit cards is more behaviorally expensive. I, and most other guinea pigs under economic analysis, are more careful with our spending when we're using cash. I'm much less likely to "impulse buy" when I use cash, and being coerced away from cash is so far against my principles both as a privacy advocate and as a thrifty saver.

_____

Just fyi, this case is higher priority to Shabbat. So if ever you want to talk about the case, or need anything from me, even on a Friday night or Saturday, don't hestitate to reach out.

In general, also, it's worth knowing that I'm only a semi-observant Jew, in general. Sometimes I keep Shabbat rigorously, and sometimes I don't. I'm not super-consistent about keeping Shabbat. "Keeping the Sabbath" is the only piece of the Ten Commandments that I, and millions of other conservative and conservadox Jews like me, find incredibly hard to follow up to Orthodox standards (i.e. no electricity, etc.).

What I'm super-consistent about are _all_ the rules that are more or equal in importance to keeping Shabbat, like pikuach nefesh (the obligation to save life), and of course, here, not taking the NAME of G-D in vain.

In any case, if and when you want to speak with me over a Shabbat, if it's urgent or important, don't hesitate to reach me, even on Friday night or Saturday. Hell, you can wake me up in the middle of the night for all I care, if it has anything to do with defeating the superfluous use of IGWT.

Adam Clayman
(312) 414 - 7628

**Mike Newdow** <newdowlaw@gmail.com>                                   Sun, Jun 3, 2018 at 5:06 AM
To: Adam Clayman <adam@clayman.org>

Thanks, Adam.

By the way, your argument on the privacy aspect of cash is a great one. I'll try to get it in when I write the petition for rehearing (and the petition for cert). More importantly, it will play a strong role when I file in the next circuits.

All the best.

- Mike

PS - Keep me up to date on the Florida license matter.

[Quoted text hidden]

—
Michael Newdow

10/23/25, 6:39 PM    Clayman Family Mail - "Just Pt 1: You can call me about this on Shabbat, even

CA SBN: 220444

PO Box 248
Nice, CA 95464

916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com

---

**Adam Clayman** <adam@clayman.org>                                    Sun, Jun 3, 2018 at 12:34 PM
To: Mike Newdow <newdowlaw@gmail.com>

I forgot to write up the cash-only bond system in the State of Illinois, which raises interesting "Federal Responsibility" Questions. The State of Illinois relies on the Federal Government to print and mint legal tender that everyone can use. When the State of Illinois laughed off my efforts to pay for my bond with check rather than with cash, I couldn't direct a RFRA Accommodation claim at *Illinois*; the fault lied with the Federal Government, for "generatively entrenching" a currency that's religiously symbolic and essentially sectarian.

It's actually a similar "reliance" occurring on the Florida Driver's License. The State of Florida is relying on the Federal Government to select a National Motto that everyone can agree to at least minimally use.

The Judges want "unavoidable consequences of IGWT, assuming perfect accommodations in terms of everyone accommodating your use of digital currency, debits, credit cards, and checks". The two places where accommodations are absolutely impossible are (a) coin-operated machinery (the permanency of the laundry claims) and (b) privacy needs (the permanency of privacy needs).

_____

P.S. Just sent you two private video files introducing and explaining *Rosh Hashana 18B⁴*, and why it's so important to have a copy nearby and in your hand every time you go up for oral argument.  The physicality of it matters! Trust me, almost any "Judeochrislam" Judge or Justice will respect our arguments more if we approach them with a physically-embodied religious text in hand to back up not just the sincerity of our argument, but the profundity of claiming that **the Government is either (a) weakening or (b) strengthening the power of the NAME of G-D, and that the Government can't do either.**

The NAME OF G-D is like a trademark that the Government is either making stronger or weakening, wearing out, and exposing to the dung-heap..

P.P.S. Will keep you up to date on the Florida License. No one called me back, and I don't think they will follow-up with me; I think they'll follow-up with you. While the US Passport question is also important to us, it's not as urgent for me as getting the driver's license corrected.

Adam Clayman
(312) 414 - 7628

[Quoted text hidden]

---

**Mike Newdow** <newdowlaw@gmail.com>                                    Mon, Jun 4, 2018 at 4:18 AM
To: Adam Clayman <adam@clayman.org>

I couldn't get either of the Rosh Hashana 18B4 videos to play.

Keep bugging me to speak with the FL DMV.

[Quoted text hidden]

---

**Adam Clayman** <adam@clayman.org>                                    Mon, Jun 4, 2018 at 6:58 AM
To: Mike Newdow <newdowlaw@gmail.com>

You have to be <u>logged in to YouTube as "NewdowLaw@gmail.com"</u> to get them to play. If you're still having trouble, write me again and I'll change the privacy setting to "unlisted, but accessible to anyone with the link".

No problem, I'll remind you periodically. Their phone number again is <u>+1 (850) 617 - 3101</u>. Remember to keep meticulous notes from here on about how long you have to work on the case. Although I know you're working and in the habit of working *Pro bono* with untracked time on one hand, on the other hand, it'll help having notes about your hours if you do have a chance to bill the State of Florida under State RFRA for your time.

---

Adam Clayman
(312) 414 - 7628

[Quoted text hidden]



David Clayman <david@clayman.org>

---

## Here, this sounds better: The Bond Argument

**Adam Clayman** <adam@clayman.org>                                            Sun, Jun 3, 2018 at 12:52 PM
To: Mike Newdow <newdowlaw@gmail.com>

**Right to Liberty**

My client, Adam Clayman, was held in jail for 28 days in the State of Illinois on a cash-only bond. He offered to pay the bond immediately from his checking account, where he had more than $80,000 liquid, far, far more than he needed to cover the cost of his bail-bond payment, but the Cook County Sheriff refused to allow him to pay in anything at all but cash. So rather than being released the same day he was arraigned, Plaintiff Clayman was stripped of his freedom for 28 days because he had to refuse to use the NAME OF G-D as printed on the currency in vain for his release, for fear of how the cash would be destroyed unceremoniously after it exchanged hands.

Instead of being held in jail without bond roughly 3 days until just after my bond hearing, Plaintiff Clayman was held for 28 days, because Cook County Sheriff Personnel repeatedly refused to accommodate his offer to pay by check. Notably, he was reasonable, and offered to log-in and show a Sheriff's Deputy his bank balance and even remain in jail just as long as it took until the check cleared, and the Cook County Sheriff Personnel still refused to accept a check or let Plaintiff Clayman go. They just held him indefinitely, laughing off his religious belief, making light of his inability and incapacity to pay his own bail-bond in cash.

During the time he was in jail for those 28 days, Plaintiff Clayman suffered further proximate harms, including the total failure of the Cook County Jail to accommodate his need for kosher–or at least vegetarian–food over those 28 crushing days. **The proximate cause for Plaintiff Clayman's starvation in jail was Cook County's refusal to accept a check or anything else but IN G-D WE TRUST for bond, and the Federal Government is at fault, for the Federal Government, in superfluously printing the NAME of G-D in secular fashion, is in Clayman's view weakening the strength of G-D's NAME and exposing it to four unnecessary Ds: unnecessary damage, diminishment, dilution, and destruction.**

---

Adam Clayman
(312) 414 - 7628

*Mike / Dr. Newdow: feel free to edit this freely for length and clarity. Just be careful to keep enough to establish the factual foundation.*

Edited June 1, 2018
— December 14, 2021

Jailed over Cash Bond (Right to Liberty) — 1

Can Not Use Coins for Laundry (Right to Pursuit of Happiness) — 2

Cash Cover Fees for Salsa Dance, Barbeque, and Bar Entrance (Right to Freedom of Association) — 2

Unable to Borrow Reading Material Freely at Local Library, Coerced Book Purchasing Pattern — 3

Full Sacrifice of Commercial Privacy Rights (Rights to Privacy) — 3

Cash Unavailable in an Emergency or Loss Scenario – Extra Credit Card Required — 4

Transactional Burdens on Shopkeepers and Self: Bike Shop — 4

Can not eat at cash-only restaurants or food trucks — 5

Inability to Sell Books to a Used Bookstore — 5

Catastrophically cash-dependent toll roads — 5

Frozen Cash — 6

Can't donate change or cash to street performers, panhandlers — 6

Cash-reliant PalmTran Busing — 6

Credit Card Convenience Fees — 7

Reliant on Uninterrupted Electricity: Unprepared for Blackouts, Brownouts, Hurricanes, Register Failures — 7

Can't work a cash register, and can not work for, launch, or participate as a major shareholder in a cash-dependent business or franchise (financial system isolation) — 8

Alienated periodically from friends and family who use cash — 8

Can not slip cash to friends, family, or strangers — 8

## Jailed over Cash Bond (Right to Liberty)

Plaintiff Clayman, was held in jail for 28 days in the State of Illinois on a cash-only bond. He offered to pay the bond immediately from his checking account, where he had far, far more than he needed to cover the cost of his bail-bond payment, but the Cook County Sheriff refused to allow him to pay in anything at all but cash. So rather than being released the same day he was arraigned, Plaintiff Clayman was stripped of his freedom for 28 days because he had to refuse to use the NAME OF G-D as printed on the currency in vain for his release, for fear of how the cash would or could be destroyed unceremoniously after it exchanged hands.

Instead of being held in jail without bond roughly 3 days until just after his bond hearing, Plaintiff Clayman was held for 28 days, because Cook County Sheriff Personnel repeatedly refused to accommodate his offer to pay by check. Notably, he was reasonable, and offered to log-in and show a Sheriff's Deputy his bank balance and even remain in jail just as long as it took until the check cleared, and the Cook County Sheriff Personnel still refused to accept a check or let Plaintiff Clayman go. They just held him indefinitely, laughing off his religious belief, making light of his inability and incapacity to pay his own bail-bond in cash.

During the time he was in jail for those 28 days, Plaintiff Clayman suffered further proximate harms, including the total failure of the Cook County Jail to accommodate his need for kosher–or at least vegetarian–food over those 28 crushing days. The proximate cause for Plaintiff Clayman's long-term starvation and month-long stay in jail was Cook County's refusal to accept a check or anything else but IN G-D WE TRUST currency for bond.

## Can Not Use Coins for Laundry (Right to Pursuit of Happiness)

Plaintiff Clayman moved to a month-to-month lease on the Northside of Chicago for what he thought would only be a couple months while conducting a job search. The only affordable month-to-month rental options he could find all happened to have coin-operated laundry machines in the building. He eventually found a laundromat that said by phone that they would take credit card, and so he agreed to a lease nearby, only to find out after moving in that the laundromat was card-operated, but that the cards could only be purchased with coins. So Plaintiff Clayman was stuck at 4128 N Clarendon without laundry service, soldiering on, thinking that he could get through two months showering daily without laundry, but his job applications, job search, and location transfer stretched on month-by-month unexpectedly to eight months. During that time, he only was able to wash his clothes twice in eight months. He wore the same five pairs of pants for weeks, to avoid the superfluous use on coins of G-D's NAME for secular purposes, as outlawed in Rosh Hashanah 18B4. It was like Plaintiff Clayman was forced to live

a camping lifestyle in the middle of the City of Chicago because he couldn't use coins and enter and utilize coin-operated laundromats any longer.

On the whole, with one lapse withstanding, he was coerced into an unusually slovenly, unkempt lifestyle by the Government. This was not a mere inconvenience; not being able to do laundry when running out of clothes, or alternatively, being forced into higher-income "laundry in-unit" annual lease housing, is a substantial burden.

In Florida, Plaintiff Clayman currently lives in a condo with an in-unit washer and dryer, but Clayman is worried about what future rental searches will look like, complicated as they are by his inability to agree to use IGWT coins in coin-operated laundry facilities.

## Cash Cover Fees for Salsa Dance, Barbeque, and Bar Entrance (Right to Freedom of Association)

Plaintiff Clayman, was also living during this time less than a mile from a bar (the Cubby Bear) that held a salsa dance every Saturday night. He couldn't enter and freely associate with other dancers because the Cubby Bear insisted on a cash-only cover fee for entrance, and despite offering every alternative under the sun, the Cubby Bear would not make any accommodation for any other form of tender from Plaintiff Clayman. So for those eight months he would have preferred to dance each and every weekend, Clayman's rights to free association were set aside for the sake of preserving the National Motto.

Clayman is also unable to attend cash-only barbeques and can not enter any bars with cash-only cover fees.

## Unable to Borrow Reading Material Freely at Local Library, Coerced Book Purchasing Pattern

Plaintiff Clayman lost his Chicago Public Library (CPL) Card in 2016. When he went to replace it, the CPL Main Branch Supervisor insisted that the $1 Replacement Card Fee be paid in cash, no exceptions. Plaintiff Clayman could not pay the $1 Replacement Fee to local government, and could not and would not fraudulently start a fresh account from scratch, so he had to make do without local library borrowing privileges in Chicago for over 5 months. During that time, he was reliant on digital library access, using his sister's Cuyahoga County Public Library Access Codes to borrow digital titles with Overdrive for a Kindle he felt forced to purchase to compensate after his borrowing privileges were taken from him in Chicago. Notably, not all books Plaintiff Clayman wished to read were available digitally, but often these same books were available at CPL Library Branches for free, had he been able to replace his card with a $1 cash-only replacement fee.

Plaintiff Clayman's Palm Beach County Library Card is active and so far unencumbered, but he fears that if he ever loses his Florida library card, he might effectively lose his Florida borrowing privileges, as has already happened when he was living in Chicago.

## Full Sacrifice of Commercial Privacy Rights (Rights to Privacy)

Because Plaintiff Clayman has been unable to benefit from the privacy rights afforded by cash, every purchase that he has made since July 2014 remains subject to Governmental review at anytime, for the full lifespan of each and every commercial transaction he has ever made since then.

Plaintiff Clayman is, among other things, a believer in the right to privacy, and finds it outrageous that the Courts do not honor and defend the critical Constitutional importance of his being able to equally buy anything including condoms and other contraceptives from the family planning aisle of his local drug store with cash rather than credit, just as other families would or might. If my client, Plaintiff Clayman, wants to buy KY Jelly at Walmart, is it not Plaintiff Clayman's essential and compelling interest that the Government not have visibility into the transaction, barring a legitimate warrant? Plaintiff Clayman's essential privacy rights are at stake here.

