David Morris Clayman / דוד משה קליימן / דוד דוד קליימן / אדם דוד קליימן, *Pro se*

FILED BY ___COS___ D.C.

OCT 29 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**David Morris Clayman** ( / אדם דוד (דוד משה קליימן),

Plaintiff,

vs.

**UNITED STATES OF AMERICA** et. al.

**CASE NO. 9:25-CV-80890-WM**

**HEARING REQUESTED IF ON THE FENCE**

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY AND/OR TEMPORARY INJUNCTION**

☑ **Completed Full Prefiling Checklist Before Printing**

## HEARING REQUESTED IF ON FENCE

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY AND/OR TEMPORARY INJUNCTION

### I. DEFENDANTS MISSTATE THE JURISDICTIONAL ISSUE

Defendants' Section I argument fails fundamentally. This Court need not resolve President Trump's joinder to grant the requested relief. Secretary Bessent, the first-named defendant, indisputably has authority over Treasury currency decisions under 31 U.S.C. § 5114. Enjoining him suffices to prevent the challenged designs. The Court clearly has jurisdiction over Secretary Bessent and his subordinate officers, including Treasurer Beach.

Moreover, Defendants' sudden jurisdictional concern rings hollow. Plaintiff's motion to join President Trump has been pending since September 22, 2025—over a month—without any sur-reply from Defendants. The question is not merely ripe but overripe, and further delay

disserves justice.

## II. THE DESIGN SELECTION IS FINAL AND IMMINENT, NOT SPECULATIVE

Defendants grossly mischaracterize the imminence of harm. On October 6, 2025—mere hours after Plaintiff filed this motion—the Treasury Department posted on its official X account: "@SecScottBessent is honored to exercise the authorities granted to him by Congress via the Circulating Collectible Coin Redesign Act of 2020 to issue coinage 'with designs emblematic of the United States semiquincentennial' reflecting @POTUS and his vision for America. On this momentous anniversary, there is no profile more emblematic for the front of this coin than that of our serving President, Donald J. Trump." See below a faithful reproduction:

← **Post**

 **Treasury Department**
@USTreasury

America's 250th Birthday is a celebration of our nation's strength and leadership on the global stage.

@SecScottBessent is honored to exercise the authorities granted to him by Congress via the Circulating Collectible Coin Redesign Act of 2020 to issue coinage "with designs emblematic of the United States semiquincentennial" reflecting @POTUS and his vision for America.

On this momentous anniversary, there is no profile more emblematic for the front of this coin than that of our serving President, Donald J. Trump.

Alongside @TreasurerBeach, we look forward to sharing more details soon.

> **U.S. Treasurer Brandon Beach** @TreasurerBeach · Oct 3
> No fake news here. These first drafts honoring America's Birthday and @POTUS are real.
>
> Looking forward to sharing more soon, once the obstructionist shutdown of the United States government is over. x.com/SteveGuest/sta...

4:05 PM · Oct 6, 2025 · 564.8K Views

💬 202      🔁 220      ♡ 1K      🔖 52      ⬆️

This is not speculation. This is official agency commitment to a final design type selection. The

plain language—"is honored to exercise," "no profile more emblematic," "for the front of this coin"—demonstrates completed selection and imminent production. Under the Administrative Procedure Act, this constitutes final agency action subject to immediate judicial review.

Defendants' reliance on the phrase "first draft" is disingenuous "salami-slicing." The selection of President Trump's profile has been made and publicly announced. Minor refinements to chin contours or arm angles, do not render the fundamental design choice speculative. By Defendants' logic, no injunction could ever issue until coins physically issue and circulate—rendering preliminary relief meaningless.

Furthermore, regarding the "In G-d We Trust" motto, there is zero speculation. Under 31 U.S.C. § 5112 and established Treasury policy, this motto will appear on every new coin and banknote design. The statutory mandate makes this harm actual and certain, not conjectural. *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994), is inapplicable where statutory requirements guarantee the challenged conduct.

The Trump Administration's recent demolition of the East Wing of the White House without preliminary National Capitol Planning Commission review demonstrates this administration's willingness to act first and seek forgiveness later. There is no reason to trust that Treasury will announce further formalization steps before delivering production specimens to the White House and run the Denver, Philadelphia, or San Francisco Mints at full-speed. Plaintiff's harm is actual and imminent.

