David Morris Clayman / אדם דוד קליימן / דוד משה קליימן, *Pro se*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| David Morris Clayman ( / דוד אדם משה קליימן), Plaintiffs,<br><br>vs.<br><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES OF AMERICA; CONGRESS; and, DONALD J. TRUMP, in his official capacity as Commander-in-Chief and President of the United States and *Principal Delegating Defendant* and/or *Fallback Delegating Defendant, et. al.* | CASE NO. 9:25-CV-80890-WM<br><br>THIRD AMENDED COMPLAINT<br><br> |

<u>EXPEDITED HEARING REQUESTED</u>

THIRD AMENDED COMPLAINT

**INTRODUCTION**

Plaintiff David Morris Clayman respectfully submits this Third Amended Complaint in response to this Court's Order of November 21, 2025 (DE 71), which dismissed the First Amended Complaint without prejudice and permitted filing of a Second Amended Complaint. The Plaintiff appreciates the Court's willingness to provide one additional opportunity to address the deficiencies identified in the Order, and submits this pleading to cure those deficiencies while preserving all prior allegations by reference.

This Third Amended Complaint responds directly to the Court's identified concerns regarding: (1) the substantial burden analysis under RFRA; (2) the applicability of existing precedent; (3) the standing of the Plaintiff to represent future interests; and (4) the specificity of factual allegations. The Plaintiff respectfully

submits that the Court's Order, while thoughtful, misapprehended key elements of the Plaintiff's claims and the applicable legal standards.

**A Necessary Apology and Explanation**

The Plaintiff owes this Court an apology. The Plaintiff has been working on a critical design chain that he hopes will be extremely lifesaving—measurable in QALYs (Quality-Adjusted Life Years) and statistical lifetime savings on the Standard International Borlaug unit scale. It turns out that the Plaintiff cannot manage to make enough concentrated, dedicated time to fully revise this case from top to bottom as the Chief Magistrate Judge requested, while balancing the competing needs of Naybor SOS™, Safeword™, Blesséd Dialekt, and all the other civic projects in the Lifesaver Labs Portfolio—including everything from The Mortal Library to the Religious RCV, Mandatory Voting, and Precedential Draft Conscription Case, and the Raising Rights Suffrage project.

It is not that this case is not a top overriding priority. It is that doing justice to the Lifesaver Labs Portfolio has the Plaintiff down to no more than typically four hours of sleep a night, overclocking constantly, and always under dread that his not producing a better, more easily digestible, harmless design might get people who did not need to be killed or injured killed or injured—for lack of adequate, engaging, and community-achievable Vision Zero Engineering language, technology, and choice architecture design in the next few years at the start of the next Quarter-Millennial.

The easiest way to explain why the Plaintiff cannot focus entirely on this case requires statements about how obviously unqualified he is for the community roles he hypothesizes he might someday have design influence with or through. Basically, the Plaintiff is planning life as if: the next nine months he will be a citizen-CEO of Lifesaver Labs Coalition and Public Benefit Corporation; the next two years after that he will be transitioning into one of the Governor slots in a Nonpartisan or Multipartisan Gubernatorial Trinity in Florida on ethically 'purple' and international safety orange lab-testing color logic; and starting in 2029 he might need to be ready for drafting a second-stage or third-stage booster rocket Precedency responsibility stack compilation following someone far better as vanguard head-group—like Lawrence Lessig—in Trinity Mode again, based on civics experimentation that the population might be willing to let us conduct in the Florida Lab in the next Gubernatorial term.

The Plaintiff does not know if he will actually be able to hit the mark on any of these projects. He knows he is not a suitable or best candidate for any of these roles, certainly not in solitary mode, not at the levels of effectiveness that these roles really should require to be optimally harmless and guiltless on Semmelweis social planning and civic systems and technology building duties on the other end of any responsible term. But he is gearing up for activism and civic build achievements over the next one, three, four, five, six, and eight years, with projects of dizzying range—from SaveUsFromSlog and TongTied to The Mortal Library and Inner Friend—and it is taking a toll on his ability to focus on restating this case again in the most elegant and concentrated revision that he would have been free enough to do before this responsibility level explosion.

That explosion occurred when the Plaintiff stumbled on the theses for Naybor SOS™ and started building related interconnected high-impact logic—like the 'Kill Seven Birds With One Stone' election law legal case to work toward and attempt exercising RFRA Civigious Rights to: Involuntarily Draft and Conscript Arguably Better Candidates for the Presidency, Vice-Presidency, Governorship and Lieutenant Governorship than the Party Volunteer Nomination System consistently fields; End Partisan Gerrymandering; Secure Mandatory Voting; Force Ranked-Choice Voting; Break down Tongue-Tying and Sterically Hindering Campaign Finance Rules slogging up Congress and the Presidency (broken through a proposed Lessig Referendum Precedency); Reform Ballot Selection Options to be more candid; Better Bound the Campaign Slog Season (at least for Draftees and Conscripts); Raise expectations for what the Precedency can be while trying to right-size community understandings of what this 'Slaveholder-in-Chief, et al.' position actually morally is; Establish civigious religious rights and the 'free marketplace for strong

human and civic moral conviction' arguments under RFRA protection; and more.

And that new legal case on election law is just one of the projects the Plaintiff is struggling to balance and get out into the world. Every day he delays releasing these projects meaningfully has tremendous costs, with the baseline cost being the range of Naybor SOS™ emergencies that could be handled earlier and wider but went improperly or incompletely handled—for lack of, or for risk of lack of, 'full steam ahead' design coverage while the Plaintiff decouples himself as a bottleneck on any of these other designs that were either embedded many years ago in Blesséd Dialekt or revived through his recent reengagement with it.

The Plaintiff therefore asks this Court's forbearance. This Third Amended Complaint may not be as elegantly streamlined as the Court might prefer. But the Plaintiff submits that it addresses the substantive deficiencies identified in the Court's Order, and respectfully requests that this Court consider the merits of the arguments presented herein—even if the presentation reflects the constraints of a pro se litigant attempting to balance lifesaving work against the demands of federal litigation.

**A Further Apology: This Filing Is One Day Late**

The Plaintiff owes this Court a further apology. This case was filed one day past the deadline, with increasingly substantial modifications made after midnight the morning after the equitable due date. The main writing was finished by approximately twenty minutes after midnight, but the Plaintiff realized late at night before bed that he had not extended arguments to United States and Territories passports, nor had he handled the argument about the naming of President Trump and the Presidency as the Principal Delegating Defendant.

This is another consequence of being incredibly pinched for time and misplanning when to switch over from other Lifesaver Labs life-preserving tasks—like The Mortal Library, which consumed approximately two days earlier this week immediately before the Plaintiff task-switched—to this Civigion and CALM Currency argument preparation. The Plaintiff is sorry for being late by a day.

The Plaintiff will be physically driving this case in to the Court when finished, to usefully accelerate the effective arrival date of the case in the Court docket by a day or two. The Plaintiff hopes that this supportive, effectively Court-advantageous time arbitrage acceleration he is offering by driving this case filing in again can, in part, be considered in the prudence of allowing these last-minute and final late-minute modifications into the record.

The Plaintiff argues that in this case it is in the best interests of judicial and administrative efficiency to review a better, more complete case with all Defendants named and included and final adjustments to the case text—rather than an incomplete case without final completed draft Plaintiff review adjustments, filed under absolute deadline strictness. It will help reduce wasted effort if this case is accepted for physical in-office courier filing the day after it was due, over an inferior copy mailed yesterday strictly before deadline.

The Plaintiff is human, he must say; humans are sometimes late and untimely. He regrets it and will endeavor not to be late in any way in the future, but he is already past the point of no return on this filing being minorly late.

**I. THE SUBSTANTIAL BURDEN STANDARD: AMERICAN COUNCIL OF THE BLIND v. PAULSON**

The Court's Order at page 7 noted that the Plaintiff relied on American Council of the Blind v. Paulson, 525 F.3d 1256 (D.C. Cir. 2008), but distinguished it as "a case involving Section 504 of the Rehabilitation Act." The Court is correct that Paulson arose under Section 504 rather than RFRA. However, the Plaintiff submits that the analytical framework and burden standard from Paulson is directly relevant to the substantial burden inquiry

under RFRA, and that a proper comparison reveals the Plaintiff's burden to be significantly more severe than that which the D.C. Circuit found cognizable in Paulson.

**A. The Burden Found Cognizable in Paulson**

In Paulson, the D.C. Circuit held that the Treasury Department violated Section 504 of the Rehabilitation Act by issuing paper currency that blind and visually impaired individuals could not independently distinguish by denomination. The court found that requiring blind persons to rely on third parties to identify currency denominations, or to purchase expensive electronic currency readers, denied them "meaningful access" to the currency system. See 525 F.3d at 1268-69.

Critically, the Paulson court rejected the Government's argument that "coping mechanisms"—including reliance on trusted third parties, folding bills in distinctive ways, and purchasing electronic identification devices—provided sufficient access to satisfy Section 504. The court emphasized that "the Rehabilitation Act's emphasis on independent living and self-sufficiency ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons." Id. at 1269.

The blind plaintiffs in Paulson could still USE currency. They could hold it, transfer it, spend it, and receive it. Their burden was that they required assistance to identify which denomination they held—a substantial inconvenience and indignity, but not a complete exclusion from the currency system.

**B. The Plaintiff's Burden Is Categorically More Severe**

The Plaintiff's religious exclusion from the currency system is categorically more complete and more severe than the accessibility barrier faced by blind Americans in Paulson. The Plaintiff cannot use currency at all—not with assistance, not with electronic devices, not through any accommodation. The Plaintiff's sincere religious beliefs prohibit him from: (a) holding, (b) circulating, (c) transferring, (d) accepting, or (e) destroying currency bearing the sacred, unhyphenated Name of G-d in the phrase "In G-d We Trust."

If the D.C. Circuit found a cognizable substantial burden where blind individuals needed third-party assistance to identify denominations but could otherwise freely use currency, then a fortiori, a complete religious prohibition on currency use must constitute at least as substantial a burden. The Plaintiff is not merely inconvenienced; he is entirely excluded from the legal tender system of his own country.

The comparative severity is illustrated as follows:

Paulson Plaintiffs (Blind/Visually Impaired): Could freely use coins by touch. Could use paper currency with assistance or electronic devices. Could carry, spend, and receive currency. Burden: Required accommodation for denomination identification.

Plaintiff Clayman (Religious Prohibition): Cannot use coins at all (all bear "In G-d We Trust"). Cannot use paper currency under any circumstances except immediate life-threatening emergencies. Cannot carry, spend, receive, or destroy currency without violating sincere religious beliefs. Burden: Complete exclusion from legal tender system.

The Court's Order suggests that the Plaintiff's burdens are "speculative, often avoidable, and generally negligible in scope." DE 71 at 7. But if requiring blind individuals to ask strangers to identify their bills was neither speculative nor negligible under Section 504, then the Plaintiff's absolute inability to participate in cash transactions—not a reduced ability, but a complete exclusion—cannot be considered speculative or negligible under RFRA.

**C. The Relevant Burden Standard Under RFRA**

RFRA was enacted to restore the compelling interest test of Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972). Under RFRA, a "substantial burden" exists when the government places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981).

The Plaintiff faces exactly this pressure: he must either violate his sincere religious beliefs by handling sacred currency, or he must forgo participation in the legal tender system of his own country. This is not a "symbolic harm" as characterized by the Newdow line of cases. The Plaintiff is not offended by seeing "In G-d We Trust" on others' currency; he is religiously prohibited from circulating currency bearing the unhyphenated sacred Name himself.

## II. NATURAL DISASTER RISK IS NOT "RARE AND UNLIKELY" IN FLORIDA

The Court's Order characterized the Plaintiff's concern about emergency situations where electronic payment systems fail as involving circumstances that are "rare and unlikely to arise." DE 71 at 6. The Plaintiff respectfully submits that this characterization reflects a profound misunderstanding of Florida's hurricane risk profile and is inconsistent with this Court's own location in Palm Beach County, Florida.

### A. Florida's Hurricane Reality

Florida is the most hurricane-prone state in the nation. More than 41% of all hurricanes that strike the United States make landfall in Florida—more than twice as many as the next closest state, Texas. Of the 292 hurricanes that have struck the United States since 1851, 120 have made landfall in Florida.

Colorado State University's Tropical Meteorology Project provides annual county-level hurricane probability forecasts. For 2025, CSU projected a 25-26% probability of a major hurricane (Category 3 or higher) making landfall on the U.S. East Coast, including the Florida peninsula—above the historical average of 21% from 1880-2020. The probability for the entire U.S. coastline was projected at 48-51%, well above the 43% historical average.

In the last seven years alone, Florida has been struck by five major hurricanes: Michael (2018, Category 5), Irma (2017, Category 4), Ian (2022, Category 4), Idalia (2023, Category 4), and the devastating 2024 season including Hurricanes Helene and Milton. Hurricane Ian alone caused $113 billion in insured losses—the costliest hurricane in Florida history and third-costliest in U.S. history.

### B. Florida's Insurance Crisis Reflects This Reality

If hurricanes and the electronic system failures they cause were truly "rare and unlikely," Florida would not have the highest homeowners insurance premiums in the nation. The average Florida homeowner pays approximately $11,759-$15,460 annually for home insurance—nearly five times the national average of approximately $2,377. Florida's insurance costs are nearly 12 times higher than Vermont's. Major insurers including State Farm and Farmers have exited the Florida market entirely due to hurricane risk.

The insurance market does not lie. When actuaries price hurricane risk at five times the national average, they are not pricing "rare and unlikely" events—they are pricing near-certainties over reasonable time horizons.

### C. Government Preparedness Mandates Contradict the Court's Characterization

Every year, federal, state, and local governments throughout Florida urge citizens to extensively prepare for hurricane season. Citizens are advised to create family emergency plans, purchase generators, stockpile potable water, and maintain 7-day

emergency supply kits. Palm Beach County's own emergency management office provides detailed hurricane preparedness guidance.

If it is so common and so expected in Florida that the Plaintiff's city and community advises him to make a family plan, buy a generator, keep potable water, and maintain a 7-day emergency kit, why should he not have standing to ensure he can make reliable payments during those 7 days after a hurricane when electronic payment systems may fail? The Government cannot simultaneously mandate emergency preparedness and then dismiss emergency preparedness concerns as "speculative."

**D. The Plaintiff's Lived Experience**

Having not used cash for over 10 years, the Plaintiff can testify from direct experience that he faces at least 2-3 electricity failures at local businesses each year. When power fails, businesses cannot process electronic payments. They have no backup means of payment and no accountable method of switching to alternative collection systems. They simply stop taking orders from obligated non-cash users like the Plaintiff. He must either find another business or go without food, goods, or services.

It is deeply inconsistent with Florida's reality—and arguably anti-Floridian—to tell Florida residents that the documented, recurring, government-acknowledged risk of hurricane strikes and associated infrastructure failures does not constitute cognizable standing over government policy choices that unnecessarily complicate emergency preparedness and threaten property and wellbeing during emergencies.

## III. EMPLOYMENT EXCLUSION IS CONCRETE, NOT SPECULATIVE

The Court's Order stated that "Plaintiff asserts that he cannot hold certain employment or own retail businesses without explaining why he would mandatorily have to handle cash in those positions." DE 71 at 6. The Plaintiff hereby provides that explanation with a concrete, documented example.

**A. The Nature of Cash-Handling Employment Requirements**

Many retail, food service, and customer-facing positions require employees to handle cash registers. This is not because every transaction involves cash, but because: (1) many American residents and visitors either must use cash because they have no other means of payment, or prefer to use cash; (2) many businesses maintain policies of accepting cash payments; and (3) employers need operational flexibility to assign employees to any task as business needs require.

**B. Concrete Example: Starbucks Employment Inquiry**

In approximately May 2025, the Plaintiff spoke with a Starbucks Store Manager about the possibility of working as a barista at a Starbucks location the Plaintiff frequents. The Plaintiff inquired about this position for multiple reasons: as a potential mode of supplemental income while designing and inventing systems; out of legal curiosity regarding employment accommodation requirements; and in contemplation of a future "Barista FIRE" retirement strategy (a financial independence approach where retirees work part-time service jobs to stay active and maintain community connection).

The Plaintiff explained to the Store Manager that he could not accept or handle cash for ordinary transactional purposes due to his sincere religious beliefs, and asked whether Starbucks could provide a religious accommodation—either immediately or at some future point when the Plaintiff might seek such employment.

The Store Manager informed the Plaintiff that she did not believe she could accommodate his position on refraining from cash acceptance. Her reasoning was operationally sound: she needs to ensure that all Starbucks employees at her location can swap into

any role and accept any task, rather than being compartmentalized during their shift and unable to fulfill customer needs. She provided the example of an early shift where only one employee is present: if a customer carrying only cash wishes to make a purchase, a cash-incapable employee would have to refuse the transaction entirely due to religious beliefs, creating an unacceptable customer service failure.