If the Court argues that Plaintiff Clayman does not need to use cash, and can find digital substitutes, it's also arguing that Plaintiff does not need the right to privacy from corporations and/or the government, jointly or severally, as no widespread private method of buying contraceptives at the corner store is otherwise–or likely will ever be–available.

## Cash Unavailable in an Emergency or Loss Scenario – Extra Credit Card Required

Twice in the last five years, Plaintiff Clayman has lost his wallet with his debit and credit card, and been left with only a checkbook with which to transact. Learning from his experiences, Plaintiff Clayman now generally keeps a second credit card account that he maintains at home just for emergencies.

Plaintiff Clayman does not want to hold a second credit card, and would not have to have a second credit card account if it were not for his inability to transact in cash because his religious beliefs are substantially burdened by IGWT.

## Transactional Burdens on Shopkeepers and Self: Bike Shop

There is a bicycle shop around the corner from where Plaintiff Clayman used to live that had a cash-only policy, but did not post "CASH ONLY" in a prominent enough location for Plaintiff Clayman to see it. The owner of the shop packed up my bicycle for him for $40. When Clayman offered to pay by credit card or debit card, the owner-shopkeeper said, "No, cash only."

Clayman offered to pay by check, and the shopkeeper said he never took a check before in the entire life of the store. He worked only with cash. That left Clayman and the owner-shopkeeper in a huge bind. Eventually, after a full 20 minutes of discussion and explanation, Clayman was able to talk him into accepting a check, but the owner was very uncomfortable with it, and he only did it because Clayman absolutely refused to use cash and Clayman offered to show the owner Clayman's checking balance would cover the check's value.

As far as Clayman knows, the business is still cash-only, and Clayman is the only person in "Nearly New Bicycles" history to have secured service paying with a check rather than with cash. If Clayman had known in advance that the business was cash only, Clayman would have had to haul his 30lb bicycle box half a mile to Kozy's Bicycles rather than two-tenths of a mile to "Nearly New Bicycles"... and hauling that huge, heavy bicycle box was pretty arduous to do by hand for 2/10ths of a mile. Here's where Nearly New Bicycles is: https://goo.gl/maps/mUpvCHYYx4J2.

They don't have a sign on the outside that says, "CASH ONLY". Clayman doesn't even know if they have a sign on the inside... Clayman never saw any signage myself that said "CASH ONLY" when Clayman was in the store. It was just a long-standing policy of the owner to only accept cash.


## Can not eat at cash-only restaurants or food trucks

Believe it or not, quite a few restaurants and food trucks are cash-only.

Plaintiff Clayman can not eat at any cash-only restaurants or food trucks because he places a greater priority on preserving G-d's Name from callous "wear-and-tear" destruction.


## Inability to Sell Books to a Used Bookstore

Plaintiff Clayman wants to unload (hundreds of) used books from his shared condo in University Heights, Ohio. There's a store called *Half Priced Books* in Mayfield Heights, OH (not far from Clayman's secondary residence in Ohio) that will make Clayman an offer on all the books that

Plaintiff Clayman can bring in to sell. But they only make cash offers, and Clayman can't accept cash as a store-of-value from them.

Here's their explainer about how their cash offer for used books works.
https://www.hpb.com/how-it-works

Basically, in this case, Clayman is stuck in a situation where he can not accept cash from a cash-only second-hand books business, and this is an example of the chilling effect this use ol the divine name on the cash has on his ability to transact in daily commerce.


## Catastrophically cash-dependent toll roads

In June 2019 Plaintiff Clayman and his father found a last-minute cheap roundtrip flight to Israel leaving from Toronto, Canada. They figured out that the most economical method of travel would be to drive from Cleveland to Toronto, park for a couple weeks in long-term parking, then drive back from Toronto to Cleveland on their return.

The crisis came when they hit a partial toll road along I-90, the road that led to Toronto, in New York State. They did not have an EZ-Pass installed in their car, and when they entered the cash-only lane and asked for an alternative means of payment, the tollbooth operator said that the only other option was EZ-Pass, and that if they bought an EZ-Pass immediately it would not even become active for quite a long time *after* the purchase.

Plaintiff Clayman was aghast and completely confounded as to what to do. He had already driven over 5 hours from home, and he couldn't abandon the toll road without payment, and he couldn't afford to go around the toll road.

If his father were not in the car, Plaintiff Clayman would have just turned off and turned around, or he would have fought the tollbooth operator a lot harder for an exception or exemption. But Clayman is ashamed to admit that when his father offered insistently to pay the toll on his behalf, Plaintiff Clayman receded into the background and let his father pay, out of dread for what would happen if he pushed the situation to its logical conclusion as he normally would.

On the way back on July 4th, they would have been in the same conundrum, but Clayman got out of the driver's seat just after the Peace Bridge and his father paid the toll in cash while Plaintiff Clayman tried his best to look the other way and turn the other cheek.

In general, Plaintiff Clayman never lets anyone pay in cash on his behalf, as for him, that is also a pretty serious religious violation, but this time the circumstances were extreme: they were driving late at night, they didn't have anywhere to stay, he had to be at a doctor's appointment in Cleveland in the morning, and driving around the cash-only toll road would have taken him over

100 miles out of his way.  This qualifies as one of the most serious and severe entrapment episodes he has faced over the five years he has stopped using cash.

## Frozen Cash

All assets in cash or coin that I held at the time that I realized I had to protect G-d's name from erasure or destruction has been effectively frozen. These frozen assets have the status of untradeable collectibles.

## Can't donate change or cash to street performers, panhandlers

Unlike others, I can not donate change or cash to street performers or panhandlers whenever the inclination strikes. Since I can't use cash, I can't reward street musicians or perform small acts of charity that others are able to perform.

## Cash-reliant PalmTran Busing

The bus system in South Florida is practically cash-only and cash-dependent. PalmTran, the local Palm Beach County transportation authority, doesn't issue a rechargeable fare card, and so realistically, in real everyday use, Plaintiff Clayman can't get around on PalmTran sporadically or routinely without being able to pay in cash at the farebox on a per-use basis when boarding the bus.

Technically, it's possible to buy incredibly inconvenient "one-time use" fare cards in advance by mail or at one of several County offices far, far away from his housing, but how does Clayman get to these Offices in the first place if he can't board a bus? And who in the world thinks or plans their trips that far ahead? The system is clearly designed for and heavily, heavily favors passengers who can employ cash on-the-spot to their advantage, and burdens anyone who can not use cash to spontaneously buy a bus trip.

The worst conflagration was when Clayman was turned away from a bus on the day he had to go all the way to Delray Beach (about an hour by bicycle) for a mandatory legal need. Plaintiff Clayman wasn't permitted to ride the bus to his appointment because Plaintiff Clayman could not pay the cash fare, Clayman did not have any pre-purchased bus passes on him, and the bus driver would not sell him a bus pass electronically or accept any alternative means of payment. So Clayman was forced to either cycle to the appointment or take a rather long and expensive car-share, as at the time he did not have a car on hand. Clayman tried cycling to the appointment, but by the time he got to my appointment, he was on his bicycle in the sun for so long his skin was peeling heavily from sunburn in the following days.

Since that cycling sunburn disaster, Clayman has stocked up on bus passes by mail, but is always nervous about relying on PalmTran, and remains anxious about running out of bus passes and becoming stranded or stuck with terrible transit options at an inconvenient time.

## Credit Card Convenience Fees

Plaintiff Clayman regularly must pay convenience fees for the use of a credit card instead of cash. If he was able to use cash guilt-free, he could avoid many and most of these credit card convenience fee surcharges.

For example, in Florida where Plaintiff Clayman lived/lives, gas stations charge one price for cash buyers and another price for credit card users. The price for credit card users is usually 10 cents per gallon higher than the price for cash buyers. Plaintiff Clayman gets "taxed" indirectly by the Government's refusal to honor and accept his religious tradition of protecting the name of G-d whenever he has to transact with a business like this that charges a significantly steeper price for credit cards.

## Reliant on Uninterrupted Electricity: Unprepared for Blackouts, Brownouts, Hurricanes, Register Failures

Plaintiff Clayman can only practically transact with a debit or credit card, and so he is entirely reliant on the electrical grid working at all times. In the event of a disaster such as a hurricane or a more quotidian blackout, Plaintiff Clayman would be unable to buy meals or basic supplies. All things considered, Plaintiff Clayman is rather anxious about being forced into using ("wearing and tearing") cash in an emergency or natural disaster.

## Can't work a cash register, and can not work for, launch, or participate as a major shareholder in a cash-dependent business or franchise (financial system isolation)

Plaintiff Clayman is locked out of a large number of financial opportunities because he can not handle and apply wear-and-tear to G-d's name on cash. Plaintiff Clayman can't work behind a cash register, invest in a franchise, or work for a cash-involved business. Plaintiff Clayman and any of his future descendents can't take tips, and as such even in a less and less cash-dependent world Clayman and his future family are deprived of reasonable economic opportunities that other workers can accept without the same kinds of religious repercussions.

## Alienated periodically from friends and family who use cash

Plaintiff Clayman has been forced into a large number of embarrassing situations with friends and even family since forswearing the use of cash, but Plaintiff Clayman can not compromise on this particular religious belief, which the Talmud says ranks approximately as high as the commandment to not take the Lord's Name in vain.

## Can not slip cash to friends, family, or strangers

Occasionally Plaintiff Clayman gets into situations where, for instance, he wants to reimburse a friend but the friend refuses to accept payment. For example, a friend goes above-and-beyond to give him a ride to the airport and refuses an offer to pay for the ride. If Plaintiff Clayman were using cash, he could just leave some cash behind in the passenger seat on his way out of the car as a way of insisting on paying something for the ride. But Plaintiff Clayman can't participate in these informal exchanges because Plaintiff Clayman religiously is prohibited from using cash.



David Clayman <david@clayman.org>

## Save For the US Passport / State Department Case

Adam Clayman <adam@clayman.org>                                    Mon, Jun 4, 2018 at 5:05 PM
To: Mike Newdow <newdowlaw@gmail.com>

Attached you'll find a scan of a two pager I sent this to the US State Department via USPS about twenty minutes ago, along with certified copies of my passport that they'll return to me, and that I'll need to make sure get buried in a Jewish cemetery one day.

We can include this later within evidence as an Exhibit to help demonstrate "significant burden" and, I guess, the beginnings of "efforts at reasonable accommodation", in the form of a request for "special handling and care".

Notarizing / certifying this document just cost me $10.00. Honestly, I wouldn't have notarized or needed to include this cover letter document requesting special care and handling if the Passport Copies didn't have this damned Shaimos (the NAME of G-D) within.

It's a one page, two paragraph letter. It's a lot shorter and simpler than my previous revised drafts, and gets right to the point, while preserving the freedom to introduce all or more of the background and arguments and introduce a "Demand Letter for Accommodations" later, when we have more time to coordinate, maybe after the FL Driver's License mess is sorted out.

Adam Clayman
(312) 414 - 7628

📄 **Notarized US Passport Request for Special Care given Shaimos Status.pdf**
942K

# Adam
# Clayman
—

**Adam Clayman**
7930 Palacio del Mar Dr.
Boca Raton, FL-22|FL-30 33433-4148
312.414.7628
adam@clayman.org

4 JUNE 2018

**US Department of State**
Passport Vital Records Section
44132 Mercure Circle
PO Box 1213
Sterling, VA 20166-1213

Dear Passport Vital Records Section,

I am in the process of applying for Portuguese Citizenship, under the Jewish Sephardic "Right of Return" Laws passed three years ago in Portugal.

**Would you please Apostille the enclosed notarized copies of my US Passport? Please make sure to not damage, rip, staple, sticker or print over, or otherwise obscure the NAME of G-D on the following pages: Pages 9, 13, 20, 31, 34, and 50**

**Thank you for your help in this matter.**

Sincerely,

**Adam David Clayman**
US Passport #5▨▨▨▨▨

*Adam David Clayman*

State of FLORIDA
County of _Palm Beach_

The foregoing instrument was acknowledged before me this _4_ day of
_June_____ , 20_18_ by _Adam David Clayman_ , who
☐ is personally known to me or ☐ who produced a _US Passport_____ as
identification, regarding the attached instrument described as _Cover letter_
_to US Dept of State Passport_____

and to whose signature(s) this notarization applies.

_[signature]_
notary public signature

_Daniel Lee_
notary public printed name

_[signature] Adam David Clayman_

DANIELLE LEE SEAL
Notary Public – State of Florida
Commission # GG 155581
My Comm. Expires Oct 29, 2021
Bonded through National Notary Assn.

FL-2001-ACK

www.NotaryFL.com provides this form pursuant to Florida Statutes §695.25(1), §117.05(13)(b)



David Clayman <david@clayman.org>

## Cash-Only, Awkward and Uncomfortable Encounter at "Nearly New Bicycles"

**Adam Clayman** <adam@clayman.org>                                           Thu, Jun 7, 2018 at 4:00 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

There's a bicycle shop around the corner from where I used to live that had a cash-only policy, but didn't post "CASH ONLY" in a prominent enough location for me to see it. The owner of the shop packed up my bicycle for me for $40. When I offered to pay by credit card or debit card, he said, "No, cash only."

I offered to pay by check, and he said he never took a check before in the entire life of the store. He worked only with cash.

That left us in a huge bind. Eventually, I was able to talk him into accepting a check, but he was very uncomfortable with it, and he only did it because I absolutely refused to use cash and offered to show him my bank balance would cover the check's value.

As far as I know, the business is still cash-only, and I'm the only person in "Nearly New Bicycles" history to have secured service paying with a check rather than with cash. If I had known in advance that the business was cash only, I would have had to haul my 30lb bicycle box half a mile to Kozy's Bicycles rather than two-tenths of a mile to "Nearly New Bicycles"... and hauling that huge, heavy bicycle box was pretty arduous to do by hand for 2/10ths of a mile.