## III. DEFENDANTS' CITED CASES ARE INAPPOSITE—THIS IS THE FIRST ADEQUATELY PLED JEWISH RELIGIOUS BURDEN CASE, ESPECIALLY LACKING CONFLICT OF INTEREST

Every case Defendants cite—*Aronow, Newdow, New Doe Child*—involved atheist plaintiffs asserting Establishment Clause violations or non-religious objections. None involved a plaintiff adequately presenting the Jewish theological position and substantial burdens that Plaintiff advances here.

Plaintiff's burden is not based principally on disagreement with government religious expression.

It is based on the affirmative Jewish duty to protect the Sacred Name of G-d from desecration. This duty is documented in:

- Talmudic Tractate Rosh Hashanah 18B: Establishing principles of *shaimos*—the requirement to protect and properly dispose of physical media bearing the Divine Name.
- Megillat Taanit on the Third of Tishrei: Commemorating when the Jewish people were successfully weaned from the practice of superfluously writing the complete Holy Name of G-d on secular documents—precisely analogous to currency and debt obligations.

For this Court to declare that the motto has "no theological impact" would constitute a severe breach of religious freedom under RFRA. The government cannot dictate to Jewish practitioners what does or does not constitute theological significance to Jews like the Plaintiff. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014) (courts must defer to sincere religious beliefs).

The doctrine of "ceremonial deism" that the Supreme Court and lower Courts have flirted with is fundamentally incompatible with Jewish tradition, which distinguishes sharply between appropriate potent sacred use and forbidden superfluous or impotent use of the Divine Name. President Theodore Roosevelt understood this in 1905-1907 when he attempted to issue the "No Motto" Double Eagle coins. Roosevelt was supported by Jews and Jewish religious authorities who objected to trivializing the Name of G-d on currency.

Defendants' cases are further distinguishable because they predate or do not properly apply RFRA's "substantial burden" pleading and analysis. Under RFRA, the question is not whether courts perceive theological impact, but whether the plaintiff's sincere religious exercise is substantially burdened (42 U.S.C. § 2000bb-1(a)) and, as the Newdow-era principal and second-class litigants found out too late at time of their dismissal, whether that substantial unavoidable burden is sufficiently and adequately pleaded and represented to overcome judicial dismissal. Plaintiff has done that sufficiently here in the *Original, First* and *Second Amended Complaints*, and each filed amended version has progressively further improved and perfected the case on multiple constitutional and statutory fronts.

## IV. PLAINTIFF'S BURDEN IS SUBSTANTIAL UNDER RFRA AND EXISTING

## PRECEDENT

Defendants argue there are "alternatives" to using cash. This argument fails under both RFRA and existing precedent.

In *American Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008), the D.C. Circuit held that the inability of blind persons to use any paper currency independently without vulnerable reliance on others constituted a substantial burden requiring government accommodation under the Rehabilitation Act. The court rejected the government's argument that credit cards and other alternatives sufficed, noting that "meaningful access" to currency is legally required.

Plaintiff's burden exceeds that of blind plaintiffs in *Paulson*. The blind can use coins without any friction or problems; Plaintiff cannot use either coins or bills bearing the Sacred Name. The blind can use even existing tactilely undifferentiable currency with assistive technology or the help of helpful friends, family, or bystanders; Plaintiff faces an affirmative religious duty to avoid handling media that bears the unhyphenated Divine Name in contexts subject to desecration—including inevitable bathroom carry, casual surface placement, and eventual careless disposal, and that effectively bars him from cash commerce and transactions even more thoroughly and broadly than the blind or visually impaired who aren't as "disabled" or handicapped in the use of cash or coins to the degree of the Plaintiff. The Plaintiff lacks "meaningful access" to currency and such meaningful access to legal tender is, as the DC Circuit established for a different even less currency-handicapped population legally required.