The Plaintiff does not fault this Store Manager or Starbucks for this position. The operational burden of accommodating an employee who cannot handle cash—particularly in a customer-facing retail environment where staffing flexibility is essential—is substantial. The Plaintiff does not wish to unduly burden private employers with accommodation requests that arise solely from the Government's decision to inscribe sacred religious text on the instruments of commerce.

### C. The Burden Properly Lies with the Government

But this Court should understand, appreciate, and act upon the Plaintiff's even greater burden. The Plaintiff is excluded from an entire category of employment—customer-facing retail and food service positions that involve cash registers—not because of any incapacity, not because of any unwillingness to work, but because the Government has chosen to inscribe the sacred, unhyphenated Name of G-d on every piece of currency in circulation.

This exclusion is not speculative. The Plaintiff has made a concrete inquiry and received a concrete denial. The Plaintiff cannot work as a barista at Starbucks. The Plaintiff cannot work as a cashier at a grocery store. The Plaintiff cannot work as a server at a restaurant that accepts cash tips. The Plaintiff cannot work as a retail associate at any store that accepts cash payments. The Plaintiff cannot operate a food truck, a farmer's market stand, or any small business that serves cash-paying customers.

Under RFRA, the question is not whether individual employers could theoretically restructure their operations to accommodate the Plaintiff. The question is whether the Government's policy substantially burdens the Plaintiff's religious exercise. Exclusion from entire categories of employment is a substantial burden by any reasonable measure.

## IV. THE PLAINTIFF'S ABSTENTION IS NOT "VOLUNTARY"

The Court's Order characterized the Plaintiff's inability to use cash as "voluntary" abstention that does not constitute a substantial burden. This characterization fundamentally misunderstands the nature of religious compulsion. The Plaintiff does not "choose" to avoid currency bearing the Sacred Name any more than an Orthodox Jew "chooses" to avoid pork or a devout Muslim "chooses" to avoid alcohol. Religious obligations are not preferences; they are commandments.

### A. The Court's "Trivial" Characterization Misapprehends the Nature of These Burdens

The Court's Order stated that the Plaintiff's "inability to use cash impairs his participation in activities such as donating to the needy, parking in certain lots, utilizing certain cash-only businesses, and accepting small political contributions in cash, but these types of activities are rather trivial." DE 71 at 6. The Court further stated that "everyday life in the United States has become increasingly cashless" and that "Plaintiff can avoid many of these situations without any difficulty."

The Plaintiff respectfully but firmly disagrees. These burdens are not trivial. They strike at fundamental dimensions of civic, religious, and personal life in the United States and its Territories.

### B. Donations to the Needy: A Religious Imperative, Not a Trivial Inconvenience

Charitable giving to the homeless and needy is not a "trivial" activity. It is a religious obligation—tzedakah—that stands at the

center of Jewish ethical life. The Court's characterization of this as trivial reflects a profound misunderstanding of religious practice.

Many homeless and needy individuals are unbanked. Many have digital illiteracies or barriers that prevent them from participating in digital payment systems. When the Plaintiff encounters a person in need at a highway exit ramp or on a street corner, he cannot spend ten minutes parked in traffic negotiating Zelle payment compatibility. The kinetic friction in existing non-cash payment systems is tremendous: exchanging payment information, determining which platform both parties can use, waiting for the transfer to complete—this process takes three to four minutes minimum between two people who do not practice digital micropayments daily. Cash, by contrast, is instantaneous, final, and requires no technological infrastructure or digital literacy.

The Court suggests the Plaintiff can avoid these situations "without any difficulty." But the difficulty is not avoidance—it is the religious and moral weight of being unable to fulfill a fundamental obligation of faith. The Plaintiff takes the highest road on religious ethics he can manage and afford to take. Being forced to drive past a person in need because the Government has rendered the only universally accepted payment instrument religiously unusable is not a trivial burden. It is a wound to conscience.

**C. The Parking Lot Example: At the Mercy of Others**

The Plaintiff concedes that parking inconvenience is the least severe of the cited burdens—at worst, it means being late to an event by ten or twenty minutes while hunting for alternative parking. But this assessment assumes everything goes smoothly. It does not account for the situation the Plaintiff encountered in Puerto Rico, where he misread the payment policies of a cash-only parking lot that was not clearly labeled as such, and found himself at the mercy of a parking lot attendant who did not appreciate claims to religious freedom and thought the Plaintiff could simply find an ATM.

The Plaintiff cannot pull cash from an ATM. He truly, honestly cannot. If push came to shove, he would rather see his car impounded until a Court could intervene to force the parking lot owner to accept an alternative to legal tender—even though the law says the owner is well within his rights to demand cash and only cash for as long as he wishes, no matter the consequences, hardship, and deprivation on the Plaintiff. This is not a hypothetical concern. This is lived experience.

**D. Bank Deposits and the Russian Roulette of Banknote Destruction**

The Court questioned why the Plaintiff could not simply deposit the $2,000 in wedding gifts at a bank and then use alternative payment methods. The Plaintiff explained this in prior pleadings but will attempt to clarify further.

Banks typically classify approximately 15% of all deposited banknotes immediately as "unfit for circulation" and earmark them for destruction. This back-office process is invisible to most depositors, but the Plaintiff is aware of it. Roughly one out of every seven banknotes deposited is immediately subject to destruction. With further downstream exchanges through the banking system, the number destroyed grows until virtually all banknotes are destroyed over a ten-year span.

Ten years is a blink of G-d's eye. And the Plaintiff would be responsible for the destructive chain all the way to the end of each banknote's life, knowing in advance his responsibility and the overwhelmingly likely course of the document's lifespan through repeated bank deposit cycles. The Plaintiff cannot play Russian Roulette—let alone start many successive rounds of Russian Roulette—with G-d's Sacred Name. When the Plaintiff has cash in his possession, he generally cannot deposit it, because doing so initiates a chain of custody that will, with near certainty, result in the destruction of sacred text.

The Court may believe this is not the Plaintiff's responsibility—that it is the bank's responsibility if currency gets destroyed on the first deposit or the tenth deposit. But the Plaintiff takes responsibility for the full lifespan and ripple effects after a banknote leaves

his hands. This is his sincere religious belief. Under RFRA, courts do not sit in judgment of the reasonableness of religious beliefs; they assess only sincerity and burden.

**D-1. Pikuach Nefesh: The Only Exception That Permits Destruction of the Sacred Name**

The Plaintiff is not conclusorily claiming that he was forced to donate the wedding gift money by some vague religious preference. The Plaintiff was actually forced to dedicate those funds exclusively to immediately lifesaving, high-impact, statistically highly effective or certain or near-certain pivotal purposes under the HhÅÆJ Jewish principle of pikuach nefesh—the doctrine that the obligation to save human life overrides virtually all other religious commandments.

Pikuach nefesh is the HhÅÆJ Jewish version of what might be called 'Lifesaver Law Overrides.' Under this principle, the Plaintiff cannot knowingly destroy a sacred copy of G-d's Name for any purpose less than medically saving or securing from imminent violence or highly-likely-deathly famine another person's life. This is an extraordinarily high threshold.

Hunger is an illustrative case. As extremely heartless as it sounds to recite, feeding the momentarily hungry—say, children over the age of six who missed one meal or were food insecure—would not have been sufficient for the Plaintiff to knowingly destroy the Name of G-d. A daylong fast, even by a vulnerable child, is not enough for the Plaintiff to shred the Sacred Name. The tragically everyday basic hunger that children face in this country is heartbreaking and completely unacceptable, but it does not meet the threshold of pikuach nefesh.

Most otherwise nourished humans can survive several days—up to ten or more days—without food, as long as they remain consistently well-hydrated. It is incredibly uncomfortable. After a few days, the situation becomes tissue- or organ-threatening. It is at that point—when risk of irreversible tissue or organ damage begins—that the Plaintiff would be religiously obligated to rush to deposit cash and thereby shred the Name of G-d.

Unless they have another medical condition or complication that makes them particularly vulnerable to hunger, only someone deep into hunger—pushing deeper and deeper past a daylong ordinary forced fast, perhaps two or three days into hunger with no prospect of food imminent—would start to qualify at the pikuach nefesh level necessary for the Plaintiff to deposit United States 'In G-d We Trust' cash at a retail bank and thereby shred the Name of G-d to rescue them from a medically risky famine problem.

This means the Plaintiff's $2,000 in wedding gifts could not simply be donated to ordinary charitable purposes. The funds had to be directed to causes meeting the pikuach nefesh threshold: immediate, certain or near-certain lifesaving interventions. This is not a preference. It is a religious obligation that severely constrained—and continues to constrain—any use the Plaintiff can make of cash that comes into his possession.

To be explicit: with the cash wedding gifts, the Plaintiff had exactly three religiously acceptable options:

1. Keep the cash in a safe forever—never spending it, never depositing it, never circulating it, allowing it to sit indefinitely as a frozen asset bearing the Sacred Name that could not be destroyed;

2. Bury the cash religiously as a sacred document—treating the banknotes as Shaimos requiring proper interment, without any use of their monetary value, effectively destroying $2,000 in wealth to preserve the Sacred Name from improper destruction; or

3. Donate the cash to a super-highly-effective, proven lifesaving charity—such as purchasing malaria nets through organizations with demonstrated cost-per-life-saved metrics—that adequately triggers pikuach nefesh duty over the obligation to protect the Sacred Name.

The Plaintiff had no other acceptable options. He could not deposit the money in a bank for personal use. He could not spend it on

ordinary goods and services. He could not invest it. He could not use it to pay bills, buy groceries, or fund any purpose that did not meet the extraordinarily high threshold of immediate, proven, statistically certain lifesaving impact. The Government's inscription of the Sacred Name on currency transformed a $2,000 wedding gift into a religious and moral crisis with only three possible resolutions—two of which involved complete forfeiture of the gift's economic value.

**E. Interference with Marriage and Family Formation**

The Government's currency policy has directly interfered with the Plaintiff's ability to form a family—the most fundamental contract most Americans ever enter.

Several months ago, the Plaintiff began a promising first date with a woman who seemed highly compatible. They both liked each other considerably. She was a retail bank manager at a bank out West. The Plaintiff explained that his religious practice and this lawsuit would continue to constrain him, and would tie his descendants as well. She deals with tens of thousands of dollars worth of banknotes every day; her livelihood depends on being able to classify and earmark cash for destruction in her typical daily operations.

The Plaintiff told her he understood it would be unreasonable to expect her to sacrifice her entire career to build a relationship with him and match him in this religious practice. She declined further dates. When the Plaintiff followed up to ask why she declined a deeper relationship, she explained that it was because of his religious belief in refraining from all use of United States cash except for lifesaving emergencies.

The Plaintiff liked her very much. After their first date, he had already begun contacting automobile transport firms to estimate the cost of moving to her state for a month or two, with the option of indefinite extension if they continued to match. He thought she was that rarely compatible. Suppose there was a one-in-four chance or greater that they would have found their way to marriage. Should the Government's printing choices on gratuitously sacred currency be such a divisive factor separating Americans from high-potential marriage matches?

Marriage is, from the eyes of the law, the most supreme and important fundamental contract anyone typically commits to in a lifetime. Any marriage is, for most Americans, a multimillion-dollar lifetime contract—easily more valuable than a housing contract, a car purchase, or a university education. If any of those contracts were tortiously interfered with by a third party like the Government setting down rules that force nonparticipation by one party, that would be ample cause for a successful lawsuit. The Plaintiff has a hard enough time finding great matches. The Government is further interfering in his ability to marry by making it necessary for him to find someone who either does not work or works in a cashless trade, rather than making it feasible to marry women who may happen to work in cash-intensive careers they cannot easily switch without paying a severely steep price—potentially losing a full lifetime of hard-won career earnings trajectory.

This policy also caused significant stress in the Plaintiff's prior marriage. His former partner was not a full supporter of total abstention from cash, came from a cash-centric culture, and found it an uncomfortable burden to significantly minimize her use of cash. After they separated and divorced, she told the Plaintiff that one of the greatest reliefs of being separated from him was her ability to use cash substantially more again.

It is a very real and substantial burden. The Government's currency policy is periodically standing between the Plaintiff and finding a great marriage and having children. That is not trivial.

**F. A Challenge to the Court: Embodied Empathy**

The Plaintiff respectfully challenges the Court's characterization of cashless life as something that can be achieved "without any

difficulty." If the Court has not personally attempted to live without cash for an extended period—months or years, through the full range of life experiences—then the Court is offering an armchair opinion without embodied empathy.

The Plaintiff is not asking anyone to take cocaine to understand addiction. He is asking the Court to consider recruiting a panel of honest lawyers and judges to refrain, with their families, from using cash for a substantial period—to test whether cashless life is truly as much of a "non-inconvenience" and "insubstantial burden" as the Court has characterized it without true lived experience.

The properties of cash—its instantaneous finality, its universal acceptance, its independence from technological infrastructure, its function as the sole form of United States legal tender—are not matched by any digital payment system the Plaintiff has access to. Until the Government provides an alternative form of legal tender that does not bear the Sacred Name, the Plaintiff's burden is substantial, ongoing, and anything but trivial.

**G. The Plaintiff Can Use Currency Freely in Two of His Three Countries—But Not His Birth Home**

The Plaintiff holds citizenship in three countries: the United States, Israel, and Portugal. It is deeply strange—and deeply telling—that the Plaintiff can use national currency freely in two of these three countries, but cannot use national currency in the country of his birth.

In Israel—a comprehensively religiously Jewish country, founded as a homeland for the Jewish people, with Hebrew as its official language and Jewish law informing much of its public life—the Plaintiff can handle Israeli shekels without any religious burden. Israeli currency does not bear the Sacred Name of G-d. The State of Israel, despite being far more explicitly religious in its national character than the United States, has not inscribed the Divine Name on its instruments of commerce.

In Portugal—a historically Catholic country with deep religious traditions—the Plaintiff can handle euros without any religious burden. Portuguese currency, and the euro generally, does not bear the Sacred Name of G-d.

But in the United States—the Plaintiff's birth home and fatherland, a nation founded on principles of religious liberty and separation of church and state—the Plaintiff cannot use national currency without violating his sincere religious beliefs. The country that constitutionally prohibits the establishment of religion has, paradoxically, created the only currency among the Plaintiff's three home nations that he cannot religiously use.

This is not merely ironic. It is constitutionally significant. The United States, alone among the Plaintiff's home countries, has rendered its legal tender religiously unusable for adherents of traditions that prohibit casual handling of the Divine Name. A Jewish state does not impose this burden. A Catholic-heritage state does not impose this burden. Only the ostensibly secular United States imposes this burden—and it does so while claiming that the burden is "trivial" and can be "avoided without difficulty."

---

The Plaintiff refers to 'United States and Territories' (USAT) throughout this filing. The Plaintiff hopes that someday this nation might be called either 'UNited States'—absorbing all territories into state communities, even if that requires forming an Overseas Islands State, and converting our country increasingly over decades and centuries toward the next Quarter-Millennial into a nation hosting a growing number of unified Nations and States, building an alternative global deliberative body and Union to the very highly dysfunctional United Nations—or polysemically switching our naming to 'L²U,' motivating us to think of our nation and community of States as experimental Lifesaver Labs United and lifelong Liberty and Love Universities. The Plaintiff admits he is a utopian, but he believes this utopian mission is not outside the realm of possibility on a long-enough timescale, especially if we orient ourselves to the mission by renaming our nation according to our hopes and aspirations for what it might become through heavily Hippocratic, harmless national and international consent, marriage union, and divorce secession protocols. The Founders could not have thought that the American project was going to be perpetually limited to America. At our Quarter-Millennial, the Plaintiff believes we should consider dropping any geographic restriction to our Union and consideration of petitioning States. Congress should be able and free to consider statehood petitions from anywhere in the world to join or leave

the United States or UNited States—from willing democratic peoples who wish to unite under our Constitution, participate in our federal system, and contribute to our collective experiment in self-governance.

The Court's Order relies on the Newdow line of cases to suggest that the Plaintiff can simply "avoid" cash transactions. This fundamentally mischaracterizes the nature of religious compulsion. The Plaintiff's abstention from cash is not a preference or a lifestyle choice that can be set aside when convenient. It is a sincere religious obligation arising from his practice of HhÆJ Judaism, which prohibits the casual inscription, circulation, and destruction of G-d's sacred Name.

**A. Religious Compulsion Is Not "Voluntary" Avoidance**

Under this Court's reasoning, virtually any religious prohibition could be characterized as "voluntary avoidance." An Orthodox Jew who cannot work on Shabbat could be told to "avoid" Sabbath observance. A Muslim who cannot eat pork could be told to "avoid" halal restrictions. A Catholic who cannot use contraception could be told to "avoid" religious teachings on reproduction.