Here's where Nearly New Bicycles is: https://goo.gl/maps/mUpvCHYYx4J2.

They don't have a sign on the outside that says, "CASH ONLY". I don't even know if they have a sign on the inside... I never saw any signage myself that said "CASH ONLY" when I was there. It was just a long-standing policy of the owner to only accept cash.

More evidence, just in case it comes up.

Adam

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Here's another example burden: Extra Credit Card Required

**Adam Clayman** <adam@clayman.org>                                 Mon, Jun 18, 2018 at 10:35 AM
To: Mike Newdow <newdowlaw@gmail.com>

**Cash Unavailable in an Emergency or Loss Scenario – Extra Credit Card Required**
Twice in the last 4 years, Plaintiff Clayman has lost his wallet with his debit and credit card, and been left with only a checkbook with which to transact. Learning from his experiences, Plaintiff Clayman now generally keeps a second credit card account that he maintains at home just for emergencies. Plaintiff Clayman does not want a second credit card, and would not have to have a second credit card account if it were not for his inability to transact in cash because his religious beliefs are substantially burdened by IGWT.

Added this one to the document. Will add the bike store example to the document in a second, too. Just remember you've got to be logged-in as newdowlaw@gmail.com to edit and view.

Adam Clayman
(312) 414 - 7628

Clayman Family Mail - No "recovery cash": Need for extra credit card for emergencies (1 application denied; 1 approved)



David Clayman <david@clayman.org>

## No "recovery cash": Need for extra credit card for emergencies (1 application denied; 1 approved)

1 message

**Adam Clayman** <adam@clayman.org>                          Mon, Jun 25, 2018 at 9:55 AM
To: Mike Newdow <newdowlaw@gmail.com>

10/23/25, 8:32 PM      Clayman Family Mail - No "recovery cash" (Need for extra credit card for emergencies cf application denied cf approved)

Case 9:25-cv-80890-WM   Document 60-5   Entered on FLSD Docket 10/27/2025   Page 46 of 94

Dear Mike,

*You said before that until I'm actually in a hurricane, I don't have standing or particularized harm over the inaccessibility of cash in the event of an emergency. But isn't it enough to say that I have persistent, augmented anxiety (fear of a future) in which I can't use cash, but need to, because of a natural disaster? Isn't that enough for me to suffer burden and harm, and for us to introduce the "cashless in wake of natural disaster" argument as a real problem?*

Another consequence of being unable to use cash is that <u>to be prepared for wallet loss</u>, in particular the loss of my wallet and primary credit and debit card (which I keep in a pouch on the back of my cellphone), <u>I've had to keep a secondary credit card on hand at home in a sock drawer... a credit card that I never use, except in the event of a catastrophic loss.</u>

<u>**Normally, I wouldn't want or need a secondary credit card. I would just keep $300 in recovery cash on hand in a hiding place somewhere, just in case.**</u> But I can't use cash under any circumstances (<u>except</u> life and death scenarios), so I kept an extra CapitalOne credit card account open over the last 4 years. That CapitalOne credit card account recently was cancelled by CapitalOne because I didn't use it at all (not once) in the last 4 years. So today, I'm trying to replace it by applying for another credit card as a replacement of my emergency secondary.

So, because I have to, I just applied for a Citi Bank card, and my application was turned down, even though I have reasonably good credit scores (Credit Karma says 720, per TransUnion). Since I was denied at Citi, I'm now applying for a Fidelity Card, but bear in mind that my application to Citi cost me some points off my credit score.

In short, not being able to use cash has
(a) forced me to carry a credit card that I don't want,
(b) intermittently impacted my credit score adversely, and
(c) caused me anxiety for lack of an emergency "recovery cash" deposit hiding in a sock drawer, in case of accidental cellphone/wallet loss or theft

(a) is a <u>direct consequence</u> of Federal Reserve and Congressional Policy in interfering with free exercise and substantially burdening religious belief.

I'm not sure if I can pin (b) on the Government, because maybe I was aiming too high in applying for this particular credit card as a back-up, but hell, I thought I should mention that my application for a backup emergency credit card was denied, and that it impacts my credit score one way or another to be forced by the Government to carry an emergency credit card in lieu of emergency cash.

But there's also (c), which is the anxiety caused by the absence of recovery cash in the case of theft. What if I lose my cellphone wallet again? I'd be dependent on the kindness of strangers, permitting me to call friends and family while waiting nearby a Western Union for an emergency money transfer.

**But even with an emergency money transfer, how would I use the monies if I lost my wallet, and couldn't cash out a Western Union money transfer in cash?** (Hence, the need for this otherwise superfluous, otherwise extraneous emergency back-up credit card, as a burdensome provision in the absence of "recovery cash".)

I lost my wallet twice in the last four years while living in the United States. Once I just misplaced my wallet/phone, and the other time my wallet/phone was stolen from me in Chicago. **It was extremely, extremely hard recovering from each loss without access to cash.** I learned the hard way, through the school of religiously burdensome hard knocks, that I have to keep a recovery credit card, given the inaccessibility of recovery cash.

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Perfect Example: Cash-only "Half-Priced Books" Store

2 messages

**Adam Clayman** <adam@clayman.org>                                            Sun, Jul 1, 2018 at 8:10 PM
To: newdowlaw@gmail.com

Hi Mike,

Here's a *perfect* example of a transaction that's cash-only.

I want to unload (hundreds of) used books from our condo in University Heights, Ohio. There's a store called "Half Priced Books" in Mayfield Heights, OH (not far from me) that will make me an offer on all the books that I bring in to sell. But they make a cash offer, but I can't accept cash as a store-of-value from them...

Here's their explainer about how they work.

Basically, in this case, I'm stuck in a situation where I can't *accept* cash from a cash-only second-hand books business. I'm going to have to call them tomorrow to see if they'd be willing to write a check instead of giving me cash.

It's a perfect, very recent example for the Appeals Case in the 6th District in Ohio.

All best,
Adam Clayman

---

Adam Clayman
(312) 414 - 7628

**Mike Newdow** <newdowlaw@gmail.com>                                          Sun, Jul 1, 2018 at 10:25 PM
To: Adam Clayman <adam@clayman.org>

Adam,

Do me a favor - quickly if you can (because I'm trying to complete our petition for rehearing by tomorrow). Please provide me with a list of incidents that have occurred since we filed the First Amended Complaint (2/29/2016). I'm especially interested in the jail time (please include how many days you served and what the ultimate outcome of the case was), the laundry issue, this incident with the book store, and any other that no one could possibly deem to be "mere inconvenience."

Thanks.

- Mike
[Quoted text hidden]
—
**Michael Newdow**

CA SBN: 220444

PO Box 248
Nice, CA  95464

916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com



David Clayman <david@clayman.org>

---

## Synthesizing a Summary: 828 Words (An Attempt)
2 messages

---

**Adam Clayman** <adam@clayman.org>                                    Wed, Jul 4, 2018 at 6:23 AM
To: Mike Newdow <newdowlaw@gmail.com>

Synthesizing a Summary: 828 Words (An Attempt)

My client, Plaintiff Clayman, hasn't used United States cash since 2014, because doing so would violate his sincerely held religious beliefs. As a result of In G-d We Trust's placement on our currency, in his view the Government actively and superfluously reducing the Name of G-d to a banality, Plaintiff Clayman has been turned away from libraries, bookstores, salsa clubs, bars, restaurants, laundromats, a bicycle shop, and more, and has been held in jail for 28 days unnecessarily on a strict policy that prisoners can only pay for their own bond in cash. In each case, Plaintiff Clayman sought and offered alternative means of debt settlement, and each time was denied service on account of his religious aversion to the currency of the United States.

 Plaintiff Clayman, as a result of Congressional "In G-d We Trust" Policy, has been and felt forced to wear dirty clothes for weeks while living without access to a non-coin-operated washer/dryer (while showering daily) just so as to avoid committing the Name of G-d to the paper shredder. He's gone hungry, he's gone thirsty, he's gone without a replacement library card, and most severely, he's spent four weeks without being able to write a check in lieu of cash in a jail that wouldn't even feed him kosher food per request simply over his religious refusal to use our nation's cash system.

Plaintiff Clayman, more so and no less than any other Plaintiff I represent, does not experience this as a "mere inconvenience". As Plaintiff Clayman has learned from the painful experience of over four years without using In G-d We Trust cash, cash is absolutely vital and indispensable to the lived experience of life in the United States. Many of these sufferings Clayman has faced were unknown to me or had not happened until after my Leap Year 2016 (2/29/2016) filing of the First Amended Complaint, and the sufferings and sacrifices the Plaintiffs face and make as a class are still ongoing, and accumulating.

Nowhere is that forced sacrifice and suffering more unavoidable, for all the Plaintiffs, than in the loss of the sacred, implied right to privacy. By making use of the anonymity of cash, you can prevent corporations like Target or Walmart or the Government from building a long-term behavioral profile on your most private spending patterns, barring a warrant. If you, Your Honor, wish to walk into a convenience store and buy condoms or lubricant with cash, there's no traceable record of the transaction linked directly to your bank accounts. But Plaintiff Clayman or any of the other Plaintiffs who feel obligated to use cash only are not just inconvenienced by the transaction: they are forced into sacrificing their essential and equitable right to commercial privacy, as an outcome of the substantial burdening of their religious beliefs. This Court's speculative reasoning on bitcoin aside, cash still to this day, and forever more into the known future, offers an unrivaled combination of immediacy, efficacy, accepted ubiquity, and privacy: there is no substitute for it, as lived experience in an apartment block with coin-operated laundry entrenched will prove beyond reasonable doubt to any who doubt. Furthermore, it's not just the right to privacy that's at stake: so many other rights, like the right to free association, are threatened when In G-d We Trust cash must be forsaken over sincerely held religious belief. When Plaintiff Clayman can't go dance each Saturday night, because he can't pay the cash-only club entrance fee, his freedom of association is thrown through the shredder by Government religious policy. He couldn't resecure his Public Library Card after he lost his old card, because his local Public Library demanded a $1 cash-only replacement card fee, and refused to accept check, debit, credit, or any other means of payment in lieu of cash. He went for 8 months without a library card because of the superfluous and vain printing of G-d's name on our national currency. Is the loss of borrowing privileges at the public library for eight months a "mere inconvenience" to this Court?

If you would like more excruciating detail on Plaintiff Clayman's joyless experience living without cash for four years, we would be happy to provide it to your satisfaction. The loss of access to cash has not been a mere inconvenience: it's been a very substantial burden, a tortious interference in Plaintiff Clayman's and all other Plaintiffs' lives, and the simple, straightforward remedy is what we all in unison request: a Court Order preventing the secular Government from imprinting the Name of G-d superfluously on any Federal Government documents, including the currency and our passports, and ordering Congress to begin the process of selection of a new National Motto properly reflecting our Government's fundamentally secular provenance and orientation, or failing responsible Congressional cooperative action, reversion to our time-honored, traditional National Motto prior to the irresponsible evangelism of In G-d We Trust, the National Motto of "Out of Many, One" (E Pluribus Unum).

Adam Clayman
(312) 414 - 7628

---

**Mike Newdow** <newdowlaw@gmail.com>                              Wed, Jul 4, 2018 at 6:57 AM
To: Adam Clayman <adam@clayman.org>

Good job, Adam - thanks.

I have to decide whether to put this in the current petition, risking our not being able to have you as a plaintiff in the 11th Circuit (Florida) case or waiting to use it (and decreasing our chances of prevailing in the Petition for Rehearing in the 6th Circuit. I'll seek some advice from the true experts.

- Mike

[Quoted text hidden]
—
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464

916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com



David Clayman <david@clayman.org>

---

## RE: Cash Bus Fares in Florida suck

**Adam Clayman** <adam@clayman.org>                                    Thu, Jul 5, 2018 at 7:23 PM
To: Mike Newdow <newdowlaw@gmail.com>

Fare Information for PalmTran (Maximally inconvenient purchase only at stations)
PalmTran Fareboxes (No rechargeable farecards, cash-reliant)

Look at the cards they sell. They sell one-time passes, unlimited one-day passes, and unlimited month passes... but they don't allow you to buy stored value cards worth $20 or $40, and they don't offer rechargeable fare cards. This would never stand in Chicago.

The fare system here in Palm Beach County is basically designed to be a pain in the ass for anyone who can't use cash. It makes the transit system entirely unusable, and I've been forced to take Lyft and Uber as an alternative, where and when normally I would take the bus.

So far, at this point, this is my only major complaint about living in Florida without cash. This is way more than a "mere inconvenience"... this is in some ways worse than the discrimination of being told that I have to sit at the back of the bus... *I can't even get on the damn bus.*

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Natural Disaster / Electrical Outage

**Adam Clayman** <adam@clayman.org>                                    Thu, Jun 7, 2018 at 3:48 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

Here's another example of where cash is necessary: natural disaster or electrical outage.

These FEMA Mobile ATMs would not help me.

I was in a restaurant yesterday where the power briefly failed. If it had been out permanently, they would have had to accept a check, or we would have had to pay by cash.

I'm living in South Florida now. If there's a hurricane and the electrical and telecommunications infrastructure blows out, I'm screwed because I can't resort to cash drawn from an ATM at a local bank or from a mobile emergency ATM.

Imagine what it would be like living in Puerto Rico right now, post-Hurricane Maria. In practice, I couldn't go help in disaster recovery anywhere in the US after any disaster because I couldn't survive in a disaster zone without being reliant on cash.

This is yet another time when we *need* to use cash, even if we try our damned best to avoid it...

Adam Clayman
(312) 414 - 7628

Case 9:25-cv-80890-WM Document 60-5 Entered on FLSD Docket 10/27/2025 Page 52 of 94



David Clayman <david@clayman.org>

---

## Teaching moment loss: Inability to use Coin-based "Gravity Well"

---

**Adam Clayman** <adam@clayman.org>                                                                       Wed, Jul 11, 2018 at 7:44 PM
To: Mike Newdow <newdowlaw@gmail.com>

Dear Mike,

I was with my niece (Yoheved, 6 1/2 years old) at the Great Lakes Science Center today. They had a Gravity Well... one of those funnels that I loved playing with as a child, where you feed it a coin and the coin spirals down to the bottom under the influence of gravity. I quickly realized that I'd be unable to demonstrate gravity to Yoheved via the gravity well, because it would involve expending, releasing, and exposing the Name of G-d to eventual destruction. As a science teacher, and as an uncle, that I lost this teachable moment really sucked and tugged at my heart strings.