As documented in the Second Amended Complaint and supporting appendices, Plaintiff faces daily burdens:

- Inability to accept cash payments for legitimate transactions
- Inability to make cash-required transactions (numerous merchants, parking meters, tips, small vendors, inability to pay (or collect) cash-only bail/bond for myself or others, subject to a pincer of excessive (unpayable) cash-only bail or excessive (bail bondsman) fine even while presumed fully innocent, paying or hiring persons who are unbanked, exclusion from working jobs that require cash-handling, setting up any kind of retail in jurisdictions like Miami-Dade

with ordinances against cash-free retail practices with penalties far above the *Hobby Lobby* level of $2,000 USD, graceful acceptance of wedding gifts that can total far above the *Hobby Lobby* level of $2,000 USD, interference in plans to rely on small donor fundraising that's frequently cash-based at events, complete transactional isolation from unbanked calmunity households, undue difficulty giving to panhandlers, buying from roadside vendors, or giving tips to service staff like porters, unreasonable barriers to Plaintiff's hire as a male stripper[1], inability to set out a kinetically friendly "cash tip jar" like other Americans for spreading joy, inability to negotiate in an emergency or natural disaster with hard cash, vulnerability to being abused at any time by government or private persons with a demand to settle a debt, duty, or fee strictly in legal tender, etc. etc. – there's a strong reason why the phrase "Cash is King" emerged and is accepted as so true)

- Religious obligation to perform *shaimos* custody responsibilities for any currency bearing G-d's Name that comes into Plaintiff's possession
- Ongoing religious distress from witnessing societal reckless desecration of the Divine Name
- Difficulty running for a Precedency (e.g. Presidency) position that has executive responsibility over the destruction of an overly "overshot" sacred currency Plaintiff is obligated to religiously protect and prevent from bathroom exposure, and only dispose through genizah or civigious or religious burial, not through shredding

Defendants cite *Mayle v. United States*, 891 F.3d 680 (7th Cir. 2018), for the proposition that "using money is not a religious exercise." But that fundamentally misstates RFRA. The question is not whether spending money is religious, but whether government conduct substantially burdens religious exercise. Plaintiff's religious exercise is the protection and proper treatment of the Sacred Name. The government's placement of that Name on universally circulating legal tender directly and substantially burdens that religious practice.

The Sixth Circuit in *New Doe Child #1 v. Congress*, 891 F.3d 578 (6th Cir. 2018), acknowledged but did not adequately address the Jewish theological position, instead dismissing the case based on lack of adequately pled unavoidability. Plaintiff's Second Amended Complaint extensively documents the unavoidability of currency encounters and the inadequacy of

---

[1] Admittedly here on this one function I'm not being entirely serious.

alternatives—pleading deficiencies that the Sixth Circuit identified as fatal are cured here.

## V. BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFF

Defendants grotesquely mischaracterize the requested relief as demanding immediate cessation of all currency production. Plaintiff seeks no such thing.

The preliminary injunction explicitly exempts "previously authorized or in-production currency designs necessary to maintain normal circulation pending final resolution of this action." Plaintiff recognizes the need for orderly transition and does not demand immediate disruption of existing production.

What Plaintiff seeks is narrow: (1) enjoining the illegal Trump portrait coin design, and (2) maintaining the status quo by prohibiting initiation of new designs bearing the unhyphenated Divine Name until this case is fully adjudicated.

The government's interest in the Trump portrait coin is nil—it violates 31 U.S.C. § 5112(n)(2)(E)'s prohibition on portraits of living persons. There is no cognizable government interest in violating its own statutes.

Regarding the motto, the government has had since 1993—when RFRA was enacted—to consider whether continuing to expand the use of "In G-d We Trust" on new currency designs substantially burdens religious exercise. It has had since July 24, 2025—when this suit was filed—to begin preparing for potential transition. If granted, this injunction merely requires the government to pause new designs while maintaining existing circulation—a minimal burden.

By contrast, Plaintiff's injury is severe and irreparable. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). RFRA protections are at least as significant as First Amendment protections.

The public interest weighs heavily in Plaintiff's favor. The public has a strong interest in:

- Government compliance with statutory prohibitions on living-person portraiture
- Protection of minority religious practices under RFRA

Plaintiff's Reply to Defendant's Response to Motion for Preliminary and/or Temporary Injunction

- Separation of synagogue and state
- Democratic rather than monarchical currency design traditions
- Currency designs that include rather than exclude all Americans

Defendants claim Americans overwhelmingly support the current motto. But constitutional and RFRA rights do not yield to popular vote. That is precisely why courts exist—to protect minority rights against majoritarian overreach.