The entire structure of RFRA exists precisely because religious obligations are not voluntary lifestyle choices subject to abandonment when the Government finds accommodation inconvenient. Congress enacted RFRA to protect Americans whose sincere religious practices conflict with generally applicable laws. See 42 U.S.C. § 2000bb(a)(4) (finding that "governments should not substantially burden religious exercise without compelling justification").

**B. Legal Tender Cannot Be Avoided in Numerous Contexts**

Moreover, even setting aside the nature of religious compulsion, the factual premise that cash can be "avoided" is incorrect in numerous legally and situationally unavoidable contexts:

1. Bail and pretrial detention: Many jurisdictions require cash-only bail. The Plaintiff has been detained for 28 days due to his inability to post cash bail—a concrete, documented harm, not speculation.

2. Legal tender statutes: Under 31 U.S.C. § 5103, "United States coins and currency... are legal tender for all debts, public charges, taxes, and dues." The Plaintiff cannot force settlement of debts using legal tender, placing him at a legal disadvantage.

3. Emergency situations: Natural disasters, power outages, and electronic system failures render cashless alternatives unavailable. The Plaintiff cannot maintain emergency cash reserves.

4. Cash-only businesses and services: Many laundromats, parking facilities, street vendors, farmers' markets, and small businesses operate cash-only.

5. Tipping and charitable giving: Cash tips to service workers and direct charitable giving to individuals experiencing homelessness require cash.

6. Certain government transactions: Some government offices, toll booths, and public transit systems accept only cash.

**C. The Court's Challenge: An Empathy Exercise**

The Plaintiff respectfully challenged this Court in prior filings to voluntarily refrain from using cash during the pendency of this lawsuit as an empathy exercise. The Plaintiff renews that challenge. If the Court, or a group of Court personnel, were to fully abstain from all forms of cash for even the limited duration of this litigation, the Plaintiff is confident that the participants would report the experience as unreasonably burdensome—and they would not face the additional complications of religious burial requirements for worn currency, the complete inability to use cash even in true emergencies, or the social consequences of appearing unable to participate in ordinary economic transactions.

### H. The Consistency of Not Carrying Currency

The Court may perceive an inconsistency in the Plaintiff's position: if the Plaintiff cannot use cash, why does it matter that he cannot carry it? The Plaintiff submits that these positions are completely consistent and mutually caused.

The Plaintiff cannot take currency into bathrooms unless it is wrapped in double layers of sealed plastic bags—and even then, only for the rare purpose of using currency in a lifesaving emergency pinch. The Sacred Name cannot be brought into unclean spaces. This means that every time the Plaintiff would need to use a restroom while carrying cash, he would need to either leave the cash outside (risking theft), transfer it to someone else, or ensure it is hermetically sealed against contamination by the unclean environment.

In practice, because of the extraordinary complications and concerns of carrying around large amounts of cash currency that the Plaintiff can barely ever use—and hopes never to be in a situation where he would need to use it—he ends up not carrying currency at all. This makes him cashless even if a life-threatening emergency happens where cash is immediately needed. The Plaintiff is not alleging anything inconsistent or contradictory. Practically, he cannot carry currency because it is so difficult to do so, given the security and sanctity ramifications, especially in light of the fact that it is almost always unusable to him anyway.

### I. The Court's Misapprehension of Burwell v. Hobby Lobby

The Court distinguished Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014), apparently on the theory that the substantial burden there was a reflection of Hobby Lobby's corporate size and the millions of dollars at stake. The Plaintiff respectfully submits that this is a ludicrously strange reading of the Supreme Court's decision.

The substantial burden analysis in Hobby Lobby was not contingent on corporate scale. The reasoning would and should precedentially apply to a sole proprietor—a 'closely held family business' with a single outside employee—facing perhaps $1,000 in added health insurance costs to cover annual contraceptive coverage duties or elections. The Supreme Court's holding protects religious exercise regardless of the dollar amount at stake; otherwise, only wealthy religious objectors would have RFRA rights.

The Plaintiff has been subjected to as much penalty as any sole proprietor or joint-tenants-in-common joint accountholders bringing forward wedding gift losses and the many other losses, opportunity costs, and prohibitions caused by this Sacred Name Printing policy. The wedding gifts 'free use loss' and the cost to Hobby Lobby to support a single female employee's contraceptive coverage are very similar in magnitude—and both qualify for RFRA protection. RFRA does not contain a minimum-dollar-threshold for substantial burden.

### J. The Court's Misapprehension of Wisconsin v. Yoder

Wisconsin v. Yoder, 406 U.S. 205 (1972), like this case, involves a situation where the plaintiff must comply with the law or face criminal sanction or fine. Here, the Plaintiff faces a choice: refrain from 'mutilating' (read: improving the circulability of) the currency by clipping out and protecting the Sacred Name—which would subject him to criminal penalties under 18 U.S.C. § 333—or face the fines, penalties, exclusions, and numerous insane and uncomfortable situations that come from not using cash.

Those situations include not being able to wash his clothes in Chicago for months on end—more than an unhygienic absolute minimum—for lack of commutable access to a non-coin-operated public washer machine or laundromat. The pressures the Plaintiff is under from not being able to use cash clearly rise to more than the maximum $5 fine (approximately $100 inflation-adjusted) at issue in Wisconsin v. Yoder.

Moreover, the Plaintiff was held in jail for 28 days—at least 25 of which were caused by his religious beliefs regarding currency and his inability to pay bail via credit card or check from the over $80,000 he had liquid in his checking account at the time. This

constitutes a Wisconsin v. Yoder 'double-forked penalty' violation: 28 days in jail AND the almost uncountable major disaster and 'thousand papercut' costs of this religious belief over the last ten-plus years—and, if this Court fails to grant relief, the rest of the Plaintiff's life in the United States and its Territories.

**K. The Cost of Currency Replacement Is Not a Compelling Government Interest**

The Plaintiff is not arguing that all currency must be replaced at once. The Plaintiff argues that the replacement should be accelerated to an Apollo-mission timeframe of approximately eight years—roughly consistent with a gentle acceleration of the ordinary currency replacement cycle. The Plaintiff argues this should be done not just for himself but also for the blind and visually impaired, whose claims were vindicated in American Council of the Blind v. Paulson.

The Court overestimates costs if it charges this case with the full cost of all currency printing. The vast, vast majority of that budget would fund necessary ordinary operations that are required with or without a design change. This is especially true if the only conservative change forced by this Court is requiring the Bureau of Engraving and Printing, the U.S. Mint, and the State Department to replace all mentions of the Sacred Name of G-d with a hyphenated form: 'In G-d We Trust.' How much burden could that change truly be? Not $1,040 million to switch the machinery for a single-letter modification.

While the Plaintiff is happy and duty-bound to work out with this Court—deeper into discovery or post-judgment—how much an ordered change will cost the country, perpetual unaccountable inertia over this religious breach for fear of design, plate, and mint conversion costs is not at all the right answer. The parties can work out the costs together and try to find a pathway that is not more expensive than it needs to be.

But if the Government has invested billions of dollars into violating the religious beliefs of a religious minority in the United States, the cost of reversing that policy is never an adequate reason under the RFRA statutes to refuse transitional and eventual steady relief. The Court appears to be legislating from the bench—applying balancing tests for what kind of religious belief is worth the cost of government change—rather than reading the law as written. The Government cannot cite fear of printing plate change costs as a 'compelling governmental interest' to refuse relief here, just as it was unable to do so in the ADA case that the American Council for the Blind brought.

**M. The Court's Cost Analysis Is Premature and Speculative**

The Plaintiff is not downplaying the logistical difficulty of his proposals. However, it is premature for this Court to weigh in on costs before discovery and a judgment on the deontological-rights merits of the claims proceed. The question of what relief is appropriate—and what that relief will cost—is properly addressed after the Court determines whether the Plaintiff's rights have been violated, not before.

Moreover, the notion that accommodating the Plaintiff's religious needs must cost the Government a great deal above its ordinary costs is not established. Consider the minimum-cost scenario: suppose the Plaintiff were to request no acceleration whatsoever on the timeframe for currency printing and minting, and simply required that all future designs be conformant to his religious needs—replacing 'In G-d We Trust' with 'In G-d We Trust' or a secular alternative on all new plates and dies as they are ordinarily replaced in the normal course of operations.

That would not cost the Government anything at all over its normal and ordinary design budgets for minting and printing. Currency plates and dies are replaced regularly as part of ordinary operations. The incremental cost of changing a few letters on the next generation of plates—during the ordinary replacement cycle—is negligible. The Plaintiff is not satisfied with this minimum-cost approach and believes acceleration to an Apollo-mission timeframe is warranted, but the floor of possible relief

demonstrates that cost is not an inherent barrier to accommodation.

Critically, the cost argument has not been pled by opposing counsel. The Government has not filed an answer asserting that accommodation would impose undue costs. The Government has not submitted declarations from the Bureau of Engraving and Printing or the U.S. Mint quantifying the expense of design modifications. No discovery has been conducted on this issue. Why, then, is the Court taking this position now—prematurely—before discovery and a decision on the overall merits of the case?

The proper sequence is: (1) determine whether the Plaintiff has stated a claim for violation of his religious rights; (2) if so, proceed to discovery on what accommodations are feasible and at what cost; (3) then determine what relief is appropriate in light of the Government's asserted interests and the actual—not speculative—costs involved. The Court has short-circuited this process by dismissing the Plaintiff's claims based on cost concerns that have not been briefed, argued, or supported by evidence.

**L. No Digital Legal Tender Alternative Exists**

The Court's suggestion that the Plaintiff can simply use digital payment methods ignores a fundamental legal reality: no digital legal tender alternative exists for everyday citizens. Under 31 U.S.C. § 5103, United States coins and currency are legal tender for all debts, public charges, taxes, and dues. No digital payment system carries this status.

Venmo, Zelle, PayPal, Apple Pay, credit cards, debit cards, checks, wire transfers—none of these are legal tender. A creditor can refuse any and all of them. Only United States currency must be accepted for the settlement of debts. By inscribing the Sacred Name on the only form of legal tender, the Government has excluded the Plaintiff from the unique legal protections that legal tender status provides.

Any allegation or implication that digital payment alternatives provide equivalent access to legal tender is false and misleading. Until the Government creates a digital legal tender option—a central bank digital currency or equivalent—that does not bear the Sacred Name, the Plaintiff remains excluded from full participation in the legal tender system that the Constitution empowers Congress to create and that 31 U.S.C. § 5103 establishes.

**M. An Almost Perfectly Matched Digital Replacement of Cash Kinetics Is Possible**

While no digital legal tender currently exists, the Plaintiff submits that an almost perfectly matched digital replacement of the kinetics of cash is possible—with better Congressional design torque and more meaningful, community-useful coercive pressure for the FedNow standard to be quickly adopted by banks as one of their key offered transactional standards.

The FedNow Standard and Congressional Hesitancy

The Plaintiff believes in standards competition, to a point. But standards competition should not turn into endless philosophers' deadlock between the critically useful FedNow Payment Standard and the inexplicable hesitancy Congress has been showing in requiring banks on a fixed, reasonably speedy schedule to adopt FedNow. This hesitation reflects excessive deference to banks who are, effectively as an industrial cartel, supporting RTP (The Clearing House's competing standard) and resisting rapid adoption of FedNow as at least one universal base layer instant payments standard—for their own platform fee interests.

It is headlags like this—obstructing the fluidity of community and neighborhood exchange of contracted moral sentiments (i.e., transactions) at kinetically very favorable rapid exchange rates—that frustrates and angers the Plaintiff about Congress and the Executive. Other countries and unions like Great Britain have very-near-instant settlement of payments, like Venmo or Zelle but better. It is a solvable problem that the Plaintiff has probably suffered more than most for lack of solution, given this deep religious freedom problem he has with cash exchange.

**A Proposal for Secretary Bessent: Inflation-Adjusting FedNow Payments**

Third Amended Complaint, Pleading, and Rejuvenating Proposal

The Plaintiff has an idea for FedNow that he would like to share with the Secretary of the Treasury, given that they are now in conversation through this proceeding about how to settle this religious claim effectively and efficiently with better 'dominant strategy' digital payments availability. This proposal would be life-changingly amazing for businesses, labor, and every form of long-term contract if implemented.

How amazing would it be if the Federal Reserve FedNow system made it possible to program recurring payments in advance to be automatically inflation-adjusted according to the CPI-U, starting on an effective date? The currency the Plaintiff is paid monthly by his firm might be $10,000 USD/CALM per month in January 2026 currency for the length of his contract, until readjustment through renegotiation, salary review, promotion, demotion, or separation. Salaries and contracts would naturally match and keep up with inflation even without active, forward, awkward, time-consuming efforts at negotiating for the baseline of inflation.

With further effort, and some additional risks but also tremendous possible value, other local, regional, or industrial labor sector inflation metrics the Government regularly and reliably publishes could be a source of contract inflation-auto-adjusting definition in FedNow payment systems. For instance, the Plaintiff could see a worker in the Miami-Fort Lauderdale-West Palm Beach Metro Area negotiating for periodic readjustments on the regional inflation rates when they jump significantly beyond the national CPI-U, as they did repeatedly during the last five years.

**Addressing Wage-Price Spiral Concerns**

The Plaintiff recognizes that this proposal could alter the economic literature, psychology, and sociology on wage-price spirals and stability, and could lead to now-not-wholly-predictable effects if auto-inflation-adjusting contracts and salaries were far more common or even became routine and platform dominant. But the Plaintiff argues that the value would be so tremendous to persons who are not as equipped to be 'pushy' and assertive about fair and just salary adjustments.

These workers deserve at least to tread water where they are at, rather than falling behind out of a lack of courage challenging their bosses on their choice to neglect or play dumb on regular pay adjustments. Workers who were promised one thing get shortchanged by inflation algorithms they do not stay assertively on top of, for lack of say a low 'power-distance index' like the Plaintiff's.

The Plaintiff is perfectly willing to call out and complain forcefully to his managers about failure to annually adjust or failure to keep up with regional and national inflation. He has super-low power-distance index—so low he is perfectly willing to challenge the Presiding Officer of the United States if he thinks they are wrong. But a large number of Americans have more cultural or familially trained tolerance of inflation-fall-behind, effectively-demotionary neglect and unaccountable, unquestionable discretion by those who hold power.

Auto-inflation-adjusting payments through FedNow would democratize fair compensation by removing the need for assertiveness that many workers lack. It would shift the default from 'falling behind unless you fight' to 'keeping pace unless renegotiated.' This is a design choice that empowers the less powerful—and it is achievable within the existing FedNow infrastructure with appropriate Congressional and Treasury Department action.

**Relevance to This Case**

The Plaintiff raises these FedNow proposals not merely as policy suggestions, but to demonstrate that the Government has tools available to create digital payment systems that could—if properly implemented—replicate or exceed the kinetic advantages of cash while avoiding the religious burden that cash currently imposes. The failure to pursue these tools is a choice, not an inevitability.

If the Government is unwilling to modify currency to accommodate the Plaintiff's religious exercise, the least restrictive alternative would be to create a robust digital payment infrastructure that provides equivalent access to instant, final, universally-accepted payment—without the Sacred Name. FedNow, properly mandated and properly enhanced, could be that alternative. The Government's failure to pursue it is relevant to the RFRA analysis of whether less restrictive means exist.

### N. The Time Has Come to Eliminate the Nickel

The Plaintiff respectfully urges this Court to recognize, and to communicate to Congress and the Treasury Department, that the time has come to eliminate the nickel from United States currency. This request is grounded in historical precedent, economic reality, and the Plaintiff's sincere religious concern for minimizing the degradation of the Name of G-d.

**Historical Precedent: The Half-Cent Elimination of 1857**

The United States once minted a half-cent coin, produced by the U.S. Mint from 1793 to 1857. When Congress eliminated the half-cent through the Coinage Act of 1857, the coin's purchasing power—adjusted for inflation—was equivalent to approximately fourteen to fifteen cents in today's currency. Some calculations place the 1857 half-cent's value even higher, at approximately eighteen cents in 2026 dollars.

The nickel today is worth five cents. This means the half-cent, when it was deemed too worthless to continue minting, had approximately three times the purchasing power of today's nickel. If the United States Government applied consistent principles—eliminating coins when they fall below a certain threshold of practical utility—the nickel would have been eliminated years ago. Indeed, applying the 1857 standard consistently, the lowest-value coin in circulation today should be the quarter.

**The Penny Has Already Been Discontinued**

In February 2025, President Trump instructed Secretary Bessent to halt penny production, citing high production costs. The U.S. Mint stopped purchasing penny planchets, and the last penny produced for general circulation was minted at the Philadelphia Mint on November 12, 2025. The penny continues to circulate and remains legal tender, but new pennies are no longer being minted for circulation.

The discontinuation of the penny establishes current precedent for eliminating low-value denominations. The nickel should follow. At five cents, it is economically vestigial—worth less than what the half-cent was worth when Congress deemed it too insignificant to continue. The logic that justified ending the half-cent in 1857, and the penny in 2025, applies with even greater force to the nickel in 2026.