Since we're on this theme of how this affects childhood, I also can't let anyone around me (whom I have cause and responsibility to influence) participate in the childhood tradition of "wishing wells". While at a mall with Yoheved, or any other child, I can't give her a coin for any reason, and I certainly can't let her throw a coin into a fountain to make a wish.

All best,

Adam Clayman



---



Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

---

## Transaction costs of cryptocurrency too damn high

Adam Clayman <adam@clayman.org>                                    Mon, Jul 23, 2018 at 11:03 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

For the record, I explored buying some cryptocurrencies last night to meet the elderly 7th Circuit Judge's suggestion that Plaintiffs explore cryptocurrencies as an alternative to cash.

Cryptocurrencies suck. Even attempting to purchase $10 of any cryptocurrency on Coinbase (the most popular provider in the US) costs $1 in transaction fees. The values are insanely unstable compared to the USD, and I'm pessimistic that any cryptocurrency will persistently hold reasonably stable value like the US Dollar does.

Please file this away in your records in case anyone else suggests that we buy cryptocurrency as an alternative to the US Dollar.

Cryptocurrencies suck.

I owned 0.01 BTC a while ago. I purchased it for about $8 then forgot about it for a long time because I couldn't use it anywhere. Then it started exploding in value, for reasons that many still believe reflect market price manipulation. It peaked at something like $180, and after it started to crash (over and over again, in waves), I sold it for about $120. It cost me dozens of hours of "endowment" anxiety well-beyond-its-market-value as it swung about in price up and down like a seesaw. BTC isn't even remotely stable in value, and it's more like a deadly risky investment than a functional currency. Processing each transaction burns a ridiculous amount of electricity, because of the 'proof-of-work'-based algorithm's increasing inefficiency (which is per design). I have no interest in buying any more cryptocurrency of any kind ever again, unless forced by the Courts to do so further on some stupid experimental basis... at least not until cryptocurrency *actually* acquires the properties of the US Dollar. There was actually one cryptocurrency that was *supposed to act like* the US Dollar called "Tether", which was issuing USD Tokens (USDT) simulating a flat 0 interest money-market fund, but it turned into a total mess: it's been the target of numerous issuance fraud allegations and investigations, and its value, which should have been rock-solid stable, has been topsy-turvy. Also, most critically, nobody accepts Tether or any other cryptocurrency in my daily life.

If a Judge questions you again in oral argument about cryptocurrencies as an alternative, use this/these experiences as ammunition to fire back that cryptocurrencies blow, and that at least one of your Plaintiffs refuses to use them because they suck, and don't have any of the most important properties of USD cash.

Judge: "Why don't your Plaintiffs try using cryptocurrencies? I heard X and Y about these new-fangled cryptocurrencies... "

Newdow: "One of my Plaintiffs who *has* experimented with cryptocurrency doesn't believe they deserve the name of currency. They're more like toxic assets. Some of the most popular are designed to perform like gold, which is an asset he wants no part of. Others perform like the Zimbabwe dollar: a practically worthless, hyperinflationary instrument that hardly holds any value. Nothing offered in the cryptocurrency markets currently effectively and securely simulates the nature of the US Dollar, and my client(s) are skeptical that any cryptocurrency ever will, unless issued as legal tender by the Federal Government itself. This particular Plaintiff, Clayman, was imprisoned by the State of Illinois. Do you think he was allowed to use cryptocurrency to pay his bond? Of course not. The State of Illinois demanded cash. They wouldn't even accept a check. Do you think the Courts are going to start accommodating my Plaintiffs by taking cryptocurrency in lieu of USD cash? Are you prepared to issue today an Emergency Injunctive Order requiring all Local, State, and Federal Courts to accept both volatile cryptocurrencies and dollar-denominated checks as a religious accommodation to my Plaintiffs?"

Adam Clayman

---

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Recibí tu mensaje: Mootness and Busing

**Adam Clayman** <adam@clayman.org>                                            Thu, Jul 5, 2018 at 7:12 PM
To: Mike Newdow <newdowlaw@gmail.com>

No sabía que tu hablas espanol. Puedo esperar el 11º circuito. Estoy seguro que estas tomando la decisíon correcta.


Mootness
========

En ingles.... you're going to have to use that exception to the mootness rules to shoehorn in all my experiences from all the other Circuits into Florida, on the observation that I never stay in one place for very long.

1. "Conduct Capable of Repetition, Yet Evading Review"
2. "Collateral Legal Consequences of Forsaking Cash in its Entirety"
3. "Class Action Litigation, Bringing of Suit in Representational Capacity"

Because I've moved so often as this case proceeds at the Courts' glacial pace, the whole shebang will have evaded review in Ohio (6th) and Illinois (7th). I hope you'll be able to shoehorn everything into the Florida (11th) case on one of these exceptions you pointed me toward.

Soy feliz que usted tuve la oportunidad de hablar con un profesor de abogados sobre el tema.

Btw, since we're talking about "conduct evading review" because of my constant migration from state to state, it's worth noting that I'm searching for web developer jobs nationwide now and not just in Florida, and there's a small chance (maybe 1 in 4, maybe 1 in 3) I'll be required for my first job to move my *residency* temporarily out of Florida while keeping my *domicile* in Florida. I filed and formally recorded a *Declaration of Domicile* last week in a Courthouse in Florida. I'll send you a scan as soon as I'm back in Florida from this fortnight or two in Ohio, just so you have it in case you need to prove where I legally domicile or reside at any point here on.

I'll let you know if and when my address changes again, of course. At the moment, my most promising job leads are split between Hollywood, FL, South Florida generally, and Columbus, OH. But whatever happens with my job placement, because of this *Declaration of Domicile* I'll send your way soon, you'll definitely permanently be able to file a case in Florida with me included as a Plaintiff in the 11th Circuit.

Busing: A fresh Florida issue
=======================

Aside from the severe issue of cash-dependent busing, I haven't suffered many slights in Florida yet over IGWT. Since I'm living with my parents in a nice condo, I have an in-unit washer/dryer combo now. But last night I was thinking of whether there was any salient injury to include in the summary for an 11th Circuit case, and my experience with busing and public transportation in my section of South Florida has been horribly cash-dependent.

**Unlike in Chicago, the bus system in South Florida is practically cash-only and cash-dependent. PalmTran, the local Palm Beach County transportation authority, doesn't issue a rechargeable fare card, and so realistically, in real everyday use, I can't get around on PalmTran sporadically or routinely without being able to pay in cash at the farebox or a per-use basis when boarding the bus.**

Technically, it's possible to buy "one-time use" fare cards in advance by mail or at one of several County offices far away from my house, but how do I get to these Offices in the first place if I can't board a bus? And who in the world thinks or plans their trips that far ahead? The system is clearly designed for and heavily, heavily favors passengers who can employ cash to their advantage, and severely burdens anyone who can't use cash.

The worst was when I was turned away from a bus on the day I had to go all the way to Delray Beach (about an hour by bicycle) for a Probation Appointment. I wasn't permitted to ride the bus to my appointment because I couldn't pay the cash fare, so I was forced to ride my bike. **By the time I got to my appointment, I was on my bicycle in the sun for so long my skin was peeling from sunburn the next day.**

So, we're talking not just inconvenience but also sun burn and skin cancer risk, because I can't take public transportation easily because of IGWT.

I couldn't drive for months now because I was worried about In G-d We Trust on the Driver's Licenses, so this additional inability to use public transportation because they won't take credit card, check or digital transfer when I board PalmTran is like adding salt to the wound, making it impossible for me to commute independently. So I'm stuck within walking and a short biking distance of our condo, rather than being able to take the bus anywhere I want to go, all because of this IGWT fiasco on our currency.

Keep me posted on your deadlines for the 11th Circuit Case and I'll try another attempt at a Summary as we get closer to your filing deadlines in Florida.

Adam Clayman
(312) 414 - 7628

**Florida State ID - 2018-06-27.pdf**
4301K

Dear Plaintiffs,

~ July 15, 2018
Letter to New Doe Child Plaintiffs

[Please excuse the length of this email. Hopefully, you will read it to the end and conclude it is very worthwhile.]

As you may recall, we lost our challenge to "In G-d We Trust" in the U.S. Court of Appeals for the Sixth Circuit.* It was a 2-1 decision, so we did better than usual. However, we still lost.

A case begins in the lowest court (called the "District Court" in the federal system) when a plaintiff filed a "complaint." We did that. There is one judge in the district court, and that judge ruled against us. As of right, we appealed the district court judge's decision to the U.S. Court of Appeals for the Sixth Circuit.

There are three judges in the Court of Appeals. When one loses there, there are two remaining methods to keep the case alive. The second method is to ask the Supreme Court to hear the case. This is called a "petition for certiorari," and literally 99% of these are denied. In a case like ours – where the political will of the majority of the people (and, probably, a majority of the justices) is to maintain the status quo – the odds of a petition for certiorari being denied is probably more like 99.99%.

Before submitting a petition for certiorari to the Supreme Court, however, one can petition for a "rehearing," which can be (i) before the three-judge panel that heard the case, or (b) before all of the judges in the Circuit (i.e., a rehearing "en banc"), or both.  Although the odds of succeeding with such petitions are also terrible, I think it's fair to say that the odds in this case are less terrible than usual. I mention this because – although the main thrust of this letter is for those of you who will be plaintiffs in the cases we are about to start (in the First, Third, Seventh, and Eleventh Circuits), I would like those of you who joined the Sixth Circuit case to do as I am about to request as well. That is because – on the off chance our petition for rehearing is granted, we

will need to be prepared to provide the same information (through trial testimony) that we will be providing in the future complaints in the remaining circuits.

Allow me to provide a little more review. I think all of us agree that having an exclusionary religious phrase such as "In G-d We Trust" espoused by the government of the United States is wrong. It contradicts not only the spirit but also the text of the Constitution. It is for that reason – and the fact that such espousals have significant negative consequences for everyone – that we have been bringing these cases. (You might want to look at this somewhat related New York Times commentary piece from just three days ago.)

In any event, one of the advantages of having twelve courts of appeals is that we get to see the (generally nonsensical) arguments judges come up with when they rule against us, which allows us to at least attempt to counter those arguments the next time around. The argument that the Sixth Circuit came up with is that the burden upon those who object to using money with "In G-d We Trust" inscribed is not "substantial" because there are credit cards and checks that can be used instead. To the extent that it is true when one has a credit card or check with them at a store, it obviously is total malarkey for those who don't carry credit cards or checks. It's also total malarkey for those who do have credit cards and checks but are at locations that only take cash.

So here is where my request comes in. Although we indicated that such situations exist in our Sixth Circuit complaint, the court said, in essence, that we weren't detailed enough. In other words, we did not provide specific instances where these circumstances arose. Accordingly, I plan to fill our future complaints with instances:

(a) Where the given payee – be it a store, a contractor, a vending machine, a bus, a farmers' market, a homeowner having a garage sale, a seller from Craigslist, a laundromat, etc. – only accepts cash and does not accept credit cards or checks, and

**(b) Where plaintiffs do not (or cannot) have credit cards or checks.**

Note that no one has to forgo using the money in order for us to prevail. The Supreme Court has written that a substantial burden exists "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith." Phrased alternatively, it doesn't matter if you choose to violate your religious beliefs to obtain the benefit (i.e., the ability to pay for things with cash) or if you forgo the benefit in order to stand by your religious ideals. The very fact that the government has placed you in a situation where you have to make that choice is enough for us to prevail.

That said, I think that instances where people do forgo using the money show even more forcefully the reasons why the "In G-d We Trust" inscriptions need to be ended. For instance, our one Monotheistic plaintiff* (in the Sixth Circuit case) was arrested and needed to post bond. Although he had the funds in the bank (which he was willing to demonstrate by computer to the jail personnel) and he was willing to write a check and wait for the payment to clear, the jail required payment in cash. Our plaintiff refused to use cash based on his religious beliefs. As a result, he ended up serving 28 days in jail! If that isn't an example of a substantial burden, nothing is.

In any event, I would like each of you to make a list of every time you go to a location that requires cash payments. While keeping your list, please make sure you mark down whether or not you chose to forgo the given transaction because of the "In G-d We Trust" inscription. If you did, please detail what happened as a result of your choice. For instance, were you at a garage sale and violating your religious beliefs by using cash was the only way you could get that ladder for such a great price? Did you end up not getting the ice cream cone or the slice of pizza you wanted? Did you have to spend ten minutes on the Internet or making phone calls in order to find a place that accepted credit card or check payments? Did you then have to drive ten minutes

out of your way to get to some other location? If you were going to get on a bus or subway and the only way to pay was with cash, did you have to take a taxi? How much extra did that cost you? Were you at a gas station or a store that charged a fee for using the credit card? What was the fee? Did you go somewhere that had a minimum charge for credit card payments? Were you below that minimum, and what did you do?