## VI. THE QUARTERMILLENNIAL MOMENT DEMANDS ACTION, NOT STASIS

The approaching 250th anniversary of American independence presents a once-in-250-years opportunity to redesign American currency consistent with constitutional, statutory, and religious freedom principles. Congress created the America250 Commission for precisely this purpose.

Yet Treasury, BEP, and the Mint remain in a dogmatic slumber regarding currency design. Rather than seizing this moment for genuine innovation—proposing new currency names, new denominations, new symbols, new technologies—they default to Latin mottos incomprehensible to modern Americans and personality-cult portraiture forbidden by law.

The government's continued use of "E Pluribus Unum"—a dead language known only to a tiny elite—exemplifies this creative bankruptcy. Why not "Out of Many, One" or "Through Diversity, One" in the globally understood American English? Why not invite public design competitions? Why not embrace modern translation and accessibility?

Similarly, why rush to mint an illegal Trump portrait coin when countless legal, creative, unifying designs await consideration? The answer suggests that vanity and political aggrandizement, not public service, drive current Treasury decisions.

This Court's intervention is necessary to break the government free from unconstitutional inertia and force genuine engagement with Plaintiff's religious burdens and with the Quartermillennial design opportunity.

## VII. DEFENDANTS' VEXATIOUS LITIGANT ALLEGATIONS ARE BASELESS

**AND PREJUDICIAL**

Defendants repeatedly characterize Plaintiff as "vexatious" without legal or factual basis. This rhetoric appears in almost every filing they've made since they first brought up the subject. The Defendants' are fond of listing out docket entry titles in avalanche form when they attempt to criticize me for having filed too much. If I did the same to them for every mention they've made mention of the word "vexatious litigant", it would take up an entire page. Such persistent bad-faith attacks on Plaintiff's good faith waste judicial resources and prejudice Plaintiff's claims.

Plaintiff is a pro se litigant pursuing civil rights claims arising from sincere religious obligations. Plaintiff has brought cases addressing kidney and liver donation incentives, age limits for Commander-in-Chief eligibility, and currency religious neutrality and reform—all matters of significant public concern. That Plaintiff has not always prevailed or not always prevailed immediately does not establish vexatiousness; it rather establishes how insanely complex and challenging the procedures of the legal system have grown to become and how long these procedures and protocols take for pro ses to master.

The proper standard for vexatious litigant status requires a pattern of frivolous, harassing litigation undertaken in bad faith. Plaintiff's careful, extensively researched, factually, civigiously (civically religiously), and religiously supported claims do not remotely approach that threshold. Plaintiff respectfully requests that this Court admonish Defendants to cease these baseless characterizations and respect Plaintiff's sincerely held religious beliefs and related substantial burdens.

## VIII. CONCLUSION

Plaintiff has demonstrated: (1) likelihood of success on the merits under RFRA and 31 U.S.C. § 5112; (2) irreparable harm from ongoing statutory violations and religious burden; (3) balance of equities favoring protection of minority religious rights over unlawful government conduct; and (4) public interest in lawful, inclusive currency design.

The preliminary injunction should issue as requested. The Plaintiff requests a Hearing if this is on the fence in any way and any part of the required elements of this are still not accepted as a "clear

showing" by the preponderance of evidence standard.

Respectfully submitted this 27th day of October 2025,

s/Plaintiff David Clayman, Still *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@ingwetrust.org
david@inhashemwetrust.org
david@lifesaverlabs.us
david@clayman.org

## APPENDICES

**Appendix A:** Underlying Original Prompt to Claude AI, demonstrating more detailed logic

## CERTIFICATE OF SERVICE – ELECTRONIC AND PAPER SERVICE

I HEREBY CERTIFY that on this 27th day of October, 2025, I served a copy of this reply electronically upon opposing counsel of record and, as required by the rules governing pro se litigants in the Southern District of Florida, subsequently printed and mailed a copy of this filing to the Court by certified mail.

I respectfully preserve an objection that the categorical prohibition on electronic filing and service for even non-prisoner pro se litigants imposes unequal substantial burdens that place pro se parties at a significant and severe disadvantage in the Southern District of Florida and other lagging edge judicial district locales compared with attorneys and represented litigants.

/s/ David M. Clayman
Pro Se Plaintiff