**Religious Concern: Minimizing Degradation of the Sacred Name**

From the Plaintiff's religious perspective, eliminating the nickel serves a sacred purpose: minimizing the degradation of the Name of G-d. Nickels bearing 'In G-d We Trust' are, by virtue of their low value, treated with casual disregard. They accumulate in jars, fall between couch cushions, roll into gutters, and end up in garbage disposals, vacuum cleaners, and worse places. The lower the denomination, the less care people exercise in handling it.

Every nickel that ends up in a landfill, a sewer, or ground into a parking lot represents the Sacred Name of G-d being subjected to degradation. While the Plaintiff cannot control what others do with currency, he can urge the Government to reduce the volume of low-value currency bearing the Divine Name that inevitably ends up in unclean and degrading circumstances. Eliminating the nickel would reduce the quantity of Sacred Names circulating in forms that receive the least careful treatment.

**The Urgency of Acting Now**

If the nickel is not eliminated now, the Lord only knows how long it will take to clear nickels out of the currency system. Coins have remarkable persistence. Half-cents minted before 1857 still exist in collections and occasionally surface in circulation 168 years later. Every year the Government continues minting nickels is another year of nickels that will circulate—and eventually be degraded—for decades to come.

The longer Congress waits, the larger the stock of nickels bearing the Sacred Name that must eventually work their way out of circulation through loss, destruction, and disposal. Acting now minimizes the total quantity of Divine Names that will be subjected to degradation over the coming century.

**Making Room for Future Higher-Value Coins**

Eliminating the nickel would create space in the coin ecosystem for a more valuable coin in the future. When the Treasury and

Congress are ready, they could mint a $2 or $5 coin that occupies a similar neighborhood of shape and hand-feel to the nickel—but not exactly the same, so as to be machine-distinguishable and hand-distinguishable from any nickels still in circulation.

Inflation shall march on. A $2 or $5 coin would be extremely valuable for physical commerce in the future, providing a meaningful denomination for everyday transactions in an economy where a nickel purchases essentially nothing. The slot in the national coin purse currently occupied by the nickel—a coin too worthless to bend over and pick up—could be reallocated to a denomination that actually facilitates commerce.

The Plaintiff therefore requests that this Court, in addition to the other relief requested herein, communicate to Congress and the Treasury Department the appropriateness—indeed, the long-overdue necessity—of eliminating the nickel from United States currency, thereby reducing the degradation of the Sacred Name, creating space for more useful future denominations, and bringing American coinage policy into alignment with the economic logic that justified elimination of the half-cent in 1857 and the penny in 2025.

## V. THIS COURT'S FAILURE TO RULE ON THE PRELIMINARY INJUNCTION HAS ALLOWED THE HARM TO MATERIALIZE

On October 6, 2025, the Plaintiff filed a Motion for Preliminary and Temporary Injunction (DE 51) seeking to block the proposed "quarter-millennial" currency designs bearing the unhyphenated Divine Name. That motion has never been ruled upon. As a direct consequence, on January 5, 2026—the date of this filing—newly redesigned quarter-millennial coins bearing the Sacred Name of G-d began circulating in the United States currency supply.

The Plaintiff's harm is no longer imminent. It is actual. It is ongoing. It is happening today.

### A. The Quarter-Millennial Coins Are Now in Circulation

As reported by NPR on January 5, 2026, "New coins begin to circulate today, commemorating the 250th anniversary of the United States' founding." The first of the new anniversary quarters features the Mayflower Compact, with the text "IN GOD WE TRUST" prominently displayed along the bottom edge. Additional commemorative quarters will roll out throughout 2026, each bearing the unhyphenated Divine Name.

The Treasury Department proceeded with these designs despite the Plaintiff's pending preliminary injunction motion. The coins are now entering circulation, flowing into cash registers, pockets, and purses across America—including the cash registers the Plaintiff cannot operate, the pockets of pants the Plaintiff cannot wear into bathrooms, and the transactions the Plaintiff cannot participate in without violating his sincere religious beliefs regarding the Sacred Name of G-d.

### B. The Government Overruled Its Own Advisory Committee

The quarter-millennial coin designs were authorized by Congress in 2021, launching a lengthy design process involving focus groups and public outreach. The Citizens Coinage Advisory Committee—a body Congress established to ensure democratic input into currency design—recommended commemorative quarters honoring Frederick Douglass, the 19th Amendment giving women the right to vote, and Ruby Bridges celebrating school desegregation.

The Trump administration rejected all of these recommendations. As Donald Scarinci, a twenty-year member of the Citizens Coinage Advisory Committee, stated: "We saw designs we'd never seen before." Scarinci boycotted the unveiling ceremony. The Frederick Douglass, Ruby Bridges, and suffragette quarters were scrapped, replaced by coins featuring pilgrims, the

Revolutionary War, and the Gettysburg Address—all bearing the unhyphenated motto "In G-d We Trust."

**C. The Trump Portrait Coin Remains Under Consideration**

Beyond the quarter-millennial quarters now in circulation, the U.S. Mint has proposed issuing a $1 coin featuring President Trump's likeness—the very coin the Plaintiff sought to enjoin in his October 2025 motion. Douglas Mudd, curator and director of the Money Museum at the American Numismatic Association, confirmed: "This would be a first to have a sitting president on a coin that's intended for circulation."

George Washington himself refused to appear on currency, expressly stating that he would not have his portrait on United States coins because "We are done with kings." As Scarinci noted: "For 250 years, around the world, the only nations that placed images of their rulers on coins are monarchs and dictatorships." Nine Democratic senators have written to Treasury Secretary Bessent urging rejection of the Trump coin to avoid the appearance of a "cult of personality."

Yet the proposed Trump coin would bear not only the President's living likeness but also the unhyphenated Sacred Name of G-d. The combination of political idolatry with religious sacrilege compounds the Plaintiff's burden: commemorative currency celebrating the nation's founding would unite the graven image of a political leader with the Most Sacred Name, on legal tender that the Plaintiff would be compelled to handle or refuse.

**D. The Harm Can No Longer Be Characterized as Speculative**

The Court's November 21, 2025 Order dismissing the First Amended Complaint characterized the Plaintiff's claims as involving speculative future harm. Whatever merit that characterization may have had three months ago, it cannot survive contact with present reality. The quarter-millennial commemorative currency is now circulating. The Sacred Name of G-d has been freshly minted onto new coins that will flow through the American economy for decades.

The Plaintiff is not asking this Court to speculate about what the Government might do. The Plaintiff is informing this Court of what the Government has done—while this case was pending, while a preliminary injunction motion sat unruled-upon on this Court's docket for over ninety days.

**E. The Paradox of Sacred Contamination**

It may seem strange to describe currency as "tainted" by holiness. Typically, contamination implies defilement—something unclean that renders an object unusable. But the Plaintiff's religious burden operates in the opposite direction: the quarter-millennial currency supply is tainted to unusability by its excessive sacredness.

The Government has taken ordinary instruments of commerce—coins that should be freely exchangeable, carryable, and discardable—and transformed them into sacred objects bearing the unhyphenated Name of G-d. For the Plaintiff, these are not merely coins. They are Shaimos: objects containing the Divine Name that cannot be casually handled, cannot be carried into bathrooms, cannot be placed face-down on unclean surfaces, cannot be thrown to the floor, cannot be recklessly abandoned or discarded.

The Government has, in effect, "sacredly complicated" the quarter-millennial celebratory currency supply. The Plaintiff cannot participate in the nation's 250th anniversary celebration through the ordinary act of handling commemorative currency—because the Government has rendered that currency too holy for ordinary use by Jews like the Plaintiff.

As Scarinci observed: "This is not just a coin. It is American history that will last for an eternity. These coins that we produce reflect the values of a nation." The Plaintiff agrees. And the values reflected by inscribing the Sacred Name of G-d on currency

destined to be dropped, lost, carried through bathrooms, and eventually discarded—those values exclude the Plaintiff and all who share his sincere religious beliefs from full participation in American economic and civic life.

**F. The Preliminary Injunction Motion Remains Pending**

The Plaintiff's Motion for Preliminary Injunction (DE 51) remains on this Court's docket, unruled-upon for over ninety days. The Plaintiff respectfully urges this Court to rule on that motion. While the quarter-millennial coins already in circulation cannot be recalled, a preliminary injunction could still prevent further minting of religiously problematic designs—including the proposed Trump portrait $1 coin and the forthcoming $10 banknote redesign scheduled for completion by the end of 2026.

The Plaintiff further respectfully submits that the same facts that supported preliminary injunctive relief in October 2025 now compel this Court to recognize that the Plaintiff has Article III standing: the Government has taken concrete action that substantially burdens the Plaintiff's religious exercise, that burden is ongoing, and judicial intervention remains necessary to prevent further entrenchment of the challenged practice.

## VI. THE PLAINTIFF'S THREAT OF ARREST IS IMMINENT AND CONCRETE

The Court's Order suggested that the Plaintiff's concerns about bail are speculative because "there is no allegation that posting bail will become necessary." DE 71 at 6. The Plaintiff respectfully submits that this characterization is factually incorrect. The Plaintiff has already been detained for 28 days due to his inability to post cash bail—this is documented, concrete, past harm. Moreover, the Plaintiff hereby alleges, with complete candor to this Court, that arrest is not merely possible but virtually certain in the near future.

**A. Past Detention Establishes Concrete Harm**

The Plaintiff's 28-day detention for inability to post cash-only bail is not speculation—it is documented fact. This past harm establishes that the intersection of the Plaintiff's religious beliefs and the Government's currency policy has already resulted in deprivation of liberty. Under basic standing principles, past harm combined with ongoing policy creates a reasonable likelihood of future harm.

**B. The Plaintiff's Stated Intent to Engage in Civil Disobedience**

The Plaintiff informs this Court, with complete transparency, of his intentions should this Court issue a final rejection of his RFRA claims:

Within days or weeks of any final adverse ruling, the Plaintiff intends to contact the United States Secret Service and organize a public demonstration near their headquarters. At this demonstration, the Plaintiff will openly cut the motto "In G-d We Trust" from Federal Reserve notes in order to separate the sacred from the secular before circulating the modified currency.

This conduct may violate 18 U.S.C. § 333, which provides that "[w]hoever mutilates, cuts, defaces, disfigures, or perforates... any bank bill, draft, note, or other evidence of debt issued by any national banking association, or Federal Reserve bank, or the Federal Reserve System, with intent to render such bank bill, draft, note, or other evidence of debt unfit to be reissued, shall be fined under this title or imprisoned not more than six months, or both."

The Plaintiff's purpose in this demonstration would be twofold: (1) to force the question whether the Religious Freedom Restoration Act provides a defense to prosecution under 18 U.S.C. § 333 when currency mutilation is undertaken for sincere religious purposes; and (2) to provide the Secret Service with an opportunity to exercise prosecutorial discretion and issue

guidance—whether a broad nonprosecution letter or otherwise—clarifying the rights of religious dissenters to modify currency bearing sacred inscriptions.

**C. The Bail Allegation This Court Found Missing**

The Court's Order stated that "there is no allegation that posting bail will become necessary or that all jurisdictions disallow cashless bail." DE 71 at 6. The Plaintiff hereby makes that allegation expressly and unequivocally:

The Plaintiff alleges that he will need to post bail imminently. The Plaintiff intends to test the currency mutilation statute at or near the Secret Service field offices in South Florida—either the West Palm Beach field office (Palm Beach County) or the Miami field office (Miami-Dade County). The Plaintiff expects to be arrested for this conduct.

The Plaintiff alleges that both Palm Beach County and Miami-Dade County require cash-only payment for bail. Upon information and belief, neither jurisdiction's detention facilities accept credit card payments for bail. The Plaintiff cannot pay cash bail due to his sincere religious beliefs. Therefore, arrest in either jurisdiction will result in the Plaintiff's inability to post bail through religiously permissible means.

The Plaintiff alleges that bail will almost certainly be set. At any bail hearing, the Plaintiff intends to inform the presiding judge, with complete candor, that he plans to continue cutting the sacred motto "In G-d We Trust" from United States banknotes freely and without restraint as soon as he is released. This statement of continuing intent will almost certainly result in the court setting bail as a condition of release, rather than releasing the Plaintiff on his own recognizance.

The Plaintiff alleges that he faces indefinite detention. Because the Plaintiff cannot pay cash bail and will openly state his intent to continue the challenged conduct, he faces the prospect of indefinite pretrial detention until his criminal case is heard and resolved—unless a friend or family member can arrange bail payment on his behalf.

The Plaintiff alleges that the only cashless bail alternative itself constitutes a substantial RFRA burden. The only method the Plaintiff is aware of for posting bail without personally handling cash would be to engage a bail bondsman, which typically requires payment of a 10% non-recoverable premium on the bond amount. This premium—money permanently lost solely because the Plaintiff cannot handle sacred currency—would itself constitute direct, quantifiable economic harm caused by the Government's refusal to accommodate the Plaintiff's religious beliefs. If the Plaintiff must pay a bail bondsman $500 to avoid handling $5,000 in sacred currency, that $500 loss is a concrete injury traceable to the Government's currency policy.

**D. This Stated Intent Establishes Imminent, Concrete Standing**

The Plaintiff is not required to actually be arrested before challenging the constitutionality of laws that burden his religious exercise. Pre-enforcement challenges are routinely permitted where, as here, a plaintiff has stated a credible intent to engage in conduct that may be prohibited by law. See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014) (holding that "[w]hen an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law").

In Susan B. Anthony List, the Supreme Court unanimously held that pre-enforcement standing exists where a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Id. at 159 (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)). All three elements are satisfied here: (1) the Plaintiff intends to cut the motto from currency; (2) this conduct is arguably protected by RFRA; and (3) 18 U.S.C. § 333 expressly prohibits cutting currency, and the Secret Service has jurisdiction over currency crimes.

The Plaintiff's statement of intent in this pleading—filed under penalty of perjury and Rule 11 obligations—establishes the

concrete and imminent nature of his exposure to criminal liability and pretrial detention. The only question is whether this Court will resolve the RFRA question before the Plaintiff is forced to resolve it through arrest, indefinite detention, and criminal prosecution.

**E. The Plaintiff Seeks Judicial Resolution Before Arrest**

The Plaintiff is petitioning this Court scrupulously for recognition of his religious rights before he is criminally charged. He is attempting to work within the legal system, seeking a declaratory judgment that he may modify currency to remove the sacred motto without threat of prosecution. This is the orderly, respectful approach to constitutional adjudication.

If this Court declines to adjudicate the Plaintiff's claims on their merits—dismissing them as "speculative" when the Plaintiff has now placed his intentions squarely on the record—it will leave the Plaintiff with no choice but to force the question through civil disobedience and subsequent criminal prosecution. The Plaintiff would prefer to resolve these questions through civil litigation rather than criminal proceedings, but he will not abandon his religious convictions simply because this Court finds adjudication inconvenient.

The Plaintiff cannot make it clearer: this is not speculation. This is notice. The Plaintiff will test 18 U.S.C. § 333 at or near the Secret Service field offices in Palm Beach or Miami-Dade County. The Plaintiff expects to be arrested. The Plaintiff expects to be unable to post cash bail. The Plaintiff expects to be detained, potentially indefinitely, until his criminal case is resolved. The only variable is whether resolution of the underlying RFRA question will come through this civil proceeding or through a criminal case that will necessarily follow the Plaintiff's principled resistance to laws he believes violate his religious freedom.

## VII. STANDING TO REPRESENT FUTURE CHILDREN'S INTERESTS

The Court's Order characterized the Plaintiff's allegations regarding future children as "speculative." DE 71 at 6. This characterization inflicts serious dignitary harm upon the Plaintiff's religious beliefs and fundamentally misapprehends both the concrete nature of the Plaintiff's parental intentions and the religious framework within which conception is understood.

**A. The Plaintiff's Children May Already Exist**

As a threshold matter, the Court cannot confidently assert that the Plaintiff's children do not yet exist. The Plaintiff plans to adopt at least one child, preferably multiple children. Adoption means that the Plaintiff's future children may already be alive, already exist as concrete persons in the world, and are simply awaiting formal legal connection to the Plaintiff through the adoption process.

The Plaintiff has committed to a firm deadline: by approximately March 31, 2031—on or about his 45th birthday—he will have children, whether through adoption, foster parenting, or, if partnered, through pregnancy with a spouse. This is not speculation; this is a concrete life plan with a defined timeline. The question is not whether the Plaintiff will have children, but how—and the Government's continued violation of the Plaintiff's religious rights will burden those children from their first day in the Plaintiff's custody.

**B. Religious Conception at Naming: The HhÅÆJ Jewish Framework**

The Plaintiff practices HhÅÆJ Judaism, a tradition that places exceptional importance on the naming of children. In Hebrew, the words for "Name" (Shem, שם) and "Soul" (Neshamah, נשמה) share the same root letters, reflecting the deep Jewish belief that a person's soul is captured in their name. This linguistic and theological connection is taught from childhood and deeply reinforced

in Jewish community life.