Please keep careful notes of the date and other details of each incident. People often ask me what they can do to help. THIS IS IT! We need your list! I want to fill pages and pages of our future complaints (or hours of testimony should the Sixth Circuit remand the case) with examples. A typical complaint paragraph might read as follows:

Incident #3,286: On Saturday, July 14, 2018, Plaintiff Jan Atheist had a date and was in a rush to do laundry because of a lack of clean underwear. Plaintiff Atheist walked to the laundromat a block from home, but found out that the only way to pay for the machines at that location was with coins that are inscribed with the Monotheistic message "In G-d We Trust" Refusing to bear or assist in transmitting that message, Plaintiff Atheist went home and started searching the web and calling local laundromats. After spending twenty-five minutes on the computer and on the phone, Plaintiff Atheist was finally able to locate a facility that would take a credit card. Plaintiff Atheist then went to catch a bus to that location. Unfortunately, the bus only accepted cash. Accordingly, Plaintiff Atheist called a cab. As a result, the fare was $12.00 (plus a two-dollar tip) instead of $1.50 for the bus. When Plaintiff Atheist arrived at the second laundromat, there was a sign indicating that credit card payments required a ten dollar minimum charge. Plaintiff Atheist only had $5.00 worth of laundry to do. Recognizing how difficult it was to find a second laundromat, Plaintiff A paid the ten dollars. Another cab (and another $12.00 + $2.00 was paid to get home. Upon arrival home, Plaintiff A decided to unwind with an Italian ice from a street vendor. Of course, the street vendor only took cash as well. Plaintiff A then went home, deprived of an Italian ice,

*[handwritten left margin: Inspired by Plaintiff Clayman's experience]*

deprived of five wasted hours, and deprived of $33.00 additional dollars … all to wash clothing that would have cost $5.00 and less than 30 minutes of time to have cleaned had Defendants not chosen to inscribe every coin and currency bill with Monotheistic religious dogma. Additionally, as a proximal result of this unconstitutional act, Plaintiff A missed the date!

[Okay, that was a bit of an extended example, but – hopefully – you get the point. The more incidents and the more details, the better.]

One last – but equally important – issue pertains to those of you who have (or are) children. The Sixth Circuit ruled against us in part because we didn't specifically allege that the children could not get credit cards or checks. Thus, I would like you to attempt to get a credit card and checking account. Note that there are laws and regulations that preclude financial institutions from providing children with credit card and checking accounts. And, for those occasions when such accounts are available, a "responsible party" must co-sign. For children, please see how burdensome it is to get a credit card or checking account. See if you can do it without a co-signer. Keep track of how much time you need to invest to get the given account (if you can get one at all). Keep track of all the hurdles you face. Then, if you get one, see if there are hassles using that account.

For parents, if you feel that is appropriate to co-sign, go right ahead. If you feel that is not appropriate (because your child is a child, who, by law, cannot be held legally responsible for many contractual agreements, etc.), then do not co-sign. Either way, please keep track of how much time your child – and you – needed to spend to get the given account. If the child is unable to get such an account (whether because you don't want to co-sign or because of some policy on the part of the credit card company or bank), please note that as well. If the child cannot get such an account, of course, the Sixth Circuit's claim that not using cash is a "mere inconvenience" goes right out the window, since

that child will have no possibility of using a credit card or a check as a substitute for cash.

Lastly, there are other reasons to use cash. One of the biggest is for privacy reasons. One may not want to have a traceable record of a donation to some unpopular cause, or the purchase of a sex toy, or a medication for HIV, or a host of things. If there are times when you would have preferred to use cash for that – or any other – reason, put that on your list as well. (Of course, you may not want me to know either for privacy reasons. All I can say is that unless I have your permission to divulge information, I am obligated to keep any information you provide to me confidential, and that I will do that no matter what.)

Please feel free to let us know if you have any questions or concerns. And please be diligent in keeping careful, detailed records of any of these situations. Those records may well prove to be the key in our finally prevailing in one of these lawsuits.

Thank you, and may you have a reasoned day.

- Mike


* Out of respect for our Monotheistic plaintiff's beliefs., we are using the "G-d" spelling in all our Sixth Circuit filings and in this email.



David Clayman <david@clayman.org>

## 10¢ surcharge from vending machine @ gym today
2 messages

**Adam Clayman** <adam@clayman.org>                          Wed, Aug 22, 2018 at 9:41 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hey Mike,

Today is the first time in over four years where I used a snack food vending machine in the United States.

I almost never order anything from vending machines, partly out of health concerns, and partly because of IGWT. But today, after finishing my workout, I had to wait for an hour for my father to finish and was extremely hungry.

I found vending machines at our YMCA in Boca Raton, FL that dispensed relatively healthy snacks and, very unusually, took credit cards, but only with a 10¢ surcharge on all credit card transactions. So I bought a "Bobo Bar" (this one specifically, a variety of energy bar) priced at $1.75, but because of IGWT, the vending machine charged me $1.85 (10¢ more) instead. I would have definitely used cash if it were possible for me to use cash to avoid the surcharge.

I have video of the vending machine and video of me purchasing from the vending machine with my credit card, and can send it your way if you'd like. You might use it as indisputable visual proof that vending machines are in their essence highly problematic for us that forgo IGWT entirely. I just don't want to distribute the video too widely, because if you look really closely, you can read out my credit card number and CVV in the video.

I don't want to make too much of this, because yes, it's only 10¢, but it's definitely an inconvenience periodically that I can't buy food from vending machines for myself or others when anyone I care about gets quite hungry or thirsty.

All best,
Adam

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Adam Clayman
(312) 414 - 7628

**Mike Newdow** <newdowlaw@gmail.com>                        Fri, Aug 24, 2018 at 2:26 AM
To: Adam Clayman <adam@clayman.org>

Thanks, Adam. We'll include that as well (without the video, which - at least at the Complaint stage - is unnecessary).

- Mike
[Quoted text hidden]
⎯
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA 95464

916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com



David Clayman <david@clayman.org>

## Can't donate cash to excellent street performers / buskers or give directly to the homeless / hungry

3 messages

**Adam Clayman** <adam@clayman.org>                                      Tue, Aug 28, 2018 at 4:02 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

I also can't donate coins or dollar bills to street performers or panhandlers without cash, solely because of IGWT.

Here's an example video of some youth street performers, drummers in Chicago, I would have wanted to drop a few coins for. I don't remember if it was this same group I saw last summer, but groups like this are out in force in Chicago, and I usually saw them further south on Michigan Avenue near Macy's. I'm not usually impressed by street performers, but something about their frenetic energy and ferocity on bucket drums got to me. There's also a really good saxophonist, usually, at O'Hare Airport that I would have liked to have dropped a few coins for. I used to play sax myself; I appreciate how hard it is to play popular jazz anthems well.

Whatever your feelings might be about giving cash to the homeless, I mechanistically can't do it anymore, and I have to imagine the Courts don't appreciate how much of a pain it is that I can't usually successfully give money to street performers or panhandlers, if and whenever the circumstances may merit intervention. If and when I tell a panhandler that I can't give to them because I simply can't use any cash, they usually look at me with a blank stare, then they maybe plead again, not believing or having heard before what they're hearing.

Like the vending machine problem, I haven't mentioned this myself before, I guess because it's so obvious and "right under my nose" that it hardly seemed worth mentioning explicitly to you every time it has happened. But I should mention this as an infrequent but annoying problem, because it has happened quite a bit over the last 4 years since I stopped using cash, and it really does suck when it does happen that I should wish to give to a street performer or panhandler on a charitable impulse and find myself alienated from them by the problem of IGWT on cash.

Mike Pence can perform a good, charitable deed by giving a dollar to a street performer or a deserving, sincere panhandler, but I can't. Why is that? Why does our Christian Vice-President have an easier time performing charity than I do with our nation's cash?

All best,
Adam Clayman

---

**Mike Newdow** <newdowlaw@gmail.com>                                   Tue, Aug 28, 2018 at 4:27 PM
To: Adam Clayman <adam@clayman.org>

Another good argument. Make sure you are keeping a list ... I plan on filing in the 11th Circuit soon.

By the way, we lost in the 8th today.

- Mike

[Quoted text hidden]
—
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464

916-201-6078 (cell)
626-532-7694 (Google voice)

10/20/25, 11:19 AM Clayman Family Mail - Can I donate cash to excellent street performers / buskers or give directly to the homeless / hungry

Case 9:25-cv-80890-WM Document 60-5 Entered on FLSD Docket 10/27/2025 Page 65 of 94

NewdowLaw@gmail.com

📄 **2018-08-28 Opinion.pdf**
154K

---

**Adam Clayman** <adam@clayman.org>                    Tue, Aug 28, 2018 at 4:29 PM
To: Mike Newdow <newdowlaw@gmail.com>

Ok, thanks for sending this to me! I'll read it in a minute and get back to you if I think of anything.

Adam Clayman
(312) 414 - 7628
[Quoted text hidden]



David Clayman <david@clayman.org>

---

## Scoring a win (Notes on Case Overhaul)
4 messages

---

**Adam Clayman** <adam@clayman.org>                          Fri, Aug 31, 2018 at 6:10 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

I know you want to have me be the "star" and "focus" of the 11th Circuit Case, and I'm grateful that you're turning the focus over to the Jewish burdens and claims.

But I think that means you have more work cut out for you than you realize.

Clausewitz famously said, "War is politics by other means." The <u>law is also</u> politics by other means.

In order to win in Court, you <u>first</u> need to write a case that *prima facia* gives the Judges and us air cover from *Fox News* Editorial attacks.

That means appealing to the higher principles of American Jews like Steve Mnuchin, Ivanka Trump, and Jared Kushner, and persuading them that it might be wise for them to speak in my defense.

I'm asking you, at a minimum as a "thought-experiment" and "drafting technique", to split the case into two completely separate complaint filings:

- (A) the ancient and modern Jewish Complaint (not even 2% argued)
- (B) the ancient and modern Atheist Complaint (100% complete but failing without assistance from the Jewish case as a political "wedge issue", illustrating improper governmental entanglement in Christian-Jewish and internal Jewish sectarian beliefs)

Try revising and presenting a legal case that not only focuses on the Jewish claims, but is ENTIRELY about the Jewish RFRA, Free Exercise, and Establishment claims, as a companion to the case that you've already written. I understand I'm asking a lot of you, and you can definitely refuse of course if it's too much to do or not how you want to spend your time, but I very sincerely believe you're not going to collapse the Christian-dominated laws into compliance with the Separation of Church and State until you make a complete case that "goes against your own grain" and argues exhaustively (on my behalf, and on behalf of others like me) that the Name of G-d isn't being treated with nearly enough reverence when used superfluously in secular contexts, or when the Government fails to exercise due precaution over the eventual destruction of the document at end-of-life.

You are outstanding at representing the Atheist arguments exhaustively. But in your writings so far, you haven't even scratched the surface of the reasons, practices, traditions, history, and laws that compel the Jewish claims. I trust you want to include them in the coming case; I think it'll take more work to write, revise, and finalize than you realize, because a full, compelling, logically exhaustive treatment of the Jewish case has a lot of historical detail. You're an outstanding lawyer, and an outstanding amateur historian. Turn those talents not just toward a more exhaustive depiction of my burdens over the last 4 years, but also toward a full and complete picture of Jewish history and tradition in the United States and in Israel, especially as it relates to the writing of G-d's Name on secular documents like currency notes.

I'm super-grateful for everything you've done for me, and am loathe to suggest that we start from scratch. But nonetheless, I would be remiss if I didn't bring this to your attention.

All best,
Adam

---

Adam Clayman
(312) 414 - 7628

---

**Mike Newdow** <newdowlaw@gmail.com>                        Sat, Sep 1, 2018 at 1:30 AM

To: Adam Clayman <adam@clayman.org>

Adam,

Thanks as always for your thoughts.

I disagree that "the reasons, practices, traditions, history, and laws that compel the Jewish claims" are important in terms of the legal arguments. In fact, the courts have specifically stated, time and again, that such information is irrelevant.

That said, I do agree that trying to get the judges to see that this is not some odd-ball claim, and that you have a rational basis for your religious ideas might be beneficial. Thus, feel free to put that information together and I will work with you to have it in a form that we can include as an appendix.

Will that work for you?

- Mike
[Quoted text hidden]
—
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464


916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com

---

**Adam Clayman** <adam@clayman.org>                                    Sun, Sep 2, 2018 at 3:47 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hey Mike!

Yes, thanks! That will work, for the most part. I'm going to start writing an Appendix that talks through the religious position of ("G-d Hyphenating", or simply "Hyphenating") Jews. But I'd also like to insist, if I may, on amending the Historical Background, to bookend the History with older (168 BCE - 63 BCE) and newer (1917 - Present) Indisputable Historical Truths™.

First, a section called "Protecting G-d's Name From Dungheaps: An Ancient Jewish Holiday, 168 BCE - 63 CE" to add into the "Historical Background" before the "Brief History of American Religious Freedom", and a second History section called "Modern Israeli Currency Printing: Guarding G-d's Name from Systematic Destruction, 1948 CE - Present" to the end, as the most modern chapter of the Historical Background.

Proposed Index of HISTORICAL BACKGROUND

> 1. **Digging G-d's Name Out of Dungheaps: An Ancient Jewish Holiday (168 BCE - 63 BCE)**
> 2. Brief History Of American Religious Freedom,
> 3. History of IGWT On United States Money
> 4. **Modern Israeli Currency Printing: Guarding G-d's Name post-Balfour Declaration (1917 CE - Present)**

Appendices

> 1. **Rational Basis for Religious Belief among Hyphenating Jews**

---

**Mike Newdow** <newdowlaw@gmail.com>                                  Sun, Sep 2, 2018 at 4:26 PM
To: Adam Clayman <adam@clayman.org>

I look forward to reading your work.

By the way, I have a Jewish friend who is a law professor at Stanford, who (I believe) schooled at some Yeshiva in Israel for his (?) high school years. I mentioned your views to him and he was puzzled. I'll try to run what you write by him to get his take on it before filing the Complaint.

By the way, be succinct! If there is a question as to the importance of a given point, leave it out. Judges are very limited in time, and the more you write, the less likely they are to read what you have written.

- Mike
[Quoted text hidden]
[Quoted text hidden]



David Clayman <david@clayman.org>

---

## Message to Jared Kushner and Kushner Family (Today, 9/7/2018)
1 message

**Adam Clayman** <adam@clayman.org>                                Fri, Sep 7, 2018 at 3:32 PM
To: Mike Newdow <newdowlaw@gmail.com>



Adam Clayman
(312) 414 - 7628

 **KUSHNER**

ABOUT   BUSINESSES   SELECT PROJECTS   PARTNER

# CONTACT

....