For the Plaintiff, the moment of conception is not solely the biological event of fertilization—it includes, and may be preceded by, the religious act of naming and parental imprinting. When a dedicated future parent chooses a name for a future child and develops a clear picture of the values, direction, and identity they wish to impart to that child, the child becomes conceived in a religiously meaningful sense.

The Plaintiff has already named his future children. His highest-ranked and most fully conceived name is Δ (Delta). The Plaintiff has maintained a baby naming spreadsheet since May 3, 2020—over five years ago. By May 18, 2020, Δ was listed as one of his top two choices. The choice of this name reflects years of careful thought about:

(1) The scientific meaning of Δ as representing change in physics and chemistry, reflecting the Plaintiff's hope that his child will achieve meaningful, lasting change in the world;

(2) The legal symbolism of Δ as shorthand for "Defendant," reflecting the Plaintiff's hope that his child will develop post-conventional morality and the courage to defy unjust laws;

(3) The practical benefit of a one-character name, based on the Plaintiff's own childhood experience of preferring his three-letter Hebrew name (דוד) to his five-letter English name (David);

(4) The constitutional implications of naming laws that restrict parents to ASCII characters, which the Plaintiff believes violate the Religious Freedom Restoration Act and the free exercise rights of parents from Greek, Hebrew, Hindi, Chinese, and other linguistic traditions.

The Plaintiff's child Δ is not speculative. Δ has been conceived through naming, through parental imprint development, and through years of careful preparation. The only question that remains is the biological and legal formalities of bringing Δ into the Plaintiff's custody—not whether Δ will exist.

**C. The Concept of Konseptual Parenthood**

The Plaintiff's religious and civic framework recognizes the concept of a "konseptual parent"—a person who has thought deeply about bringing children into the world and takes parenting responsibility seriously, even before having biological or adopted children. The shift from non-parent to conceptual parent is marked by choosing names for future children and developing a model of intergenerational responsibility.

In Jewish tradition (and other religious traditions), life does not begin solely at fertilization but at this concrete intergenerational thinking and "parental imprint." Conceptual parents may exist five or more years before traditional parenthood, as measured by biological birth or legal adoption. The Plaintiff has been a conceptual parent since at least May 2020.

This Court's dismissal of the Plaintiff's children as "speculative" effectively imposes a single theological framework—one that ties personhood and parental responsibility exclusively to biological fertilization—upon the Plaintiff's different religious understanding. This imposition is itself a form of religious discrimination, privileging certain religious views of conception over others.

**D. The High-Inertia Nature of Currency Reform**

Even if the Court declines to recognize the Plaintiff's religious framework of conception at naming, practical considerations strongly favor granting standing to represent future children's interests. Currency system reform is an extraordinarily high-inertia undertaking. The Court's own Order noted that the 2025 currency operating budget for new currency alone is $1,040.0 million.

DE 71 at 8.

A transition to religiously accommodating currency—whether through hyphenation of the Divine Name, adoption of a secular alternative, or development of digital legal tender without the motto—would take many years, potentially a decade or more, to achieve full circulation. If the Plaintiff is denied standing to advocate for his children's interests until those children are physically born or legally adopted, the window to protect their childhood years from religious burden will have closed.

By the time the Plaintiff's children are old enough to participate in the economy—to receive allowances, to purchase school supplies, to tip service workers, to donate to charity—the currency system will either have been reformed or it will not have been. That determination must be made now, while there is still time to affect the outcome. The bell of childhood under religiously incompatible currency cannot be unrung; the clock cannot be reversed. Standing must therefore be recognized now.

## VIII. ALLOPARENTAL STANDING AND RESPONSIBILITY

Beyond his direct parental interests, the Plaintiff also acts as an "alloparent"—a community member who provides parental-type care and protection to children who are not custodially his own. The Plaintiff is a former teacher and maintains ongoing responsibility for the welfare of youth in his religious and civic communities.

The Plaintiff's alloparental work includes projects such as RaisingRights.org (also accessible through RaisingWrights.org and RaisingRites.org), which advocates for youth rights, rites, and responsibilities. The Plaintiff's work on Safeword™ consent technology serves older adolescent youth approaching the age of legal consent. Through his practice of HhÅÆJ Judaism, the Plaintiff maintains community responsibility for Jewish youth.

The notion that a high school science teacher or substitute lacks standing to challenge practices that harm their students—because those students are not "custodially theirs"—represents impoverished legal policy that fails to recognize the web of care and responsibility that surrounds every child. Teachers, mentors, religious leaders, and community members all have legitimate interests in protecting children from foreseeable harm, including the religious burdens that will fall upon children raised in traditions that prohibit casual use of the Divine Name.

## IX. REINCARNATION STANDING UNDER RFRA AND THE DOCTRINE OF GILGULIM

The Plaintiff advances a novel but religiously grounded argument for intergenerational standing based on the Kabbalistic doctrine of Gilgulim—the transmigration of souls. Under the Religious Freedom Restoration Act, this Court should be able to find cognizable a form of 'reincarnation standing' that extends intergenerationally and beyond the reach of the Plaintiff's own lifetime, for those who live in religious traditions that believe in reincarnation and approach the Judiciary with claims meaningfully strong and targeted enough to be cognizable across generations of soul migration.

### A. The Kabbalistic Doctrine of Gilgulim

Gilgulim (גלגולים), meaning 'cycles' or 'rotations,' is the Kabbalistic concept of the migration and reincarnation of souls. This doctrine holds that souls return to the physical world in successive bodies to complete spiritual tasks, rectify past errors, and

achieve tikkun (repair). The doctrine is elaborated in foundational Kabbalistic texts including:

The Zohar (13th century), the central text of Kabbalah, which discusses soul transmigration extensively throughout its volumes, particularly in the sections on Mishpatim;

Sha'ar HaGilgulim ('Gate of Reincarnations'), written by Rabbi Chaim Vital based on the teachings of Rabbi Isaac Luria (the Arizal, 16th century), which provides the most systematic treatment of soul transmigration in Jewish mystical literature;

Sefer HaGilgulim ('Book of Reincarnations'), also from the Lurianic tradition, which elaborates on how souls are assigned to new bodies and the purposes of each incarnation.

The doctrine of Gilgulim is not peripheral to Judaism—it is embraced by Hasidic communities, many Sephardic traditions, and significant streams of Orthodox Judaism. The Plaintiff's HhÀÆJ Jewish practice incorporates this belief.

**B. The Plaintiff's Reincarnation Belief and Personal Standing**

The Plaintiff believes, through the birth-naming mechanism central to Jewish tradition, that he carries and embodies the reincarnated soul of his Uncle David Nathan Clayman, after whom he was very intentionally named. In Jewish tradition, naming a child after a deceased relative creates a soul-connection (neshamah-bond) that honors the departed and, under Gilgulim doctrine, may facilitate the continuation or completion of the soul's journey.

This is not metaphor for the Plaintiff—it is sincere religious belief. The Plaintiff understands himself to be, in a religiously meaningful sense, a continuation of his Uncle David's soul-journey. Under RFRA, courts do not assess the reasonableness of religious beliefs; they assess only sincerity.

**C. Standing for Future Reincarnates**

Specifically, in this case, the Plaintiff cites the Gilgulim doctrine to argue that this case should be continued for him by an appointed steward and legal advocate guardian even in the event of his unexpected, untimely death and likely expected reincarnation as a fetal baby or child before this case concludes. The Plaintiff's reincarnated form in the next generation deserves the settlement of these case arguments as quickly as administratively and judicially possible, and a cleaned currency system before she or he reaches the age where she or he might need to use the civigious currency of the United States and Territories.

The Plaintiff requests that this Court make accommodation under RFRA for his sincere religious belief that particularized harm may come to his future reincarnate—a being the Plaintiff has religious obligation to look after interests for, just as he looks after interests for his future biological or adopted children.

**D. The Soul-Based Personhood Authority Is More Direct Than Custodial Authority**

No person is better placed to argue claims for future generations than the living reincarnate. The soul-based personhood legal authority is even more direct than the custodial legal authority that a parent has for their children, who are religiously different entities with their own distinct souls. By contrast, soul transmigration involves an identical or nearly identical soul—guaranteed by G-d or the gods, as appropriate to each person's reincarnating faith—continuing its journey across bodies and generations.

If a parent has standing to represent the interests of a child who is a distinct soul-entity, then a fortiori the Plaintiff should have standing to represent the interests of his own future reincarnation—who is, under his sincere religious belief, the same soul-entity as himself.

**E. Broader Applications: Climate Change and Intergenerational Harm**

This type of religious standing argument applies to other legal cases involving intergenerational harm—for instance, climate change litigation brought by those in reincarnating religious belief structures. Hindus, Buddhists, Jains, many indigenous traditions, and Kabbalistic Jews all hold beliefs in some form of soul transmigration or reincarnation. These billions of people have religious standing to argue for protection of future generations in a way that is more direct than abstract concern for 'posterity.'

When a Buddhist plaintiff argues that climate policies will harm her future reincarnations, she is not arguing abstractly about 'future generations'—she is arguing about particularized harm to herself, in her future form. Under RFRA's protection for sincere religious exercise, such claims deserve recognition.

The Plaintiff submits that reincarnation standing is a necessary accommodation for religious believers who approach courts with intergenerational claims. To deny such standing is to impose a secular, materialist conception of personhood—one that limits the legal 'person' to a single biological lifespan—upon believers whose sincere religious understanding encompasses multiple lifetimes. Such imposition would itself burden religious exercise in violation of RFRA.

## X. EXTENDING RELIEF TO STATE, TERRITORIAL, AND LOCAL GOVERNMENTS

The Plaintiff faces a practical problem that this Court should address: numerous state, territorial, and local governments also abuse the Sacred Name of G-d on their official seals, documents, and papers they issue to citizens. The Plaintiff cannot spend the rest of his life chasing down local governments where he may work, live, or travel. He does not want to be back in Court a million times every time he moves to a new city or state, and there are a tremendous number of states and localities that abuse the Sacred Name of G-d in 'unprotected printings.'

### A. The Scope of the Problem

Many states include religious references in their official seals, mottos, and documents. Florida's state motto is 'In G-d We Trust.' Ohio's motto is 'With G-d, All Things Are Possible.' Arizona, Colorado, Georgia, Kentucky, Mississippi, South Dakota, and numerous other states have similar religious inscriptions on official documents, seals, or mottos. County and municipal governments add further layers of religious inscription on birth certificates, marriage licenses, property deeds, court documents, and countless other official papers.

If the Plaintiff must file separate litigation against each state, territory, county, and municipality that issues documents bearing the Sacred Name, he will be engaged in endless litigation for the remainder of his life—and likely the remainder of his reincarnated lives as well. This cannot be what the Religious Freedom Restoration Act, the First Amendment, or basic principles of judicial economy contemplate.

### B. Constitutional Incorporation and the Fourteenth Amendment

The First Amendment's Religion Clauses apply to state and local governments through incorporation via the Fourteenth Amendment. See Cantwell v. Connecticut, 310 U.S. 296 (1940) (Free Exercise Clause); Everson v. Board of Education, 330 U.S. 1 (1947) (Establishment Clause). Any constitutional ruling this Court issues on the Free Exercise or Establishment Clause claims therefore applies with equal force to state and local governments.

The Plaintiff respectfully requests that this Court's declaratory judgment explicitly state that the constitutional principles articulated herein apply to all levels of government—federal, state, territorial, and local—such that any government entity issuing

official documents bearing the unhyphenated Sacred Name of G-d is on notice that such practice burdens the religious exercise of HhÅÆJ Jews and others with similar beliefs.

**C. State RFRAs and Parallel Protections**

Thirty states have enacted their own Religious Freedom Restoration Acts or equivalent statutes providing heightened protection for religious exercise—with this number growing as states like Georgia and Wyoming adopted RFRAs in 2025, and Iowa, Utah, and Nebraska did so in 2024. The Plaintiff submits that this Court's analysis of substantial burden, compelling governmental interest, and least restrictive means under federal RFRA should serve as persuasive—if not binding—authority for interpretation of parallel state RFRA statutes.

The Plaintiff requests that this Court explicitly invite state courts to adopt the reasoning of any favorable ruling in this case when adjudicating state RFRA claims involving religious burdens from official inscriptions of the Divine Name.

**D. Request for Class Certification**

The Plaintiff respectfully requests that this Court consider certifying a class of similarly situated religious practitioners—including HhÅÆJ Jews, other observant Jews, and persons of other faiths whose sincere religious beliefs prohibit casual handling or destruction of the Divine Name—for purposes of obtaining declaratory and injunctive relief against all governmental entities, federal, state, territorial, and local, that issue official documents bearing the unhyphenated Sacred Name.

Class certification would: (1) provide judicial economy by resolving in one proceeding claims that would otherwise require thousands of separate lawsuits; (2) ensure consistent treatment of identical legal questions across jurisdictions; (3) provide meaningful relief to class members who lack the resources to pursue individual litigation; and (4) put all governmental entities on notice simultaneously of their obligations under the Religion Clauses and applicable RFRA statutes.

**E. The Principal Delegating Defendant Model for States**

The Plaintiff has argued that President Trump, as Principal Delegating Defendant, should be able to delegate responses across the federal Executive Branch. The same logic should apply at the state level. If a Governor can be sued and expected to delegate appropriately to state agencies, and if a Mayor can be sued and expected to delegate to municipal departments, then the Plaintiff should not be required to separately name and serve every state agency, county clerk, and municipal office that might issue documents bearing the Sacred Name.

The Plaintiff requests that this Court's ruling articulate a framework by which future litigants—including the Plaintiff in any subsequent state or local proceedings—may name the chief executive of any governmental unit as a Principal Delegating Defendant, with the understanding that such executive will delegate appropriately to all subordinate offices and agencies.

**F. Nationwide Injunctive Relief**

The Plaintiff recognizes that nationwide injunctions have become controversial in recent years. However, the Plaintiff submits that this case presents precisely the circumstances where broad injunctive relief is appropriate: the constitutional and statutory violations are identical across all jurisdictions; the Plaintiff and class members are harmed wherever they travel, work, or reside; and piecemeal litigation would impose enormous costs on courts, litigants, and governmental entities alike.

The Plaintiff requests that this Court issue declaratory and injunctive relief that reaches all governmental entities within the United States and Territories, or alternatively, that this Court certify any unresolved questions of constitutional law for immediate appeal to facilitate a binding nationwide precedent from the appropriate Circuit Court or the Supreme Court of the United States.

### G. Template Relief for Future Cases

In the alternative, if this Court determines that it cannot directly bind state and local governments in this proceeding, the Plaintiff requests that this Court's ruling include a detailed template for relief that future litigants—or the Plaintiff himself—can use in subsequent state and local proceedings. Such a template should include: (1) findings of fact regarding the nature of the religious burden; (2) conclusions of law regarding the constitutional and RFRA analysis; (3) specific accommodations that would satisfy the least restrictive means requirement; and (4) suggested injunctive language that state and local courts may adopt.

This approach would at least reduce the burden on the Plaintiff and similarly situated litigants, allowing them to seek streamlined relief in state and local courts by presenting this Court's template ruling as persuasive authority and requesting conforming relief.

The Plaintiff should not have to spend the rest of his life—or lives—in litigation. The legal principles at stake are clear. The burden is substantial. The accommodations are straightforward. This Court has the opportunity to provide meaningful, comprehensive relief that protects not only the Plaintiff but all persons of sincere religious belief who are burdened by governmental inscription of the Sacred Name across all levels of American government.

## XI. THIS CASE AS A VEHICLE FOR RECONSIDERING EMPLOYMENT DIVISION v. SMITH AND CITY OF BOERNE v. FLORES

The Plaintiff respectfully submits that this case presents an appropriate vehicle for the Supreme Court of the United States to reconsider two decisions that have created the patchwork problem described above: Employment Division v. Smith, 494 U.S. 872 (1990), and City of Boerne v. Flores, 521 U.S. 507 (1997). The Plaintiff urges this Court to rule in his favor on the existing legal framework, but also to recognize and certify for appellate review the broader constitutional questions that this case implicates.

### A. The Problem Created by Smith and City of Boerne

In Employment Division v. Smith, the Supreme Court held that the Free Exercise Clause does not require religious exemptions from neutral, generally applicable laws—even if those laws substantially burden religious exercise. This departed from decades of precedent applying strict scrutiny to laws burdening religious practice, most notably Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972).

Congress responded to Smith by passing the Religious Freedom Restoration Act in 1993, which restored strict scrutiny for all governmental actions—federal, state, and local—that substantially burden religious exercise. RFRA passed the Senate 97-3 and the House by unanimous voice vote, representing a rare moment of near-total bipartisan consensus that Smith had gotten the Constitution wrong.