**666 Fifth Avenue, New York, NY 10103**
T 212.527.7000

**30 Vreeland Road, Florham Park, NJ 07932**
T 973.822.0050

For press inquiries, please contact:
E-mail MediaInquiries@kushner.com



Adam                                    Claym

COMPANY

3124147628                              adam@

Dear Jared Kushner and the Kushner Fam

This is about a matter of deep significanc
people and Jewish religion. Do you hyphe
d? Why does the Federal Reserve shred a
G-d on US Currency and melt the Name of

Would you please help me protect the Na
programmatically shredded United States
the President to issue an Executive Order
Name of G-d, or moving us in the United
newer currency Motto where the Name of
harm? (See 1st Amendment, Talmudic Tra
18b4, and our customary hyphenation of

SEND



David Clayman <david@clayman.org>

# Update: Florida Driver's License, Clipped State ID (Another Superfluous Printing)

**Adam Clayman** <adam@clayman.org>                                         Fri, Jan 4, 2019 at 12:11 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

I hope all is well with you!

Another religious breach to document today.

I applied for and secured a Driver's License in Florida, and the Department of Highway Safety and Motor Vehicles cut a strip off my State ID, rendering it invalid. Luckily, and thankfully, they did not cut off any part of the ID with G-d's Name on it.

I attached images of my Driver's License and Clipped ID.

I still think your best argument for me is, **"The Government is reimposing** the superfluous enthusiasm for G-d's sacred and unerasable names that was last prevalent in **the Hasmonean Dynasty,** and was ruled then to be against Jewish canonical law."

Or, for short, **"The Government reimposing the Hasmonean Dynasty."** (Then explain, and return again and again to the theme of the reimposition of the lessons of the Hasmonean Dynasty.....)

Also, I think the Florida case regarding *Driver* Licensing may be a moot point for me personally from this point onward, because this Driver's License lasts 8 years and crashless cars (driverless cars) will definitely be fully released by that time, but *Florida State IDs will still be a problem*, and will still have IGWT printed on them unless we do something before 2027.

*But the cash system, the US Passport, etc.* are higher (i.e. more immediate) priorities for us, I understand. For me, that's especially true of the cash system, and the status of the Motto *in general* as "printable" superfluously and ceremonially on secular documents.

All best,



Adam Clayman
(312) 414 - 7628

**2 attachments**

📄 **Florida Driver's License - Adam Clayman.pdf**
      365K

📄 **Florida Clipped State ID - Adam Clayman.pdf**
      336K



David Clayman <david@clayman.org>

---

## Palm Beach County Sheriff's Office only accepts cash for background checks
1 message

**Adam Clayman** <adam@clayman.org>                                  Mon, May 20, 2019 at 5:10 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

I need to get a background check done ASAP for my citizenship application to Portugal. I called around and discovered that the Palm Beach County Sheriff performs background checks. But when I called the hotline (561) 688 - 3838 after hours, they say very clearly in their recorded message that they only accept cash.

I'll call them tomorrow to see if they can accommodate me with some other form of payment. But as it stands, it looks like another really good example of a Branch of Government refusing to accept anything other than cash for an essential service. The Judges thought credit was a substitute in all cases. This looks like a great example of a situation where I'm being denied a rather important government service because I can't use cash.

I was thinking you could even call that line [(561) 688 - 3838] after hours and get a recording of *their* recording, and submit it as evidence and play it back at your next Court appearance, to prove to the Judges that local Government agencies demand cash.

Call me sometime. I'd love to hear how you're doing (it's been awhile), and I'd be interested in any updates you might have on *No More IGWT*'s progress through the Courts.

All best,
Adam Clayman

---

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Severe crisis on the New York Turnpike (Cash-only confusion / burden)

Adam Clayman <adam@clayman.org>                                      Sat, Sep 7, 2019 at 3:50 AM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

A couple months ago my Dad and I found a last-minute cheap roundtrip flight to Israel leaving from Toronto, Canada. We figured out that the most economical method of travel would be to drive from Cleveland to Toronto, park for a couple weeks in long-term parking, then drive back from Toronto to Cleveland on our return.

The crisis came when we hit a partial toll road along I-90, the road that led to Toronto, in New York State. We did not have an EZ-Pass installed in our car, and when I entered the cash-only lane and asked for an alternative means of payment, the tollbooth operator said that the only other option was EZ-Pass, and that if we bought an EZ-Pass immediately it wouldn't even become active for another few days *after* the purchase.

I was aghast and completely confounded as to what to do. We had already driven over 5 hours from home, and we couldn't abandon the toll road without payment, and we couldn't afford to go around the toll road.

If my Dad wasn't in the car, I would have just turned off and turned around, or I would have fought the tollbooth operator a lot harder for an exception or exemption. But I'm ashamed to say that when my Dad offered insistently to pay the toll on my behalf, I receded into the background and let him pay, out of dread for what would happen if I pushed the situation to its logical conclusion as I normally do.

On the way back on July 4th, we would have been in the same conundrum, but I got out of the driver's seat just after the Peace Bridge and my Dad paid the toll in cash while I tried my best to look the other way and turn the other cheek.

In general, I never let anyone pay in cash on my behalf, as for me, that's also a pretty serious religious violation, but this time the circumstances were extreme: we were driving late at night, we didn't have anywhere to stay, I had to be at a doctor's appointment in Cleveland in the morning, and driving around the cash-only toll road would have taken us over 100 miles out of our way. What's more, I realized now that because I was an idiot and didn't buy EZ-Pass the first time we passed through the toll booth over and above the cash toll, we didn't have EZ-Pass active on our return trip, either. I failed to think ahead, and it cost me dearly.

This qualifies as one of the most serious and severe entrapment episodes I've faced over the five years I've stopped using cash.

We still don't have EZ-Pass (for Midwest) or Sun-Pass (for Florida) installed on this car, and I'm unfortunately only insured to drive this one car (Ohio License Plate DJU3151). I'll have to install EZ-Pass and Sun-Pass, but until I do, I won't be able to safely take any toll roads anywhere in the United States. They insist on cash only, and by policy steadfastly refuse to accept credit or debit cards.

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## RE: Bad Supreme Court News
4 messages

---

**Adam Clayman** <adam@clayman.org>                                        Sat, Sep 7, 2019 at 3:54 AM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

I read a while ago about the Supreme Court passing over the No More IGWT lawsuit. I've been waiting patiently to hear from you, but I haven't heard anything for a couple months now.

From where you're standing, is there any future for the claims of us plaintiffs? Are you planning to send out an update sometime regarding the status of the case and any ongoing appeals?

Is there any hope left of an Appeal breaking through next term?

Adam Clayman
(312) 414 - 7628

---

**Mike Newdow** <newdowlaw@gmail.com>                                     Tue, Sep 10, 2019 at 2:27 PM
To: Adam Clayman <adam@clayman.org>

Hi, Adam. Sorry for the late reply. As always, I'm swamped, and I'm just now getting this email account.

I am currently waiting for the appellate decision (1st Circuit) in the challenge to "so help me G⟩d" in the citizenship oath. (Judging from the oral argument, we'll lose that for sure.)

As soon as I get a chance, I plan on going to the last few circuits to challenge "In G⟩d We Trust" on the money. Yours (wherever you may be) will be first.

So, where will you be?

- Mike
[Quoted text hidden]
—
Michael Newdow

CA SBN: 220444

PO Box 248
Nice, CA  95464

916-201-6078 (cell)
626-532-7694 (Google voice)

NewdowLaw@gmail.com

---

**Adam Clayman** <adam@clayman.org>                                       Tue, Sep 10, 2019 at 4:07 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

**RE: Residence:** I'm currently in Ohio for the hot season of summer. I'll be in Florida in October for the greater part of the year, once the temperature in Florida cools down to something more bearable. I'm finishing a BS in Computer Science online through Oregon State University, so I'm able to split my time seasonally between Florida and Ohio for this year.  I

spend the majority of the year in Florida, so that's where my domicile and residency is. I'm registered to vote in Florida, my driver's license is issued in Florida, etc., but I still maintain ties to Ohio, and I'm in University Heights, Ohio at this instant. By the time you file, I should be back in Florida for the year.

**RE: Cash-only Turnpikes:** I'd be happy to try the case with this example RFRA violation front-and-center. It's very easy to understand and sympathize with, and quite hard for the Government to dodge as as example of a place where cash is not just convenient but in practice utterly necessary in a pinch.

**RE: Strong Cases:** There are other strong cases worth emphasizing, including the convenience of cash and extreme inconvenience of credit in PalmTran bus transport, the privacy-from-corporations case, the need-for-cash-in-a-disaster case, and the freedom-of-association case (cash-only covers for special events [ex: Barbeque night or Latin dance nights] that interfere with my ability to freely associate).

**RE: Reverting my name change:** I want you to know of another small wrinkle: that when I move back to Florida in or around October, I plan on filing a petition almost immediately to restore my name to David Morris Clayman.
To be clear, I was born with the name David Morris Clayman. I was named after my Uncle David, who committed suicide in the 70s. I changed my name on Leap Year 2012 (two years before I stopped using cash, long before we spoke) to escape the implications of being named after a suicide. Being named after a suicide was having a lifelong depressive effect on my psyche. But since then, I've come to terms with my uncle's suicide and want to restore my name to David Morris Clayman. There's another factor at play: I'm worried that if I keep my name as Adam David Clayman, employers will search my name on Google and find evidence that I was indicted with a felony for aggravated battery against a law enforcement officer (pepper-spraying a police officer), without any remediating information available online (i.e. that it was in self-defense, that I contend I was wrongfully and without warrant assaulted by an officer). Unlike in Europe, we don't have a right to privacy from search engines; I unfortunately can't file a petition in the US as a US Citizen to have my search engine results expunged and cleaned for employment purposes. I also don't want future romantic partners searching for me on Google or, worse, Bing, right now, because the results make me look like a figure of controversy.
In any case, I'd prefer to keep this RFRA lawsuit and controversy under the name "Adam David Clayman" that I live under presently, so that I can silo it from my name restoration, but if necessary we might need to change my name to "David Morris Clayman" once the name change restoration petition is approved. Again, I'd prefer to participate in this suit as Adam David Clayman, and keep it that way from the time of filing, but if necessary, we can change my name on the lawsuit to David Morris Clayman if and when the name restoration petition is approved.

**RE: Rewrite for 11th Circuit Case (Florida):** I still think, as ever, that we're going to need to add significant sections to the case to explain, in an impregnable fashion, how important "G-d-shred prevention" is on a religious level, under the laws of *Shaimos*. As always, I feel very, very, very strongly that the Courts will continue to dismiss us until we fight fire with fire, and claim the religious and not just the moral high ground with well-argued, well-researched religious logic tracing back to *Tractate Rosh Hashanah (RH) 18B4*. Not to put to fine a point on it, but **I would argue with the greatest possible force that Appendix #1 *must* be Tractate Rosh Hashanah 18B4 for us to win.**  Otherwise, the Courts will continue acting cravenly in favor of and to avoid becoming the personal target of Christian religious fervor. You have to recall how much fire and fury was directed at the Judges who ruled for you in the Pledge of Allegiance case in California. Everybody in the Federal Judiciary remembers that case, and doesn't want to go out on a limb to rule in your favor unless conditions are different, and they have a well-researched major religious doctrine like Talmudic Judaism to defend. Judges will be much more likely to side with you if they can play the "Holier than Thou" card themselves, on behalf of a plaintiff, rather than getting hit with the unmitigated fury of three million angry Christians, whipping themselves into a fury over their absolute right to print, mint, shred, smelt, and destroy the name of G-d without thinking of the Jewish consequences. You need to get battle-hardened, girded up in the armor of a major religious branch, or you're going to lose the politics and the political chatter, and as always, I posit that the Courts are nothing more than "politics by other means", and are not immune to the effect and fear of political chatter.

That's all the news that's fit to print.

Hope all's well with you, Mike!

Adam Clayman
(312) 414 - 7628

[Quoted text hidden]

---

**Mike Newdow** <newdowlaw@gmail.com>                                          Tue, Sep 10, 2019 at 5:31 PM
To: Adam Clayman <adam@clayman.org>

Thanks for the info, Adam.

10/23/25, 5:38 PM                                   Grayman Family Mail - RE: Bad Supreme Court News

If you get a chance (and have the desire), please put together your Tractate. I can always include that. But try to be succinct and logical so that someone who is reviewing the information can say, "Okay, I can see how this person believes this stuff."

- Mike
[Quoted text hidden]



David Clayman <david@clayman.org>

---

## I've added a number of harms to the Harms Listing

---

**Adam Clayman** <adam@clayman.org>                    Sun, Sep 22, 2019 at 11:58 PM
To: Mike Newdow <newdowlaw@gmail.com>

- Can't work a cash register
- Can't own or invest as major shareholder in a business franchise that relies on cash
- Reliant on uninterrupted electricity in event of disaster (e.g. Florida hurricane)
- Can't eat at cash food trucks or restaurants
- Alienated periodically from friends and family

It's possible that I'll be reminded of more types of categorical harms, but I think I've captured the vast majority of cases already.

I'd love to organize the document in a more rational way, but to be honest I'm not sure how.

https://docs.google.com/document/d/1OxyXmDyhRhY3rwYiXDUUsypJFGKZ0DOhpq4SjT55pUU/edit?usp=sharing

---

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

---

## A little inconvenience (an example)

**Adam Clayman <adam@clayman.org>**                                                    Fri, Oct 4, 2019 at 9:06 AM
To: Mike Newdow <newdowlaw@gmail.com>

Hi Mike,

I hope this reaches you well!

I figure I should send an exemplary small update. I encounter little inconveniences all the time. I don't document half of them.Just to be clear, I'm in Cleveland, Ohio at the moment, so this particular experience of a small inconvenience happened in Ohio. I'll be in Florida again starting in November.

The day before yesterday, I needed to get a $10 money order to pay for some certified copies at Probate Court for my name change judgment, which I need immediately to apply for citizenship in Portugal under the "Sephardic Jew right of repatriation" laws. If all goes well with this, I'll be a EU Citizen by the end of next year.

In any case, I went to a Speedway for the money order. The attendant there told me it was strictly cash only, so after I told them I couldn't use cash, I left empty-handed. I had to drive to Giant Eagle (a nearby grocery store) to try again. Luckily it wasn't far, and at Giant Eagle, they accepted debit cards or cash, so I was able to buy the money order on my second try with my debit card.