But in City of Boerne v. Flores, the Supreme Court struck down RFRA's application to state and local governments, holding that Congress exceeded its enforcement power under Section 5 of the Fourteenth Amendment. The Court reasoned that Section 5 gives Congress power to 'enforce' constitutional rights but not to 'expand' or 'define' them—and that by imposing strict scrutiny where Smith required only rational basis review, Congress was impermissibly telling the Court what the Free Exercise Clause means.

The combined effect of these decisions is the patchwork the Plaintiff now faces: RFRA protects him from the federal government's inscription of the Sacred Name on currency and passports, but provides no protection against identical inscriptions by state and local governments—unless those governments happen to be among the thirty states that have voluntarily enacted their own RFRAs. The Plaintiff's religious liberty depends on which side of a state line he stands, and on whether state legislators have

chosen to provide protection that the Supreme Court has declined to constitutionally require.

**B. Multiple Justices Have Called for Smith to Be Overruled**

The current Supreme Court has shown significant skepticism toward Smith. In Fulton v. City of Philadelphia, 141 S. Ct. 1868 (2021), three Justices—Alito, Thomas, and Gorsuch—wrote separately to call for Smith to be overruled. Justice Alito's concurrence, spanning over 70 pages, systematically dismantled Smith's reasoning and historical foundations.

Justice Alito wrote: 'Smith was wrongly decided. As long as it remains on the books, it threatens a fundamental freedom.... Smith's holding is used by government officials and lower courts in every jurisdiction to deny claims for religious exemptions.' He concluded that 'Smith committed a constitutional error' and called on the Court to 'correct that mistake.'

Justice Barrett, joined by Justice Kavanaugh, expressed openness to reconsidering Smith but sought further briefing on what legal standard would replace it. Justice Barrett wrote that she was 'skeptical about swapping Smith's categorical antidiscrimination approach for an equally categorical strict scrutiny regime' and wanted the Court to 'confront these questions before deciding that Smith should be overruled.'

The Plaintiff respectfully submits that this case provides an opportunity to address Justice Barrett's concerns. The Plaintiff's claims present a concrete factual context in which the Court can examine what a post-Smith regime would look like in practice. The burden is clear and substantial. The government interest in inscribing the unhyphenated Divine Name on currency is minimal at best. And the least restrictive means analysis is straightforward: hyphenation, alternative mottos, or digital legal tender alternatives would all accommodate the Plaintiff's beliefs without sacrificing any legitimate governmental objective.

**C. Smith Does Not Apply to This Case Anyway: The Motto Is Not 'Neutral and Generally Applicable'**

Even if the Court declines to overrule Smith, the Plaintiff submits that Smith's framework should not govern this case because the Government's currency motto policy is not 'neutral and generally applicable' within the meaning of Smith and its progeny.

As the Plaintiff has demonstrated, the inscription of 'In G-d We Trust' on currency directly contradicts a specific, documented, historical Jewish teaching from the Hasmonean era—the Sages' ruling that the Name of Heaven should not be written on debt instruments because they would end up on dungheaps. The Government's policy forces the Plaintiff into precisely the position that the Sages prohibited: handling currency bearing the Divine Name that will inevitably be destroyed through ordinary circulation and banking processes.

A law that directly contradicts a specific religious teaching is not 'neutral' in any meaningful sense. It targets the religious practice as surely as if Congress had passed a law stating: 'Notwithstanding the teachings of the Talmudic Sages in Tractate Rosh Hashanah 18B, the Divine Name shall be inscribed on all currency and shall be destroyed through ordinary banking operations.'

The Plaintiff offered a hypothetical in Count II: if Congress required that every seventh banknote transaction involve burning or urinating on the name of Christ, no court would call such a law 'neutral and generally applicable' simply because it applied to all transactions. The Government's cash-shredding rules target HhÆJ Jewish law just as directly—they simply do so less visibly, buried in banking regulations rather than stated explicitly.

**D. City of Boerne Should Be Reconsidered**

The Plaintiff further submits that City of Boerne v. Flores itself warrants reconsideration. The Court's Section 5 jurisprudence has evolved significantly since 1997, and the reasoning of City of Boerne sits uneasily with more recent decisions recognizing Congress's broad enforcement power in other contexts.

More fundamentally, protecting religious exercise from state interference is exactly what the Fourteenth Amendment was designed to do. The Amendment was ratified in the aftermath of the Civil War to protect fundamental freedoms—including religious liberty—from state governments that had shown themselves willing to trample individual rights. If Congress can enforce the Fourteenth Amendment to protect other fundamental rights against state action, it should be able to enforce the Amendment to protect religious exercise as well.

The 'congruence and proportionality' test that City of Boerne announced has proven difficult to apply consistently. Courts have struggled to determine how much evidence of constitutional violations Congress must compile before legislating, and how 'proportional' a legislative response must be. The result is doctrinal confusion that serves no one—least of all religious minorities who depend on consistent protection across jurisdictional lines.

**E. The Case for Constitutionalizing RFRA-Level Protection**

The Plaintiff urges the Supreme Court, when this case reaches it, to constitutionalize RFRA-level protection by overruling Smith and holding that the Free Exercise Clause itself requires strict scrutiny of governmental actions that substantially burden religious exercise—whether those actions come from federal, state, or local governments.

This would not be judicial activism; it would be a return to the constitutional understanding that prevailed from Sherbert (1963) through Smith (1990)—nearly three decades of precedent that Smith disrupted. It would also honor the overwhelming congressional judgment, expressed in RFRA's near-unanimous passage, that strict scrutiny is the appropriate standard for protecting religious exercise.

Constitutionalizing RFRA-level protection would resolve the patchwork problem that currently burdens religious practitioners. A HhÀÆJ Jew in Florida (which has a state RFRA) should not have greater religious liberty protection than a HhÀÆJ Jew in New York (which does not). The Free Exercise Clause applies equally in both states; the protection it affords should be equally robust.

**F. The 'Free Marketplace for Strong Moral Conviction' Argument**

The Plaintiff advances what he calls the 'free marketplace for strong moral conviction' argument for RFRA-level protection. Just as the First Amendment protects a marketplace of ideas in the speech context, it should protect a marketplace of sincere moral and religious convictions in the free exercise context.

This marketplace encompasses not only traditional 'divigious' beliefs—those pertaining to the divine and theological—but also 'civigious' beliefs: civic-religious convictions about how a well-ordered society should treat sacred matters, about the proper relationship between government and conscience, and about the moral foundations of public life. Vegetarianism, for instance, can be a form of civigious religious belief—a moral conviction about the treatment of animals that rises to the level of religious commitment for many practitioners.

The Free Exercise Clause should protect this marketplace by requiring government to justify—through strict scrutiny—any action that substantially burdens sincere religious or civigious exercise. Smith's 'neutral and generally applicable' standard fails to protect this marketplace because it allows government to burden religious exercise without justification, so long as the burden is formally neutral. But formal neutrality can mask substantive targeting, as this case demonstrates: the Government's currency policy is formally neutral but substantively targets Jewish religious practice by contradicting specific Talmudic teachings.

**G. Grandparental Libertarian Models and Intergenerational Religious Freedom**

The Plaintiff's arguments for reincarnation standing and future children's standing connect to a broader 'grandparental libertarian' model of religious freedom. Just as grandparents have standing to protect their grandchildren's interests in other legal contexts,

religious practitioners should have standing to protect the religious freedom of future generations—including, for those who believe in reincarnation, their own future selves.

Constitutionalizing RFRA-level protection would serve this intergenerational interest by ensuring that religious freedom is protected not just for current practitioners but for all future Americans across all jurisdictions. The Plaintiff's children, grandchildren, and (under the doctrine of Gilgulim) reincarnated future selves deserve the same robust religious liberty protection regardless of where they live or when they live.

The Supreme Court has recognized that constitutional rights often implicate intergenerational interests. Environmental cases, for instance, recognize standing to protect future generations from present harms. Religious liberty deserves no less protection. A constitutional rule that varies by state imposes intergenerational harms by forcing families to consider religious liberty when deciding where to live, work, and raise children.

**H. Request for Certification of Constitutional Questions**

The Plaintiff respectfully requests that this Court, in addition to ruling on the merits of his RFRA and constitutional claims, certify the following questions for appellate review as presenting substantial constitutional issues of first impression or exceptional importance:

1. Whether Employment Division v. Smith should be overruled and the Free Exercise Clause restored to its pre-Smith meaning, requiring strict scrutiny of governmental actions that substantially burden religious exercise;

2. Whether City of Boerne v. Flores should be reconsidered to permit Congress to apply RFRA's strict scrutiny standard to state and local governments under its Section 5 enforcement power;

3. Whether a governmental policy that directly contradicts a specific, documented religious teaching—such as the Hasmonean-era Talmudic ruling against inscribing the Divine Name on debt instruments—can be considered 'neutral and generally applicable' under Smith;

4. Whether the Free Exercise Clause protects 'civigious' beliefs—sincere moral convictions about civic and public life that rise to the level of religious commitment—in addition to traditional 'divigious' beliefs pertaining to the divine;

5. Whether religious practitioners have standing to assert Free Exercise claims on behalf of future generations, including (for those who sincerely believe in reincarnation) their own future reincarnated selves.

These questions go to the heart of religious liberty in America. The Plaintiff should not have to spend the rest of his life—or lives—litigating the same fundamental issues in jurisdiction after jurisdiction. This Court has the opportunity to set this case on a path toward comprehensive resolution by the Supreme Court, which can finally provide the uniform, robust protection for religious exercise that the Constitution demands and that RFRA's near-unanimous passage reflected.

## XII. COUNTS

The Plaintiff incorporates by reference all factual allegations from the First Amended Complaint and the proposed Second Amended Complaint, as supplemented by the arguments above, and reasserts the following Counts:

**COUNT I: Violation of the Religious Freedom Restoration Act**

The Government's inscription of "In G-d We Trust" on all United States currency substantially burdens the Plaintiff's sincere

religious exercise by completely excluding him from participation in the legal tender system. This burden is more severe than that found cognizable in American Council of the Blind v. Paulson, 525 F.3d 1256 (D.C. Cir. 2008), where mere inconvenience in identifying denominations—not complete exclusion from currency use—was held sufficient to trigger accommodation requirements. The Government cannot demonstrate that continued inscription of the unhyphenated Divine Name is the least restrictive means of furthering any compelling governmental interest.

**COUNT II: Violation of the Free Exercise Clause**

The Plaintiff's Free Exercise claim is more fully developed in the Second Amended Complaint and is incorporated herein by reference. The Court dismissed this claim on the basis that the Government's currency inscription policy is a 'neutral, generally applicable law.' The Plaintiff respectfully but firmly disagrees.

**A. The Policy Directly Targets the Hasmonean-Era Talmudic Teaching**

The Government's policy is not a neutral, generally applicable law—it is specifically designed in a manner that directly contradicts and effectively targets the Talmudic Tractate Rosh Hashanah 18B passage and Megillat Ta'anit passages that the Plaintiff has disclosed to this Court.

These passages record that in the early Hasmonean period, some Jews began writing the Name of Heaven willy-nilly on debt notes. The Jewish Sages of the time intervened and stopped this practice precisely because such documents would inevitably end up on a dungheap or garbage pile after the debts were paid off, causing the Name of G-d to be treated disrespectfully. This teaching—that the Sacred Name should not be inscribed on documents destined for destruction—is exactly what the Government's currency policy forces the Plaintiff to violate.

The Government is forcing upon modern American Jews the same position that the early Hasmoneans took before the Sages intervened. The currency policy requires the Sacred Name to be inscribed on instruments of commerce that will inevitably be worn, dirtied, carried into unclean places, and ultimately destroyed. This is not a neutral law that incidentally burdens religion—it is a law that directly contradicts a specific, documented, historical Jewish teaching.

**B. A Hypothetical Demonstrating the Non-Neutrality of This Policy**

Consider an analogous situation. Suppose Congress were to pass a law providing that before every cash monetary transaction in the United States, the person offering cash must first roll a seven-sided die, and if the die comes up seven, they must burn, trash, or shred the name of Christ or a Christian cross in effigy to complete the transaction—or, perhaps even more repugnantly, urinate on a copy of the name of Jesus Christ or mix a copy of the name of Christ in with garbage.

Would that be a 'neutral, generally applicable law' that does not target the Christian religion in violation of the First Amendment? The Plaintiff submits that no reasonable person would characterize such a law as neutral. And yet the Government's cash-shredding rules target the Jewish religion and Hasmonean Jewish law just as directly as if pastors had to burn the name of Christ as a necessary step for every seventh banknote they use or deposit.

The Plaintiff considers this a clear First Amendment violation. The Defendants' policy is not neutral—it directly contradicts and cuts to the core of the Hasmonean-era Sages' teachings. It violates and targets the Plaintiff's faith practices and those of other religious adherents who have had historical momentum on this issue, including all those religious leaders and followers who supported Theodore Roosevelt's removal of the Name of G-d from the Saint-Gaudens 'No Motto' Double Eagle Coin in 1907. The mandatory inscription of "In G-d We Trust" is not neutral as applied to persons whose religious traditions prohibit casual inscription and destruction of the Divine Name. The policy privileges religious traditions that permit unrestricted use of God's Name while disadvantaging traditions—including the Plaintiff's HhÅÆJ Jewish practice—that require custodial care and proper end-of-life treatment of sacred inscriptions.

**COUNT III: Violation of the Establishment Clause**

The Court rejected the Plaintiff's Establishment Clause claim, arguing that 'In G-d We Trust' should be interpreted in light of 'historical practices and understandings' under the Kennedy v. Bremerton standard. The Plaintiff respectfully submits that proper application of that standard supports—not defeats—his claim.

**A. The Founders Never Wanted the Name of G-d on Currency**

Under the Kennedy v. Bremerton 'historical practices and understandings' framework, the first point is that the Founders never wanted the Name of G-d to be printed on currency. This was a much more recent invention, introduced in the 1860s. For nearly a century after the Founding, American currency bore no religious inscription. The Founders, who debated extensively about the proper relationship between religion and government, did not see fit to inscribe the Divine Name on the nation's money.

When 'In G-d We Trust' was introduced in the 1860s, it met with huge historical resistance from many dissenting religious communities. It took almost a century of community religious friction for Americans to become habituated to this inscription. The current acceptance of the motto is not evidence of constitutional validity—it is evidence of normalization through repetition, which is not the same thing.

**B. Theodore Roosevelt's Resistance and the Relevance of RFRA**

The Court's 'historical practices' analysis ignores a crucial chapter of American history: Theodore Roosevelt went out of his way as the leading citizen of his time to spend considerable political capital to resist and defeat the 'In G-d We Trust' motto. Roosevelt specifically commissioned the Saint-Gaudens Double Eagle coin without the motto, and publicly defended this decision on grounds that inscribing God's Name on currency was irreverent and inappropriate.

As the Plaintiff has argued, had Roosevelt and his supporters had access to modern RFRA laws, the 'In G-d We Trust' motto would have been fully defeated in 1907 or 1908 and switched to a more religiously diverse, secular-compatible motto. The fact that Roosevelt lost this political battle in Congress does not mean he was wrong on the constitutional merits—it means he lacked the statutory tools that RFRA now provides.

By mandating the inscription of the Divine Name on currency and thereby privileging theological traditions that permit casual use of that Name, the Government has positioned itself as a theological arbiter, endorsing certain religious understandings over others. This violates the constitutional requirement of governmental neutrality among religions.

**C. The Plaintiff's Assessment of This Court's Approach**

The Plaintiff's general reading is that the Chief Magistrate Judge has done everything possible to twist the law and facts to resist ordering a change that could lead to community political blowback. Or perhaps has done so in this manner a bit pronoiacally to provoke and guide, through reverse psychology, a wave of calmunity[5] editorial support in seeing such a "calmpact" crystallization of the case stakes in Judge Matthewman's summary order. The Plaintiff believes the Courts learned from the strong, vocal public reaction to the Newdow Pledge of Allegiance case—where an Appeals Court ruled in favor of removing 'under G-d' from the Pledge—that any change to the religious symbology of the United States should be undertaken with great care.

But the Plaintiff is on the right side of the law on this. The Plaintiff has helped do some of the public conversation groundwork by reaching out to community newspapers to spark a dialogue—after the Court's Order was handed down—about what the next generation of American currency should look like to be more compatible with our diversity, whether persons like the Plaintiff should continue being excluded from the currency system, and whether all cashless-carry persons in the United States should be subject to indefinite incarceration in counties like Palm Beach and Miami-Dade just because jail systems refuse to take alternative modern forms of payment.

The Plaintiff suspects that the Chief Magistrate Judge does not truly believe the pretzel-twisting positions he has taken, but has adopted them as a trial-level devil's advocate—helping the case reach a state of high contrast and better-stated, more thoroughly revised claims for strong relief. If that is the Court's intention, the Plaintiff appreciates the exercise and submits that this Third Amended Complaint reflects the strengthening that the Court's Order demanded.