Honestly, most of the time, living without cash is like this: it's generally only a small inconvenience, since we're almost, but not quite, a cashless society. But once in a blue moon I encounter a huge obstacle, like cash-only bail, and then you're in jail for an extra month for no reason at all.

**I think it would be helpful to concede to the Court that usually my experience is smooth, and most inconveniences are minor, and that major obstacles only present once in a blue moon.** I think they'll appreciate that we have a sense of perspective, and aren't blowing things out of proportion.

I'll write you with an update on my coin-operated laundry problem under separate cover in a minute. In short, I've decided it's ok for me to use quarters in a pinch, but not dimes, pennies, or nickels. I'll explain in a minute.

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Chipotle on tape refuses my credit cards

Adam Clayman <adam@clayman.org>                                    Tue, May 5, 2020 at 6:20 PM
To: Mike Newdow <newdowlaw@gmail.com>

Hey Mike!

I hope this email finds you well. I hope you're staying safe from COVID-19.

Today something interesting happened at Chipotle. Their "system was down" at my local store in Boca Raton, FL (7028 W Palmetto Park Rd #106, Boca Raton, 33433), and as a result, they were only accepting cash. I couldn't pay in cash of course, because IGWT is printed on cash, a secular document, superfluously, in violation of Jewish religious law.

So I had to skip dinner tonight at Chipotle because of IGWT.

I caught a clip on video of the guy at Chipotle telling me I had to pay in cash and just sent you a copy of it. While I'm somewhat jumbled and inarticulate in the video, it's pretty good audiovisual evidence of the unique, useful properties of cash.

There are a couple of reasons this is interesting. For one, I was going to order unkosher food at Chipotle. I might lose some street cred, but hey, tons of Jews don't keep perfect kashrut, and I'm one of them. Perhaps the Court will appreciate the imperfect nature of my Judaism. It would be interesting if the Courts decided IGWT couldn't be printed on cash because Jews need to be able to eat freely at Chipotle without interruption.

Second, this illustrates the "cash is useful in a pinch or emergency" use case pretty convincingly.

Also, tons of restaurants I would otherwise eat out are "cash only" all the time, and this is a rare circumstance where I had an opportunity to have a full face-to-face encounter with a major restaurant chain's "bouncer" telling me my (digital) money wasn't good enough for him, and that I'd have to basically commit a sin if I wanted to buy food from a place that everyone would expect should have stable infrastructure.

Hope this video makes your life work a little easier.

This incident happened in South Florida. I'll be moving back to Northeast Ohio on May 28th, then I'll be moving permanently to Northern Virginia sometime between early July and early October. I think you really should be free to bundle up all of these events from all jurisdictions that I've been in into one case, using one or more exceptions to the jurisdictional requirements ("circumstances otherwise escaping..."). Like many Americans, I'm highly migratory. It would be so unfair for my case to keep resetting to zero for each time I move. But anyway, that said, this just happened in South Florida.

All my best,

Adam Clayman
(312) 414 - 7628

10/23/25, 7:40 PM
Case 9:25-cv-80890-WM    Document 60-5    Entered on FLSD Docket 10/27/2025    Page 80 of 94
Clayman Family Mail - Will this make winning the case simpler?



David Clayman <david@clayman.org>

## Will this make winning the case simpler?
4 messages

---

**Adam Clayman** <adam@clayman.org>                                      Thu, Jun 3, 2021 at 4:30 PM
To: Mike Newdow <mikenewdow@gmail.com>

Hey Mike!

Haven't heard from you in a long while, since prepandemic I think. I figured you were buried in deadly COVID cases plus your regular ED burden and so haven't wanted to bother you.

But now that the pandemic is abating, I wonder if you'll be able to move the case forward again.

I'm attaching a photograph of a cash-only discount at a popular kosher felafel store located near my place in Florida. I ate there about once a week, and I was always charged over 3% more than any other customer because I just couldn't take advantage of the cash "discount", simply because of IGWT. I took this photo in April I think, in Florida. I'm in Ohio now, and I'm planning to move to Virginia permanently by September.

Maybe this is the simple, clear evidence of IGWT fiscal burden that you were missing in earlier cases? The courts seem to be set up to be highly responsive to concrete claims of damages based in dollars and cents. With this evidence, judges can't deny that I'm being financially burdened by IGWT, because of my commitment to hyphenating G-d's name in print.

Call me sometime... I'd love to hear how you're doing and I'd be interested in hearing how you've been coping during this pandemic...

My phone is +1 (312) 414 - 7628, although I'm changing it soon to (321) CLAYMAN (252-9626).

Also, if you're working by any chance anywhere near NE Ohio these days, like you were in Parma before, I'd love to come by to meet you in person.



**IMG_20210414_124555177.jpg**
3731K

---

**Adam Clayman** <adam@clayman.org>                                      Thu, Jun 3, 2021 at 4:36 PM
To: Mike Newdow <mikenewdow@gmail.com>

For the record, the restaurant was Chill & Grill Pita of Boca Raton. The address is 7158 Beracasa Way, Boca Raton, FL 33433.

They have Square payment terminals, so I think they can look up my entire payment history there and report on how much I've been surcharged over the last year. Or I can just look it up on my end if you want that info.
[Quoted text hidden]

---

**Adam Clayman** <adam@clayman.org>                                      Thu, Jun 3, 2021 at 4:49 PM

10/23/25, 7:19 PM      Clayman Family Matt - will this make winning the case simpler?

Case 9:25-cv-80890-WM    Document 60-5   Entered on FLSD Docket 10/27/2025    Page 81 of 94

To: Mike Newdow <mikenewdow@gmail.com>

Also, to be perfectly upfront and for the sake of full disclosure, my primary Fidelity credit card has 2% cash back on it. So depending on how you account for that, I either was subject to a full 3.95% penalty at Chill & Grill or a 1.95% penalty if you subtract what I receive in the form of a cash back kickback.
[Quoted text hidden]

---

**Mike Newdow** <mikenewdow@gmail.com>                                     Fri, Jun 4, 2021 at 2:47 AM
To: Adam Clayman <adam@clayman.org>

Great to hear from you, Adam. I'll try to call this weekend. Feel free to try me as well: 916-201-6078.

- Mike
[Quoted text hidden]
--
Michael Newdow

2985 Lakeshore Blvd
Upper Lake, CA 95485

916-201-6078 (cell)
707-739-6837 (Google voice)
MikeNewdow@gmail.com



David Clayman <david@clayman.org>

## Cash "discounts" (read: credit card premiums) on gas
3 messages

**Adam Clayman** <adam@clayman.org>                                                     Sat, Jul 10, 2021 at 9:20 PM
To: Mike Newdow <mikenewdow@gmail.com>

Hi Mike!

Hope this finds you well! Are you closer to a deal on the sale of the RV park?

Well, I have one more claim type to add to the pile....

In Florida, many gas stations advertise a cash-only price that you only pay if you pay with cash. I can't pay with cash, so I'm economically discriminated against on the basis of religious belief.

https://www.gasbuddy.com/go/updated-gasbuddy-mobile-app-includes-cashcredit-price-reports

The gas station that is closest to my Florida home address (7930 Palacio Del Mar Drive, Boca Raton, FL 33433) is Mobil (7176 Beracasa Way, Boca Raton, FL 33433). I just called them to verify what their charges are. Today they charge $3.49/gallon for cash users, or $3.59 for credit card users. So every time I fill up my family's 2021 Honda CRV 14 gallon gas tank, I get charged an extra $1.40.

Let's add this to the list of "injuries".

GasBuddy lists the following jurisdictions that will charge credit card users more than cash buyers: **Florida**, New York, California, New Jersey, Michigan, Washington, Connecticut, South Carolina, Massachusetts, **Maryland**, Nevada, Oregon and **Washington DC**

I called around to two or three gas stations in DC near the Supreme Court and they all said that gas was the same price for any method of payment, cash or credit. I think this might be more pervasive as a Florida thing, but I'll keep my eye out for price differences after I move to Northern Virginia on October 1st.

I'm still in Ohio currently until October 1st.

Adam Clayman
(312) 414 - 7628

**Mike Newdow** <mikenewdow@gmail.com>                                               Sun, Jul 11, 2021 at 10:27 AM
To: Adam Clayman <adam@clayman.org>

Case 9:25-cv-80890-WM   Document 60-5   Entered on FLSD Docket 10/27/2025   Page 83 of 94

Hi, Adam.

I probably asked you this before (and I'm pretty sure the answer is yes), but are you keeping a list of all of the ways your religious prohibition against using cash with IGWT on it has harmed you?

- Mike
[Quoted text hidden]
---
Michael Newdow

2985 Lakeshore Blvd
Upper Lake, CA  95485

916-201-6078 (cell)
707-739-6837 (Google voice)
MikeNewdow@gmail.com

---

**Adam Clayman** <adam@clayman.org>                                    Sun, Jul 11, 2021 at 10:39 AM
To: Mike Newdow <mikenewdow@gmail.com>

Yes, I am. I just have to update it again...
[Quoted text hidden]



David Clayman <david@clayman.org>

---

## Cash Discounts Come Back as Small Businesses Tire of Credit Card Swipe Fees - Bloomberg
1 message

**Adam Clayman** <adam@clayman.org>                                    Sun, Jul 11, 2021 at 3:40 AM
To: Mike Newdow <mikenewdow@gmail.com>

We could include this article as another appendix/exhibit in the lawsuit....

https://www.bloomberg.com/news/articles/2021-05-07/cash-discounts-come-back-as-small-businesses-tire-of-credit-card-swipe-fees



David Clayman <david@clayman.org>

## There's a MUCH easier way to argue my case for me...

Adam Clayman <adam@clayman.org>                                        Wed, Jul 21, 2021 at 4:05 PM
To: Mike Newdow <mikenewdow@gmail.com>, Mike Newdow <newdowlaw@gmail.com>

Hey Mike!

I just realized there's a MUCH easier way to argue my case.

Just start off by pointing out that every Jew everywhere in the world would oppose the Government printing the tetragrammaton ("Yud Hay Vav Hey") on printed dollar bills or minted coins. We Jews would UNIVERSALLY get super-super-*super*-angry about the Government using G-d's most sacred name. That would never stand.

So first, make the Government concede in writing and in oral argument that it would not be able to print the tetragrammaton on dollar bills, out of respect for Jewish religious beliefs, because once th tetragrammaton is printed it should not be destroyed (except through sanctioned decomposition when buried in specially arranged ceremonial burials).

Once you get the Government to agree not to print G-d's name in Hebrew, then ask, "Why are you comfortable printing G-d's name in English? Millions of American Jews hyphenate G-d's name in the print medium. Why don't you?"

Then point to my religious stance and burdens.

And then you win your case.

But start out with the impermissibility of printing the tetragrammaton on cash. That's your first step.

https://www.jewishencyclopedia.com/articles/14346-tetragrammaton

The key is to start with a position about the impermissibility of printing that 100.00% of practicing Jews agree on... and then establish that my views are just a very small step from and a principled variation on that completely normal, pervasive religious position.

I think starting with the tetragrammaton and working your way down from there will also help focus you in on how to make a believer's case against printing IGWT.

Adam Clayman
(312) 414 - 7628



David Clayman <david@clayman.org>

## Relevant WSJ Article...

2 messages

**Adam Clayman** <adam@clayman.org>                                    Fri, Aug 20, 2021 at 8:50 AM
To: Mike Newdow <mikenewdow@gmail.com>

  https://www.wsj.com/articles/paying-with-a-credit-card-thats-going-to-cost-you-11629378047

**Mike Newdow** <mikenewdow@gmail.com>                                Fri, Aug 20, 2021 at 10:53 AM
To: Adam Clayman <adam@clayman.org>

  Thank you. We will use that.

  On Fri, Aug 20, 2021 at 5:50 AM Adam Clayman <adam@clayman.org> wrote:
  `  https://www.wsj.com/articles/paying-with-a-credit-card-thats-going-to-cost-you-11629378047

  --
  Michael Newdow

  2985 Lakeshore Blvd
  Upper Lake, CA  95485

  916-201-6078 (cell)
  707-739-6837 (Google voice)
  MikeNewdow@gmail.com



David Clayman <david@clayman.org>

---

# Corporate vending machine 5% surcharge
2 messages

---

**Adam Clayman** <adam@clayman.org>                                      Fri, Aug 20, 2021 at 5:59 PM
To: Mike Newdow <mikenewdow@gmail.com>

Yesterday I was in one of our Amazon corporate buildings (IAD31) where a sister team is located. I was extremely thirsty. The vending machines we have on my sister team's floor are programmed to surcharge credit card users by 5% to encourage use of cash.

Even if I get 2% cash back on this transaction, this 5% surcharge puts me overall in the red.

I would have absolutely paid for this (and many other things) in cash if I were able to.

**2 attachments**



IMG_20210819_161742186.jpg
2595K



IMG_20210819_161751973_MP.jpg
6547K

---

**Mike Newdow** <mikenewdow@gmail.com>                                   Fri, Aug 20, 2021 at 6:09 PM
To: Adam Clayman <adam@clayman.org>

Keep up the list of these events, Adam.

- Mike
[Quoted text hidden]
--
Michael Newdow

2985 Lakeshore Blvd
Upper Lake, CA  95485

916-201-6078 (cell)
707-739-6837 (Google voice)
MikeNewdow@gmail.com



David Clayman <david@clayman.org>

---

## My Puerto Rico trip. Gas prices in Florida. Permanently in FL. Also, can we set a deadline?

---

**Adam Clayman <adam@clayman.org>**
To: Mike Newdow <NewdowLaw@gmail.com>

Sun, Jan 30, 2022 at 2:14 PM

Hey Mike!

I hope this email finds you well!

What's new with you? Have you been successful selling the RV park yet?

I have a bunch of updates for you.