**D. The Plaintiff Is Not the Only Person Affected by This Policy**

The Plaintiff is not the only person affected by the Government's currency inscription policy. Millions of other Jews are affected. It is simply rare for other Jews to be willing to put up with all the extreme pain, hardship, and burden that the Plaintiff has been willing to endure to stand up for his beliefs on this matter.

This is because the burden is, in fact, so substantial that being religiously rigorous about currency abstention is quite painful. It requires tremendous amounts of principled social resistance and years of suffering penalties and accepting deferred gratification—bouts of hunger, thirst, service and venue exclusion, opportunity restrictions, jail time, marital stress, romantic incompatibility, employment exclusion, and countless other hardships documented throughout this Complaint.

But the right to RFRA relief does not require the Plaintiff to recruit his community into similar complete suffering. The Plaintiff does not need to approach this Court sharing his suffering with the rest of the Jewish people. RFRA requires only that the Plaintiff show and plead substantial burdens that he has faced or been compelled to make hard choices on—and the Plaintiff has done that beyond any level that any reasonable Judge should need to expect, from years and years of experiences that are not and could not be faked.

**E. The Right to Religious Freedom Is Individual, Not Congregational**

The right to religious freedom under RFRA and the First Amendment is individual, not congregational. While the Plaintiff is himself a minister, he does not need to be a minister to cite a religious belief for which he has a moral conviction. RFRA protects sincere religious exercise by individuals—it does not require denominational backing, rabbinical certification, or congregational endorsement.

The Plaintiff's religious beliefs may be characterized as both 'civigious' (civic-religious, pertaining to moral convictions about civic life and governance) and 'divigious' (pertaining to the divine and theological obligations). For instance, vegetarianism is both civigious and divigious for the Plaintiff—rooted both in ethical convictions about civic responsibility and in theological commitments. Similarly, the Plaintiff's currency practice is both civigious and divigious: it reflects both his moral convictions about how sacred texts should be treated in a well-ordered society and his theological obligations regarding the Sacred Name of G-d.

The Court cannot dismiss the Plaintiff's claims on the ground that other Jews continue to use currency. Other Jews may have different interpretations of the relevant halacha. Other Jews may believe their burden is less substantial because they have not thought through the implications as thoroughly. Other Jews may simply lack the resources, time, or willingness to endure what the Plaintiff has endured. None of this diminishes the Plaintiff's individual right to religious freedom or the substantial burden that the Government's policy places on his sincere religious exercise.

**COUNT IV: Violation of the Takings Clause**

The combined effect of government policy inscribing the Divine Name on all currency and the Plaintiff's religious prohibition on circulating such currency has rendered the Plaintiff's cash assets effectively frozen. Over $2,000 in cash wedding gifts were rendered unusable for ordinary purposes and had to be donated exclusively to pikuach nefesh (lifesaving) causes meeting the threshold required for the Plaintiff to permissibly initiate the destruction of the Sacred Name. This constitutes a regulatory taking without just compensation.

**A. Response to the Court's Rejection of Count IV**

The Court rejected Count IV on the grounds that the Government has not directly taken the Plaintiff's property. The Plaintiff respectfully but firmly disagrees. The Plaintiff does here plead that the Government has directly taken from him in the form previously pled.

The Government's policies are the only reason the Plaintiff could not convert, for instance, the wedding gifts he and his spouse

received into freely usable cash resources. Before the Government inscribed the Sacred Name on currency, cash was freely usable by all Americans regardless of religious belief. After the Government inscribed the Sacred Name, the Plaintiff's cash became encumbered—not by any action of the Plaintiff, but by the Government's unilateral decision to transform ordinary instruments of commerce into sacred objects that the Plaintiff's religious tradition prohibits him from casually handling, circulating, or destroying.

If the Government encumbers to uselessness the Plaintiff's property with laws that target his property and no one else's—simply because the Government passes laws targeting his ancestral religious beliefs—the Plaintiff argues reasonably that this constitutes a Fifth Amendment Takings Clause violation. The Government should reasonably compensate him for what it has taken.

The Takings Clause does not require physical seizure. A regulatory taking occurs when government action deprives property of all economically beneficial use. Here, the Government's inscription policy has deprived the Plaintiff's cash assets of all economically beneficial use to him. The Plaintiff cannot spend the cash. He cannot deposit the cash without initiating its destruction. He cannot invest the cash. He can only keep it frozen indefinitely, bury it as sacred text, or donate it to narrow pikuach nefesh purposes—none of which constitute 'economically beneficial use' to the Plaintiff personally.

The Government may argue that cash retains its face value and can be used by anyone else. But this misses the point. The question under the Takings Clause is whether the Government's action has taken the property from this owner—not whether the property retains value in the abstract or in other hands. The Plaintiff's $2,000 in wedding gifts was taken from him the moment the Government's inscription policy made that cash religiously unusable to him. That the same cash would be usable by a non-observant person does not cure the taking as to this Plaintiff.

The Government has effectively imposed a 100% tax on all cash that comes into the Plaintiff's possession—a tax payable not in money but in religious compromise or total forfeiture. This is a taking, and the Fifth Amendment requires just compensation.

**COUNT V: Violation of the Equal Protection Clause of the Fourteenth Amendment**

The Plaintiff invokes the Equal Protection Clause of the Fourteenth Amendment, both independently and in conjunction with all other counts in this Complaint.

The Government's mandatory inscription of "In G-d We Trust" on all United States currency creates a classification that discriminates against religious adherents whose traditions prohibit casual handling, circulation, or destruction of the Divine Name. The policy treats adherents of such traditions unequally by: (a) excluding them from employment in cash-handling positions available to other citizens; (b) excluding them from emergency cash-based commerce during natural disasters; (c) excluding them from participation in bail systems that require cash payment; (d) excluding them from ordinary retail transactions available to all other Americans; and (e) excluding them from participation in the nation's quarter-millennial celebration through commemorative currency.

This classification fails even rational basis review because there is no rational relationship between inscribing the unhyphenated Divine Name on currency and any legitimate governmental interest. The Government could achieve any purported ceremonial, historical, or patriotic purpose through secular alternatives ("E Pluribus Unum," "Out of Many, One") or through hyphenation ("In G-d We Trust") that would not exclude religious minorities from economic participation.

Under heightened scrutiny—which applies because the classification burdens a fundamental right (free exercise of religion) and discriminates based on religious practice—the Government cannot demonstrate that this discrimination is narrowly tailored to serve a compelling governmental interest. No compelling interest justifies forcing the Plaintiff to choose between his sincere religious beliefs and full participation in the American economy.

**COUNT VI: Violation of the Eighth Amendment—Excessive Bail**

The Eighth Amendment to the United States Constitution provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' The Plaintiff respectfully submits that bail becomes constitutionally 'excessive' not only when the dollar amount is unreasonable, but when the required payment method renders an otherwise reasonable bail structurally unpayable by the defendant.

**A. Structural Excessiveness: The 'But For' Test**

The Plaintiff argues that any structurally unpayable bail or fine that 'but for' its payment structure stands in the way of pretrial liberty must be seen by its nature as excessive. The constitutional analysis cannot end at the dollar figure; it must examine whether the defendant can actually pay that figure given the payment methods the facility accepts and the defendant's circumstances. Consider: if a court tells the Plaintiff he must pay $100 bail to exit jail, but his only method of paying is with his wallet, and the facility takes his wallet and prevents him from accessing it, then the seemingly reasonable $100 bail assessment transforms from reasonable to excessive through the facility's own detention practices. The problem is not the $100—it is the structural impossibility of paying it.

Likewise, if a person is told they can only pay in cash, but they ordinarily pay everything by debit or credit card and have sincere religious or civigious beliefs against handling cash, and the facility has no reasonable compelling reason not to accept credit or debit payment, that converts a reasonable bail into structurally excessive or truly structurally impossible bail. The defendant has the funds. The defendant has the means to transfer those funds. The facility simply refuses to accept the transfer in any form the defendant can provide.

**B. The Bail Bondsman Premium as Per Se Excessive**

When a facility's cash-only policy forces the defendant to engage a bail bondsman, the resulting 10% premium converts reasonable bail into unreasonable bail. Courts must presume that bail was set at the very edge of the upper end of reasonable—the maximum the defendant should be required to pay to secure pretrial release while still ensuring appearance at trial. A bail set at 100% of tolerability becomes 110% of tolerability when the bondsman's premium is added.

Moreover, the bail premium payment to a bondsman is an injury per se. The defendant—whom we must presume innocent until proven guilty—loses money permanently for something they have not been proven to have done. The premium is not refundable upon acquittal. It is not credited against any sentence. It is simply lost, a penalty imposed on the presumptively innocent solely because the Government refuses to accept modern payment methods.

**C. The Wallet Hypothetical and Structural Sham Bail**

It should be obvious—and should require no elaborate case law citation—that if you give a person a duty to pay but then take their checkbook away from them, you have converted the charge from reasonable to impossible, excessive, and a sham bail meant to structurally detain them. The same logic applies when a facility refuses to accept electronic payment from a person who pays electronically for everything, or refuses to accept credit cards from a person whose liquid assets are accessible only through credit lines, or refuses to accept any payment method other than the one form of payment the defendant cannot religiously provide. Such practices create sham bail systems meant to structurally detain certain classes of defendants—including those who lack adequate principled social support networks to bail them out. The risk of arbitrary and capricious social abandonment in jail is heightened for those whose moral frameworks differ from those around them. Under Kohlberg's stages of moral development and Haidt's moral foundations theory, people operate at different moral levels and along different moral axes. When conflicts arise, observers and arrestees often do not share the same moral framework, raising the risk that local contacts will be unwilling to support the defendant and take bail responsibility—not because the defendant lacks funds, but because they lack social approval from those with access to cash.

**D. Case Law Supporting Structural Excessiveness**

The Supreme Court has long recognized that the Eighth Amendment's prohibition on excessive bail serves to prevent 'the Government's use of money bail to detain persons prior to trial.' See Stack v. Boyle, 342 U.S. 1, 4-5 (1951). Bail set higher than necessary to ensure the defendant's appearance is 'excessive' under the Eighth Amendment. Id. The Plaintiff submits that bail payable only through methods the defendant cannot access is, by definition, higher than necessary—indeed, it is infinitely higher than necessary, because no amount the defendant can actually pay will secure release.

In United States v. Salerno, 481 U.S. 739 (1987), the Court recognized that pretrial detention implicates fundamental liberty interests. While Salerno upheld preventive detention in limited circumstances, it reaffirmed that 'liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.' Id. at 755. A bail system that detains defendants not because they are flight risks or dangers, but because they cannot pay in the Government's preferred currency form, violates this principle. More recently, in Timbs v. Indiana, 139 S. Ct. 682 (2019), the Supreme Court unanimously held that the Eighth Amendment's Excessive Fines Clause is incorporated against the states through the Fourteenth Amendment. The Court emphasized that the Clause 'guards against abuses of government's punitive or criminal-law-enforcement authority' and traced the prohibition to Magna Carta. Id. at 687-89. The same historical pedigree and the same concern for governmental abuse supports incorporation of robust protections against structurally excessive bail.

### E. The Plaintiff's Proposal: A Library of Bond Payment Methods

The Plaintiff is prepared to work constructively with the Attorney General or her designee to structure a library of bond payment methods that any United States and Territories resident will be able to use—paying with the means of payment they ordinarily rely on for similar large costs, within their capacity to pay, given access to their bank accounts, brokerage accounts, payment apps, credit and debit cards, checkbooks, and other modern financial instruments.

There must be better, broader ways of paying bail without the involvement of a bail bondsman and without extra fundamentally excessive fees. The technology exists. The payment infrastructure exists. The only barrier is governmental inertia and an anachronistic preference for physical currency that predates the digital payment revolution. The Eighth Amendment should not permit the Government to maintain this anachronism at the cost of pretrial liberty for those who have moved beyond cash.

The Plaintiff therefore requests that this Court declare cash-only bail policies unconstitutional under the Eighth Amendment as applied to defendants who have religious or civigious objections to handling cash, or who simply do not carry cash but have the ability to pay through electronic means—and that this Court order the Defendants to implement comprehensive electronic payment alternatives for all bail and fine obligations throughout the federal system, and to cease any pressure on state and local governments to eliminate cashless bail alternatives.

### The Equal Protection Clause Should Be Automatically Implied in All Filings

The Plaintiff respectfully submits that the Equal Protection Clause of the Fourteenth Amendment is so fundamental to the operation of American justice that it should not require explicit citation in any pleading. The Equal Protection Clause embodies the foundational principle that the law must treat similarly situated persons equally—a principle so basic to the concept of justice itself that any person approaching any American court for relief is necessarily invoking it, whether or not they possess the legal training to cite it by name.

To require explicit citation of the Equal Protection Clause is, in a sense, to require litigants to recite that laws should be fairly designed. But fairness is the very essence of what courts exist to provide. It is the gravitational center around which all legal claims orbit. When a plaintiff files any complaint in any American court, they are asserting that they have been treated unjustly—which is to say, unequally. The Equal Protection Clause is not one claim among many; it is the conceptual foundation upon which all claims rest.

The Plaintiff therefore requests that this Court—and any reviewing court—treat the Equal Protection Clause as automatically

invoked in this and every filing, mixed in wherever necessary with the Plaintiff's other claims, whether explicitly stated and referenced or not. Pro se litigants in particular should not be penalized for failing to cite a constitutional provision that represents the very reason they have come to court: to seek equal treatment under law.

## ADDITIONAL DEFENDANTS, THE UNITARY EXECUTIVE, AND MOTION FOR PRELIMINARY INJUNCTION

### A. The President as Chief Defendant and the Unitary Executive

The Plaintiff names President Donald J. Trump, in his official capacity as President of the United States and Territories and as the Principal Delegating Defendant, as the chief defendant in this action. The Plaintiff does so not out of any personal animus toward President Trump, but because the President stands at the apex of the Executive Branch and bears ultimate responsibility for the policies challenged herein. As the Principal Delegating Defendant, the President has the authority and responsibility to ensure that all relevant Executive Branch departments and officers respond appropriately to this litigation.

The Supreme Court has increasingly embraced the theory of the 'unitary executive'—the view that the President possesses complete control over the Executive Branch and all its officers. If this theory is correct, or anything approaching it, then the Plaintiff respectfully submits that he should be able to sue the President and Presiding Officer of the United States and Territories and rely on him, in his wisdom, to delegate correctly to all 'inferior' officers who play a role in the questions that the Plaintiff is creatively and constructively challenging the Executive Branch Government on.

The process of service and lawsuit namings for such multidisciplinary and broad demanded changes—changes that could impact so many departments and officers—should not require the Plaintiff to separately serve every 'inferior officer' who may be under the management and operating under the powers of the Presidency. This is a game of whack-a-mole otherwise, where the Plaintiff as a citizen must anticipate and cite every problematic use of the Name of G-d in any department of the United States and Territories, and serve every one of those 'inferior' high officers in the Cabinet or outside the Cabinet.

What the Plaintiff actually wants to do is sue the Presiding Officer and have him delegate freely and comprehensively to all those departments that might play a role in: (a) printing the Sacred Name of G-d without truly overwhelming need; (b) ensuring adequate care is planned for disposal of sacred text at end-of-life; (c) making allowances for persons like the Plaintiff to avoid ownership, possession, or custody of the printed Sacred Name more than necessary, except in divigious study contexts; and (d) not entailing unusual and substantial burdens or burdening the Plaintiff with endless ethics problems in his travel, employment, business ownership, community engagement, or commercial transactions.

The Courts can argue and hold, if they wish, under Separation of Powers concerns, that the President cannot be held very personally individually liable for resolving anything—giving him a 'pocket' of freedom from which to operate without being constantly interrogated in discovery in lawsuit after lawsuit. The Plaintiff does not seek now to pierce that pocket. But this immunity should not preclude the Plaintiff from serving process on the whole of the United States and Territories Government through identification of the President as the chief party to this suit.

### Principal-Agent Problems and the Mayor/Governor Comparison

There are potentially irresponsible or responsibility-diffusive principal-agent problems if citizens cannot directly name the Presidency as a Delegating Defendant and allow the President to delegate as he or she wishes to responding officers across Government. Consider how we would address a problem, even a severe problem in the form of a lawsuit, to a City Mayor: we would sue the Mayor and expect the Mayor to delegate appropriately to the relevant city departments. The same logic applies to suing a Governor.

Third Amended Complaint, Pleading, and Rejuvenating Proposal

Why can the President not be named in a lawsuit if a City Mayor or a Governor does not hold such executive-freedom-from-lawsuit-naming immunity? The Plaintiff submits that there is no principled distinction. Grant the freedom pocket, to the extent it is prudent—but do not bar citizens from suing the principal body of Executive Branch Government and relying on the President's delegatory protocol and delegation competency to finish reaching everyone most relevant for these complex whack-a-mole problems.