**Puerto Rico**
I was in Puerto Rico on vacation Jan 11 - Jan 18 with my girlfriend, and given that Puerto Rico has a dependence on the dollar but different financial infrastructure I found myself in plenty of awkward situations. For instance, I was unable to pay for some parking or any street-side *Helado Caribe* (Carribbean ice cream) because the vendors only accept ATH-linked mobile payments from ATH-approved bank accounts. Since I didn't have a Puerto Rican bank account, I couldn't pay with ATH.

I tried parking at a parking lot close to our AirBnB one day and their credit card system was down that night and they didn't know if it would be up or not the next day. This I found out after driving all the way into Old San Juan. The nearest alternative parking stations were closed at that time of night, and I had my girlfriend with me, and I can only ask her to have so much patience with me, so I took a risk and agreed to park there in the hopes that their credit card system would be working the next day. Thankfully it was fixed overnight and I was able to get out of there without "outsourcing" responsibility for my payment on my girlfriend paying in cash, which I obviously never ever want to do.

But there was a situation I was in where I did end up "outsourcing" responsibility inadvertently. There was a guy in an alley who was holding a giant iguana and made a motion to offer to put it on my shoulder for a picture. Naively I "agreed" to this, and my girlfriend snapped a photo of me with an iguana on me. Then the guy started folding and unfolding dollar bills in his hand, apparently looking for tip payment in cash. My girlfriend jumped in and paid him $2 before I could stop them.

My girlfriend and I got into several small arguments during the course of the trip over what she and I should do when there's a situation where cash is the only apparent option. I asked her to grow more patient with me negotiating for a credit or electronic option, and also asked her to develop the habit of negotiating for a noncash option herself. My girlfriend is Jewish of course, and like me she also hyphenates the name of G-d wherever and whenever she can, but like a lot of American Jews she hasn't applied that belief with logical consistency to the case of G-d-imprinted cash.

There were quite a few situations in Puerto Rico where cash was the primary or only option for commerce. **One of the hardest was the turnpike / highway system.** The highway pass in Puerto Rico (AutoExpreso) only had a cash option or an electronic pass option but wouldn't accept credit cards. So I had the option when renting a car of either activating the toll pass add-on for $10 per day or getting hit with a $50 penalty every time I went onto a toll road, because I just didn't have the ability like other people would have to have paid in cash in the cash lane.

Even the National Park Service was taking donations at the El Morro and San Cristobal Forts in cash. Sometime this week I'll go through my photographs of "cash only" storefronts and try to document more systematically all the places I went where cash was king.

The judges and justices who hear this case probably aren't thinking of US territories as they decide whether cash is or is not an "unbypassable" piece of American commerce. But Puerto Rico is definitely, in my experience, marginally more cash-dependent than most places in the US I've lived.

**Gas prices in Florida**
I need to send you a picture sometime, but gas prices in Florida where I live are 10 cents more expensive if you use credit card, or said differently, 10 cents cheaper if you pay in cash. It's a systemic financial penalty against my religious beliefs and hits me harder now that I'm living mostly on my own here in South Florida. In the past, I was getting hit by a price difference of around $1 or $1.50 everytime I filled up the car.

That said, between us, I've since learned through my girlfriend of a smartphone app called "GetUpside" that I can use to "negotiate" price discounts even when I pay by credit card. I've only used it once so far, but the first time I used it I got a 34 cent price discount per gallon on my gas... which was significantly more than the cash discount. So while I've been hit many times by Florida's cash discount discrimination, I might now finally have a workaround.

**Staying permanently in Florida**
Now that I have a girlfriend I'm quite committed to here in South Florida, and now that reportedly my position at Amazon is changing to a fully virtual / remote one, there's a very strong chance I'll be able to stay in Florida forever from this point on. I probably won't be moving to Virginia, unless I break up with my girlfriend rather than marrying her (and I prefer to marry her). So my location is finally pretty stable and fixed for once as far as I know for the foreseeable future.

**Deadline?**
So... I first contacted you in 2015 I think and it's 2022 now. From 2015 to 2022 the Federal Reserve has printed and shredded *billions (like >10 billion)* banknotes, and minted and melted many, many more coins.

So far you've included me on a couple cases but we haven't filed a case where I'm the named Plaintiff wherein the judges/justices can't get distracted or avoid the question of deciding whether I am or am not burdened by IGWT and whether I have or don't have a legitimate religious belief.

Is it ok if we decide on a deadline for the filing of this case? I want you to represent me, but I also have to be mindful that years have slipped by already and I don't have a clear picture of when we'll get this in front of the Supreme Court. We had better chances back when Justice Ginsburg was on the bench, before there was a conservative super-majority, but even now I think we can still win a removal of IGWT from cash and coin with heavy focus on the Jewish arm of the case. I'm the most burdened by IGWT of all the Plaintiffs you've ever represented, and the theology behind my case, unfortunately, is not just a little but much more likely to constructively interfere with preconceptions and win over the hearts and minds of the Christian conservatives on the Court.

Is it unreasonable to set an Independence Day deadline for drafting and filing the case? Would that give you enough time to get prepared?

If It takes longer than this year, I'm just wondering if it makes more sense practically to get in touch with the ACLU or try to even find a Jewish legal organization that might push my claim forward.

In any case, I hope everything's going really really well for you, medically, commercially, and legally.

Feel free to give me a call anytime, I'd love to hear from you and have a chance to chat again!

Adam Clayman
(321) CLAYMAN (252-9626)



David Clayman <david@clayman.org>

---

## RE: My girlfriend

**Adam Clayman** <adam@clayman.org>                                      Wed, Feb 9, 2022 at 5:48 AM
To: "Michael A. Newdow, Esq." <NewdowLaw@gmail.com>

Hi Mike,

I hope this reaches you well!

How is the fight against COVID treating you?

I read a Letter to the Editor you wrote favoring algorithmic automation and mechanization of medicine. I myself wonder just how long it will be (in decades) before most of medicine is classified as one of the dirty, *dangerous*, or demeaning professions that are high priorities for near-complete submission to computational logic.

In any case, the real reason I feel the need to write you at 5 AM is that my girlfriend Michelle and I were in an argument last night over what she feels are logical extremes that I follow. She cites my zero tolerance for tackle football, my teetotaler attitude toward alcohol, my recent abstention from sucralose, and critically my refusal to use IGWT currency for commerce.

I'm telling her all my stances above are medically moderate positions with the exception of IGWT currency, which reflects an underlying religious belief that underpins all the rest, especially my commitment to the findings of science and medicine on health.

In any case, my refusal to use IGWT currency is definitely causing unusual, undue, and undeserved strain in our relationship. Whatever happens to our relationship from here, I want to add this to the list of burdens I'm under because of existing Federal Reserve G-d shred policies. Until I win my case, my girlfriend is going to be having second thoughts about getting married because she sees me fighting a fruitless, zealous battle with the government, and she prefers not to be tied to someone who takes their beliefs to the logical extreme.

The government shouldn't be facilitating the stigmatization of persons with logical religious beliefs, beliefs that are a natural extension of how so many other Jews, including my girlfriend, behave in protecting the Name of G-d with hyphenation anywhere they write it.

I'm not backing down on my beliefs. I just need to know that we're making progress on the case this year.

Call me sometime soon when you get a chance. If I don't hear from you this week I'll try you this weekend.

All my best,
Adam Clayman



David Clayman <david@clayman.org>

# I get hit with this extra charge regularly
1 message

**Adam Clayman <adam@clayman.org>**                                    Wed, Jul 6, 2022 at 12:37 PM
To: "Michael A. Newdow, Esq." <NewdowLaw@gmail.com>

This restaurant, Chill & Grill, in Boca Raton, FL near my house, keeps overcharging me because I must pay with credit card rather than by cash.

At 3.85%, my customary 2% credit card cash back offer doesn't ever cover the difference.

I eat here pretty regularly. It's the best kosher pita place and grill within miles. And the price discrimination against credit card users is easily demonstrable and incontrovertible.



**PXL_20220706_163356704.jpg**
2320K



David Clayman <david@clayman.org>

---

## Another interesting example

**Adam Clayman** <adam@clayman.org>                                    Wed, Jul 27, 2022 at 9:04 AM
To: Mike Newdow <NewdowLaw@gmail.com>

Apparently I can't transfer buses on New Jersey Transit, according to this song:

https://digg.com/video/alex-davis-nj-transit-song-reddit

But that's true in a way that impacts me even here in South Florida. At least until recently, I couldn't pay for bus trips
digitally or with credit card or any other means on the fly: bus fare boxes only accept cash down here, or trip cards that
you have to buy by mail or with an exceptionally inconvenient trip to a central office location (which I did once... it was not
fun). So I don't ever ride the bus, even when it would be more convenient, because bus fare payment is just too much of a
hassle or impossible without tons of premeditation and planning.

---

Adam Clayman
(321) CLAYMAN (252-9626)



David Clayman <david@clayman.org>

---

## Status Update? Also: Lottery fail

**Adam Clayman** <adam@clayman.org>                                                    Mon, Aug 8, 2022 at 8:16 AM
To: Mike Newdow <NewdowLaw@gmail.com>

Dear Mike,

What's your status on availability? We're already into August now...

Also, I won the lottery. Sort of... it's complicated. I bought one $2 ticket in Ohio and one $2 ticket in Florida using a debit card back when the Mega Millions jackpot reached $1.3 billion dollars. The ticket that I purchased in Florida was a small-time winner. I matched the MegaBall and one ordinary number (36 and MB 14), which is basically a $4 "win" (or in my case, a break-even $4 "non-loss").

But now the problem is I can't "cash out" my prize. I went to the Florida Publix (7060 W Palmetto Park Rd, Boca Raton, FL 33433) that I bought my ticket at this morning around 7:45 AM. I asked for my prize in check, money order, store credit, or a commensurate credit back to my debit card, and they refused. They said they could only pay me in cash. They said that if I can't accept cash, I have to communicate with a Florida Lottery District Office to get repaid.

The nearest Florida Lottery District Office is comically far away. And they ordinarily, by policy, only accept claims of $600 or more – all lesser claims are ordinarily paid out in cash at the lotto retailers. I'll call when their offices open at 8:30 AM in about half an hour, but at this point the only option I have is to mail in my lottery ticket and hope that they decide to honor my small-time ticket and pay me back, even though it's under their ordinary repayment threshold. And it will cost me a stamp and letter at the very least (worth 40 cents?).

While I'd much prefer to cash this ticket out, and would if it weren't so burdensome, what I think I'm going to do instead is just preserve this lotto ticket as evidence of a religious burden and mail it to you.... assuming you can certify soon that you have time to write this complaint and get things rolling. If you can't, please just let me know so that I can try to find someone to take the case before the end of the year.

I think having a $4 lottery ticket that I couldn't manage to cash out without being unusually burdened vis-a-vis anyone else would make for a good exhibit to file in the case. It's emblematic and symbolic of all the small but cumulative "paper cuts" I've had to endure for seven years since giving up cash, and in this case it's a direct burden applied end-to-end by the government: the Florida Lottery is a state government entity, after all. Actually, in that sense, it might be an excellent example to focus some attention on because it provides a connective tissue to attached encumbering state regulations built up around federal-state interdependencies on cash like state jail cash-only bail and state lotto cash-only lottery prizes.

Anyway, looking forward to hearing from you when you come up for air. I hope you'll be able to find some time soon to start the drafting process, but if you really can't manage to do it I'd understand. Just let me know.

All the best!
Adam Clayman

---

Adam Clayman
(321) CLAYMAN (252-9626)

## Chronological Evidence of Burdens

| Organization / Event | Grievance Type? | Cost? | What happened? | Photographs? | Other Verifier? | D |
|---|---|---|---|---|---|---|
| Bureau of Engraving & Printi | Sells 5lb bags of unburied shredded currency to anyone wh | | I must bury a 5lb bag of shredded currency for the BEP | | | |
| Cook County Jail | Public | $89,338.42 | Liquidated almost $90,000 to cover any possible bond that I might be assigned, not knowing anything about the bail | | | Ja |
| Cook County Jail | Public | $5,200.00 | Guard offered to cover my bond for $200 surcharge, cash-only. Could not transact, because of In G-d We Trust on c | | | Ja |
| Mandatory purchase minimur | Private | Significant | Prevents a large number of trades. Repeats itself many times over the course of a year. | | | A |
| Cook County Clerk of Courts | Public | $0.48 | Charged an extra 48¢ for $2 | Y | | A |
| Illinois Secretary of State | Public | $1.00 | Charged an additional dollar | Y | | A |
| Food Market mandatory minir | Private | $10.00 | Did not meet $10.00 minimu | Y | | A |
| Cubby Bear | Private | 5 + No place to go d | Could not pay $5/person ca | N | | Au |
| Craigslist Housing Search | Private | Unmeasurably high | Must coordinate with card-b | N | | Au |
| BP "To Go" Powerball Lottery | Private | $2.00 +/- Outcome | Vendor only takes cash for | N | (773) 477-8328 | Au |
| Laundry Frustration | Public Accommodation | Religious Fulminatic | Overdue on laundry by at le | N | | Au |
| Laundry Breach | Private | Religious Collapse | Broke down and used coins | Y | | Au |
| Chicago Public Library | Public | 1 + Loss of Library F | Denied CPL Library Card ov | Y | | Au |
| Chicago Public Library | Public | | Can't borrow books on Algorithms & Data Structures that I need, for lack of access to a Replacement Card, because O | | | |
| Florida Gas Stations | Public | $1.40 per refill | 10 cent surcharge per gallon | | | |
| Levy's Schwarma | Public | 98¢ | I finally learned that I could avoid credit card surcharges by paying with a debit card under the Durbin Amendment of | | | O |
| Costco | Public | 25¢ | Vending machine for water bottles only took coins and cash. I only wanted 1 bottle. | | | O |
| Costco | Public | | Can't cash out remainder of a Costco Shop Card. Must lose remaining value. | | | |
| Beth Torah Benny Rok Camp | Public | Significant | Can't go to Cuba on religious mission, out of fear for being unable to transact with cash and having accounts shut dow | | | |
| Broward Center for the Perfo | Public | | Credit card processing broke down. Had to return at end of comedy show to pay. | | | |