Otherwise, litigants might have principal-agent problems or mistakenly forget at an early enough stage to explicitly do something important to problem-solving efficiency—like joining the State Department on the United States and Territories passport book issues until the morning after the final draft, as the Plaintiff nearly did here. Those problems are easily correctable if the Plaintiff can name the Presiding Officer as a party to the suit. But litigants might get frozen, unable to include interconnected officers and departments where prints of Shaimos or other problems occur or are detected, simply because they did not name the whole of the Executive Branch early enough in the process through the ability to sue the Presiding Officer as a Principal or Review Fallback Delegating Authority.

The Plaintiff therefore names President Trump as the Principal Delegating Defendant, and asks that the Court treat this designation as sufficient to reach all Executive Branch departments and officers who may be implicated in the relief sought—while reserving to President Trump, as the Principal Delegating Defendant, the authority to delegate responses and responsibilities as he sees fit within his constitutional powers.

This is especially appropriate when the President has performed such an inciting action as pushing for the termination nationwide of cashless bail through his unique Executive Action powers. President Trump's executive actions on bail policy directly affect the Plaintiff's RFRA claims regarding cash bail. The President is not a mere bystander to this litigation; he is actively shaping the policy landscape that creates the Plaintiff's substantial burdens.

**B. Additional Named Defendants**

While the Plaintiff believes that naming the President as Principal Delegating Defendant should be sufficient under the unitary executive theory, the Plaintiff also names the following additional Defendants in their official capacities to ensure complete relief and to satisfy any procedural requirements this Court may impose. The Plaintiff has not dropped any previously named Defendant in this case—Secretary Bessent remains a named Defendant as in prior filings. The Plaintiff is joining these additional Defendants under the 'whack-a-mole' theory described above: the inability to rely solely on the naming of the Principal Delegating Defendant or Fallback Delegating Defendant in the body of the Presidency to reach all relevant Executive Branch officers.

1. Marco Rubio, Secretary of State. The State Department is responsible for issuing United States and Territories passports. As detailed below, USAT passport books contain multiple inscriptions of the Sacred Name of G-d, creating religious burdens for the Plaintiff when traveling. The Plaintiff reluctantly joins Secretary Rubio to this proceeding, has extraordinary respect and admiration for him, recognizes that he is exceptionally competent and well-motivated, and does not wish to distract him from his very important life-and-death work in ongoing foreign policy crises and ordinary diplomacies. But the Plaintiff asks for a moment of his time to consider the question of USAT passport design.

2. Kristi Noem, Secretary of Homeland Security. The United States Secret Service is a component of the Department of Homeland Security. The Secretary of Homeland Security has supervisory authority over Secret Service enforcement activities.

3. Ronald Rowe Jr., Director of the United States Secret Service. The Secret Service is charged with investigating violations of 18 U.S.C. § 333, which prohibits the 'mutilation' of currency. The Plaintiff seeks to enjoin the Director from enforcing this statute against religious practitioners who modify currency to remove or replace the Sacred Name.

4. Pam Bondi, Attorney General of the United States. The Department of Justice is responsible for prosecuting violations of 18

U.S.C. § 333. The Plaintiff seeks to enjoin the Attorney General from: (a) prosecuting religious practitioners who modify currency for religious purposes; and (b) pressuring in any way any locality from moving away from cashless bail, or attempting to enforce through any mechanism whatsoever the Executive Orders related to terminating cash bail that President Trump has signed. The Plaintiff's RFRA claims regarding cash bail are directly implicated by any federal pressure on localities to eliminate cashless bail alternatives, which would force the Plaintiff to handle currency bearing the Sacred Name in order to secure his release from detention.

5. The United States of America. The United States of America is named as a party to ensure complete relief and to permit any award of costs or fees to which the Plaintiff may be entitled.

**C. The Sacred Name in United States and Territories Passport Books**

In addition to currency, United States and Territories passport books contain multiple inscriptions of the Sacred Name of G-d, complicating the Plaintiff's ability to use his USAT passport in airports in religiously careful ways. The Plaintiff's believed-to-be-ordinary-size USAT passport contains at least the following inscriptions:

Page 9: Quoting Martin Luther King Jr.: "We have a great dream. It started way back in 1776, and G-d grant that America will be true to her dream."

Page 24: An inscription at Promontory, Utah on a Golden Spike: "May G-d continue the unity of our country as this railroad unites the two great oceans of the world."

Page 30: Quoting Thomas Jefferson: "The G-d who gave us life, gave us liberty at the same time."

Page 42: Quoting Abraham Lincoln: "...that this nation, under G-d, shall have a new birth of freedom."

While all of these quotes are admirable, notable, and quotable to the Plaintiff as a HhÀÆJ Jew in a divigious context, their heavy, repeated presence in the USAT passport book appears to be a very intentional choice to maximize the use of G-d's Name in print. This violates the Separation of Synagogue and State principles that motivated and drove the Founders in an originalist view of their writing choices in preparing the Constitution of the United States and Territories.

**The Passport Creates Specific Religious Burdens**

The presence of these recitations of the Name of G-d makes travel more difficult for the Plaintiff, not less so. Specifically:

1. Bathroom exposure risk: The Plaintiff cannot take the Sacred Name into bathrooms. When traveling through airports, the Plaintiff must either leave his passport outside restrooms (creating security and loss risks) or carry it in sealed protective layers to prevent defilement—an awkward and burdensome process repeated multiple times during any journey.

2. End-of-life burial impossibility: The State Department demands return of old passports at replacement at the end of usable term. This places the Plaintiff in an impossible position: he must either (a) allow the State Department to destroy a sacred object containing the Name of G-d, violating his religious obligations; or (b) lie to the State Department about his knowledge of the whereabouts of his expired passport book, claiming it was lost when it was really buried or kept sacred and separate and designated for religious burial. The Plaintiff should not be forced to choose between violating his religion and lying to his government.

The Plaintiff asks Secretary Rubio, when he is not handling a life-and-death crisis, to consider what the State Department can do to make future USAT passport books and future expiration replacements and exchanges consistent with universal civigious religious and divigious practices—including those of HhÀÆJ Judaism and the other religious families the Plaintiff seeks here to protect under the umbrella of pluralistic civigion.

**D. The Need for Preliminary Injunction Against Enforcement of 18 U.S.C. § 333**

The Plaintiff seeks a preliminary injunction barring the Defendants from enforcing 18 U.S.C. § 333 (the currency 'mutilation' statute) against the Plaintiff or any person who modifies United States currency by carefully cutting out, clipping out, or otherwise removing or replacing the Sacred Name of G-d or the full motto 'In G-d We Trust' for sincere religious reasons—whether those reasons are civigious (civic-religious), divigious (pertaining to the divine), or both.

This injunction should protect not only the Plaintiff—a HhÁÆJ Jew—but all persons with beliefs identical, similar, adjacent, or supportive to his, whatever their faith tradition, who seek to improve the circulability and religious compatibility of United States currency through careful modification.

**E. The Scope of Protected Religious Modification**

As concrete examples, the requested injunction should cover:

1. HhÁÆJ Jews like the Plaintiff, who may wish to cut out the Sacred Name to avoid violating the Third Commandment. Deuteronomy 12:3-4, Talmudic Tractate Rosh Hashanah 18B, and Megillat Ta'anit by casually circulating or destroying the Name of G-d;

2. Atheists and religious 'Nones' such as Dr. Esq. Michael Newdow, who may wish to cut currency to separate what they believe should be a secular government from religious endorsement, exercising their civigious conviction that church and state must be separated;

3. Polytheists who may wish to cut out the monotheistic motto and replace it with language compatible with their beliefs in the plurality of gods, so they may teach their children their faith without government-imposed monotheism on every transaction;

4. HhÁÆIer Muslims who may wish to cut out the English rendering of the Divine Name and replace it with a printing of the Name of Allah in Arabic, consistent with their religious tradition;

5. HhÁÆCer Christians who may wish to clarify that it is Jesus in whom they place their trust, replacing the generic motto with a specifically Christological affirmation;

6. HhÁÆl Bahá'ís who, as members of the Judeochrislamhai faith family seeking syncretic harmony among the Abrahamic traditions, may wish to clarify that their trust is in Bahá'u'lláh, or in any of the other prophetic figures the Bahá'í faith embraces—Jesus, Mohammed, Moses, or a diverse representation reflecting their belief in progressive revelation and the unity of religion;

7. Any person of any faith or no faith who wishes to coordinate with the Plaintiff and others on building up the fundamentals of United States and Territories Civigion—whether through 'In G We Trust,' 'E Pluribus Unum,' 'Out of Many, One,' or any other motto the People and Congress may competitively align to choose.

The common thread uniting all these protected modifications is the sincere religious or civigious conviction that the current motto violates or burdens the modifier's principles. The currency remains legal tender after modification; only the religiously objectionable content is removed or replaced. This is not destruction for destruction's sake—it is improvement for conscience's sake.

**F. The Gadfly Warning**

The Plaintiff respectfully warns the Defendants: the modest changes requested—'In G-d We Trust' or 'In G We Trust' or 'Out of

Many, One'—would likely satisfy the Plaintiff and resolve this litigation. These changes would make the currency civigiously sacred and compatible, reasonably well-targeted or very reasonably acceptable to every bearer's beliefs.

Until such change occurs, the Plaintiff may need to be a Socratic gadfly—even a civilly disobedient one—to the Secret Service, the Department of Homeland Security, and the United States of America. The Plaintiff intends to test 18 U.S.C. § 333 by carefully modifying currency to remove the Sacred Name. The Plaintiff does not wish to be arrested. The Plaintiff does not wish to burden the federal courts with criminal proceedings that could be avoided by simple accommodation. But the Plaintiff is prepared to engage in civil disobedience if the Defendants continue to oppose reasonable religious accommodation.

The Plaintiff therefore seeks a preliminary injunction to prevent such confrontation—to allow this Court to adjudicate the underlying constitutional and RFRA claims before the Defendants attempt to prosecute the Plaintiff for exercising what he believes to be his religious rights. The alternative—arrest, prosecution, and incarceration of a religious practitioner for the 'crime' of protecting the Sacred Name from desecration—would be a profound injustice that this Court has the power to prevent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that the inscription of "In G-d We Trust" on United States currency violates the Religious Freedom Restoration Act as applied to the Plaintiff;

2. Declare that the inscription of "In G-d We Trust" on United States currency violates the Equal Protection Clause of the Fourteenth Amendment as applied to the Plaintiff and all persons whose sincere religious beliefs prohibit casual handling, circulation, or destruction of the Divine Name;

3. Order the Defendants to develop and implement an accommodation, which may include any of the following: (a) hyphenation of the Divine Name ("In G-d We Trust"); (b) adoption of a secular alternative motto; (c) issuance of currency without the motto; or (d) development of digital legal tender alternatives without the motto;

4. Order the Defendants to ensure that self-pay cashless bail alternatives are available in all federal facilities and to use appropriate means to encourage states to adopt similar accommodations;

5. Issue a preliminary and permanent injunction barring the Attorney General of the United States, Pam Bondi, and all persons acting under her direction or authority, from pressuring in any way any locality from moving away from cashless bail, or from attempting to enforce through any mechanism whatsoever the Executive Orders related to terminating cash bail that President Trump has signed, insofar as such pressure or enforcement would burden: (a) the religious exercise of the Plaintiff and similarly situated persons who cannot handle currency bearing the Sacred Name; and (b) any person who is present anywhere in the United States and Territories without cash on their person but with the ability to pay electronically, by credit card, debit card, or other payment method accessible through their phone, mobile device, or any reasonable computer interface provided access to their belongings—such persons should not be detained solely for lack of physical cash when

they possess the means to pay bail through modern payment infrastructure;

6. Issue a declaratory judgment establishing that the Equal Protection Clause of the Fourteenth Amendment is automatically and implicitly invoked in every filing submitted to this Court and any court reviewing this case, such that any litigant—whether represented by counsel or proceeding pro se—shall be deemed to have asserted Equal Protection claims wherever such claims would be applicable to the facts alleged, without requiring explicit citation;

7. Issue a preliminary and permanent injunction barring the Secretary of Homeland Security, the Director of the United States Secret Service, the Attorney General of the United States, and all persons acting under their direction or authority, from investigating, arresting, detaining, prosecuting, or otherwise enforcing 18 U.S.C. § 333 against the Plaintiff or any person who modifies United States currency by carefully cutting out, clipping out, or otherwise removing or replacing the Sacred Name of G-d or the motto 'In G-d We Trust' for sincere religious, civigious, or conscience-based reasons—including but not limited to HhÂÆJ Jews, atheists and religious 'Nones,' polytheists, Muslims, Christians, and any other persons whose sincere beliefs are burdened by the current motto;

8. Issue a declaratory judgment stating that the constitutional principles articulated in this case—including the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause as incorporated against the states through the Fourteenth Amendment—apply with equal force to all state, territorial, and local governments, such that any governmental entity issuing official documents bearing the unhyphenated Sacred Name of G-d is on notice that such practice burdens the religious exercise of persons with sincere beliefs prohibiting casual handling or destruction of the Divine Name;

9. Certify a class of similarly situated religious practitioners—including HhÂÆJ Jews, other observant Jews, and persons of other faiths whose sincere religious beliefs prohibit casual handling or destruction of the Divine Name—for purposes of obtaining declaratory and injunctive relief against all governmental entities, federal, state, territorial, and local;

10. In the alternative, if class certification is not granted, issue a detailed template for relief that future litigants may use in subsequent state and local proceedings, including findings of fact, conclusions of law, specific accommodations satisfying the least restrictive means requirement, and suggested injunctive language;

11. Award the Plaintiff reasonable costs and fees associated with this litigation as a pro se litigant;

12. Grant such other and further relief as this Court deems just and proper.

## INCORPORATION BY REFERENCE

The Plaintiff hereby incorporates by reference all arguments, evidence, experiences, claims, and prayers for

relief set forth in the Second Amended Complaint (DE 70), as if fully restated herein. This Third Amended Complaint is intended to supplement and expand upon—not to replace or withdraw—the factual allegations, legal arguments, constitutional claims, and requested relief articulated in prior filings. To the extent any argument, claim, or prayer for relief was stated in the Second Amended Complaint but not expressly repeated in this Third Amended Complaint, it remains part of the Plaintiff's case and is incorporated here in full.

The Plaintiff further incorporates by reference all factual allegations, exhibits, and supporting materials from the original Complaint (DE 1) and the First Amended Complaint, to the extent not superseded by subsequent filings.

## RE: MISLEADING HARASSMENT CLAIMS

The Assistant US Attorney in some of her last filings made allegations that I had harassed her by quoting me out of context, even after I had requested of her explicitly not to do that and to instead, if she was going to quote me, quote the entire document I sent to her.

I maintain for the record that her claims were deliberately out-of-context and misleading. I would agree that I "flipped out" on her for running a power move seeking to refuse an extension and get the case dismissed just because I lacked the capacity to prioritize the case under Naybor SOS life-and-death emergency proposal and build logic. It would be like telling an emergency doctor like Michael Newdow, MD, Esq. that because he had to be in the Emergency Department stabilizing patient after patient in a string of emergencies all day on the deadline date of a civigious case he was pleading no extensions would be granted and the civil rights case he worked on for over a year against "under G-D" in the Pledge of Allegiance would need to be permanently extinguished and turned into lifelong precedent.

There are somewhere on the order of 77,000 PSAP hotline medical, security, or fire emergencies worldwide every 10 minutes. Knowing that, and knowing that Naybor SOS™ and adjoining design solutions and systems could help, I could not focus principally on this case as I had the weight of the world on my shoulders for a time, and I fear still do until I can discharge my responsibilities further on Naybor SOS™ and Safeword™.

Note Please: The lack of contrast relatively at the end of this document is my home printer running out of ink. If you granted Pro Ses Electronic Filing Privileges in all US District Courts including laggards like this one, misprintings and ink contrast quality wouldn't be an issue. For a better copy, please request an emailed digital copy at my email address or turn up the contrast on your PDF reader.

s/Plaintiff David Clayman, Currently *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@clayman.org
david@ingwetrust.org
david@inhashemwetrust.org

Third Amended Complaint, Pleading, and Rejuvenating Proposal

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the afternoon of this Tuesday, the 6th day of January, 02026, I dropped a copy of this document off to the Court and electronically served a copy of this response to the opposing counsel on the case. I wrote equitably[5] up to midnight on the 5th of January, 02026 as if I had had the same amount of time as a lawyer granted electronic filing privileges rather than being subject to an unfairly earlier USPS post office closure deadline. After that stroke of midnight deadline time, I became late by roughly one writing day. I am sorry that I did not plan out my writing and wrighting process with a higher degree of awareness of how time-consuming writing this would be even with all the help that I'm grateful to have received.

/s/ David M. Clayman
Pro Se Plaintiff